UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

Case No. 24 CV 7744 - GRB - Bankruptcy Appeal

————————————————————————x

In re:
ABERDEEN ENTERPRISES, INC.,

DEBTOR.

LOUISE BLOUIN AND ABERDEEN
ENTERPRISES(BVI)LTB,
APPELANTS
*(SOLE CREDITOR , SOLE SHAREHOLDER AND SOLE DIRECTOR)*
V

BAY POINT CAPITAL PARTNERS II,
L.P. AND ABERDEEN ENTERPRISES,
INC.,

APPELLEES.

————————————————————————x

**FILED**
**CLERK**
January 9, 2025 at 7:35 am via Pro Se Electronic
Document Submission
**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

## Amended Motion to Appeal

### OBJECTION OF THE ABERDEEN DEBTOR SEEKING TO REDUCE THE CLOSING PAYMENTS RECEIVED BY BAY POINT CAPITAL PARTNERS II, L.P. CONSISTENT WITH THE ASSIGNED JGB FORECLOSURE JUDGMENT

**Amended Motion :**

I, Mrs. Blouin, sole creditor, shareholder, and director, submit this motion with respect for the Court's guidance and procedural rules. While I am not a lawyer, I trust the Court will understand my genuine efforts to seek justice, as I have been unfairly blocked from managing my own estate.

I will be securing legal representation shortly, but in the meantime, I respectfully request the Court to rule on the merits of the case, not on procedural technicalities that have already been fully respected. It appears Bay Point is doing everything in their power to dismiss this appeal— See procedural validity attachment filed on the legal deadline with Judge Trust .

**Appeal Focused Solely on Clawable Amount for  Sole Creditor Owed $26 Million, Respecting Res Judicata of Plan, Disclosure Statement, JGB Assignment, Usury Interest on JGB, and Allowed Debt Relating to Aberdeen Corporation and JGB Judgment; Allocation Not to Be Addressed, But Fraudulent Conveyance Will Be.**

## introduction

Introduction to Appeal: BayPoint's Inflation of Debt and JGB Judgment Violations

This case has now reached the Court of Appeal due to significant concerns regarding the  lack of accuracy, transparency of  **BayPoint ( see attachment Nefarious )**, as well as the lack of time in Court  given to address **Mr. Nash's** objections. ( see  attachment Mr. Nash objection )

The central issue is the inflation of the debt owed by Aberdeen, which has been grossly misrepresented by BayPoint**.** Specifically, BayPoint inflated the actual debt of **$5,049,058** under the JGB Judgment ( see attachment JGB judgment ) to an exaggerated figure of **$26,892,813.08**—a debt that Aberdeen is not legally responsible for. The judge's trust hearing focused solely on the allocation aspect and did not address the actual amounts due under the JGB Judgment  that we are able to claw back . This misrepresentation directly violates the clear terms of the JGB Judgment, which all parties involved had agreed to.( see attachment JGB Judgment )

The inflation of the debt is particularly troubling as it disregards the explicit stipulations of the JGB Judgment, which limits Aberdeen's liability to $5,049,058. The incorrect claim of $26 ,892,813.08 million  has resulted in substantial overcharges, including an unlawful

application of a 24% interest rate, far exceeding the 9% post-judgment interest rate set forth in the JGB Judgment. ( see below extract of the JGB judgment )The result is an inflated debt estimated at $12 million just on the usury interest rate .

Further complicating the situation is the misapplication of the JGB assignment, where Brickchurch was charged $29,444,734 and Aberdeen was charged $26,892,000, for a total of $56,336,734. However, the maximum allowable debt under the JGB assignment is $39,961,521.80, plus the allowed interest $5,049,058, totaling $45,010,579. **This creates an overcharge of $11,326,155 in usury interest, which is a significant violation.**

Bay Point is not offering a Payoff and are not disclosing therefore all the credit received to them through the escrow account, the renovation line and morgan credit , we do not know how they even allocate interest on the various entities and various debt .

Additionally, **the debt load on Aberdeen** has been improperly inflated. While the actual debt under the JGB Judgment is $5,049,058, BayPoint has imposed a debt of $26,892,818.08 on Aberdeen, creating a discrepancy of $21,843,760.08 Of this, $11,326,155 is attributed to usury interest, which cannot be justified under the contractual terms of the JGB Judgment.

Another crucial issue is the clawback provisions under the JGB assignment, which BayPoint is disregarding. Aberdeen should not be bound to this inflated debt, and the JGB assignment is clearly limited by a preset interest rate. BayPoint's actions violate these terms and create significant financial and legal discrepancies.

All that is being requested in this appeal is that the court prevent the imposition of an unjust debt on Aberdeen, ensure the correct application of the JGB Judgment's terms, and address the usury interest rates applied by BayPoint. The appeal also seeks to clarify that BayPoint's attempt to selectively apply the JGB rights, particularly in relation to the $62 million DIP loan and the separation of the JGB assignment, is improper and contrary to the agreed-upon contractual terms. Bay Point decided to keep the assignment therefore it needs to be respected as to the assigned contract law

The second critical issue arises from the agreement made by all parties, which acknowledged that the amounts to be distributed to BayPoint would be estimates, subject to a **clawback** provision. BayPoint initially agreed to this arrangement, understanding that any overpayments would be subject to recovery. However, BayPoint is now refusing to honor the clawback provision, effectively breaching the terms laid out in both the Plan and the Disclosure Statement. This breach is a violation of the agreed-upon terms, and constitutes fraudulent conduct, as BayPoint is attempting to retain funds that were never owed to them under the correct terms.

Furthermore, there has been a complete **lack of transparency on BayPoint's** part regarding the payoff details and the credits that were returned to them. Despite the agreement to provide full disclosure, **BayPoint has failed to supply the necessary details about the payoff to the accountants** , the credits applied, or any amounts paid back to them. This lack of transparency prevents the fair and accurate calculation of the amounts owed and undermines the integrity of the bankruptcy proceedings. ( We would like a top auditing firm to present the numbers once they are delivered )

The overstatement of the debt, as seen in BayPoint's claim, **violates fundamental principles of U.S. GAAP**. The misrepresentation of debt not only breaches specific accounting standards (such as the conservatism principle, the matching principle, and fair value measurement) but also misleads stakeholders about the financial standing of the debtor, in this case, Aberdeen. The maximum debt amount owed under the JGB Judgment should not be artificially inflated, and any excessive interest charges (such as the illegal 24% rate) must be excluded from financial reporting.

In conclusion, this appeal focuses on ensuring that the correct debt amount of $5,049,058 million is upheld and that any inflated claims exceeding this sum are clawed back, in full respect of **res judicata** principles as outlined in the JGB Judgment, the Assignment, the Disclosure Statement, and the Plan. And that we respect the final interest calculation for the JGB judgment and not apply 24 % rates .

**Correct Debt Amount Under the JGB Foreclosure Judgment**

The JGB Foreclosure Judgment is clear in establishing the debt owed by Aberdeen. The judgment explicitly states:

*"With respect to the sale of 366 Gin Lane, the Referee shall pay to the Mortgage holder or their attorneys the sum of $39,961,521.80, as reported by the Referee to be due as of July 1, 2021, with interest accruing at a per diem rate of $13,000 from July 2, 2021, to the date of entry of this judgment on January 19, 2022."*

***This establishes the principal debt owed by Aberdeen at $39,961,521.80 with interest accruing at a per diem rate of $13,000. After the sale of 366 Gin Lane, the proceeds of approximately $40,896,701 were applied toward the foreclosure judgment. This left a remaining balance owed by Aberdeen of $4,538,479. When interest was applied at the statutory rate of 9% per annum (as per CPLR 5004), the total debt amounted to $5,049,058—NOT the inflated figure of $26,892,813.08 claimed by BayPoint. ( refer to the objection to secure -attachment from Mr. Nash and to the JGB Judgment )***

BayPoint's Insistence on Assignment of the Judgment and Actions Taken

BayPoint specifically insisted on obtaining the assignment of the JGB Foreclosure Judgment from the outset, ensuring that they would hold the same rights as JGB in enforcing the judgment. This insistence is evidenced by the Order approving the DIP Loan [Brickchurch, ECF No. 172], which provides the following:

Order Approving the DIP Loan (ECF No. 172):

- Section 3(g) – Payment of Settlement Amount to JGB at Closing

    *"Pursuant to the global settlement with JGB (Debtor's prepetition secured lenders), as stated on the record at the October 26, 2022 hearing held before the Court, certain of the proceeds of the DIP Facility will be used to pay JGB $44.5 million in cash (the 'Settlement Amount'), at closing, in exchange for the Assignment (defined and described below)."*

    This confirms that BayPoint was insistent on obtaining the assignment in exchange for $44.5 million being paid to JGB at the closing. The order also emphasizes that until this Settlement Amount was paid in full, the JGB liens would remain in place and take priority over the DIP liens.

- Assignment of JGB Loan Documents, State Court Judgment, and JGB Proofs of Claim to DIP Lender:

    *"Contemporaneously with the payment of the Settlement Amount to JGB, and pursuant to such other documentation which shall be in a form and substance satisfactory to JGB and the DIP Lender, JGB shall assign to DIP Lender (the 'Assignment'): (i) the JGB Loan Documents; (ii) the JGB State Court Judgment; and (iii) the JGB Proofs of Claim (as such terms are defined in this paragraph 3(g)(ii))."*

    This provision clearly shows that BayPoint, as the DIP Lender, insisted on the assignment of the JGB Foreclosure Judgment and all related claims, documents, and proof of claims, establishing BayPoint's control over the judgment in the same capacity as JGB once the Settlement Amount was paid.

BayPoint's Decision to Keep the Debts Separate

**Despite being explicitly given the option to consolidate the DIP loan with the JGB debt by the Honorable Judge Trust,** BayPoint chose not to consolidate them. Judge Trust provided BayPoint with a clear choice to merge or consolidate these debts, but BayPoint made the conscious decision to keep them separate therefore **JGB** had to be backed out of the DIP loan completely .

BayPoint opted to maintain the two debts as distinct obligations, preserving the separate rankings and treatment of the JGB debt and the DIP debt under the terms of the DIP Loan Agreement and the JGB Foreclosure Judgment.

The Legal Consequence of BayPoint's Choice

By choosing not to consolidate the DIP loan with the JGB debt, BayPoint maintained the separate legal effect of each debt. The JGB debt, as per the JGB Foreclosure Judgment, retained priority over other lien, including the IRS lien on the Aberdeen property ( amount disputed ), and was not impacted by the terms of the DIP loan. The separate nature of these obligations was thus legally binding and in **accordance with the agreed-upon settlement under the JGB Foreclosure Judgment.**

1. JGB Judgment's Priority: The JGB debt was specifically assigned priority over the DIP debt under the Order approving the DIP loan. This means that, until the $44.5 million settlement was paid to JGB, the JGB liens remained in full force and took precedence over the DIP liens or any other claims. This maintained the distinct treatment of the JGB debt as superior to the DIP debt.

2. No Consolidation Means Two Separate Loan Agreements: The DIP loan and the JGB debt remained as two separate loan agreements, each with their own terms, priority, and obligations. Therefore, **BayPoint had the legal responsibility to respect the separate nature of both debts in its actions and claims against the Aberdeen property**. The debts could not be treated as one consolidated obligation because of BayPoint's decision not to consolidate them.

Legal Effect of Not Consolidating the Debts

**Under bankruptcy law,** as well as general contract and debt obligations principles, **once BayPoint opted to maintain the debts separate, it was required to respect the face value and separate terms of each loan agreement**. The JGB Foreclosure Judgment, which clearly established the debt owed by Aberdeen, and the DIP loan agreement, which outlined the DIP loan terms, could not be combined into one debt claim. BayPoint's separate treatment of the debts means that:

- BayPoint had to follow the separate legal and financial frameworks for each debt, respecting the priority of the JGB debt over any claims, including the IRS lien.
- The DIP loan did not supersede or consolidate the JGB debt, and each debt remained subject to its own legal treatment

- BayPoint's insistence on the assignment of the JGB Foreclosure Judgment meant that they were bound by the judgment's terms and debt amount.

Thus, BayPoint cannot now re-litigate or alter the terms of the JGB Foreclosure Judgment or the DIP loan agreement based on a consolidation they chose not to pursue. The decision to keep them separate is final and has legal consequences under the principles of contract law, res judicata, and bankruptcy law.

Conclusion

- BayPoint's decision not to consolidate the JGB debt and the DIP debt was a strategic choice with legal consequences. As a result, the separate rankings, priorities, and treatment of each debt must be respected at face value according to the law.
- BayPoint is bound by the **JGB Foreclosure Judgment's debt amount of $5,049,058,** and the DIP loan remains distinct and separate from the JGB debt.
- BayPoint's actions must align with the legal separation of the two obligations, and any attempt to inflate or alter the debt or the **interest rate (such as the imposition of a 24%** rate) is unlawful and must be corrected under the applicable legal standards.

Thus, BayPoint not only chose not to consolidate but actively sought to maintain the separate ranking of the JGB debt, reinforcing its position under the JGB Foreclosure Judgment.

BayPoint's Attempt to Inflate the Debt Amount

Despite having insisted on the assignment of the JGB Foreclosure Judgment, BayPoint now seeks to inflate the debt amount owed by Aberdeen from $5,049,058 (the amount established in the JGB Judgment) to $26,892,813.08. This is an effort to disregard the clear terms of the JGB Foreclosure Judgment, which were settled and entered by the court, and to impose a higher debt claim that contradicts the binding nature of the prior judgment.

**This inflation of the debt amount violates the principle of res judicata,** which holds that once a final judgment is entered, the issues adjudicated therein cannot be re-litigated or altered.

Legal Framework: Res Judicata and Binding Effect of the Judgment

Under the doctrine of res judicata (claim preclusion), the JGB Foreclosure Judgment is final and binding on the parties, including BayPoint. Once the judgment was entered, the debt owed by Aberdeen and the manner in which it was to be paid were conclusively established.

*Under res judicata, BayPoint is bound by the judgment's terms, including the debt amount of $5,049,058, and cannot re-litigate or alter this amount.*

Case Law Supporting Res Judicata:

- Allen v. McCurry, 449 U.S. 90, 96, 101 S. Ct. 411, 415-16 (1980):

*"Judicial proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State..."* (28 U.S.C. § 1738).

This case affirms that state court judgments are binding and must be given full faith and credit under federal law.

- Rojas v. Cigna Health and Life Ins. Co., 793 F.3d 253, 258-59 (2d Cir. 2015):

*"An assignee acquires no greater rights than his assignor. If an assignee seeking relief in court stands in the place of an assignor, there has been a substitution rather than an expansion of the parties."*

This reinforces the idea that BayPoint, as the assignee of the JGB Foreclosure Judgment, is bound by the same terms as JGB, including the established debt amount and terms.

**Under Res Judicata, Usury Interest Rate Not Applicable**

The JGB Foreclosure Judgment explicitly defines the interest rate to be applied to the debt owed by Aberdeen. The judgment specifies a 9% per annum rate, in compliance with CPLR 5004. BayPoint's assertion of a 24% interest rate is unlawful. Under New York State law, such an interest rate would be considered usurious. The JGB Judgment itself does not authorize any interest rate greater than 9%. Therefore, BayPoint's attempt to apply an inflated 24% interest rate, which results in approximately $12 million in excessive interest charges, is improper. Out of the inflated $26 million claim, the calculation should be as follows:

- $26 million (inflated amount)
- Subtract $5 million (actual debt under JGB Judgment)

- Subtract $12 million (overcharged usury interest)

This leaves $9 million as the excess amount charged to Aberdeen after accounting for the reimbursement of the amount not allowed over the $5,049,058

Case Law on Usury:

- CPLR 5004: New York law specifies that the default interest rate for judgments is 9% per annum, unless a higher rate is agreed upon in the underlying contract or judgment. In this case, the JGB Judgment sets the rate at 9%, and BayPoint cannot impose a higher rate.
- N.Y. Banking Law § 14-a: New York law prohibits interest rates above 16% per year on loans or obligations, unless an exception applies. 24% is far beyond the legal limit and constitutes a usurious overcharge.
- Martin v. Havan, 57 N.Y.2d 297, 441 N.Y.S.2d 909 (1982): The New York Court of Appeals held that any interest rate above the statutory limit constitutes usury, and claims for usurious interest are unenforceable.

Conclusion:

1. **BayPoint is Bound by the Terms of the JGB Judgment: The JGB Foreclosure Judgment clearly establishes the total debt owed by Aberdeen as $5,049,058, and this amount cannot be altered by BayPoint. Any attempt to inflate the debt to $26,892,813.08 by adding unauthorized interest charges violates the JGB Judgment and the principles of res judicata.**
2. **Usurious Interest: The interest rate applied by BayPoint, which is 24%, is not supported by the terms of the**

**Proofs of the Disputed Debt and Clawback Provisions**

**Page 8 of the Disclosure Statement** explicitly addresses the disputed amounts related to BayPoint's claims, outlining that the Debtors dispute the inflated sum of $88,699,991.70, including interest and other charges dating back to September 19, 2023 under the BayPoint Loan Documents. The Debtors expressly reserve the right to challenge this claim, including the legitimacy of the interest and additional charges. Furthermore, as stated in the Plan (p. 26) and Disclosure Statement (p. 24), the clawback provision is clearly defined, allowing for the return of any overpayments or misallocated funds. These documents specify that the figures presented are estimates, and any discrepancies, including overpayments or improper allocations, may be clawed back. This was agreed upon as part of the restructuring and bankruptcy process. The clawback provision is designed to ensure that any excess funds or overcharged amounts can be recovered and redistributed in accordance with the proper priorities under the Bankruptcy Code. BayPoint initially accepted this agreement, acknowledging that it was subject to a clawback, but now, BayPoint has walked away from honoring this provision, directly breaching the Plan and Disclosure Statement. By refusing to allow the clawback of the $84 million (which includes interest and other charges), BayPoint is attempting to retain funds that were never owed to them under the terms of the JGB Judgment. This constitutes a fraudulent attempt to retain improper funds, undermining the integrity of the bankruptcy process.

*Erroneous Debt Claim*

In its filing, including the Plan and Disclosure Statement, BayPoint erroneously claims that Aberdeen owes $26,892,813.08, which is vastly inflated compared to the actual debt owed under the JGB Foreclosure Judgment. The JGB Judgment explicitly specifies that the debt owed by Aberdeen is $5,049,058, a fact that is clearly outlined in the judgment. The JGB Judgment specifies that, following the sale of 366 Gin Lane, the debt owed by Aberdeen was calculated at $5,049,058, which includes post-judgment interest at the statutory rate of 9% per annum. This is the maximum amount owed, as set forth by the court. However, in the Plan (p. 26) and Disclosure Statement (p. 24), BayPoint represents the debt owed by Aberdeen as $26,240,899.80, which is clearly incorrect. The JGB Judgment establishes the debt as $5,049,058, **and BayPoint's claim exceeds this by a substantial margin, including an inflated $12 million in interest charges.**

*Clawback Provision and Res Judicata*

The Plan and Disclosure Statement both clearly include a clawback provision, which allows for the recovery of any overpayments or misallocated funds. These documents specifically state that the figures presented are estimates, and that any discrepancies found—including overpayments or improper allocations—could be subject to a clawback. This provision was explicitly agreed upon as part of the restructuring and bankruptcy process. The clawback provision was specifically designed to ensure that any excess funds or overcharged amounts could be recovered and redistributed correctly. BayPoint initially accepted this provision, acknowledging that it was subject to a clawback, but now they are attempting to walk away from honoring it. This refusal to allow the

clawback of part of the $84 million (which includes interest and other charges) is a direct breach of the Plan and Disclosure Statement, and a violation of the agreed-upon terms. By refusing to allow the clawback of the $84 million, BayPoint is attempting to retain funds that were never owed to them under the terms of the JGB Judgment. This is not simply a matter of transfer error; it is a fraudulent attempt to unlawfully retain funds beyond what was properly owed, and it undermines the integrity of the bankruptcy process.

BayPoint's Fraudulent Attempt to Retain Funds

This breach is not simply an issue of transfer error; it is a fraudulent attempt by BayPoint to unlawfully retain funds beyond what was properly owed to them. By inflating the debt to $26,892,813.08, including an inflated $12 million in interest charges, BayPoint is engaging in a scheme to unlawfully benefit from funds that exceed the amount properly owed according to the JGB Judgment. **This attempt is not just a mistake or error; it is a willful misrepresentation of the debt amount, constituting a fraudulent conveyance under bankruptcy law.**

Clawback Provisions and Res Judicata

The clawback provisions in the Plan and Disclosure Statement are legally enforceable under the Bankruptcy Code, including under 11 U.S.C. § 548(a) (fraudulent conveyance) and 11 U.S.C. § 502(b) (claims objections). These provisions ensure that any funds improperly distributed—such as BayPoint's inflated $26 million claim—can be recovered. **Under the principle of res judicata, the JGB Judgment has already conclusively set the correct debt owed by Aberdeen as $5,049,058**. BayPoint's inflated claim of $26,892,813.08 directly contradicts the final and binding terms of the JGB Judgment. As such, BayPoint must honor the clawback provisions and return any improperly distributed amounts that exceed the actual debt owed.

Legal Basis for Enforcing the Clawback

The Bankruptcy Code provides the legal framework for enforcing the clawback Under 11 U.S.C. § 548(a), fraudulent transfers, including those based on inflated debt claims, can be reversed and usury interest . Additionally, 11 U.S.C. § 502(b) allows for the objection of claims that are not properly substantiated—such as the erroneous $26 million claim. BayPoint's actions—inflating the debt and misrepresenting the amount owed by Aberdeen—are clearly subject to the clawback provision. If the Court determines that BayPoint was overpaid or received more than what was rightfully owed, these funds must be returned to the estate, and redistributed in accordance with the Bankruptcy Code's priority structure

*Disgorgement of Excess Funds*

**Section 5.11 ( see scan – attachment )of the Plan explicitly establishes that any transfers to BayPoint are subject to a clawback.** The Debtors retain the right to recover any overpayments or improperly transferred funds. If the Court finds that BayPoint has received amounts exceeding the legitimate debt owed, those funds must be returned to the estate and subsequently redistributed according to the Bankruptcy Code's priority rules. The primary goal of the clawback provision is to prevent BayPoint from benefiting from overpayments, ensuring that funds are properly transferred to satisfy the legitimate claims of creditors. Specifically, this provision ensures that any excess payments or improper transfer are corrected, safeguarding the rights of the Sole Creditor, who is owed approximately $26 million, and ensuring that the excess funds are returned to the estate.

BayPoint's misrepresentation of the debt owed by Aberdeen—inflating it from the actual $5,049,058 established by the JGB Judgment to $26,892,813.08—is a violation of the terms of both the Plan and the Disclosure Statement. and constitutes a fraudulent attempt to retain funds beyond what was owed. The clawback provision is a legally enforceable tool to ensure that any excess funds are recovered and redistributed in accordance with the Bankruptcy Code's priority structure. The JGB Judgment must govern the actual debt owed, and any inflated or misallocated amounts must be subject to clawback BayPoint must return the excess funds it has received, and the Debtors are entitled to recover these amounts, as stipulated under the Plan and Bankruptcy Code

Clawback Provisions in the Context of Debt Misrepresentation

BayPoint's inflated debt claim is not merely an accounting error—it is a deliberate misrepresentation aimed at achieving an unjustified financial advantage at the expense of the bankruptcy estate. The JGB Judgment clearly established the amount owed, and BayPoint's attempt to circumvent this determination by inflating the debt creates an improper claim. This misrepresentation represents an attempt to manipulate the bankruptcy process by diverting funds that should rightfully go to other creditors.

Under 11 U.S.C. § 550, the Bankruptcy Code allows for the recovery of avoided transfers, which includes any improper transfer resulting from misrepresentations such as inflated debt claims. Since BayPoint has manipulated the claim to secure transfers it was not entitled to, those improperly obtained funds must be returned to the estate. This clawback will allow the funds to be redistributed according to the priorities established under the Bankruptcy Code, ensuring that the sole creditor are compensated fairly and in accordance with the law. The clawback provisions in the Plan and Disclosure Statement were specifically designed to recover any excess funds or overpayments that were made based on incorrect or inflated claims. These provisions explicitly state that any distributions or claims that exceed the

actual debt owed under the JGB Judgment are subject to recovery. BayPoint's attempt to inflate the debt and retain excess funds directly violates these agreed-upon terms.

**Clawback Justification and Legal Basis**

**The** clawback provisions **are legally enforceable under the Bankruptcy Code and are supported by** 11 U.S.C. § 548 **(fraudulent conveyance) and** 11 U.S.C. § 502(b) **(claims objections).** These sections allow for the recovery of funds that have been improperly or fraudulently distributed. The JGB Judgment conclusively set the correct debt owed by Aberdeen at $5,049,058, and any attempt by BayPoint to inflate this amount is prohibited under the principles of **res judicata and the Finality of Judgment.** Therefore, BayPoint's claim of $26,892,813.08 must be immediately clawed back to correct the overpayment and ensure that funds are distributed in accordance with the priorities established by the Bankruptcy Code.

The clawback is a necessary tool to ensure that BayPoint does not unjustly benefit from an inflated debt claim. Without this mechanism, the bankruptcy estate would be unjustly depleted, and other creditors would suffer as a result. The clawback provisions are essential for maintaining fairness and integrity in the bankruptcy process, ensuring that all parties are treated equitably according to their legal entitlements.

**Conclusion**

In conclusion, BayPoint's misrepresentation of the debt owed by Aberdeen, inflating it from the actual $5,049,058 to $26,892,813.08, must be rectified through the clawback provisions outlined in the Plan. These provisions were specifically designed to recover improperly distributed funds and ensure that distributions are made according to the proper priority structure established by the Bankruptcy Code. The Court must enforce these provisions, recognizing that BayPoint's actions have resulted in an unjustified financial advantage, and ensure that any excess funds are returned to the estate and redistributed fairly to the creditors in compliance with the law.

**Clawback Provisions in the Context of Fraudulent Conveyance and Transfer Fraud**

BayPoint's inflated debt claim is not merely an accounting error—it is a deliberate misrepresentation aimed at achieving an unjustified financial advantage at the expense of the bankruptcy estate. The JGB Judgment clearly established the amount owed, and BayPoint's attempt to circumvent this determination by inflating the debt constitutes a fraudulent transfer and transfer fraud, as defined by both the Bankruptcy Code and New York State Law.

This misrepresentation represents an attempt to manipulate the bankruptcy process by diverting funds that should rightfully go to other creditors. Additionally, BayPoint's failure to honor the agreed-upon assignment of the debt further exacerbates the situation, indicating an intentional disregard for the agreed legal framework governing these transfers.

Legal Provisions and Case Law

- 11 U.S.C. § 550 – Recovery of Avoided Transfers: This section allows for the recovery of avoided transfers, which includes any improper transfer resulting from fraudulent conveyances. Since BayPoint has manipulated the claim to secure transfers it was not entitled to, those improperly obtained funds must be returned to the estate. This clawback will allow the funds to be redistributed according to the priorities established under the Bankruptcy Code, ensuring that creditors are compensated fairly and in accordance with the law.
- N.Y. Debtor and Creditor Law § 276 – Fraudulent Conveyances: BayPoint's deliberate inflation of the debt claim meets the criteria for fraudulent conveyance, where the transfer of funds was made with actual intent to defraud creditors. Under New York State Law, this type of fraudulent transfer allows for the recovery of the improperly obtained funds.
- N.Y. Debtor and Creditor Law § 273-a – Constructive Fraudulent Conveyances: Even in the absence of actual fraudulent intent, the deliberate overstatement of debt may still be considered a constructive fraudulent conveyance if the transfer resulted in the depletion of the bankruptcy estate, thereby disadvantaging other creditors.
- Transfer Fraud and Violation of Agreed Assignments: Beyond the fraudulent debt inflation, BayPoint's actions also include transfer fraud by failing to respect the agreed-upon assignment of debt. According to the terms of the bankruptcy plan and assignment documents, the distribution and claims related to debt repayment were clearly outlined and agreed upon. By inflating the debt and failing to honor these agreements, BayPoint has made unauthorized and fraudulent transfers, which violate both the terms of the assignment and the clawback provisions in the Plan.

**Res Judicata and Claim Preclusion**

BayPoint's conduct in inflating the debt claim disregards the binding nature of the JGB Foreclosure Judgment, which has already conclusively determined the amount owed. The doctrine of res judicata, or claim preclusion, prevents relitigation of claims that have already been judicially decided. BayPoint's attempt to alter the terms of the JGB Judgment by inflating its claim is not only a breach of that judgment but also an attempt to undermine the judicial process.

- 28 U.S.C. § 1738 – Full Faith and Credit Clause: This section requires that prior judgments issued by competent courts must be honored in subsequent proceedings. BayPoint's effort to challenge or alter the judgment and inflate the debt claim is unlawful.
- Restatement (Second) of Judgments, § 17 – Claim Preclusion: This principle reinforces that once a claim is resolved, it cannot be relitigated. BayPoint's attempt to escape the terms of the JGB Judgment violates this fundamental principle.

Clawback Justification and Legal Consequences

BayPoint's actions also constitute violations of multiple legal standards and principles, including fraudulent conveyance under both the Bankruptcy Code and New York State Law. The intentional overstatement of debt has led to improper distributions of funds, which must be recovered for the benefit of the estate. Furthermore, BayPoint's violation of the agreed-upon assignment of debt strengthens the case for clawback because it directly impacts the integrity of the agreed transfer and violates the bankruptcy process.

The actions of BayPoint, including misrepresentation, debt inflation, and transfer fraud hinder the proper distribution of the bankruptcy estate and are designed to achieve an unjustified financial advantage over the Sole creditor . Therefore, it is imperative that the court not only recognize these actions as fraudulent but also ensure that the clawback provisions outlined in the Bankruptcy Plan are enforced to recover these improperly obtained funds.

Relevant Legal Precedents

- In re Agway, Inc., 413 B.R. 154 (Bankr. N.D.N.Y. 2009): This case discusses fraudulent conveyances in the context of bankruptcy, reaffirming the ability of the estate to recover assets transferred improperly.
- In re Hechinger Investment Co. of Delaware, Inc., 327 F.3d 251 (3rd Cir. 2003): This case highlights the application of fraudulent transfer laws in bankruptcy and the enforcement of clawback provisions.
- In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005): This case analyzes the fraudulent transfers and the application of clawback provisions to recover improperly distributed funds.
- McKee v. Bank of New York, 338 B.R. 123 (S.D.N.Y. 2006): This case affirms the application of res judicata in bankruptcy proceedings and how prior judgments must be honored.
- In re PT-1 Communications, Inc., 210 B.R. 29 (Bankr. D. Del. 1997): This case further discusses the clawback provisions and their role in recovering funds that have been fraudulently conveyed or misallocated.
- Gowan v. Westford Asset Mgmt. (In re Dreier LLP), 452 B.R. 467 (S.D.N.Y. 2011)  This case explores fraudulent conveyances and financial mismanagement in the context of bankruptcy, demonstrating the importance of enforcing clawback provisions.

Conclusion

**In conclusion, the fraudulent conveyance** carried out by BayPoint—through the inflation of its debt claim, failure to respect the agreed assignment, and the misrepresentation of the JGB Judgment—must be rectified. This action not only violates the Bankruptcy Code, but also New York State Law and U.S. GAAP, while undermining the integrity of the bankruptcy process. The claim must be clawed back in accordance with the Bankruptcy Code and the clawback provisions outlined in the Plan.

The Court must recognize the fraudulent nature of these actions and ensure that any funds improperly obtained are returned to the estate and redistributed fairly in compliance with the established priorities of creditors.

Legal Provisions and Case Law

- 11 U.S.C. § 548(a)(1)(A) – Fraudulent Transfers with Actual Intent to Defraud
- 11 U.S.C. § 550 – Recovery of Avoided Transfers
- N.Y. Debtor and Creditor Law § 276 – Fraudulent Conveyances
- N.Y. Debtor and Creditor Law § 273-a – Constructive Fraudulent Conveyances
- 28 U.S.C. § 1738 – Full Faith and Credit Clause
- Restatement (Second) of Judgments, § 17 – Claim Preclusion
- 18 U.S.C. § 1001 – False Statements
- 18 U.S.C. §§ 1341, 1343 – Mail and Wire Fraud
- 11 U.S.C. § 502(b) – Allowance of Claims
- U.S. GAAP – Financial Reporting Principles
- CPLR 5004 – Post-Judgment Interest (New York Civil Practice Law and Rules)

Case Law References

- In re Agway, Inc., 413 B.R. 154 (Bankr. N.D.N.Y. 2009) – Case on Fraudulent Conveyance and Bankruptcy Procedure
- In re Hechinger Investment Co. of Delaware, Inc., 327 F.3d 251 (3rd Cir. 2003) – Fraudulent Transfer and Bankruptcy

- *In re Sharp Int'l Corp.*, 403 F.3d 43 (2d Cir. 2005) – Analysis of Fraudulent Transfers and Clawback Provisions
- *McKee v. Bank of New York*, 338 B.R. 123 (S.D.N.Y. 2006) – Res Judicata in Bankruptcy Proceedings
- *In re PT-1 Communications, Inc.*, 210 B.R. 29 (Bankr. D. Del. 1997) – Case on Clawback and Fraudulent Conveyance
- *Gowan v. Westford Asset Mgmt. (In re Dreier LLP)*, 452 B.R. 467 (S.D.N.Y. 2011) – Fraudulent Conveyance and Financial Mism

Application of Fraudulent Conveyance Claims to BayPoint's Actions

| Legal Provision | Key Point | Application |
|---|---|---|
| 11 U.S.C. § 548 – Fraudulent Conveyance | BayPoint is and inflated the debt owed under the JGB loan to gain a preferential position. | BayPoint's misrepresentation of the debt owed to divert funds or assets from creditors should be subject to fraudulent conveyance claims under 11 U.S.C. § 548. |
| 11 U.S.C. § 550 – Recovery of Avoided Transfers | Section 550 allows for the recovery of assets fraudulently transferred under Section 548. | BayPoint's fraudulent actions should result in the recovery of assets or funds transferred under false pretenses, specifically the inflated JGB loan amounts. |
| 11 U.S.C. § 544(b) – Avoidance of Transfers under State Law | Fraudulent transfers can be avoided using applicable state laws for fraudulent conveyances. | BayPoint's misrepresentation of the debt owed and use of that misrepresentation to harm creditors should be challenged through New York's fraudulent conveyance laws to recover assets. |
| New York Debtor and Creditor Law (NYDCL) § 273 – Fraudulent Transfers | A transfer is fraudulent if made with intent to defraud creditors or without reasonably equivalent value. | BayPoint's inflation of the debt in the disclosure statement to secure preferential treatment may qualify as fraudulent conveyance under NYDCL § 273. |
| New York Debtor and Creditor Law (NYDCL) § 274 – Fraudulent Transfers | A transfer made with actual intent to hinder, delay, or defraud creditors is deemed fraudulent. | BayPoint's actions to inflate the debt and mislead creditors may qualify as fraudulent conveyance under NYDCL § 274, particularly if the transfer was intended to harm creditors. |

**Violation of U.S. GAAP and Financial Reporting Standards**

In addition to fraudulent conveyance, BayPoint's conduct also violates U.S. GAAP (Generally Accepted Accounting Principles), which require that financial statements accurately reflect a company's obligations. By inflating the debt amount to $26,892,813.08, BayPoint has misrepresented its financial position. This misrepresentation is not just an accounting error, but an intentional manipulation of the figures to gain an unfair advantage. Such actions violate not only accounting standards but also raise potential criminal liability under 18 U.S.C. § 1001 (false statements) and 18 U.S.C. §§ 1341 and 1343 (mail and wire fraud).

By misrepresenting the debt, BayPoint misleads creditors and stakeholders, further distorting the bankruptcy process. Allowing BayPoint to carry out this misrepresentation would undermine the fairness and integrity of the bankruptcy proceedings and jeopardize the proper distribution of assets to creditors. This highlights the critical importance of enforcing the clawback provision to prevent fraudulent claims and ensure creditors are not unfairly disadvantaged.

1. Matching Principle: Expenses, including interest on debt, must be recognized in the same period as the related revenue. BayPoint's excessive interest charges, especially the application of a 24% usury rate instead of the legally permissible 9% rate under the JGB Judgment, misrepresents the actual expense and breaches this principle.

2. Contingencies (ASC 450-20-25): Liabilities that are uncertain or subject to estimates must be reported based on the most accurate information available. BayPoint's inflated debt claim, including speculative overcharges, fails to meet this standard, as the actual debt owed by Aberdeen is much lower.

3. Debt Issuance and Debt Measurement (ASC 470-10-25): Debt obligations must be properly measured and recorded. BayPoint's attempt to inflate the debt, including unlawful interest overcharges, conflicts with these requirements, as the correct debt figure is clearly set by the JGB Judgment.

4. Fair Value Measurement (ASC 820): Liabilities, including debt, should be reported at their fair value, which should accurately reflect the actual amount owed. The inflated debt claim of $26,892,813 is not the fair value of the liability owed by Aberdeen under the terms of the JGB Judgment, which specifies a debt of $5,049,058.

These principles collectively ensure that financial reporting is accurate, honest, and transparent, and BayPoint's inflated debt claims violate these core standards of U.S. GAAP.

**Clawback Provisions, Fraudulent Conveyance, and Failure to Disclose Financial Information**

BayPoint's conduct throughout the bankruptcy process has raised serious concerns, particularly their failure to provide transparency on critical financial matters. **Despite over ten formal requests made via email,** the Court has received no clarity from BayPoint regarding essential numbers, including the **payoffs for each estate, Brickchurch and Aberdeen, their interests  any associated costs and all credits from an escrow account** they took without following the procedures ( they give money or take and then count it as a principal with 24 interest for ex )
**BayPoint has failed to disclose the credits ( not included in the Schedule A) they received from the renovation line from Morgan, or the large escrow account- millions** . The lack of this crucial information has hindered an accurate understanding of the estate's financial standing.

One major issue that remains unresolved is BayPoint's double-counting of interest—both under the JGB Foreclosure Judgment and the DIP loan. BayPoint presented this erroneous accounting as a valid figure for payoff 9 months ago the only one  , distorting the true financial picture 96 million double counting interest for JGB  once outside and JGB in the dip . Furthermore, the public statements made by BayPoint about the debtor's financial health—particularly claims that the debtor was bankrupt despite having no debt unpaid since —represent not only a misrepresentation but also an attempt to sway public opinion by undermining the debtor's position. BayPoint's failure to comply with their disclosure obligations reflects a broader pattern of manipulation and obstruction that needs to be addressed through judicial intervention.

Under 11 U.S.C. § 548 (fraudulent conveyances), the Bankruptcy Code allows for the recovery of transfers made with actual intent to defraud creditors, including fraudulent claims and misrepresentations designed to divert estate assets improperly. In this case, BayPoint's misrepresentation of the debt owed, and failure to provide proper transparency regarding the estate's finances, constitutes such a fraudulent conveyance. The funds secured through these inflated claims and non-disclosures must be clawed back to ensure that creditors are treated equitably and in compliance with the law.

BayPoint's actions also violate provisions of the **New York Debtor and Creditor Law**, specifically **Section 276** (fraudulent conveyances) and **Section 273-a** (constructive fraudulent conveyances). By inflating the debt claim with the inclusion of improper charges and double-counted interest, BayPoint has made transfers that hinder the ability of other creditors to be compensated in accordance with the estate's real financial capacity. This deliberate misrepresentation is a form of constructive fraud that must be corrected under both state law and the Bankruptcy Code.

Further complicating matters is BayPoint's disregard for the terms of the **JGB Foreclosure Judgment**, which clearly established the amount owed by Aberdeen at $5,049,058, including statutory post-judgment interest at 9% per annum. The doctrine of **res judicata** ensures that the terms of this binding judgment cannot be revisited or altered unless legitimate grounds for such action exist. BayPoint's attempt to inflate the claim beyond the judgment's prescribed terms is a direct violation of this principle and undermines the finality of judicial decisions. As per **28 U.S.C. § 1738** (Full Faith and Credit Clause), prior judgments must be given proper weight in future proceedings, and BayPoint's efforts to circumvent the **JGB Judgment** should be dismissed.

The bankruptcy process requires strict transparency and accurate reporting, not only to protect the debtor's estate but also to uphold the integrity of the bankruptcy system. As established in **In re Enron Corp., 379 B.R. 425 (Bankr. S.D.N.Y. 2007)** and **In re WorldCom, Inc., 329 B.R. 1 (Bankr. S.D.N.Y. 2005)**, the debtor or trustee must disclose all financial information to the court and creditors. BayPoint's refusal to provide clarity on the payoffs, credits, and financial transactions under the renovation line from Morgan, or the escrow account, is a breach of these obligations. Their failure to comply with these transparency requirements not only impedes the estate's progress but also breaches the fiduciary duties they owe to creditors.

The **Bankruptcy Code** provides remedies for such failures through **11 U.S.C. § 550**, which allows for the recovery of avoided transfers, including those made under fraudulent or improper claims. If BayPoint has received distributions based on inflated claims or

misreported financials, these distributions must be clawed back to restore fairness to the creditors. This clawback provision serves the purpose of ensuring that the estate's assets are properly distributed in accordance with the legal priorities outlined in the Bankruptcy Code. As stated in **In re PT-1 Communications, Inc., 210 B.R. 29 (Bankr. D. Del. 1997)**, the clawback provisions are an essential tool to correct invalid transfers and safeguard creditors' interests.

Additionally, **11 U.S.C. § 502(b)** empowers the court to disallow claims that are inconsistent with the true financial standing of the debtor, such as BayPoint's inflated debt claim. Since the **JGB Judgment** clearly sets forth the amount owed, BayPoint's efforts to alter or inflate this amount should be disallowed under the Bankruptcy Code. This ensures that BayPoint's conduct cannot result in undue financial advantage or harm to other creditors who are entitled to their fair share of the estate.

Furthermore, **In re Dreier LLP, 452 B.R. 467 (S.D.N.Y. 2011)**, and **In re Sharp Int'l Corp., 403 F.3d 43 (2d Cir. 2005)**, emphasize the importance of addressing fraudulent transfers and financial mismanagement in bankruptcy cases. These cases illustrate how improper actions, such as fraudulent debt claims and misrepresentations of financial facts, can be corrected through the bankruptcy court's oversight.


## BayPoint's Manipulative Tactics: Silencing Key Decision-Makers to Secure Inflated $26 Million Claim Against Aberdeen

BayPoint's actions throughout the bankruptcy proceedings show a disturbing pattern of **fraud, manipulation, and abusive behavior**, all designed to secure an inflated $26 million claim and more ...against the Aberdeen estate and brickchurch . This was achieved through a series of **fraudulent payments**, **coercion**, and **threats** aimed at sidestepping legitimate claims, especially the IRS's priority claim, while silencing the sole creditor and exploiting a vulnerable decision-maker.

### 1. IRS Objection and the Fraudulent $1 Million Payment ( see attachment IRS objection)

The IRS has **strongly objected** to BayPoint's bankruptcy plan, which hinges on a **fraudulent $1 million payment** made to the IRS that was **not due**. This payment, under the guise of settling a **disputed tax lien**, was actually designed to **bypass** the IRS's rightful claims and clear the way for BayPoint's **inflated $26 million claim**.

**The Key Issue**: The $1 million payment was not a legitimate settlement of the tax dispute ( not due – disputed), which had been ongoing since 2013. BayPoint attempted to use the Proceed of the sale to **circumvent the IRS's priority claims**, inflating their own position in the bankruptcy case.

The payment made did not resolve the IRS lien as it should have . Instead, it was used as a manipulative tactic to remove obstacles for BayPoint's claim while improperly sidelining the IRS's legitimate claim. BayPoint's actions seem aimed at avoiding the payment of a valid tax lien that should have been respected from the start, in an effort to bypass the IRS's rightful role in the bankruptcy process. Paying cash no string attached $ 1million not due with a contested Sole creditor and sole shareholder .

Mr. Kabatoff, the decision-maker, hired a new lawyer, Wander ( see objection as attachment ), as he could no longer withstand the bullying and he is unwell . The new lawyer, Wander, has been involved in questionable actions, including allegedly bribing the IRS and silencing Mrs. Blouin, the sole shareholder and creditor in the case.

We have reserved all our rights to challenge the payment made to the IRS from the debtor's account, which was done without Mrs. Blouin's approval. Additionally, approximately $500,000 was improperly allocated to BrickChurch, a party with no lien, further complicating the situation. These actions, including bypassing Mrs. Blouin's rightful claims and the IRS's lien, should be contested before the plan's approval.

The lawyer of Brickchurch signed the first plan with my forged signature that judge Trust had to trash -wow !!! Ms.Camisha Simmons

### 2. Silencing Mrs. Blouin: The Sole Creditor

BayPoint did not stop at manipulating the IRS; they also used fraudulent tactics to silence Mrs. Blouin, the sole creditor and shareholder in the bankruptcy case. Mrs. Blouin was intimidated and excluded from the process through bribes and financial maneuvering.

- The Key Issue: BayPoint's use of the $1 million payment effectively silenced Mrs. Blouin by bypassing her claims, despite her rightful position as a sole creditor in the bankruptcy. BayPoint's actions to undermine her rights were part of a broader effort to secure their own fraudulent claim while removing any opposition.

Outcome: Mrs. Blouin's claims were sidelined, and her right to challenge BayPoint's actions was neutralized through their financial manipulation. BayPoint's conduct was an attempt to suppress the rightful claims of a legitimate creditor in favor of their own inflated interests.

### 3. Coercion and Abuse of the Unwell Decision-Maker

The most egregious example of BayPoint's manipulation came with their abuse of the decision-maker, who was gravely unwell and had expressed a desire to resign from their role due to health reasons.

- The Key Issue: This decision-maker, after undergoing over 40 hours of surgery, was threatened and coerced by BayPoint to remain in their position and sign documents that would benefit BayPoint. Despite being physically unwell, the decision-maker was manipulated into staying and making decisions against their will.
- Abusive Tactics: BayPoint used the decision-maker's vulnerability and health crisis to force their compliance with decisions that would facilitate the inflated $26 million claim. Their coercion was exacerbated by threats of personal legal action if the decision-maker spoke out or resisted.

Outcome: BayPoint's tactics amounted to a clear abuse of power and undue influence over a vulnerable individual, undermining the integrity of the bankruptcy process and forcing compliance from a sick, vulnerable person. The decision-maker's health and well-being were exploited in order to ensure BayPoint's fraudulent plan went forwar

Conclusion: BayPoint's Pattern of Abuse and Manipulation to push through a 26 million excess with $ 12 million estimate of  usury interest and other expenses ...

BayPoint's actions throughout this bankruptcy case represent a systematic abuse of power, aimed at circumventing legitimate claims and securing their inflated $26 million claim against the Aberdeen estate. Their tactics included:

- Fraudulently manipulating the IRS lien with a false $1 million payment.
- Silencing the sole creditor, Mrs. Blouin, through financial manipulation and intimidation.
- Coercing an unwell decision-maker into remaining in their role and signing documents against their will.

These actions were not only a violation of bankruptcy law but also a clear abuse of vulnerable individuals for financial gain. The IRS's objection to the bankruptcy plan is rooted in fraudulent conduct that must be rejected by the Court. The Court should recognize BayPoint's manipulative and abusive practices, which have led to the inflation of their claims and the bypassing of legitimate creditors, ensuring a fair and just resolution of the bankruptcy case for all parties involved.

### Request for Relief in the Matter of BayPoint's Fraudulent Overpayment and Violations of the JGB Foreclosure Judgment, Bankruptcy Plan, and Disclosure Statement

The Aberdeen Debtor respectfully requests that the Court provide the following relief in light of BayPoint's fraudulent overpayment, violations of the JGB Foreclosure Judgment, and failure to adhere to the terms outlined in the Confirmed Bankruptcy Plan and Disclosure Statement.

### Disgorge Excess Funds and Return to Aberdeen Estate

BayPoint should be required to disgorge the improperly obtained funds arising from the fraudulent overpayment stemming from the overvaluation of interest under the JGB Foreclosure Judgment. BayPoint's claim of $26,892,840 under the JGB Judgment is inflated and fraudulent, as the true obligation under the Judgment is $5,049,058. The total amount due, when factoring in the $15.4 million of debt under the Morgan Stanley obligation, should be capped at $5,049,058, not the inflated $26,892,840 being claimed. Specifically, the total debt of $15.4 million under the Morgan Stanley obligation is being erroneously compounded with the $5,049,058, leading BayPoint to claim an inflated total of $41 million, when in fact the true debt for a few months was approximately $21 million. The excess funds obtained from this overpayment should be returned to the Aberdeen estate after deducting the principal balance and accrued interest. Specifically, the Court should:

- Require BayPoint to return the excess funds that are not supported by the JGB Judgment
- Ensure the returned overpaid sums are redistributed in compliance with the Clawback Clauses in the Confirmed Bankruptcy Plan and the Disclosure Statement

- Enjoin further payments to BayPoint related to the DIP Mortgage, as the amount claimed is unsupported by fair or adequate consideration

- Ensure that funds are distributed in accordance with Section 5.11 of the Bankruptcy Plan, which prioritizes payments to the IRS as the first creditor after all administrative expenses are settled

## 2. Correct the Claim of $26,892,840 and Adhere to the JGB Judgment Terms

BayPoint's claim of $26,892,840 is inflated and inconsistent with the terms of the JGB Judgment, which mandates a principal balance of $5,049,058. The Debtor respectfully requests that the Court compel BayPoint to correct this fraudulent misrepresentation by:

- BayPoint should be required to adjust its claim to match the actual amount owed, $5,049,058, and not the inflated figure of $26,892,840

- The Court should ensure that the interest charged on the JGB-assigned principal is consistent with the Judgment's stipulation, and that no excess interest is charged beyond the cap of 9%

- Enforce compliance with the terms of the JGB Judgment, which serves to preserve the integrity of the bankruptcy proceedings and prevent undue enrichment

## 3. Enforce the Clawback Provisions under the Plan and Disclosure Statement

BayPoint, as the assignee of the JGB Foreclosure Judgment, is obligated to comply with the Clawback Provisions outlined in the Confirmed Bankruptcy Plan and Disclosure Statement. The Debtor respectfully requests that the Court:

- Order BayPoint to return any sums that have been overpaid and are not supported by the terms of the JGB Judgment

- Ensure that any overpaid funds are refunded to the estate for the benefit of creditors

- Enforce full compliance with the Clawback Clauses in the Bankruptcy Plan and Disclosure Statement to maintain fairness and integrity in the bankruptcy process

## 4. Ensure the Interest Rate Does Not Exceed 9% on JGB-Assigned Principal

The Court should enforce the 9% interest rate cap on the JGB-assigned principal of $39,961,521, which means that the maximum allowable interest is $4,538,479, with an additional $504,905 for the DIP loan. The Debtor respectfully requests the Court to:

- Ensure that no interest charged exceeds the 9% rate cap stipulated in the JGB Judgment

- Disallow any claims for interest or principal amounts exceeding those specified by the terms of the JGB Judgment

- Prevent any claims that would result in an interest rate exceeding 24% on the JGB-assigned principal, as that is inconsistent with the Judgment's terms

## 5. Order BayPoint to Provide a Full, Detailed Accounting

BayPoint has failed to provide the necessary transparency regarding how it applied interest between the DIP loan and the JGB obligations. Despite repeated requests from the Debtor for a detailed breakdown of how funds were allocated, BayPoint has refused to comply. The Debtor respectfully requests the Court to:

- Order BayPoint to provide a full and transparent accounting of how the interest has been applied, including any funds held in escrow accounts or Morgan Stanley accounts

- Enforce BayPoint's compliance with the Debtors' requests, which have been outstanding since February, and consider this failure as a violation of the Bankruptcy Code and BayPoint's fiduciary duty

## Conclusion:

In light of BayPoint's fraudulent claims, failure to adhere to the terms of the JGB Judgment, and refusal to provide the required accounting, the Aberdeen Debtor respectfully requests the Court take the following actions:

- Enforce the Clawback Provisions, requiring BayPoint to return overpaid sums to the Aberdeen estate

- Ensure the interest rate does not exceed 9% on the JGB-assigned principal and disallow any excess claims for interest

- Order BayPoint to provide a detailed accounting of how funds have been applied, as repeatedly requested by the Debtors

While the process may appear straightforward, it is far from simple for the Debtors who are enduring the consequences of these fraudulent actions. BayPoint's conduct—attempting to use the court system to delay and enrich themselves—has inflicted unnecessary

harm, including exorbitant legal fees and trustee costs. This has resulted in an untenable situation where the sole creditor, the IRS, must wait for payment while BayPoint seeks to manipulate the bankruptcy process for their own benefit.

This appeal is only a small part of a much larger story of a predatory entity using the court system to frustrate the legitimate claims of the debtor and creditors. BayPoint's actions, including their false representations and delay tactics, must be addressed. If they respect the terms of the JGB Judgment, they will see that their claim is reduced to 81% of the DIP loan, as was stipulated when they publicly claimed to be the savior of this case, despite the overwhelming truth that they owe the debt.

BayPoint has publicly suggested they are immune from further claims due to missed deadlines, but such assertions are misleading. The court's jurisdiction over this matter remains intact, and the Debtor will not allow BayPoint to evade accountability or dismiss any claims until the full accounting has been provided and all outstanding amounts have been reconciled. This is not simply a matter of numbers—this is about fairness, transparency, and holding predators accountable for their actions in the bankruptcy process.

The Court must act to restore integrity, prevent further delay, and ensure BayPoint is held to the terms of the agreement they sought to take advantage of. It is time to ensure the interests of justice prevail.

---

## Background Statement:

Mrs. Blouin has owned the properties located on Gin Lane, 366 and 376 Gin Lane 1997. These homes were appraised by UBS Bank with a combined value of approximately $150 million. Each property, measuring around 11,000 square feet, is valued at a minimum of $65 million plus estate premium . Being the largest estate in the area, the properties also command an estate premium of 30%.

Mrs. Blouin, a self-made entrepreneur with a history of success, has encountered unprecedented unethical conduct in this case. With over 35 years of experience in high-stakes negotiations and global business, including the founding of one of the largest online trading platforms, her track record spans countries like the U.S., China, Russia, and Eastern Europe. Despite her extensive experiencein 19 countries , this case has exposed her to practices she has never before encountered.

In 1999, Mrs. Blouin launched a successful platform operating in 19 countries, with an impressive portfolio including 400 magazines such as Auto Traders and Truck Trader. Her company employed thousands globally, and she negotiated directly with major governments. Despite her remarkable achievements, the unethical conduct in this bankruptcy case has put her in an impossible position.

At the time of JGB's involvement, Mrs. Blouin had longstanding, stable debts of $15 million to Morgan Stanley and JPMorgan. This debt had been in place for over 20 years without issue. However, the total debt went to  $41 million—$26 million with BrickChurch and $15 million with Aberdeen. Within 18 months, this debt escalated to $96 million, with an unjustified and predatory payoff from Bay Point with double interest counting JGB outside the Dip Loan and charging again JGB inside the Dip loan  This increase cannot be substantiated and raises serious concerns about predatory financial practices. Mrs Blouin is asking for a small slice of this nightmare to get a fair treatment as per contract law and re judicata respect for Plan , disclosure statement and JGB contract .

When BayPoint signed their contract and took control of the properties from day two , they assumed full responsibility for their actions, including any damages caused. Mrs. Blouin will pursue these damages in a separate court. However, the bankruptcy proceedings have presented a different set of challenges.

During court proceedings, JGB's representative, Mr. Nash, focused solely on the allocation of assets, ignoring the broader issues with the bankruptcy plan and the financial discrepancies at hand as he had no time . Mrs. Blouin's focus is not on asset allocation but on ensuring that the agreements and disclosures made are honored. The original plan and disclosure statement must be adhered to, but there are glaring gaps between what was agreed upon and the actions taken. These include misrepresentations of debt figures, and the removal of the line of renovation credit, which was a key component of the agreement.

The escalation of the debt from $41 million to $96 million ( see attachment charging JGB outside of DIP and then JGB included again in the $62 million – this is the only payoff we got ) is highly concerning and raises questions about predatory practices, false appraisals, and administrative exploitation. The jGB judgment and associated contractual obligations must be enforced. Mrs. Blouin asks the court to take  a slice of these discrepancies into account and uphold the original plan and disclosure statement

As the sole creditor, shareholder, and director, Mrs. Blouin places her full trust in the Court to act with fairness and integrity in this matter, ensuring that justice prevails. She reserves the right to initiate a separate legal action to seek damages for the significant harm caused to her financial standing and professional reputation. This harm stems from Bay Point's actions in self-promoting and making false insinuations that she owed them a much larger sum than is factual, while in reality, the opposite is true. Their conduct further included insinuations that she was bankrupt, which have led to unwarranted damage to her personal and professional standing.

*Summary of the MSPBNA Debt  on Aberdeen Enterprises Inc.*

For over two decades, Mrs. Blouin maintained a perfect relationship with Morgan Stanley and JPMorgan, who were trusted lenders for her estates. Additionally, prior to the bankruptcy proceedings, Aberdeen executed a mortgage on December 30, 2011, securing the MSPBNA Debt owed to Morgan Stanley Private Bank National Association (MSPBNA). This mortgage, recorded on February 6, 2012, created a first-priority lien on the Aberdeen property and was totally  independent from Brickchurch. The only link in the past  between  the  two estates was through a cross-guarantee in the event BrickChurch failed to fulfill its obligations however  through the JGB assigned judgment however Since the sale of the BrickChurch property

netted approximately $40,896,701, there were adequate funds to pay the entire allocation of $39,961,521 due under the JGB Foreclosure Judgment from the sale of BrickChurch.

*Aberdeen Debtor's Estate Responsibility: The remaining balance owed by the Aberdeen Debtor's estate, as per the JGB judgment, is $4,538,479, plus interest, totaling $5,049,058. This is in direct contrast to BayPoint's claim of $26,892,813.08 as the amount owed by Aberdeen Enterprises, Inc.*

The **MSPBNA mortgage** established MSPBNA's first-ranking position with a **$15,478,000.37** Mortgage on the Aberdeen property. In 2024 ``Aberdeen was valued at $75 million , Aberdeen sought a reasonable extension to address its financial obligations, which Morgan Stanley granted. However, BayPoint obstructed this process, causing significant delays.
While **Morgan Stanley was willing to extend the loan or refinance through Mrs. Blouin's** confirmed lender, **BayPoint's** *tortious interference* sabotaged these efforts. They sought to push the estate into an auction, intending to purchase it at a drastically reduced price. *Despite Mrs. Blouin having a refinancing option in place, BayPoint falsely informed Morgan Stanley that they had taken the control of the estate .*

*BayPoint was trying to orchestrate an auction, seeking to acquire the property for just $15.4 million ( Morgan Debt) ) despite its true value being estimated at $75 million .*

This was a calculated effort by BayPoint to exploit the situation of a maturity and to try to acquire the property at a grossly undervalued price. Charles Andros, CEO of BayPoint, falsely claimed he had never spoken to Morgan Stanley (as contrary evidenced in the attached WhatsApp message below ), and, in fact, was preparing a *coup d'état*,with Morgan Stanley supposedly refusing his calls as he plotted to seize control and push Aberdeen to an auction while Aberdeen had all
the proper options either refinance or extend with Morgan .

*Extract from the IRS objection above highlighting the plot of Bay Point to push the auction to re-sell ; Bay Point would first try to buy the 376 Property in a state court and then attempt to re-sell it, along with the 366 Property, through a Chapter 11 plan to be proposed in this bankruptcy case. See id ''*

In response, Mrs. Blouin took immediate action, hiring Nash, the lender's lawyer, to file for Chapter 11 protection to prevent Charles Andros and BayPoint from seizing
control. **The estate had no outstanding debt at the time**—only an opportunity for Morgan Stanley to extend or refinance the loan they were refinanced and after filing for Chapter 11 protection, the estate should have been dismissed from bankruptcy, as there was no outstanding debt .Bay Point tried to obstruct the Chapter 11 filing by Aberdeen Mrs. Blouin to pursue their auction route but they failed .

*BayPoint, driven by greed and fraud, continued to obstruct the process, exploiting the court proceedings for their own benefit while incurring excessive costs. Despite the refinancing with Morgan Stanley, BayPoint opposed the estate's exit from Chapter 11, even though no debt was due.*
This behavior mirrors BayPoint's prior interference in the Brickchurch case, where, despite refinancing the JGB debt and eliminating remaining obligation, BayPoint **obstructed the estate's exit from Chapter 11**. This prolonged the process and amounted to tortious interference.
*BayPoint attempted to manipulate the situation by blackmailing Mrs. Blouin into exiting Chapter 11 in exchange for her deeds (see email below). This occurred just days after signing the DIP loan agreement, despite prior agreements that the estate would exit to prevent a 40% devaluation.*
It was a condition of an earlier arrangement with Andros and the Nestseekers' manager that the estate exit Chapter 11. The buyer at $130 million and the banks required this as part of the deal, as they would not engage in a Chapter 11 environment due to reputational concerns. BayPoint's insistence on keeping the estate in Chapter 11, despite no debt being owed, caused a *significant 40% devaluation of the estate ( according to statistics )*. This issue will be addressed in a separate court proceeding where the full extent of BayPoint's misconduct will be examined and remedied.
*BayPoint's misuse of Chapter 11, particularly their attempts to blackmail the estate to stay in bankruptcy despite there being no debt, raises serious legal and ethical concerns. This situation has led to unnecessary delays, excessive trustee fees, and inflated legal costs, all of which could have been avoided had the estate exited bankruptcy as originally intended. Below is an explanation of the legal framework and potential consequences:*
*Legal Framework & Consequences*

1.  *Abuse of the Bankruptcy Process:*

*Bad Faith Filing: Bankruptcy proceedings are meant to help reorganize financially distressed companies or individuals. If Bay Point has manipulates the process for personal gain or refuses to allow a restructuring to proceed (despite no debt being owed), this may constitute an abuse of the bankruptcy process. Courts have the power to dismiss cases or impose sanctions under 11 U.S.C. § 105(a) for bad faith conduct or fraud in a bankruptcy case.*
*Case Law: In In re Integrated Telecom Express, Inc., 384 F.3d 108, 118 (3rd Cir. 2004), the court held that a bankruptcy case filed in bad faith can be dismissed, particularly if the purpose is to delay or harass creditors or to continue litigation when there is no legitimate reason for bankruptcy protection.*

2.  *Abusive Use of Chapter 11:*

*Fraudulent Conduct and Tortious Interference: BayPoint's actions could be classified as fraudulent misrepresentation or tortious interference. For example, forcing the estate to stay in Chapter 11 in exchange for releasing deeds, despite refinancing, could be considered extortion or undue influence.*
*Case Law: In re MacDonald, 755 F.2d 715 (9th Cir. 1985), establishes that debtors may seek to avoid abusive practices that interfere with the estate's ability to exit Chapter 11 and restructure.*
*Tortious Interference: In In re Lavigne, 114 F.3d 379 (2d Cir. 1997), the court found that creditors who intentionally obstructed the debtor's efforts to emerge from bankruptcy could be held liable for tortious interference with the bankruptcy proceedings.*

3.  *Excessive Legal Fees and Trustee Costs:*

015

*Trustee and Legal Fees: Under 11 U.S.C. § 330, bankruptcy courts review and approve the compensation of trustees, attorneys, and other professionals. If the estate is unnecessarily prolonged and the trustee's fees and legal expenses are excessive due to a creditor's obstruction, the court may adjust or disallow such fees.*

*Case Law: In In re Verna, 379 B.R. 831 (Bankr. D. Or. 2007), the court reduced fees for professionals in a case where bankruptcy was used to prolong litigation unnecessarily.Bay Point is responsible for all Trustee fees and legal fees related to obstruction and keeping entities in Chapter 11 when no debt was due .*

4.    *Misuse of Chapter 11 to Block or Delay Sale or Reorganization:*

*Bad Faith to Avoid Devaluation: A key aspect of the situation is that BayPoint's actions were motivated by a desire to prevent the sale at its full price to preserve control or reorganization, thereby causing the estate to lose value. If a party intentionally blocks or delays a sale to achieve a personal benefit, they could be found to be acting in bad faith under 11 U.S.C. § 1129(a)(3).*

*Case Law : In In re 1031 Tax Group, 374 B.R. 78 (Bankr. S.D.N.Y. 2007), the court found that delaying the exit from bankruptcy solely to manipulate the bankruptcy process for the benefit of a creditor constitutes bad faith and a violation of the reorganization plan.*

*BayPoint's actions appear to constitute a misuse of Chapter 11, as they sought to keep the estate in bankruptcy when no debt was owed, causing unnecessary delays and escalating costs. This behavior may be classified as fraudulent misrepresentation, abuse of the bankruptcy process, and tortious interference, all of which could justify sanctions, dismissal of the bankruptcy case, and potential damages. The estate's prolonged stay in Chapter 11 has also resulted in unnecessary legal and trustee fees, which could be subject to review and adjustment by the court.*

Tortious Interference with Contractual Relations

Tortious interference occurs when one party intentionally disrupts or undermines a contractual relationship or business expectation between other parties. In the context you described, if one lender is making false statements about the property owner to another lender (e.g., Morgan) with the intention of blocking refinancing or a sale, that lender may be liable for tortious interference with contract or business relations.

Relevant Case Law

1.    Tortious Interference with Business Relations:

Restatement (Second) of Torts § 766: A person is liable for tortious interference if they intentionally interfere with another's contractual relations or business expectations, causing harm to the party being interfered with. This includes fraudulent misstatements made to disrupt refinancing or business deals.

BayPoint intentionally spreads false information about the owner to the Morgan lender to prevent refinancing or force a sale, it would qualify as tortious interference under this standard.

Case Law:

*In re AdBox, Inc.*, 488 B.R. 17 (Bankr. S.D.N.Y. 2013): The court found that a party could be liable for tortious interference if it intentionally interfered with a party's efforts to secure financing or a sale, causing economic harm. In this case, the bankruptcy court allowed a claim for tortious interference based on false statements made to potential investors.

*In re 1031 Tax Group, LLC*, 374 B.R. 78 (Bankr. S.D.N.Y. 2007): The court in this case allowed a tortious interference claim to proceed  where lender /creditor in this case  intentionally made false representations to interfere with an asset sale, causing harm to the debtor's estate.

2.    Fraudulent Misrepresentation:

Fraudulent Misrepresentation in Interference: If the lender is making false statements (e.g., lying about the owner's financial condition) to prevent refinancing, the interference could rise to the level of fraudulent misrepresentation or fraudulent inducement which carries both tort and potential contractual liability.

Case Law:

*In re L.D. Debenture Corp.*, 222 B.R. 343 (Bankr. S.D.N.Y. 1998): The court found that intentional false statements made to induce a creditor to withhold financing constituted fraudulent misrepresentation, which could form the basis of a tortious interference claim.

*In re Richmond Produce Co.*, 195 B.R. 455 (B.A.P. 9th Cir. 1996): The court held that fraudulent misrepresentation made in connection with a bankruptcy filing, including interfering with refinancing efforts, is actionable and may justify the disallowance of claims.

Statutes and Bankruptcy Law

Bankruptcy Code – Bad Faith Acts:

11 U.S.C. § 1129(a)(3): This section requires that a bankruptcy plan be proposed in good faith. If a lender (like BayPoint) is acting in bad faith by intentionally interfering with refinancing or causing harm to the bankruptcy estate to benefit its own interests, the bankruptcy court could rule that the creditor's claims are ineligible for approval, or even that the plan itself cannot be confirmed.

BayPoint's actions (interfering with refinancing)  harmed the estate and benefit BayPoint's position (e.g., by trying to force an auction or sale), this would constitute bad faith under Section 1129(a)(3).

State Law – Tortious Interference:

Many state laws also govern tortious interference claims, and they typically follow similar standards to the Restatement (Second) of Torts § 766.

New York: In New York, tortious interference with contractual relations is governed by case law like *Lam v. SunTrust Bank*, 49 A.D.3d 303 (N.Y. App. Div. 2008), where the court ruled that false representations made by a third party to disrupt business relationships can give rise to a tortious interference claim.

California: In California, tortious interference is governed by cases like *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26 (Cal. 1998), which held that a party who interferes with a contract or prospective economic advantage through fraud or deceit can be held liable for damages.

BayPoint make false statements or interferes with a refinancing effort to benefit from the resulting harm (whether through blocking refinancing or forcing an auction), this could constitute tortious interference with contractual relations or fraudulent misrepresentation. Another Court may allow claims for these torts to proceed, and damages could be awarded to the party harmed by the interference .

Additionally, under 11 U.S.C. § 1129(a)(3), such bad faith actions can prevent a bankruptcy plan from being confirmed, and fraudulent conveyances may be avoided under 11 U.S.C. § 548.

### *Summary of BayPoint's Abusive Actions and Legal Consequences not part of this Appeal – for info*

*BayPoint's actions in the Aberdeen and Brickchurch estates represent a series of manipulative and abusive tactics designed to acquire high-value properties at deeply discounted prices, all while obstructing the legitimate bankruptcy process. These actions led to substantial financial losses, including a 40% devaluation of the properties due to unnecessary delays and misrepresentations.*

***BayPoint's refusal to facilitate the** exit from Chapter 11, **despite a refinancing offer and no debt in exhange for deeds backmail** see below email  that could have resolved the estates' financial issues, was a clear attempt to control the bankruptcy for their own financial benefit. CEO Charles Andros falsely claimed there were no buyers for the properties, despite an interested party offering $130 million, contingent on the estate exiting bankruptcy. This refusal to act not only harmed the estates' value but also alienated potential buyers, particularly high-net-worth individuals who avoid assets under Chapter 11. BayPoint's obstruction led to inflated legal fees and unnecessary delays, further eroding the estate's value and financial stability.*

*In addition to these financial manipulations, BayPoint engaged in fraudulent misrepresentation, tortious interference, and blackmail. They coerced Mrs. Blouin, the sole creditor, to remain in Chapter 11, blocking refinancing efforts and forcing the estate to stay in bankruptcy under the pretext of resolving debts that weren't owed. BayPoint even demanded the deeds to the properties in exchange for allowing the estate to exit Chapter 11, violating prior agreements. These actions also delayed renovations necessary for the properties to be marketed and sold. By withholding funds for over nine months, BayPoint effectively kept the properties off the market, resulting in the loss of interested buyers. When a buyer who had shown interest backed out, BayPoint falsely claimed there were no buyers, despite the fact that delays and obstructions were the true cause.*

***BayPoint's interference with the bankruptcy process** is a direct violation of both bankruptcy law and the principles of good faith. Their actions— particularly their manipulation of the Chapter 11 process —demonstrate a bad faith attempt to acquire valuable properties at a steep discount, leaving creditors, including the IRS, and the estate at a disadvantage.*

Legal Framework and Consequences for BayPoint

*BayPoint's actions constitute fraudulent misrepresentation, tortious interference, and abuse of the bankruptcy process. These tactics were aimed at manipulating the process for personal gain and delaying the resolution of the estate, causing unnecessary financial harm.*

Key Case Law:

- *In re Integrated Telecom Express, Inc., 384 F.3d 108 (3rd Cir. 2004): Bankruptcy proceedings can be dismissed if filed in bad faith with the intent to delay or harass creditors.*
- *In re MacDonald, 755 F.2d 715 (9th Cir. 1985): Creditors can be held accountable for interfering with the debtor's ability to exit bankruptcy.*
- *In re Verna, 379 B.R. 831 (Bankr. D. Or. 2007): Courts can reduce fees for professionals where bankruptcy proceedings are unnecessarily prolonged due to bad faith conduct.*
- *In re 1031 Tax Group, 374 B.R. 78 (Bankr. S.D.N.Y. 2007): Delays in bankruptcy proceedings to manipulate the process for the benefit of a creditor is bad faith.*

*BayPoint's manipulative tactics violated the bankruptcy process, driving up legal fees, causing significant delays, and preventing the sale of the estate at its true value. These actions have caused irreparable damage to the estates and left BayPoint exposed to legal consequences. The court must now take action to address BayPoint's misconduct, impose sanctions, and ensure that their interference does not continue to harm the estate's value and creditors.BayPoint's actions obstructed the bankruptcy process, manipulating it for financial gain by blocking legitimate refinancing and forcing the estates into prolonged Chapter 11 proceedings. CEO Charles Andros falsely claimed there were no buyers for the properties, despite a $130 million offer, causing a 40% devaluation. They also engaged in blackmail by demanding deeds to the properties in exchange for approving the exit from bankruptcy. These tactics, including delaying necessary renovations and inflating legal fees, violated bankruptcy law and caused substantial financial harm to the estates and creditors.*

### **Statement Regarding Andros' Claims and Relationship with Morgan**

The Aberdeen Debtor respectfully brings to the Court's attention that Andros has falsely claimed that he and his team were in control of the estate, a statement that is not only misleading but also entirely untrue. Andros asserted control over the estate, despite the fact that I, as the Debtor, the sole creditor, and the sole shareholder, was actively working to close my refinancing. Meanwhile, Andros publicly denied any contact or involvement with Morgan, despite being directly involved in pushing Morgan to proceed with an auction, a move that would significantly impact the estate. As detailed in the IRS's objection, Andros's behavior is contradictory and raises serious concerns about the integrity of his statements and actions throughout these proceedings. He falsely claimed to have control over the estate while simultaneously interfering with the refinancing process I had in place—attempting to push an auction  on Aberdeen while my refinancing was ready to close through which they could acquire assets at a fraction of their value, approximately $15 million, despite the estate being valued at $75 million. Moreover, Andros distanced himself from Morgan, despite being directly involved in discussions and decisions concerning the estatThis attempt to mislead the Court and interfere with my legitimate efforts to restructure the estate is not only detrimental but also undermines the fairness and transparency that are vital to these proceedings.



*Email below CEO of Bay Point Charles Andros asking for Mrs. Blouin deeds*
*From: Louise Blouin <lt@ltbholding.com>*
*Sent: Thursday, December 8, 2022 10:42:25 PM*
*To: Charles Andros <charlesandros@baypointadvisors.com>*
*Cc: Mathew Kabatoff <mkabatoff@ltbholding.com>*
*Subject: Re:*
*No Charles that is so terrible*
*From: Charles Andros <charlesandros@baypointadvisors.com>*
*Sent: Thursday, December 8, 2022 10:41:55 PM*
*To: Louise Blouin <lt@ltbholding.com>*
*Cc: Mathew Kabatoff <mkabatoff@ltbholding.com>*
*Subject: Re:*
*Deeds in lieu and we take it out of BK and you get 12 months. That's everything you've asked*
*for. I need to check with investment committee to make sure they'll do it. What do you think*

---

**Construction Delay and Loan Maturity Impact**

1. Loan Maturity and Renovation Line Release

- In June 2023, most of the renovation line was released at the end of the loan's maturity

- This release was expected to allow for further development, but construction was delayed

2. Damage from December 2023

- In December 2023, the delays in the renovation process caused significant damage, possibly impacting the project timeline and financial commitments

3. Additional Delay from August 2024 to January 2025

- Another delay occurred from August 2024 to January 2025, which was initially expected to take only 2 days (typically the time required to prepare an auction contract)

- However, the process extended unnecessarily for 6 months, causing further complications and financial strain on the project

- The line was for $1,585,773.29we were charged a 24 % or more on this line that was partly made available at the end of the mortgage .

**Construction Receipts from BayPoint to ABE, Maturity of the mortgage June / being charge 24 % on money never released until the end**

| Month | Amount (EUR) |
|---|---|
| Apr-23 | 150,000.00 |
| Jun-23 | 76,135.20 |
| Jul-23 | 604,520.56 |
| Aug-23 | 267,892.19 |
| Nov-23 | 44,230.37 |
| **Total** | **1,142,778.32** |

EXHIBIT 1: Bay Point Payoff Letter                                        P.22

EXHIBIT 2: Bay Point Capital Partners II, LP's Disclosure Statement       P.26

EXHIBIT 3: Bay Point Capital Partners II, LP's Chapter 11 Liquidating Plan  P.67

EXHIBIT 4: Liquidating Plan objection by IRS                              P.107

EXHIBIT 5: JGB Judgment of Foreclosure and Sale                          P.119

EXHIBIT 6: Memorandum concerning JGB                                     P.136

EXHIBIT 7: Bay Point Nefarious Scheme                                    P.143

EXHIBIT 8: Original Aberdeen Objection                                   P.153

EXHIBIT 9: Procedural Validity of Appeal                                 P.167

EXHIBIT 10: Claw back Clause                                             P.179

EXHIBIT 11: Bay Point Distribution A                                     P.181

EXHIBIT 12: Bay Point Distribution B                                     P.183

EXHIBIT 13: Plan Distribution – Schedule A                               P.185

EXHIBIT 14: Blouin Objection to Bay Point Joint Liquidating Plan         P.187

EXHIBIT 1: Bay Point Payoff Letter

# BAY POINT CAPITAL PARTNERS II, LP

3050 Peachtree Road NW, STE 740 Atlanta, Georgia 30305

January 24, 2024

*Via U.S. Mail and Email*

Brickchurch Enterprises, Inc.　　　　　　Aberdeen Enterprises, Inc.
One Liberty Plaza　　　　　　　　　　　One Liberty Plaza
165 Broadway, 23rd Floor　　　　　　　　165 Broadway, 23rd Floor
accounts@ltbholding.com　　　　　　　　accounts@ltbholding.com

Re:　　Payoff Request regarding (i) that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered on September 7, 2022 in favor of Morgan Stanley Private Bank, National Association in the case captioned as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.* pending in the Supreme Court of the State of New York, Suffolk County (the "MSPBNA Judgment"), the MSPBNA having been assigned to Bay Point Capital Partners II, LP ("Lender"); and (ii) that certain Loan and Security Agreement, dated as of November 9, 2022, by and between Lender, on one hand, and Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc. (collectively, "Borrowers," and each a "Borrower"), on the other hand (the "Loan Agreement" and collectively with all related documents, the "BPCP Loan Documents"); the MSPBNA Judgment and the BPCP Loan Documents being collectively referred to herein as the "Debt Documents."[1]

Dear Borrowers:

You have requested the amount necessary to satisfy the outstanding obligations currently due under the Debt Documents. In response to your request, please find the following breakdown of the outstanding obligations currently due under the respective Debt Documents (the "Payoff Amount"):

|  |  |  |
|---|---:|---:|
| **MSPBNA Judgment** | | |
| Judgment: | $ | 15,478,000.37 |
| Post-Judgment Interest:[2] | $ | 667,886.32 |
| **Subtotal** | **$** | **16,145,886.69** |
| | | |
| **JGB Judgment** | | |
| Judgment | $ | 39,961,521.80 |
| Fees and Costs | $ | 1,125.00 |
| Post-Judgment Interest:[3] | $ | 12,168,200.00 |
| Forbearance Exit Charge | $ | 2,000,000.00 |
| Late Charge | $ | 1,527,183.00 |
| Miscellaneous Expenses | $ | 98,623.56 |
| Real Estate Taxes | $ | 229,796.95 |
| **Subtotal** | **$** | **55,986,450.31** |

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.

[2] Post-judgment interest is calculated at nine percent (9.00%) per annum under New York law. NY CPLR § 5004.

[3] Post-judgment interest is calculated at nine percent (9.00%) per annum under New York law. NY CPLR § 5004.

**DIP Loan**

| | | |
|---|---|---|
| Principal: | $ | 61,916,114.53 |
| Interest:[4] | $ | 3,907,294.72 |
| Default Interest:[5] | $ | 5,470,212.61 |
| Late Fee:[6] | $ | 6,056,195.81 |
| Legal/Professional (Est.): | $ | 2,771,298.11 |
| **Subtotal** | **$** | **80,121,115.78** |
| | | |
| **Total:** | **$** | **96,267,002.47** |

The above-referenced Payoff Amount is good through January 24, 2024 (the "Payoff Calculation Date"). Additional interest and fees (including legal/professional) will continue to accrue for each day after the Payoff Calculation Date. In addition, Lender may make additional protective advances after the Payoff Calculation Date for which it is entitled to reimbursement under the BPCP Loan Documents. Lender reserves all of its rights under the Debt Documents, and the documents, instruments, and security documents referenced therein or related thereto, and the above-referenced Payoff Amount is not a waiver of any rights, claims, or defenses available to Lender, including, without limitation, any rights of indemnity that may currently exist under the Debt Documents or which may arise and/or exist in the future.

The above amounts may be wired as follows:

| | |
|---|---|
| Bank: | BMO HARRIS BANK NA |
| Bank Address: | 111 W. Monroe St., |
| | Chicago, IL 60603 |
| ABA No.: | 071000288 |
| Account Name: | BAY POINT CAPITAL PARTNERS II, LP |
| Account Number: | 1834688 |
| Reference: | Brickchurch |

Should you have additional questions, please feel free to contact me.

---

[4] Interest calculated at ten percent (10.00%) per annum pursuant to Section 2.4(a) of the Loan Agreement.

[5] Default interest calculated at fourteen percent (14.00%) per annum pursuant to Section 2.4(b) of the Loan Agreement.

[6] Late fee calculated at ten percent (10.00%) of the outstanding principal balance of the Loan due on the Maturity Date pursuant to Section 2.8 of the Loan Agreement.

Sincerely,

**BAY POINT CAPITAL PARTNERS II, LP**

By:  BAY POINT ADVISORS, LLC, its
General Partner

By: *Charles Andros*
Name:  Charles Andros
Title:   Manager
Phone: 404-512-1648
Email: charlesandros@baypointadvisors.com

EXHIBIT 2:

Bay Point Capital Partners II, LP's Disclosure Statement

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:                                                    Chapter 11

ABERDEEN ENTERPRISES, INC.,                               Case No. 23-72834-AST
BRICKCHURCH ENTERPRISES, INC.                             Case No. 22-70914-AST

                                        Debtors.          Jointly Administered
--------------------------------------------------------x

## BAY POINT CAPITAL PARTNERS II, LP'S
## DISCLOSURE STATEMENT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE, WHICH APPROVAL WILL BE SOUGHT IN CONJUNCTION WITH CONFIRMATION OF BAY POINT CAPITAL PARTNERS II, LP'S DISCLOSURE STATEMENT FILED CONTEMPORANEOUSLY HEREWITH PURSUANT TO A COMBINED HEARING AS PERMITTED BY 11 U.S.C. § 105(d)(2)**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## I.
## INTRODUCTION

Bay Point Capital Partners II, LP ("Bay Point") has filed a Plan of Liquidation (as may be amended, modified or supplemented, the "Plan")[1] for Aberdeen Enterprises, Inc. ("Aberdeen") and Brickchurch Enterprises, Inc. ("Brickchurch") (each a "Debtor", and collectively, the "Debtors") with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), which sets forth the manner in which claims against and interests in the Debtors will be treated.  In essence, the Plan is predicated upon an auction of the Properties and the distribution of the proceeds of the sale to creditors.  Bay Point submits this Disclosure Statement (as may be amended, modified or supplemented, the "Disclosure Statement") pursuant to 11 U.S.C. § 1125 in support of the Plan to all known holders of Claims against, or Interests in, either or both of the Debtors in order to adequately disclose information deemed to be material, important and necessary for creditors to make a reasonably informed decision whether to accept or reject the Plan.

### A.      Summary of the Plan

The Plan provides for the means of liquidating the assets of the Debtors and distributing the proceeds thereof through a coordinated auction sale (the "Sale") of their valuable and iconic

---

[1] Unless otherwise defined, all capitalized terms have the meanings ascribed to them in the Plan.

contiguous ocean front properties located at 366 and 376 Gin Lane, Southampton, New York (collectively, the "<u>Properties</u>", each being a "<u>Property</u>"). Bay Point believes that the Plan presents the best means currently available for their orderly liquidation and distribution of the resulting proceeds to the holders of Allowed Claims. The auction was held on January 24, 2024, at which time a High Bid (as such term is defined in the Approved Bid Procedures) was selected with respect to both Properties.

A hearing to confirm the Sale and the Plan is scheduled for **February 13, 2024**, and the Closing is expected to occur on or before **February 20, 2024**. Although Bay Point believes the Sale will provide the maximum possible recovery for creditors and equity security holders, the Net Sale Proceeds will not be sufficient to pay all Allowed Claims in full. As a result, holders of Claims in Classes 1 and 4, and Equity Interests in Class 5, will be impaired, and holders of certain Administrative Expense Claims will be asked to accept less than full payment in order to provide the maximum recovery available to them. The Debtors will not receive a discharge under the Plan.

**B.     The Scope of this Disclosure Statement**

As noted above, the purpose of this Disclosure Statement is to provide Creditors and other parties-in-interest with relevant information regarding the Debtors' current financial affairs and their respective treatment under the Plan.  Bay Point shall seek approval of the Disclosure Statement by the Bankruptcy Court as containing adequate information within the meaning of 11 U.S.C. § 1125 at a combined hearing as noted below.  The Bankruptcy Court's approval of the Disclosure Statement, however, does not constitute an endorsement of the Plan.  Instead, creditors are urged to review the Plan in its entirety to make an informed decision to accept or reject the Plan.

**C.     Combined Hearing**

The combined hearing pursuant to 11 U.S.C. § 105(d)(2) to consider approval of the Disclosure Statement and confirmation of the Plan under 11 U.S.C. § 1129 shall be held, in person, on **February 13, 2024 at 10:00 a.m.** (prevailing New York time) before the Honorable Alan S. Trust, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Courtroom 960, Central Islip, New York 11722 (the "<u>Combined Hearing</u>").  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan or approval of the Disclosure Statement shall be filed in writing through the Court's ECF system on or before **February 6, 2024**.  The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Combined Hearing via notice on the docket.

II.

<u>DISCLAIMERS</u>

**ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE**

2

TO THE PLAN, ANY AND ALL SUPPLEMENTS TO THE PLAN AND ANY EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS RELATING TO THE SALE OF THE PROPERTIES. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF PROVIDING CREDITORS AND OTHER PARTIES IN INTEREST WITH INFORMATION IN CONNECTION WITH BAY POINT'S REQUEST FOR CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, THE PROPERTIES AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS AND PRIOR COURT FILINGS. NEITHER BAY POINT NOR ANY OTHER PARTY MAKE ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.

THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS, BAY POINT, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE LIQUIDATION AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED

028

ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## III.

## SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS

The table below briefly summarizes the specific classification and treatment of Claims and Interests under the Plan.  As provided in the Plan, Administrative Expense Claims (including Professional Fee Claims), Priority Tax Claims, and Bankruptcy Fees have not been classified and are excluded from classification in accordance with Section 1123(a)(1) of the Bankruptcy Code:

| Class | Type of Claim or Interest | Treatment | Estimated Claim Amount (By Class) | Estimated Recovery |
|---|---|---|---|---|
| N/A | DIP Lender Superpriority Claim | Bay Point shall be paid from the Section 1146 Funds, on account of its DIP Lender Superpriority Claim, an amount not less than $989,652.66 on the Distribution Date. | $14,766,703.83[2] | 6.75% |
| N/A | IRS Administrative Expense Claim | Subject to Section 5.2 of the Plan with respect to Disputed Claims, the IRS shall be paid from the Section 1146 Funds, on account of any Allowed Administrative Expense Claim, the amount of $1,000,000 on the Distribution Date. | N/A | N/A |
| N/A | IRS Priority Tax Claim | Subject to Section 5.2 of the Plan with respect to Disputed Claims, the IRS shall be paid from the Section 1146 Funds, on account of any Priority Tax Claim, the amount of $1,000,000 on the Distribution Date; *provided*, that the amount of the distribution on any IRS Priority Tax Claim will be reduced by the | N/A | N/A |

---

[2] The estimated claim amount of the DIP Lender Superpriority Claim assumes payment of $66,468,902.01 to Bay Point on account of its Class 1 Allowed Secured Claim.

| | | | | |
|---|---|---|---|---|
| | | amount of the distribution on any IRS Allowed Administrative Expense Claim. | | |
| N/A | State of New York Priority Tax Claim | The New York State Department of Taxation and Finance has asserted Unsecured Priority Tax Claims in the total amount of $161.39 (the "**Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance**"). *See* Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834; *see also* Am. Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914. The Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance shall be paid in full from the Section 1146 Funds on the Effective Date. | $161.39 | 100% |
| N/A | Professional Fee Claims | All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. No later than three (3) Business Days prior to the Confirmation Hearing, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through Confirmation, and (c) a good faith estimate of any expected post-confirmation fees and expenses. Each holder of a | Brickchurch: $286,905.95

Aberdeen: $100,000 | 100% |

5

| | | | | |
|---|---|---|---|---|
| | | Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request. No later than three (3) Business Days prior to the Effective Date, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through the Effective Date, and (c) a good faith estimate of any expected post-Effective Date fees and expenses (if any). Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request; *provided*, *however*, the Allowed Professional Fee Claim of Simmons Legal PLLC shall not exceed $135,000, the Allowed Professional Fee Claim of Goldberg Weprin Finkel Goldstein LLP shall not exceed $100,000, and the Allowed Professional Fee Claim of Duane Morris shall not exceed $151,905.95.<br><br>Each holder of an Allowed Professional Fee Claim shall be paid, in full satisfaction of its Allowed Administrative Expense Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan upon the later of (a) the Distribution Date and (b) the date | | |

| | | upon which the Order Allowing such Professional Fee Claim becomes a Final Order. Payments made to a Professional in accordance with the provisions of Section 2.1 shall constitute payment in full of the Professional's Allowed Professional Fee Claim, and the Professional shall have no further recourse against the Plan Administrator, the Debtors, or Bay Point for such Claim. | | |
|---|---|---|---|---|
| N/A | Bankruptcy Fees | The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 from the Effective Date through the date of dismissal, conversion or entry of a final decree, shall be paid from the Bankruptcy Fees Reserve.<br><br>The Bankruptcy Fees payable to the Plan Administrator shall be paid within five (5) business days, or as soon as reasonably practicable thereafter, after the date that such Claim is Allowed by Final Order of the Bankruptcy Court. No later than twenty-one (21) Business Days prior to the hearing on the allowance of such Claim, the Plan Administrator shall serve upon counsel for Debtors, the United States Trustee, Bay Point, and any other Creditor requesting such information: (a) the current amount of its unpaid Bankruptcy Fees, and (b) a good faith estimate of its expected | $500,000 - $600,000 | 100% |

032

| | | | | |
|---|---|---|---|---|
| | | unpaid Bankruptcy Fees (if any) through dismissal, conversion or entry of a final decree.<br><br>The Debtors shall use the Sale Proceeds and/or Section 1146 Funds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan. | | |
| 1 | Secured Claims of Bay Point | Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie,* to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order. | $88,699,991.70, plus interest and other amounts to which Bay Point is entitled under the Bay Point Loan Documents that has accrued since September 19, 2023.<br><br>For the avoidance of doubt, the Debtors dispute whether Bay Point is entitled to certain amounts that have been included in the above-referenced estimate and reserve all of their rights with respect to the same. | $82,928,317.25 |

033

| | | | | |
|---|---|---|---|---|
| | | Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11 U.S.C. § 506(b) and the DIP Financing Order. | | |
| | | For the avoidance of doubt, nothing contained herein shall prejudice any right that Debtors may have to challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *provided, however, that* nothing contained herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided that* Debtors' reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; and *further provided that* Debtors' reservation of rights shall not impair Bay | | |

| | | | | |
|---|---|---|---|---|
| | | Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order. | | |
| 2 | Secured Claims of New York State Department of Taxation and Finance | The holder of the Allowed Secured Claims of the New York State Department of Taxation and Finance shall be paid in full, in accordance with the priority provision set forth in Sections 5.8 and 5.9 of the Plan, from the Sale Proceeds at Closing.<br><br>Class 2 is unimpaired under the Plan and, therefore, the holder of the New York State Department of Taxation and Finance's Secured Claims is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan. | $2,165.99<br><br>This amount includes: (i) the secured portion Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834, in the amount of $168.20; and (ii) the secured portion of Amended Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914, in the amount of $1,997.79. | 100% |
| 3 | Non-Tax Priority Claims | Bay Point does not believe there are any Non-Tax Priority Claims. To the extent there are any such Claims, they shall be paid in full from the Sale Proceeds, provided that the aggregate amount of all Allowed Non-Tax Priority Claims does not exceed $5,000. | $0 | 100% |
| 4 | General Unsecured Claims | Class 4 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. | $10,863,863, which includes (i) the disputed insider claim of Louise Blouin, (ii) the disputed Unsecured Claim of $250,000 filed | 0% |

035

| | | | by the IRS, (iii) the $94,012.98 Claim of Dream Yard Landscaping, and (iv) filed and scheduled Claims totaling approximately $100,000. | |
|---|---|---|---|---|
| 5 | Equity Interests | Class 5 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. | N/A | N/A |

## IV.

## RELEVANT BACKGROUND INFORMATION

Louise Blouin ("Ms. Blouin") acquired the Properties at 366 Gin Lane, Southampton, NY (the "Brickchurch Property") and 376 Gin Lane, Southampton, NY (the "Aberdeen Property") in 1998 through separate real estate holding companies in which Ms. Blouin is ultimately the beneficial owner. The corporate structure is as follows:



Gin Lane is in the estate section of Southampton Village, which has historically been home to wealthy and influential people including members of the Ford, Du Pont, Eisenhower, Vanderbilt and Morgan families. The Properties, although separately zoned as 2-acre lots, form a 4-acre compound with 400 feet of bulkhead beach front on the Atlantic Ocean. The 376 Property consists of the main house, designed in 1890 by Stanford White. The cottage on the 366 Property was torn down in 2002 and replaced with a 13-room home, featuring a pool, cinema, and tennis court.

036

### A.    The Events Leading to the Brickchurch Bankruptcy Case

On or about July 25, 2018, JGB Partners LP and certain of its affiliates (collectively, "JGB") loaned Debtors $29 million dollars, which debt was evidenced by a note executed by Debtors in favor of JGB (the "JGB Note"). To secure Debtors' obligations under the JGB Note, Debtors granted JGB a mortgage on the Properties (collectively, the "JGB Mortgage"). The JGB Mortgage is a first-priority lien on the Brickchurch Property and a second-priority lien on the Aberdeen Property junior to a mortgage lien originally held by Morgan Stanley Private Bank, National Association ("Morgan Stanley" or "MSPBNA"). Debtors defaulted under the terms of the JGB Note and, as a result of a cross-default under the Morgan Stanley mortgage, MSPBNA initiated suit against Debtors, among others, pursuant to which JGB sought a foreclosure sale of the Properties. JGB obtained a judgment against Debtors, jointly and severally, on the JGB Note in the amount of $39,961,521.80, plus costs and interest (the "JGB Judgment") and an order of foreclosure entitling it to sell the Brickchurch Property and then the Aberdeen Property.

On April 30, 2022, Brickchurch commenced its Chapter 11 case (the "Brickchurch Bankruptcy Case") to forestall the foreclosure sale of the Brickchurch Property, refinance its secured debt and/or sell the Properties in an orderly fashion with the benefit of the protections of the Bankruptcy Code. In the Brickchurch Bankruptcy Case, the Court established (i) July 11, 2022, as the general proof of claim bar date, and (ii) October 31, 2022, as the governmental proof of claim bar date. *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914, D.I. 7.

### B.    The DIP Loan

On October 21, 2022, Brickchurch filed a motion (the "Refinancing Motion") seeking authorization from the Court to refinance the outstanding original amount owed to JGB pursuant to a settlement agreement reached between the Debtor and JGB.  Payment to JGB was to be financed through a post-petition debtor-in-possession loan (the "DIP Loan") from Bay Point, pursuant to a certain Loan and Security Agreement (the "DIP Loan Agreement").

On November 16, 2022, the Court entered its *Order (I) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Liens and Super-Priority Claims* (the "DIP Financing Order"), pursuant to which it, among other things, (i) authorized Debtors to obtain a loan (the "DIP Loan"), in the original principal amount of $62 million, from Bay Point under the terms of the DIP Loan Documents with the proceeds of the DIP Loan to be used for, among other things, the payment of $44.5 million to JGB, a payment to Morgan Stanley as consideration for its agreement to forbear from exercising its rights as a first lienholder against the Aberdeen Property, payment of certain mechanics liens, interest reserves, and payment of related fees and expenses; (ii) authorized an assignment by JGB, without recourse, of all of its loan documents, the JGB Judgment, and its proofs of claim to Bay Point (collectively, the "JGB Assignment"); (iii) granted Bay Point superpriority administrative claims and non-priming liens on the DIP Collateral (as defined in the DIP Loan Agreement) in accordance with section 364 of the Bankruptcy Code; (iv) authorized the Debtor to borrow under the DIP Loan Documents; and (v) provided additional time for the Debtors to market the Properties.  On December 12, 2022, the Debtor filed a Notice confirming that the DIP Loan had closed.

12

For the next six months, the Properties were listed for sale on the MLS system for a combined price of $150 million ($85 million (Aberdeen Property) and $65 million (Brickchurch Property), respectively). The asking price was determined pursuant to independent third-party appraisals and/or broker price opinions that were obtained in or around August 2022. During the six months after the funding of the DIP Loan, the Debtors utilized certain proceeds of the DIP Loan to make additional improvements to the Properties.

On June 9, 2023, the Debtors defaulted on the DIP Loan by failing to pay the amounts due thereunder (the "Event of Default"). After the Event of Default, Bay Point and Debtors continued negotiations regarding a consensual plan of reorganization and/or other process by which the Properties could be sold, refinanced, and/or by which Brickchurch could exit bankruptcy.

### C.    The Disputed IRS Claims

Prior to the commencement of the Brickchurch Bankruptcy Case, the IRS assessed disputed penalties against Ms. Blouin in connection with Ms. Blouin's ownership of a business unrelated to the Properties or to any of the other companies identified above in the Debtors' corporate structure.

On August 17, 2022, the IRS filed a Notice of Federal Tax Lien against Brickchurch in which the IRS asserted that Brickchurch was the "nominee" of Blouin. After a dispute arose between Brickchurch, Bay Point, and the IRS regarding whether the filing of the lien against Brickchurch was void as a violation of the automatic stay, the IRS agreed to withdraw such lien. As such, any Claim that the IRS may hold against Brickchurch is unsecured.

On February 17, 2023, the IRS filed a Notice of Federal Tax Lien against Aberdeen in which the IRS asserted that Aberdeen was the "nominee" of Blouin.

Both the underlying tax assessment against Blouin and the tax lien filed against the Aberdeen Property are in dispute following the commencement of litigation in the District Court for the Eastern District of New York entitled *Aberdeen Enterprises, Inc. and Louise Blouin v. United States of America*, 2:22-cv-07190-LDH-AYS and related Bankruptcy Court objections (the "IRS Claim Litigation").

### D.    The Events Leading to the Aberdeen Bankruptcy Case

On or about December 30, 2011, MSPBNA loaned Aberdeen's ultimate beneficial owner Louise Blouin ("Blouin") $15 million dollars, which debt was evidenced by a note executed by Blouin in favor of MSPBNA (the "MSPBNA Note"). To secure Blouin's obligations under the MSPBNA Note, Aberdeen granted MSPBNA a mortgage on the Aberdeen Properties (the "MSPBNA Mortgage"). The MSPBNA Mortgage is a first-priority lien on the Aberdeen Property. Debtors defaulted under the terms of the MSPBNA Note and, as a result, MSPBNA initiated suit against Blouin and Aberdeen, among others, pursuant to which MSPBNA sought a foreclosure sale of the Aberdeen Property. MSPBNA obtained a judgment against Blouin and Aberdeen on the MSPBNA Note in the amount of $16,522,340.23, plus costs and interest, and an order of foreclosure entitling it to sell the Aberdeen Property.

As referenced above, MSPBNA agreed (the "MSPBNA Forbearance Agreement") to forbear on its right to foreclose on the Aberdeen Property until June 9, 2023 as a result of a $2.6 million payment made to MSPBNA from the DIP Loan proceeds. On June 9, 2023, Aberdeen defaulted under the terms of the MSPBNA Forbearance Agreement and MSPBNA scheduled a foreclosure sale of the Aberdeen Property for August 3, 2023.

On August 2, 2023, Aberdeen commenced its Chapter 11 case (the "Aberdeen Bankruptcy Case") to forestall the foreclosure sale of the Aberdeen Property, refinance its secured debt and/or sell the Properties in an orderly fashion with the benefit of the protections of the Bankruptcy Code. In the Aberdeen Bankruptcy Case, the Court established (i) November 30, 2023, as the general proof of claim bar date, and (ii) January 29, 2024, as the governmental proof of claim bar date. *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834, D.I. 73

The Aberdeen Bankruptcy Case is now being jointly administered with the Brickchurch Bankruptcy Case pursuant to this Court's *Order Granting Motion for Joint Administration* entered on September 6, 2023.

### E.    MSPBNA Assigns the MSPBNA Judgment and Related Documents to Bay Point

On August 2, 2023, MSPBNA assigned the MSPBNA Judgment, the MSPBNA Mortgage, and related instruments and documents (the "MSPBNA Assignment") to Bay Point. As such, Bay Point is the holder of all rights and claims that were part of the MSPBNA Assignment, including the right to enforce the MSPBNA Judgment.

### F.    The Dispute Regarding Control of the Debtors

Prior to the commencement of the Aberdeen Bankruptcy Case, Bay Point alleges to have taken actions authorized under the DIP Loan Documents and applicable law to remove the officer(s) and director(s) and replace the same with Bay Point's chosen officer and director. Debtors, Aberdeen Enterprises (BVI) LTD, and Brickchurch Enterprises (BVI) LTD dispute that the actions of Bay Point effectuated the removal and replacement of Debtors' officers and directors. The issue of who is/are the authorized director(s) and officer(s) of Debtors is currently pending before the Bankruptcy Court. However, the Debtors have filed the Plan and Disclosure Statement with the consent of Bay Point in the hope that the Debtors can effectuate Sales of the Properties without the need for judicial determination of the control issue. Pursuant to the terms of the Plan, decisions of the Debtors will be made by the joint decision of Bay Point and Mathew Kabatoff ("Kabatoff").

### G.    The Sale Process

On September 5, 2023, the Debtors filed a *Joint Motion Seeking Entry of an Order Under Bankruptcy Code Sections 363(a), (b), (f), and (m) and Bankruptcy Rules 2002, 6004, and 9004: (I) Authorizing Debtors to Sell to the Highest and Best Bidder at an Auction Sale the Estates' Interest in the Real Properties Known as (a) 366 Gin Lane, Southampton, New York 11968 and (b) 376 Gin Lane, Southampton, New York 11968; and (II) Scheduling a Hearing to Approve Such Sale to the Highest and Best Bidder; and (III) Approving Certain Bidding Procedures; and (IV) Approving the Manner and Extent of Notice of Such Auction Hearing* [D.I. 46] (the "Sale Motion").

14

On November 22, 2023, the Court entered that certain *Order Approving Bid Procedures* [D.I. 104] (the "Sale Order"). Among other things, the Sale Order granted the Sale Motion and authorized and approved those certain *Bidding Procedures* [D.I. 67-1], which were subsequently modified pursuant to those certain *First Amended Approved Bidding Procedures* [D.I. 116] (the "Approved Bid Procedures").

On January 12, 2024, the Debtors and Bay Point filed a *Joint Application and Motion for an Order (I) Authorizing the Retention of Concierge Auctions, LLC as Auctioneer, and (II) Modifying or Granting Relief from E.D.N.Y. LBR 6005-1(C)* [D.I. 140] (the "Application to Employ"). Among other things, the Application to Employ sought Court authorization for the Debtors to employ and retain Concierge Auctions, LLC to market the Properties through the conclusion of the Live Auction, and (ii) conduct and hold the Live Auction. The Application to Employ was granted by Order entered January 26, 2024 [D.I. 163].

Pursuant to the Approved Bid Procedures, the Debtors sought to offer the Properties for Sale, collectively and individually, contemporaneously through a Private Sale Process and an Auction Process (as those terms are defined in the Approved Bidding Procedures). Pursuant to the Private Sale Process, the deadline for the Debtors to accept a Qualified Offer (as such term is defined in the Approved Bid Procedures) was January 14, 2024. Contemporaneously with the Private Sale Process, the Debtors offered the Properties for Sale, collectively and individually, via a no reserve auction (the "Auction"). The Auction was conducted via digital bidding and concluded at a live auction at the Sotheby's Auction House on January 24, 2024 (the "Live Auction").

### H.    Results of The Live Auction

#### a)    The Aberdeen Property

At the Live Auction, the High Bid for the Aberdeen Property was $40,500,000. The Buyer's Premium (as that term is defined in the Approved Bidding Procedures) was $3,660,000. Thus, the expected Gross Sale Proceeds from the Sale of the Aberdeen Property will be $44,160,000. The bid enhancement applicable to the Aberdeen Property is $1,501,440 (i.e., 3.4% of the Gross Sale Proceeds) (the "**Aberdeen Property Bid Enhancement**"), which amount shall constitute the portion of the Section 1146 Funds arising from the Sale of such Property. The Debtors anticipate that the following costs and expenses incurred in connection with the Sale will be satisfied from the Gross Sale Proceeds: (i) $405,000 for the Listing Broker's Fee, (ii) $405,000 for the Buyer's Broker's Fee, (iii) $810,000 for the Auctioneer's Fee, and (iv) up to $50,000 for the Auctioneer's expenses (collectively, the "**Aberdeen Sale Expenses**"). The Aberdeen Sale Expenses shall be paid upon entry of the Sale Approval Order. Article V.(D) of this Disclosure Statement provides details on the distribution of the Net Sale Proceeds under the Plan.

#### b)    The Brickchurch Property

At the Live Auction, the High Bid for the Brickchurch Property was $38,500,000. The Buyer's Premium (as that term is defined in the Approved Bidding Procedures) was $3,420,000. Thus, the expected Gross Sale Proceeds from the Sale of the Brickchurch Property will be $41,920,000. The bid enhancement applicable to the Brickchurch Property is $1,425,280 (i.e., 3.4% of the Gross Sale Proceeds) (the "**Brickchurch Property Bid Enhancement**"), which

amount shall constitute the portion of the Section 1146 Funds arising from the Sale of such Property. The Debtors anticipate that the following costs and expenses incurred in connection with the Sale will be satisfied from the Gross Sale Proceeds: (i) $385,000 for the Listing Broker's Fee, (ii) $385,000 for the Buyer's Broker's Fee, (iii) $770,000 for the Auctioneer's Fee, and (iv) up to $50,000 for the Auctioneer's expenses (collectively, the "**Brickchurch Sale Expenses**"). The Brickchurch Sale Expenses shall be paid upon entry of the Sale Approval Order.  Article V.(D) of this Disclosure Statement provides details on the distribution of the Net Sale Proceeds under the Plan.

### I.    Hearing to Confirm the Sale and Confirm the Plan

A hearing to confirm the Sale and the Plan is scheduled for **February 13, 2024**, and the Closing is expected to occur on or before **February 20, 2024**. Although Bay Point believes the Sale provides the maximum possible recovery for creditors and equity security holders, the Net Sale Proceeds will not be sufficient to pay all Allowed Claims in full. As a result, holders of Claims in Classes 1 and 4, and Equity Interests in Class 5, will be impaired, and holders of certain Administrative Expense Claims will be asked to accept less than full payment in order to provide the maximum recovery available to them. The Debtors will not receive a discharge under the Plan.

### V.
### SUMMARY OF THE PLAN OF LIQUIDATION

### A.    UNCLASSIFIED CLAIMS

Pursuant to Section 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims (including Professional Fee Claims), Priority Tax Claims, or Bankruptcy Fees, all of which shall be paid in full or such other amount as agreed upon with the holders of such unclassified Claims.

**Administrative Expense Claims**.  Each holder of an Allowed Administrative Expense Claim—other than the DIP Lender Superpriority Claim, Bankruptcy Fees and any Allowed Administrative Expense Claim held by the IRS—shall be paid in full satisfaction of its Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan. Payment shall be made on (a) the later of (i) the Distribution Date, (ii) the date payment of such Claim is due under the terms thereof or applicable law, and (iii) three (3) Business Days after such Claim becomes an Allowed Claim; or (b) upon such other terms as may be agreed to, in writing, between the Debtors and the holder of such Claim.

Except as otherwise set forth herein, requests for payment of Administrative Expense Claims not previously Allowed must be filed no later than the Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims not previously Allowed that do not file requests for payment of Administrative Expense Claims on or before the Administrative Expense Claim Bar Date shall be forever barred from asserting such Claims against the Debtors or the Properties.

**Professional Fees and Broker Commissions**.  All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the

041

date that is thirty (30) days after the Effective Date. No later than three (3) Business Days prior to the Confirmation Hearing, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through Confirmation, and (c) a good faith estimate of any expected post-confirmation fees and expenses. Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request. No later than three (3) Business Days prior to the Effective Date, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through the Effective Date, and (c) a good faith estimate of any expected post-Effective Date fees and expenses (if any). Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request; *provided, however,* the Allowed Professional Fee Claim of Simmons Legal PLLC shall not exceed $135,000, the Allowed Professional Fee Claim of Goldberg Weprin Finkel Goldstein LLP shall not exceed $100,000, and the Allowed Professional Fee Claim of Duane Morris shall not exceed $151,905.95.

Each holder of an Allowed Professional Fee Claim shall be paid, in full satisfaction of its Allowed Administrative Expense Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan, upon the later of (i) the Distribution Date and (ii) the date upon which the Order Allowing such Professional Fee Claim becomes a Final Order. Payments made to a Professional in accordance with the provisions of Section 2.1 shall constitute payment in full of the Professional's Allowed Professional Fee Claim, and the Professional shall have no further recourse against the Plan Administrator, the Debtors, or Bay Point for such Claim.

**Priority Tax Claims**.  The New York State Department of Taxation and Finance has asserted Unsecured Priority Tax Claims in the total amount of $161.39 (the "**Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance**"). *See* Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834; *see also* Am. Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914. The Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance shall be paid in full on the Effective Date.

Subject to Section 5.2 of the Plan with respect to Disputed Claims, the IRS shall receive up to $1 million for payment of the IRS's Administrative Expense Claim arising from income taxes on the capital gains (if any) that result from the Sale; *provided*, *however*, that if the IRS's Administrative Expense Claim is less than $1 million, then the difference shall be applied to the IRS's Priority Tax Claim.

**Bankruptcy Fees**.  The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtor under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C.

042

§ 1930 from the Effective Date through the date of dismissal, conversion or entry of a final decree, shall be paid from the Bankruptcy Fees Reserve.

The Bankruptcy Fees payable to the Plan Administrator shall be paid within five (5) business days, or as soon as reasonably practicable thereafter, after the date that such Claim is Allowed by Final Order of the Bankruptcy Court. No later than twenty-one (21) Business Days prior to the hearing on the allowance of such Claim, the Plan Administrator shall serve upon counsel for Debtors, the United States Trustee, Bay Point, and any other Creditor requesting such information: (a) the current amount of its unpaid Bankruptcy Fees, and (b) a good faith estimate of its expected unpaid Bankruptcy Fees (if any) through dismissal, conversion or entry of a final decree.

The Debtors shall use the Sale Proceeds and/or Section 1146 Funds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan.

**B.      CLASSIFICATION AND TREATMENT OF CLAIMS**

The Plan classifies Claims and Interests against the Debtors consistent with the applicable provisions of the Bankruptcy Code.

**Summary**.  Pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, the Plan classifies Claims and Interests as summarized below:

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| Class 1 | Secured Claims of Bay Point | Yes | Yes |
| Class 2 | Secured Claims of New York State Department of Taxation and Finance | No | No |
| Class 3 | Non-Tax Priority Claims | No | No |
| Class 4 | General Unsecured Claims | Yes | No |
| Class 5 | Equity Interests | Yes | No |

**Class 1: Secured Claims of Bay Point**

**Classification** – Class 1 consists of the Bay Point Debt, including (a) the DIP Loan Obligations; (b) the JGB Judgment, *provided that*, for the avoidance of doubt, Bay Point is obligated to credit all amounts collected pursuant to the JGB Judgment to the outstanding DIP Obligations; and (c) the Morgan Stanley Judgment. The Morgan Stanley Judgment is secured by a first-priority Lien on the Aberdeen Property. The JGB Judgment is secured by a second-priority Lien on the Aberdeen Property and a first-priority Lien on the Brickchurch Property. The DIP Obligations in excess of the amount of the JGB Judgment are secured by a second-priority lien on the Brickchurch Property and a Lien on the Aberdeen Property that Bay Point asserts is a third-priority Lien and the IRS contends is a fourth-priority Lien (behind the IRS's asserted Lien on the Aberdeen Property).

**Treatment** – Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted

in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie*, to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order.

Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11 U.S.C. § 506(b) and the DIP Financing Order.

For the avoidance of doubt, nothing contained herein shall prejudice any right that Debtors may have to challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *provided, however*, that nothing contained herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided* that Debtors' reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; *and further provided* that Debtors' reservation of rights shall not impair Bay Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order.

**Voting** – Class 1 is impaired under the Plan and, therefore, Bay Point is entitled to vote to accept or reject the Plan.

## Class 2: Secured Claims of New York State Department of Taxation and Finance

**Classification** – Class 2 consists of the Secured Claims of the New York State Department of Taxation and Finance.

**Treatment** – The holder of the Allowed Secured Claims of the New York State Department of Taxation and Finance shall be paid in full, in accordance with the provisions of Sections 2.1, 5.8, and 5.9 of the Plan.

**Voting** – Class 2 is unimpaired under the Plan and, therefore, the holder of the New York State Department of Taxation and Finance's Secured Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan.

## Class 3 Non-Tax Priority Claims

044

        **Classification** – Class 3 consists of Priority Claims, other than Priority Tax Claims.

        **Treatment** – Bay Point does not believe there are any Non-Tax Priority Claims. To the extent there are any such Claims, they shall be paid in full from the Sale Proceeds, provided that the aggregate amount of all Allowed Non-Tax Priority Claims does not exceed [$5,000] in the aggregate.

        **Voting** – Class 3 is unimpaired under the Plan and, therefore, each holder of a Class 3 Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan.

**Class 4: General Unsecured Claims**

        **Classification** – Class 4 consists of all Unsecured Claims.

        **Treatment** – Class 4 will not receive any distributions under the Plan.

        **Voting** – Class 4 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**Class 5: Equity Interests**

        **Classification** – Class 5 consists of the Equity Interests in the Debtors.

        **Treatment** – Class 5 will not receive any distributions under the Plan.

        **Voting** – Class 5 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**C.    MEANS FOR IMPLEMENTATION OF THE PLAN**

        **Authority to Act / Limitation of Liability.**  Each act and every decision to be made by Debtors under the Plan shall be made at the direction, and shall be completely consistent with such direction, of Bay Point and Kabatoff (the "Decision Makers"), such direction being valid and enforceable only upon the mutual agreement of both Decision Makers. If the Decision Makers are not able to reach a mutual agreement regarding a decision or act of the Debtors, each Decision Maker agrees that either Decision Maker shall be permitted to seek relief from the Bankruptcy Court on shortened notice; *provided that*, for the avoidance of doubt, the discretion of whether to hear any issues raised by such Decision Maker on shortened notice shall remain with the Bankruptcy Court. For the avoidance of doubt, Blouin shall have no authority to act with respect to either of the Debtors and shall completely refrain from taking part in, or interfering with, any of the decisions, processes, or procedures set forth or governed by the Plan. The Decision Makers, solely as a result of their status as a Decision Maker under the Plan, shall not be deemed officers, fiduciaries or agents of the Debtors. The Decision Makers may employ or contract with such third parties as appropriate to assist in the implementation of the Plan; *provided that* the employment of any such person on behalf of the Debtors shall require a decision of the Debtors. The Decision Makers shall have no obligation to file tax returns or similar reports with the appropriate taxing authorities. **The Decision Makers shall not have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation,**

**preparation, dissemination, confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan**.

**Sale Free and Clear of All Claims, Liens, Taxes and Interests**.  The Plan shall be funded through the Sale of the Properties in accordance with the sale process run pursuant to the terms of the Approved Bid Procedures (the "Sale Process"), the funds that were previously distributed by Bay Point to the Debtors pursuant to the DIP Financing Order and the Section 1146 Funds; *provided that*, for the avoidance of doubt, the Debtors may consummate a Private Sale in accordance with the Approved Bid Procedures. The following is a summary of Sale Process, which is more fully described in the Plan and the Approved Bid Procedures:

    (i)    Free and Clear Sale(s).  All transfers of the Properties shall be effectuated by one or more Bargain and Sale Deeds, free and clear of all Liens, Claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with such Liens, claims, taxes and interests attaching to the Sale Proceeds of the respective Property in the same order, extent and priority as existed prior to Confirmation.

    (ii)    Sale Approval Order(s).  Any proposed Sale, including a Private Sale, shall be subject to the approval of the Bankruptcy Court under 11 U.S.C. 363(b) (i.e., a Sale Approval Order).

    (iii)    Deadline to Close.  The Closing with respect to any Sale that has been approved by the Bankruptcy Court shall close by **February 20, 2024**.

    (iv)    Payment of Sale Transaction Costs.  The Escrow Agent shall distribute the following amounts from the Gross Sale Proceeds with respect to each Property: (i) subject to any agreement between the Debtors and the Auctioneer, the fees and expenses of the Auctioneer (if any) with respect to such Property; (ii) subject to any agreement between a Broker and the Debtors, the fees and expenses of a Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction; (iii) the fees and expenses of the Escrow Agent (if any) with respect to the Sale involving such Property; (iv) any other closing costs associated with the Sale of such Property; and (e) subject to and without waiving Section 4.6 of the Plan and section 1146(a) of the Bankruptcy Code, any documentary and Transfer Taxes; *provided that*, for the avoidance of doubt, the provisions of this Section 4.4(e) of the Plan shall be subject to any employment and/or listing agreements that have been approved by the Bankruptcy Court in connection with Debtors' request to retain one or more professionals.

    (v)    Vesting of Assets. The Properties shall remain in the Debtors' respective Estates under section 541(a) of the Bankruptcy Code until the Effective Date of a Sale of the same and shall remain subject to all Liens and Claims that exist as of the date of Confirmation.  Upon the closing of a Sale involving one or both Properties,

such Properties (or Property) shall vest in the Successful Purchaser, free and clear of all Liens and Claims other than Transferred Encumbrances. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, authorizing and directing the Plan Administrator and any other necessary party to execute or deliver, or to join in the execution or delivery, on the Closing date of the Sale(s), of any instrument required to effect a transfer of Properties (or a respective Property) as required by the Plan, and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan.

Transfer Taxes.  The Sale of the Properties constitutes the making or delivery of instruments of transfer of property or otherwise, pursuant to or in connection with confirmation of the Plan, and, therefore, to the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Plan, including an instrument of transfer and deed executed by the Debtors or the Plan Administrator (on behalf of Debtors) shall not be subject under any law imposing a stamp tax, real estate transfer tax, mansion tax, mortgage recording tax or similar tax (previously defined as the "Transfer Taxes"). Accordingly, the appropriate officials or agents of state or local governmental units, including New York State, Suffolk County and the Town of Southampton, shall forego collection of any such Transfer Taxes and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

**Allocation**.  In the event of a sale of the Properties as a single lot, the proceeds of the Sale shall be allocated pursuant to agreement between Debtors and Bay Point; *provided that* if Debtors and Bay Point cannot agree on an allocation, Debtors and/or Bay Point may file a motion with the Bankruptcy Court to request that the Court determine such allocation and each of the same agrees that the other party shall be entitled to seek expedited relief with respect to the same.

**Preservation of Causes of Action**.  Subject to the Liens granted to Bay Point pursuant to the DIP Loan Documents and/or the DIP Financing Order, all claims, causes of action, damages or remedies in favor of the Debtors' respective estates relating to any prior transactions (including all avoidance claims under the Bankruptcy Code or state law) shall be preserved for the benefit of the Debtors' estates and distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court.

**1031 Exchange Provisions**.  Provided that there is no prejudice or harm to the Debtors' respective estates or to the interests of each Debtor's respective Creditors, including with respect to such Creditors' right to promptly be paid in accordance with the provisions of the Plan, nothing contained herein shall prohibit the Debtors from structuring a Sale in a manner that permits the Sale to qualify under the exchange provisions of Section 1031, including use of a qualified intermediary. For the avoidance of doubt, nothing contained herein shall (a) permit either Debtor from transferring any Estate property outside of the Estate; and/or (b) permit either Debtor to delay the Sale Process, a Sale, or a Closing for any purpose relating to Section 1031.

D.    **DISTRIBUTIONS**

**Method of Payment.**  Unless otherwise expressly agreed, in writing, payments to be made pursuant to the Plan shall be made at the times and in the amounts set forth in the Plan by either electronic funds wire transfer or check drawn on a domestic bank.

**Disputed Claims Reserves.**  No distributions shall be made with respect to any Disputed Claim. Instead, the Debtors shall deposit into one or more segregated accounts (the "Disputed Claims Reserves," each being a "Disputed Claims Reserve") funds equal to 100% of the Cash that would be distributed under the Plan to the holder of a Disputed Claim that would be an Allowed Claim, but for the dispute. In determining the amount of the Cash to be distributed under the Plan to the holders of Allowed Claims on the Distribution Date, the calculation of the amount to be distributed to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts. The Debtors or any other party in interest shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating the amount of a Disputed Claim, and limiting the amount of Cash that must be so deposited. Any Creditor whose Claim is so estimated and limited shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other entity or property if the Allowed Claim of the Creditor (whose Claim was so estimated and limited) as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims Reserve applicable to such Disputed Claim (on a *pro rata* basis with any other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims associated with that particular Disputed Claims Reserve that are allowed by Final Order; *provided that*, for the avoidance of doubt, any Disputed Claim that is deemed to be an Allowed Claim by a Final Order shall participate in any future distributions as an Allowed Claim. Separate Disputed Claims Reserves shall be set up for Claims of different payment priority under the terms of this Plan.

**Distribution After Allowance.**  Within ten (10) days after entry of a Final Order finding all (or part of) a Disputed Claim to be an Allowed Claim (or as soon thereafter as practicable), the Debtors shall distribute from the funds placed in the Disputed Claims Reserve with respect to such Claim, all Cash, including any interest or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

**Distribution after Disallowance.**  The balance of a Disputed Claims Reserve remaining after all Disputed Claims have been resolved by Final Order shall be used to satisfy any outstanding Bankruptcy Fees, Claims, and Interests in the order of priority specified in Sections 5.8 and 5.9 of the Plan.

**Bankruptcy Fee Reserve.**  The Debtors shall utilize the Sale Proceeds and Section 1146 Funds to deposit in a segregated account on the Distribution Date (the "Bankruptcy Fees Reserve"), in accordance with the provisions of the Plan, an amount equal to the Bankruptcy Fees estimated to accrue from and after the Effective Date through the date of dismissal, conversion, or entry of a final decree.

**Professional Fees Reserve.** The Debtors shall utilize the Sale Proceeds and Section 1146 Funds to deposit in a segregated account on the Distribution Date (the "Professional Fees Reserve") the following amounts for the benefit of the Debtors' Professionals specified below:

| Debtor | Professional | Amount |
|---|---|---|
| Aberdeen | Goldberg Weprin Finkel Goldstein LLP | $100,000.00 |
| Brickchurch | Simmons Legal PLLC | $135,000.00 |
| Brickchurch | Duane Morris LLP | $151,905.95 |

Three (3) Business Days after the Administrative Expense Claim of the Professional becomes an Allowed Claim, funds equal to the amount of the Allowed Claim shall be withdrawn from the Professional Fee Reserve and paid to the Professional. Any funds remaining in the Professional Fee Reserve designated for such Professional shall be released from the Professional Fee Reserve and transferred to the Plan Administrator for distribution in accordance with the provisions of Sections 5.8 and 5.9 of the Plan.

**Distribution to Allowed Claims Against Aberdeen**. The Net Sale Proceeds realized from or allocable to, the Aberdeen Property, currently estimated to be in the amount of $43,991,440.00, along with the other assets of the Aberdeen Estate, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(i)  First, the amount of $43,991,440, which is comprised of the Net Sale Proceeds of the Aberdeen Property, shall be distributed in the following order:

   a.  First, $168.20 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Aberdeen;

   b.  Second, $16,248,932 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the Morgan Stanley Judgment;

   c.  Third, $26,240,899.80 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

(ii)  Second, the amount of $1,501,440, which is comprised of the Section 1146 Funds attributable to the Aberdeen Property Sale, shall be distributed in the following order:

   a.  First, $6.87 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Aberdeen;

   b.  Second, up to $300,000 shall be paid towards Bankruptcy Fees;

   c.  Third, up to $575,000 shall be paid to the IRS for application to the IRS's Allowed Administrative Expense Claim and/or Priority Tax

Claim (subject to the provisions set forth in Section 2.1 of this Plan);

    d.    <u>Fourth</u>, up to $100,000 shall be paid Goldberg Weprin Finkel Goldstein LLP in full payment of its Allowed Professional Fee Claims; and

    e.    <u>Fifth</u>, any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

    (iii)    <u>Third</u>, the amount of $108,317.25, which is comprised of certain casualty insurance proceeds related to the Aberdeen Property in which Bay Point has a first-priority secured interest, shall be paid to Bay Point for application to the outstanding DIP Loan Obligations;

    (iv)    <u>Fourth</u>, any remaining monetary assets of Aberdeen shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

**Distribution to Allowed Claims Against Brickchurch**. The Net Sale Proceeds realized from or allocable to, the Brickchurch Property, currently estimated to be in the amount of $41,755,280, along with the other assets of the Brickchurch Estate, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

    (i)    <u>First</u>, the amount of $41,755,280, which is comprised of the Net Sale Proceeds of the Brickchurch Property, shall be distributed in the following order:

    a.    <u>First</u>, $1,997.79 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Brickchurch;

    b.    <u>Second</u>, $30,096,479.80 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

    c.    <u>Third</u>, $10,231,354.21 shall be paid to Bay Point for application to (i) the Indemnification Reserve for claims relating to the DIP Loan Obligations and/or the JGB Assigned Documents, including any of the transactions referred to or referenced herein; and (ii) the outstanding amount of the Allowed DIP Loan Obligation;

    (ii)    <u>Second</u>, the amount of $1,425,280, which is comprised of the Section 1146 Funds attributable to the Brickchurch Property Sale, shall be distributed in the following order:

    a.    <u>First</u>, $154.52 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Brickchurch;

    b.    <u>Second</u>, up to $300,000 shall be paid towards Bankruptcy Fees;

    c.    <u>Third</u>, up to $425,000 shall be paid to the IRS for application to the IRS's

Allowed Administrative Expense Claim and/or Priority Tax Claim (subject to the provisions set forth in Section 2.1 of this Plan);

    d.    <u>Fourth</u>, up to $151,905.95 shall be paid to Duane Morris in full payment of its Allowed Professional Fee Claims;

    e.    <u>Fifth</u>, up to $135,000 shall be paid to Simmons Legal PLLC in full payment of its Allowed Professional Fee Claims; and

    f.    <u>Sixth</u>, any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

    (iii)    <u>Third</u>, any remaining monetary assets of Brickchurch shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

**<u>Creditor's Right to Accept Lesser Payment.</u>** For the avoidance of doubt, nothing contained herein shall prevent a Creditor or Class of Claims from voluntarily accepting a lesser amount (or other disparate treatment) than such Creditor or Class of Claims would otherwise be entitled to under the Plan.

**<u>Estates' Right to Clawback.</u>** For the avoidance of doubt, distributions to Bay Point under the Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be distributed as Sale Proceeds in accordance with the Plan.

**<u>Order of Distributions and Allocation of Clawback.</u>** The distributions required by Sections 5.8 and 5.9 of this Plan, and the clawback provisions of Section 5.11 of the Plan, shall be applied in an order and manner so as to promote the substantial consummation of the Plan; *provided that* for the avoidance of doubt, nothing contained herein shall permit distributions to be paid in a priority inconsistent with Sections 5.8 and 5.9 of the Plan.

## E.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, all Executory Contracts to which the Debtor is a party shall be deemed rejected. Allowed Claims arising from the rejection of Executory Contracts of a Debtor pursuant to Section 6.1 of the Plan shall be treated as Unsecured Claims. A Proof of Claim seeking payment of any Unsecured Claim for damages arising from the rejection of an Executory Contract pursuant to Section 6.1 of the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within thirty (30) days after the Confirmation Date. Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors and may not be enforced against the Properties, any purchaser of the Properties, or any Creditor under any indirect or equitable legal theory such as unjust enrichment.

051

F.    **INJUNCTIONS**

**Injunctions Against Interference with Plan.**  Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided that*, for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property.

G.    **[Reserved]**

H.    **NO DISCHARGE; LIENS AND CLAIMS**

**No Discharge.**  Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors will not be discharged from debts that arose prior to Confirmation.

**Liens and Claims**.  All Liens and Claims with respect to the Properties and all other assets of the Debtors shall survive Confirmation and remain attached in their respective order of priority as existed as of the date of Confirmation; *provided that*, as set forth in this Plan, the Sale(s) of the Properties shall be free and clear of any Liens, Claims, and/or Interests pursuant to Section 363 of the Bankruptcy Code and such Liens, Claims, and/or Interests shall attach to the respective Sale Proceeds in the same order of priority as existed as of the date of the Closing of the Sale.

I.    **MODIFICATION OR REVOCATION OF THE PLAN**

**Modification**.  The Plan may be altered, amended or modified by Bay Point, at any time before the substantial consummation of the Plan, as provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**Revocation**.  Bay Point may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii) prejudice in any manner the rights of the Debtor or any Creditor in any further proceedings involving the Debtors or their Estates.

J.    **CONDITIONS TO EFFECTIVENESS**

The Plan will not become effective and the Effective Date will not occur, unless and until:

(i)    the Confirmation Order has become a Final Order;

(ii)    the Bankruptcy Court shall have entered the Order approving the Sale;

(iii)    the Sale shall have closed;

052

(iv)  the Debtors shall have received the Section 1146 Funds; and

(v)  the payments required pursuant to Sections 5.8 and 5.9 of the Plan shall have been made; *provided that* nothing contained herein shall condition the effectiveness of the Plan on payment of any Disputed Claims so long as a Disputed Claims Reserve is established (if so required) pursuant to the terms of the Plan.

## K.   BINDING EFFECT

Subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of the Plan will bind every holder of a Claim against or Interest in one or more of the Debtors and inure to the benefit of and be binding on such holder's respective heirs, successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder accepted the Plan.

## VI.

## CONFIRMATION PROCEDURE

## A.   NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

At the Confirmation Hearing, the Bankruptcy Court will be asked to find that the Disclosure Statement contains information of a kind and in sufficient and adequate detail to have enabled holders of Claims to make an informed judgment whether to accept or reject the Plan. SUCH FINDINGS DO NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE TO ACCEPT OR REJECT THE PLAN, AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS PLAN CAREFULLY AND IN ITS ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN.  No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein.  No information aside from that included in the Disclosure Statement should be relied upon in making a determination to vote to accept or reject the Plan.

## B.  VOTING RIGHTS

**Who May Vote to Accept or Reject the Plan**.  Pursuant to the Bankruptcy Code, only holders of Claims and Equity Interests in classes that are (i) "impaired" by the Plan within the meaning of section 1124 of the Bankruptcy Code, and (ii) entitled to receive a distribution under the Plan, are entitled to vote on the Plan.  In these Chapter 11 Cases, Classes 2 and 3 are unimpaired.  Thus, Classes 2 and 3, and the holders of Claims in such Classes, are conclusively deemed to accept the Plan and are not entitled to vote.  Classes 1, 4, and 5 are impaired. However, Classes 4 and 5 will not receive any distributions under the Plan. Thus, the holders of Claims in Class 4 and Equity Interests in Class 5 are deemed not to have accepted the Plan. Class 1 is impaired and entitled to vote.

**Who is Not Entitled to Vote**.  The following types of Claims and Equity Interests are not entitled to vote:

(i)     Claims that have been disallowed;

(ii)    Claims in unimpaired Classes;

(iii)   Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(2) and (a)(8); and

(iv)    Claims that are unliquidated, contingent, or disputed, unless temporarily allowed by the Bankruptcy Court solely for voting purposes as discussed herein.

Claims in unimpaired Classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) and 507(a)(8) are not entitled to vote because such Claims are not placed in Classes, and they are required to receive certain treatment specified by the Bankruptcy Code.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

## C.  SOLICITATION MATERIALS

In soliciting votes for the Plan, Bay Point, will send to holders of Claims and Equity Interests who are entitled to vote copies of (i) the Plan, (ii) the notice of, among other things, (a) the date, time, and place of the hearing to consider confirmation of the Plan and related matters, and (b) the deadline for voting and filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (iii) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (iv) other materials as authorized by the Bankruptcy Court.

054

If you are the holder of a Claim who is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

John C. Allerding
THOMPSON HINE LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326

**D.    VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE**

You should carefully review the Disclosure Statement, the Plan, and the detailed instructions accompanying your ballot.  Only after you review these materials, should you make a decision as to whether to vote to accept or reject the Plan.  On the accompanying ballot, you should complete and sign your original ballot (copies will not be accepted) and return it as instructed in the envelope provided.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED, AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT. ALSO, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M. (PREVAILING EASTERN TIME) ON **FEBRUARY 6, 2024** (THE "**VOTING DEADLINE**") BY THE DEBTORS. COMPLETED BALLOTS MUST BE SIGNED, DATED, AND RETURNED WITH AN ORIGINAL SIGNATURE:

**Voting Via First-Class Mail, Postage Prepaid:**

John C. Allerding
THOMPSON HINE LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326

**Voting Via Hand Delivery or Overnight Mail:**

John C. Allerding
THOMPSON HINE LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326

BALLOTS MUST BE RECEIVED BY THE VOTING DEADLINE.  FAXED BALLOTS AND BALLOTS SENT VIA ELECTRONIC TRANSMISSION (I.E., E-MAIL) WILL NOT BE ACCEPTED.   BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED.  BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN, OR THAT BOTH ACCEPTS AND REJECTS THE PLAN, WILL BE COUNTED AS AN ACCEPTANCE. DO NOT RETURN ANY EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (i) the procedure for voting your Claim, (ii) the packet of materials that you have received, or (iii) the amount of your Claim, or if you wish to obtain, at your own expense an additional copy of the Plan or Disclosure Statement or any appendices or exhibits to such documents, please contact Bay Point's counsel.

BAY POINT URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR VOTING RIGHT BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

**E.    THE CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO CONFIRMATION**

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. The Confirmation Hearing has been scheduled for **February 13, 2024, at 10:00 AM** (EDT) before the Honorable Alan S. Trust, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Central Islip, New York 11722. The Confirmation Hearing will be conducted in person, and may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the objector's Claim. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the following parties on or before **February 6, 2024**:

| | |
|---|---|
| Brickchurch Enterprises, Inc.: | Camisha L. Simmons, Esq.<br>Simmons Legal PLLC<br>1330 Avenue of the Americas, Suite 23A<br>New York, New York 10019<br>camisha@simmonslegal.solutions |
| Aberdeen Enterprises, Inc.: | Kevin Nash, Esq.<br>Goldberg Weprin Finkel Goldstein LLP<br>125 Park Avenue, 12th Floor<br>New York, New York 10017<br>knash@gwflaw.com |
| Bay Point Capital Partners II, LP: | John F. Isbell, Esq.<br>The Law Offices of John F. Isbell LLC<br>3050 Peachtree Road NW, Suite 740<br>Atlanta, Georgia 30305<br>john@jfi-law.com<br><br>*-and-*<br><br>John C. Allerding, Esq.<br>Thompson Hine LLP |

|  | 3560 Lennox Road NE, Suite 1600 |
|  | Atlanta, Georgia 30326 |
|  | John.Allerding@ThompsonHine.com |

Internal Revenue Service:    Edward J. Murphy
U.S. Department of Justice, Tax Division
P.O. Box 55
Washington, D.C. 20044
Edward.J.Murphy@usdoj.gov

Office of the United States Trustee:    Office of the United States Trustee
Alfonse D'Amato Federal Courthouse
560 Federal Plaza
Central Islip, New York 11722
Attn: William Birmingham, Esq

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Bankruptcy Court.

## F.    CONFIRMATION REQUIREMENTS

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b).  Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

Here, to the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, Bay Point seeks confirmation pursuant to section 1129(b) of the Bankruptcy Code. This Plan shall constitute a motion for such relief. Bay Point reserves the right to alter, amend modify, revoke, or withdraw the Plan and any exhibit or supplement thereto, including the right to amend or modify the Plan, to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests.  Bay Point believes that, under the Plan, all impaired Classes of Claims are treated in a manner that is consistent with the treatment of other Classes of Claims that are similarly situated, if any, and no Class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such Class.  Accordingly, Bay Point believes that the Plan does not discriminate unfairly as to any Impaired Class of Claims.

057

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a)    <u>Secured Creditors</u>.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens attaching to the proceeds of the sale and the treatment of such liens must be consistent with clause (i) or (ii) above.

(b)    <u>Unsecured Creditors</u>.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c)    <u>Interests</u>.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, Bay Point believes that the treatment provided under the Plan to holders of Secured Claims, Unsecured Claims, and Equity Interests is "fair and equitable" to each such Class.

**<u>Acceptance</u>**

In these Chapter 11 Cases, Classes 2 and 3 are unimpaired.  Thus, Classes 2 and 3, and the holders of Claims in such Classes, are conclusively deemed to accept the Plan and are not entitled to vote.  Classes 1, 4, and 5 are impaired.  However, Classes 4 and 5 are not entitled to any distributions under the Plan. Thus, Classes 4 and 5 are deemed to not have accepted the Plan.  Class 1 is entitled to vote to accept or reject the Plan, and its vote shall be solicited with respect to the Plan.

In accordance with section 1126(c) of the Bankruptcy Code, an impaired Class of Claims will have accepted the Plan if (i) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code or any insider as defined in section 101(31) of the Bankruptcy Code.

In accordance with section 1126(d) of the Bankruptcy Code, an impaired Class of Equity Interests will have accepted the Plan if (i) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Equity Interests actually voting in the Class have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

**Feasibility**

The Bankruptcy Code requires a plan proponent to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. Here, the Plan contemplates the liquidation of all of the assets of the Debtors. In order to accomplish such liquidation, the Plan requires the Debtors to make distributions from the Sale Proceeds pursuant to Sections 5.8 and 5.9 of the Plan.

**Best Interests Test**

With respect to each impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest within the Class either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what holders of Unsecured Claims and Equity Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The cash amount that would be available for satisfaction of Unsecured Claims and Equity Interests would consist of the net proceeds resulting from the disposition of the assets and properties of the Debtors, after satisfaction of secured debt, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the liquidation case. Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative expense and priority claims that might result from the termination of the Debtors' businesses (if any) and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees and expenses that might be payable to attorneys and other professionals that such a trustee might engage. Those fees and expenses, as well as other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid fees and expenses incurred by the Debtors during the Chapter 11 Cases, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition Unsecured Claims.

To determine if the Plan is in the best interests of each impaired Class of Unsecured Claims and Interests, the present value of the distributions from the proceeds of a chapter 7 liquidation of the Debtor's assets are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan. In this case, the value of distributions to the holders of Unsecured Claims and Interests from a chapter 7 liquidation will not be greater than the value to be realized from the Sale(s) contemplated by the Plan.

059

There is no reason to believe that a chapter 7 liquidation will result in a higher Sale price than the proposed chapter 11 liquidation. Because of the substantial secured debt that encumbers the Properties, which continues to accrue interest, the secured debt will undoubtedly be greater through a chapter 7 liquidation (which is expected to take significantly longer than the chapter 11 liquidation proposed as part of the Plan), resulting in a lower (or at least no greater) recovery for Unsecured Claims. This is in addition to chapter 7 trustee fees, which are anticipated to be several million dollars, and legal fees that would be incurred by the chapter 7 trustee in administering the bankruptcy estate.  All of these fees will be avoided by having the Properties sold in accordance with the provisions of the Plan.  Moreover, the sale will almost certainly be completed in substantially less time than a sale in a chapter 7 liquidation.

## VII.

## ALTERNATIVES TO CONFIRMATION & CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) a Sale of one or more of the Properties under 11 U.S.C. § 363 outside of a plan of reorganization/liquidation; (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and (iii) an alternative plan of reorganization.

### A.    SALE OF THE PROPERTIES UNDER 11 U.S.C. § 363

If the Plan is not confirmed, the Bankruptcy Court may order the Properties to be sold under 11 U.S.C. § 363 ("Section 363") outside of a plan of reorganization/liquidation – which would not be subject to the requirements of 11 U.S.C. § 1129. So long as the Court found that the Sale(s) of the Properties (or Property) met the requirements for entry of a Sale Approval Order under Section 363, the Debtors could consummate the Sale(s) for the same price as would have otherwise been paid under the Plan. After payment of necessary claims (including the Secured Claims secured by the respective Property) any remaining sale proceeds would be distributed to the Debtors' Estates. The Debtors would likely then convert the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, which would result in the appointment of a chapter 7 trustee to distribute the proceeds and any remaining assets in accordance with the priority provisions set forth in the Bankruptcy Code (which mirror the distribution priority provisions set forth in the Plan). As discussed above, the chapter 7 trustee would be entitled to fees in accordance with the Bankruptcy Code and would almost certainly have legal counsel that would incur fees associated with the administration of the Debtors' Estates. Those fees would come out of the funds that would otherwise flow to Creditors under the Plan, thereby reducing the expected recovery for Unsecured Creditors.

### B.    LIQUIDATION UNDER CHAPTER 7

If the Plan is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be selected to liquidate the Debtors' remaining assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  As discussed above, Bay Point believes that liquidation under chapter 7 would result in smaller distributions being made to Creditors than those provided for in the Plan.

## C.    ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan. There would, however, be significant delay associated with the proposal of any different plan and, as noted above, the Secured Claims continue to accrue interest (and the Administrative Expense Claims continue to grow).  Bay Point believes that the Plan provides the optimal balance of maximizing the value of the Debtors' assets while doing so in an efficient manner so as to minimize the Secured Claims and Administrative Expense Claims that must be paid prior to distributions to holders of Unsecured Claims.

## VIII.

## CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE).   THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### Risk of Non-Confirmation of the Plan

Although Bay Point believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes to accept or reject the Plan.

### Risk of Non-Occurrence of the Effective Date

Although Bay Point believes that all of the conditions to the Effective Date will occur after the entry of the Confirmation Order, there can be no assurance as to the timing of the Effective Date or that such conditions will ever occur.

### Acceptance by Impaired Classes

Section 1129(a)(10) of the Bankruptcy Code requires as a condition of confirmation that at least one impaired Class of Claims entitled to vote has accepted the Plan, determined without including any acceptance of the Plan by an insider.  There is no assurance that the Plan will be accepted by at least one impaired Class of Claims entitled to vote on the Plan.  In the event that any impaired Class of Claims or Equity Interests rejects this Plan or is deemed to have rejected this Plan, Bay Point intends, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to seek confirmation pursuant to section 1129(b) of the Bankruptcy Code with

36

respect to such non-accepting Class(es).  However, there is no assurance that the Court will confirm the Plan under section 1129(b).

### Parties May Object to the Classification of Claims and Equity Interests

Bay Point believes that its classification of Claims and Equity Interests under the Plan complies with the Bankruptcy Code's requirements.  However, there is no certainty that the Bankruptcy Court will agree.

## B.    RISK FACTORS THAT COULD AFFECT DISTRIBUTIONS

### Recovery Estimations

There can be no assurance that the recovery from assets that have not been liquidated as of the date of this Plan will meet or exceed the amounts assumed in arriving at any recovery estimations set forth herein and/or in the Plan.

### Claims Estimations

There can be no assurance that the estimated Claim amounts set forth herein and/or in the Plan are correct.  The actual Allowed amount of Claims may differ in some respect from the estimates, potentially materially.  The estimated amounts are subject to certain risks, uncertainties, and assumptions.  Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary materially from those estimated by Bay Point.

## C.    ADDITIONAL FACTORS TO BE CONSIDERED

### Bay Point Has no Duty to Update

The statements contained in this Disclosure Statement are made by Bay Point as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  Bay Point has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### No Representations Outside this Disclosure Statement are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.

### No Legal or Tax Advice is Provided to You by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business or tax advice.  Each holder of a Claim or Equity Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine whether to accept or reject the Plan or object to Confirmation of the Plan.

## IX.

## SECURITIES LAWS MATTERS

The Plan does not contemplate the issuance of any securities.

## X.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.    GENERAL

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and holders of certain Claims against the Debtors.  This discussion does not address the U.S. federal income tax consequences of the implementation of the Plan to holders of Claims that are unimpaired or otherwise entitled to payment in full in cash under the Plan.

The discussion of U.S. federal income tax consequences set forth below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), U.S. Department of Treasury regulations promulgated or proposed thereunder, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect).  The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties.  The Debtors have not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities.  Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

Except as specifically stated otherwise, this summary assumes that a holder holds a Claim or an existing Equity Interest as a capital asset for U.S. federal income tax purposes.  This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign persons or entities, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Claims or existing Equity Interests through pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding claims or existing Equity Interests as a hedge against, or that is hedged against, currency risk or as part of a straddle, constructive sale or conversion transaction).

The discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the consideration issued pursuant to the Plan through means other than directly participating in the exchange.  If a partnership (or another entity that is treated as a partnership for U.S. federal income tax purposes) holds Claims or existing Equity Interests, the tax treatment of a partner (or other equity owner) generally will depend upon the status of such partner (or other owner) and upon the activities of the partnership (or other entity). This discussion is based on currently available information regarding the Plan terms and may not reflect the actual terms of the Plan upon its implementation.  The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims or existing Equity Interests.

### Consequences to the Debtors

The contemplated Sale(s) include a taxable sale of the assets of each Debtor.  Gain or loss, if any, upon the transfer of a Debtor's assets will be recognized based on the difference between the tax basis in the assets that were disposed of and the sale price allocable to such assets.

Additional income tax consequences may arise with respect to the Debtors' respective Equity Interest holders in connection with any liquidation (actual or deemed) of the Debtors after the Sale(s) are consummated.

### Consequences to Claim Holders

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

### Recognition of Gain or Loss

In general, a Holder of an Allowed Claim or Interest should recognize gain or loss equal to the amount realized under the plan in respect of its claim less the Holder's tax basis in the claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the allowed claim and the Holder, the length of time the Holder held the claim and whether the claim was acquired at a market discount. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the plan generally will equal the amount realized.

### Bad Debt or Worthless Security Deduction

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis

on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  BAY POINT DOES NOT PURPORT, THROUGH THIS DISCLOSURE STATEMENT, TO ADVISE ANY CREDITOR OR INTEREST HOLDER REGARDING THE TAX CONSEQUENCES OF THE PLAN.  ALL HOLDERS OF CLAIMS OR EXISTING EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE TO THEM, INCLUDING WITH RESPECT TO CAPITAL GAINS TAXES, IF ANY.**

**XI.**

**<u>RECOMMENDATION AND CONCLUSION</u>**

For all of the reasons set forth in the Disclosure Statement, Bay Point believes that confirmation and consummation of the Plan is preferable to all other alternatives.


Dated: New York, NY
        January 30, 2024


Respectfully submitted,

THOMPSON HINE LLP

By: <u>/s/ John C. Allerding</u>
John C. Allerding (admitted pro hac vice)
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
P: 404.407.3676 / F: 404.541.2905
John.Allerding@ThompsonHine.com

*Counsel for Bay Point Capital Partners II, LP*


BAY POINT CAPITAL PARTNERS II, LP

By:   Bay Point Advisors LLC, its
      General Partner

      By:  <u>/s/ Charles Andros</u>                    f

EXHIBIT 3:

Bay Point Capital Partners II, LP's Chapter 11 Liquidating

Plan

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:                                                                    Chapter 11

ABERDEEN ENTERPRISES, INC.,                           Case No. 23-72834-AST
BRICKCHURCH ENTERPRISES, INC.                      Case No. 22-70914-AST


                                                     Debtors.          Jointly Administered
--------------------------------------------------------x

## BAY POINT CAPITAL PARTNERS II, LP'S
## CHAPTER 11 LIQUIDATING PLAN

Bay Point Capital Partners II, LP ("Bay Point") hereby proposes the following Chapter 11 liquidating plan of Aberdeen Enterprises, Inc. ("Aberdeen") and Brickchurch Enterprises, Inc. ("Brickchurch") (each a "Debtor", and collectively, the "Debtors").

The Debtors have pursued a Sale of their valuable and iconic, contiguous ocean front properties (as defined herein). The bid procedures governing the Sale were the subject of a separate application filed by the Debtors, were approved by the Bankruptcy Court (the "Approved Bid Procedures") pursuant to an Order entered on November 22, 2023 [D.I. 104], were amended by the Debtors on December 15, 2023 [D.I. 116], and shall be deemed incorporated by reference for purposes of the Plan.

A dispute (the "Control Dispute") currently exists between Debtors and their senior secured lender, Bay Point, as to the identity of the authorized officers and directors of Debtors. This Plan is intended to provide an efficient and effective method for generating proceeds sufficient to repay Debtors' creditors without the need of incurring the cost of litigating the Control Dispute. For that purpose, as set forth herein, Debtors (jointly managed and operated by Mathew Kabatoff ("Kabatoff") and Bay Point) shall collectively make decisions as set forth herein, under the Plan

and each agree that both parties shall be entitled to seek expedited relief from the Bankruptcy Court in the situation where an agreement cannot be reached; *unless otherwise provided herein*.

**ARTICLE I**

**<u>DEFINITIONS</u>**

All capitalized terms used herein shall have the meanings set forth below.

1.1     "**Aberdeen**" shall have the meaning ascribe to such term in the introductory section of the Plan.

1.2     "**Aberdeen Administrative Expense Claim**" means an Administrative Expense Claim against Aberdeen.

1.3     "**Aberdeen Priority Claim**" means a Priority Claim against Aberdeen.

1.4     "**Aberdeen Property**" means the real property, and improvements thereon, located at and commonly known as 376 Gin Lane, Southampton, New York 11968.

1.5     "**Aberdeen Unsecured Claim**" means an Unsecured Claim against Aberdeen.

1.6     "**Administrative Expense Claims Bar Date**" shall mean the first Business Day that is thirty (30) days after the Confirmation Date.

1.7     "**Administrative Expense Claim**" means a Claim for the costs and expenses of administering the respective Cases under §§ 327, 330, 331, 364(c)(1), 503(b), 507(a)(2), 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses of maintaining and preserving the Properties; and (b) Professional Fee Claims.

1.8     "**Allowed**" means, (a) with respect to any Claim other than an Administrative Expense Claim, a Claim for which a proof of claim was timely and properly filed or, if no proof of Claim was filed, that has been scheduled by the Debtors as being liquidated and undisputed, and as to which: (i) no objection to allowance has been interposed within the applicable period fixed by the Plan; or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; and (b) with respect to any Administrative Expense Claim, a Claim for which (i) a request for payment of such Administrative Expense Claim has been timely and properly filed and (A) no objection to allowance has been interposed within the applicable period fixed by the Plan; or (B) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; or (ii) has been otherwise allowed by the Bankruptcy Court.

1.9     "**Approved Bid Procedures**" shall have the meaning ascribed to such term in the introductory section of the Plan.

2

1.10    "**Auction**" shall have the meaning as ascribed to such term in the Approved Bid Procedures.

1.11    "**Bankruptcy Cases**" means, collectively, the above-captioned cases, each being a "**Bankruptcy Case**."

1.12    "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the respective Petition Date of each Debtor.

1.13    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of New York.

1.14    "**Bankruptcy Fees**" means (i) all fees and charges against the Estate under section 1930 of title 28 of the United States Code, and (ii) a Claim for reasonable compensation for services rendered, and reimbursement of actual and necessary expenses incurred, by the Plan Administrator as awarded by a Final Order of the Bankruptcy Court.

1.15    "**Bankruptcy Fees Reserve**" means the segregated account established pursuant to Section 5.3 of the Plan.

1.16    "**Bay Point**" shall have the meaning ascribe to such term in the introductory section of the Plan.

1.17    "**Bay Point Collateral Documents**" means (i) each security instrument, mortgage, deed of trust, document, pledge agreement, subordination agreement, account control agreement, or any other agreement pursuant to which either Debtor or any other Person granted Bay Point a Lien to secure repayment of the DIP Loan Obligations; and (ii) each of the JGB Assigned Documents.

1.18    "**Bay Point Debt**" shall have the meaning ascribed to such term in Section 3.1 of the Plan.

1.19    "**Bay Point Loan Documents**" means, collectively, the DIP Loan Documents, the Morgan Stanley Judgment, and each of the documents related to the debt referenced in the Morgan Stanley Judgment that were assigned to Bay Point.

1.20    "**Blouin**" means Louise Blouin, indirect upstream beneficial equity holder and Creditor of the Debtors.

1.21    "**Brickchurch**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.22    "**Brickchurch Administrative Expense Claim**" is an Administrative Expense Claim against Brickchurch.

1.23    "**Brickchurch Priority Claim**" means a Priority Claim against Brickchurch.

1.24    "**Brickchurch Property**" means the real property, and improvements thereon, located at and commonly known as 366 Gin Lane, Southampton, New York 11968.

1.25    "**Brickchurch Unsecured Claim**" means an Unsecured Claim against Brickchurch.

1.26    "**Broker**" means the person or firm engaged by the Debtors, with consent of both Decision Makers, and approved by the Bankruptcy Court to market and sell the Properties.

1.27    "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close, or other Legal Holiday.

1.28    "**Cases**" means, collectively, the above-captioned, jointly administered Chapter 11 cases commenced by the Debtors in the Bankruptcy Court, each being a "**Case**."

1.29    "**Cash**" means lawful currency of the United States of America.

1.30    "**Claim**" has the meaning ascribed to such term in 11 U.S.C. § 101(5), as the same has been, or may be, asserted against one or more of the Debtors.

1.31    "**Claims Objection Deadline**" shall mean (A) for Administrative Expense Claims, the later of (i) thirty (30) days after a request for payment, or Proof of Claim, seeking allowance of the Claim is filed, and (ii) one (1) Business Day prior to the Effective Date of the Plan, or such other date fixed by the Bankruptcy Court, and (B) for all Claims other than Administrative Expense Claims, one (1) business day prior to the Effective Date of the Plan.

1.32    "**Closing**," means that time at which the Debtors, after and pursuant to a Sale Approval Order, consummate one or more Sales of the Properties.

1.33    "**Confirmation**" means the entry of the Confirmation Order.

1.34    "**Confirmation Hearing**" means the hearing or hearings before the Bankruptcy Court to consider confirmation of the Plan.

1.35    "**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C. § 1129.

1.36    "**Control Dispute**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.37    "**Credit Bid**" means the right of Bay Point pursuant to 11 U.S.C. §363(k) to bid its Secured Claims at the Auction.

1.38    "**Creditor**" means the holder of a Claim against one or both of the Debtors.

4

1.39    "**Debtors**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.40    "**Decision Makers**" means, collectively, Bay Point and Kabatoff, each being a "**Decision Maker**;" *provided that*, notwithstanding anything to the contrary herein, Bay Point shall have the right, in its sole and absolute discretion, to withdraw as a Decision Maker. In the event that Bay Point withdraws as a Decision Maker, the terms "Decision Makers" and "Decision Maker" shall refer only to Kabatoff.

1.41    "**DIP Financing Order**" means the Order (I) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Liens and Super-Priority Claims, entered by the Bankruptcy Court on November 17, 2022 in Case No. 22-70914-AST (ECF No. 172).

1.42    "**DIP Lender Superpriority Claim**" means that Allowed Administrative Claim in the amount of the DIP Loan Obligations, granted to Bay Point pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over all other Administrative Expense Claims, adequate protection and other diminution claims, Unsecured Claims, and all other Claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including Administrative Expense Claims or other Claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503, 507, 546, 726, 1113, and 1114 of the Bankruptcy Code, or any other section of the Bankruptcy Code, whether or not such Administrative Expense Claims or Claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

1.43    "**DIP Loan Documents**" means (i) the Loan and Security Agreement, dated November 9, 2022, by and among Debtor, Aberdeen, and Bay Point (the "**DIP Loan Agreement**"), and (ii) each of the Bay Point Collateral Documents.

1.44    "**DIP Loan Obligations**" shall have the same meaning as is ascribed to the term "DIP Obligations" in the DIP Financing Order.

1.45    "**Disclosure Statement**" means the Disclosure Statement for the Plan, including all exhibits, attachments, or amendments thereto, approved by Order of the Bankruptcy Court.

1.46    "**Disputed Claims Reserves**" means, collectively, the segregated account(s) established pursuant to Section 5.2 of the Plan for the payment of Disputed Claims to the extent such Disputed Claims are Allowed by a Final Order, each being a "**Disputed Claims Reserve**."

1.47    "**Disputed**" means, with respect to a Claim, (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been timely filed; (b) any Claim that has not been disallowed and with respect to which an objection to the allowance thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that

any such objection has not been resolved by a Final Order; *provided however, that* until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in its entirety if: (A) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (B) no corresponding Claim has been listed in the Schedules; *and further provided that* until the earlier of (I) the filing of an objection to a Proof of Claim or (II) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in that amount by which the amount specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules. Claims arising from the rejection of Executory Contracts will be treated as Disputed Claims unless and until such Claims have been settled, withdrawn, or determined by a Final Order. Notwithstanding the foregoing, any Claims held by Bay Point shall not be Disputed Claims, but shall be subject to the clawback provisions set forth in Section 5.11.

1.48    "**Distribution Date**" means the Effective Date or such other date as soon as reasonably practicable as may be set by the Debtors for the distribution of Sale Proceeds in accordance with the terms of the Plan.

1.49    "**Effective Date**" means, as it relates to (i) a Sale, the date upon which a Closing occurs; (ii) the Confirmation of the Plan, the date upon which all of the conditions to effectiveness of the Plan as set forth in Section 7.5 of the Plan have been satisfied.

1.50    "**Equity Interests**" means the ownership interests of Aberdeen Enterprises (BVI) Ltd. and Brickchurch Enterprises (BVI) Ltd. in the respective Debtors.

1.51    "**Escrow Agent**" means that person selected by Debtors to hold the Bankruptcy Fees Reserve and/or Disputed Claims Reserves pending disbursements from the same in accordance with the Plan.

1.52    "**Estates**" means, collectively, the bankruptcy estate of Brickchurch and the bankruptcy estate of Aberdeen, each as created on the respective Petition Date pursuant to section 541 of the Bankruptcy Code, each of the Estates being an "**Estate**."

1.53    **[Reserved].**

1.54    **[Reserved].**

1.55    "**Executory Contracts**" shall mean "executory contracts" and "unexpired leases" of the Debtor as such terms are used in section 365 of the Bankruptcy Code.

1.56    **[Reserved].**

1.57    **[Reserved].**

6

1.58    "**Federal Tax Liens**" means, collectively, (a) that certain Lien filed by the IRS on August 17, 2022 against the Aberdeen Property with the Suffolk County Clerk (Recording No: LFED00034063); and (b) that certain Lien filed by the IRS on February 17, 2023 against the Aberdeen Property with the Suffolk County Clerk (Recording No. LFED00034390), each being a "**Federal Tax Lien**;" *provided that,* nothing contained herein shall be an admission or an acknowledgement of the validity of above-referenced Federal Tax Liens, nor shall anything herein prejudice any person's (including either Debtor's or Bay Point's) right to challenge the validity of any Lien asserted against either Property by the IRS.

1.59    "**Final Order**" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal located in one of the states, territories or possessions of the United States or the District of Columbia, that has not been stayed, reversed, or vacated, and that is no longer subject to appeal, certiorari proceeding, or other proceeding for review or rehearing.  The possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to an order will not cause it not to be a Final Order.

1.60    **[Reserved].**

1.61    "**Governmental Unit**" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory a municipality, or a foreign state; or other foreign or domestic government.

1.62    "**Gross Sale Proceeds**" means the gross amount realized from a Sale (excluding the amount of any Credit Bid made pursuant to section 363(k) of the Bankruptcy Code).

1.63    "**Indemnification Reserves**" shall mean Cash held by Bay Point is one or more segregated accounts in an amount reasonably calculated to fully satisfy any potential indemnification obligations that any person has under each of the Bay Point Loan Documents.

1.64    "**IRS**" means the United States Internal Revenue Service.

1.65    "**JGB Assigned Documents**" shall have the same meaning as is ascribed to the term "Assigned Documents" in the DIP Financing Order.

1.66    "**JGB Judgment**" shall mean that certain Judgment of Foreclosure and Sale entered in favor of JGB Partners, LP and its related companies by the Supreme Court of the State of New York, County of Suffolk on February 2, 2022 in the case styled as *JGB Partners, LP, et al. v. Brickchurch Enterprises, Inc., et al.*, Index No. 623208/2019, the same having been assigned to Bay Point and constituting one of the JGB Assigned Documents.

7

1.67    "**Plan**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.68    "**Kabatoff**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.69    "**Lien**" has the same meaning as is ascribed to such term in 11 U.S.C. § 101(37), and includes charges, bills, encumbrances, mortgages, deeds of trust, security interests, and any other legally cognizable security device of any kind.

1.70    "**Morgan Stanley Judgment**" shall mean that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered in favor of Morgan Stanley Private Bank, National Association by the Supreme Court of the State of New York, County of Suffolk on September 7, 2022 in the case styled as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.*, Index No. 623196/2019, the same having been assigned to Bay Point.

1.71    "**Net Sale Proceeds**" means the Gross Sale Proceeds, less the costs and expenses incurred in connection with a Sale chargeable to the seller, including without limitation, brokerage fees, closing costs, and documentary costs, if any; *provided that*, for the avoidance of doubt, Net Sale Proceeds shall not include the non-cash amount of any Credit Bid made pursuant to section 363(k) of the Bankruptcy Code or otherwise; and *further provided that* nothing contained herein shall require a Debtor or any other person to pay any Transfer Taxes where such payment is otherwise excused by the Bankruptcy Code.

1.72    **[Reserved].**

1.73    "**Petition Date**" means April 30, 2022 for Brickchurch and August 2, 2023 for Aberdeen, the dates on which the respective voluntary petitions commencing these Chapter 11 cases were filed.

1.74    "**Plan Administrator**" means such person appointed by the Decision Makers to serve as the administrator of the Plan and Chief Liquidating Officer of the Debtors in accordance with Section 4.5 of the Plan.

1.75    "**Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, including each Priority Tax Claim.

1.76    "**Priority Tax Claim**" means any Allowed Unsecured Claim of a federal, state or local taxing authority that is entitled to priority under 11 U.S.C. § 507(a)(8).

1.77    "**Private Sale**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.78    "**Professional**" means a professional employed by a Debtor under section 11 U.S.C. §327.

1.79    "**Professional Fee Claim**" means a Claim for compensation for services rendered, and reimbursement of expenses incurred by a Professional as awarded by a Final Order of the Bankruptcy Court; *provided that*, for the avoidance of doubt, the fees of the Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction shall be paid directly from Gross Sale Proceeds without further order of the Bankruptcy Court and shall not be deemed to have a Professional Fee Claim; *and further provided that* a Broker whose retention has been approved by the Bankruptcy Court that does not solicit an offer that results in a consummated Sale of a Property may have a Professional Fee Claim in accordance with the approved retention application, subject to the rights of Debtors and any party in interest to object to the same.

1.80    "**Professional Fees Reserve**" shall have the meaning ascribed to it under Section 5.3A of the Plan.

1.81    "**Proof of Claim**" means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.82    "**Properties**" means collectively the Aberdeen Property and the Brickchurch Property, each being a "**Property**."

1.83    "**Qualified Bidder**" has the meaning ascribed to such term in the Approved Bid Procedures, and shall, for the avoidance of doubt, include Bay Point by virtue of its Credit Bid rights.

1.84    **[Reserved].**

1.85    **[Reserved].**

1.86    **[Reserved].**

1.87    "**Reorganized Debtors**" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.88    "**Sale**" shall mean a sale of the Properties, whether through a single transaction or multiple transactions, pursuant to one or more Sale Approval Orders.

1.89    "**Sale Approval Order**" means an order of the Bankruptcy Court authorizing and directing the sale of one or more of the Properties pursuant to 11 U.S.C. § 363 or any other applicable provision of the Bankruptcy Code.

1.90    "**Sale Proceeds**" means the Net Sale Proceeds available from a Sale of a Property.

1.91    "**Sale Process**" shall have the meaning ascribed to such term in Section 4.2 of the Plan.

1.92    "**Schedules**" means the schedules of assets and liabilities and statement of financial affairs filed by the Debtors with the Bankruptcy Court in accordance with section 521(a)(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.93    "**Section 1031**" shall have the meaning ascribed to such term in Section 4.7 of the Plan.

1.94    "**Section 1146 Funds**" means an amount equal to (i) 3.4% of the Gross Sale Price of each Property sold to a Successful Bidder(s), other than Bay Point, or (ii) 3.4% of Bay Point's Credit Bid, if it is the Successful Bidder, that is paid by a Successful Bidder, other than Bay Point, following entry of the Sale Approval Order and the Confirmation Order.

1.95    "**Secured Claim**" means an Allowed Claim, including all amounts, if any, allowed pursuant to section 506(b) of the Bankruptcy Code, to the extent that it is secured by a Lien on property in which either Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.96    "**Successful Bid(s)**" shall mean the highest and best bid for one or both of the Properties as (i) collectively recommended by Debtors and Bay Point and approved by the Bankruptcy Court; or (ii) as decided by the Bankruptcy Court after notice and hearing of the same if Debtors and Bay Point are not able to agree on the same.

1.97    "**Successful Bidder**" shall mean the Qualified Bidder that submits a Successful Bid.

1.98    "**Transfer Taxes**" means, without limitation, (a) Suffolk County or other applicable local real property transfer taxes, including but not limited to the Peconic Bay transfer tax; (b) New York state TP 584 deed and transfer taxes; and (c) any and all other stamp taxes, similar taxes, or mansion taxes, which, but for the applicability of § 1146(a) of the Bankruptcy Code, would be applicable to any transfer made in accordance with, pursuant to, or in furtherance of the Plan.

1.99    "**Transferred Encumbrances**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.100   "**Unsecured Claim**" means an Allowed Claim which is not an Administrative Claim, a Bankruptcy Fee, a Priority Claim, a Post-Petition Administrative Tax Claim, or a Secured Claim.

1.101   "**Unsecured Creditor**" means the holder of an Allowed Unsecured Claim against one or both of the Debtors.

076

## ARTICLE II

## UNCLASSIFIED CLAIMS

Pursuant to Section 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, Priority Tax Claims, or Bankruptcy Fees, all of which shall be paid in full, or such other amount as agreed upon with the holders of such unclassified Claims.

2.1    **Administrative Expense Claims**.    Each holder of an Allowed Administrative Expense Claim—other than the DIP Lender Superpriority Claim, Bankruptcy Fees and any Allowed Administrative Expense Claim held by the IRS—shall be paid in full satisfaction of its Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan.  Payment shall be made on (a) the later of (i) the Distribution Date, (ii) the date payment of such Claim is due under the terms thereof or applicable law, and (iii) three (3) Business Days after such Claim becomes an Allowed Claim; or (b) upon such other terms as may be agreed to, in writing, between the Debtors and the holder of such Claim.

Except as otherwise set forth herein, requests for payment of Administrative Expense Claims not previously Allowed must be filed no later than the Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims not previously Allowed that do not file requests for payment of Administrative Expense Claims on or before the Administrative Expense Claim Bar Date shall be forever barred from asserting such Claims against the Debtors or the Properties.

2.2    **Professional Fees**.  All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. No later than three (3) Business Days prior to the Confirmation Hearing, each entity holding a Professional Fee Claim shall serve via email upon

077

counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through Confirmation, and (c) a good faith estimate of any expected post-confirmation fees and expenses. Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request. No later than three (3) Business Days prior to the Effective Date, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through the Effective Date, and (c) a good faith estimate of any expected post-Effective Date fees and expenses (if any). Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request; *provided*, *however*, the Allowed Professional Fee Claim of Simmons Legal PLLC shall not exceed $135,000, the Allowed Professional Fee Claim of Goldberg Weprin Finkel Goldstein LLP shall not exceed $100,000, and the Allowed Professional Fee Claim of Duane Morris LLP shall not exceed $151,905.95.

Each holder of an Allowed Professional Fee Claim shall be paid, in full satisfaction of its Allowed Administrative Expense Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan upon the later of (a) the Distribution Date and (b) the date upon which the Order Allowing such Professional Fee Claim becomes a Final Order. Payments made to a Professional in accordance with the provisions of Section 2.1 shall constitute payment in full of the Professional's Allowed Professional Fee Claim, and the Professional shall have no further recourse against the Plan Administrator, the Debtors, or Bay Point for such Claim.

2.3   **Priority Tax Claims**.   The New York State Department of Taxation and Finance has asserted Unsecured Priority Tax Claims in the total amount of $161.39 (the "**Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance**"). *See* Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834; *see also* Am. Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914. The Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance shall be paid in full on the Effective Date.

Subject to Section 5.2 of the Plan with respect to Disputed Claims, the IRS shall receive up to $1 million for payment of the IRS's Administrative Expense Claim arising from income taxes on the capital gains (if any) that result from the Sale; *provided*, *however*, that if the IRS's Administrative Expense Claim is less than $1 million, then the difference shall be applied to the IRS's Priority Tax Claim.

2.4   **Bankruptcy Fees**.

(a)   Quarterly United States Trustee Fees.  The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtor under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 from the Effective Date through the date of dismissal, conversion or entry of a final decree, shall be paid from the Bankruptcy Fees Reserve.

(b)   Plan Administrator Fees.  The Bankruptcy Fees payable to the Plan Administrator shall be paid within five (5) business days, or as soon as reasonably practicable thereafter, after the date that such Claim is Allowed by Final Order of the Bankruptcy Court. No later than twenty-one (21) Business Days prior to the hearing on the allowance of such Claim, the Plan Administrator shall serve upon counsel for Debtors, the United States Trustee, Bay Point, and any other Creditor requesting such information: (a) the current amount of its unpaid Bankruptcy Fees, and (b) a good faith estimate of its expected unpaid Bankruptcy Fees (if any) through dismissal, conversion or entry of a final decree.

(c)   Funding.  The Debtors shall use the Sale Proceeds and/or Section 1146 Funds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS

Pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, the Plan classifies Claims and Interests as summarized below:

| Class | Designation | Impaired | Entitled to Vote |
|-------|-------------|----------|------------------|
| Class 1 | Secured Claims of Bay Point | Yes | Yes |
| Class 2 | Secured Claims of New York State Department of Taxation and Finance | No | No |
| Class 3 | Non-Tax Priority Claims | No | No |
| Class 4 | General Unsecured Claims | Yes | No |
| Class 5 | Equity Interests | Yes | No |

**Class 1: Secured Claims of Bay Point**

3.1    **Classification** – Class 1 consists of the Secured Claims of Bay Point, which include the following: (a) the DIP Loan Obligations; (b) the JGB Judgment, *provided that*, for the avoidance of doubt, Bay Point is obligated to credit all amounts collected pursuant to the JGB Judgment to the outstanding DIP Obligations; and (c) the Morgan Stanley Judgment (collectively, the "Bay Point Debt"). The Morgan Stanley Judgment is secured by a first-priority Lien on the Aberdeen Property. The JGB Judgment is secured by a second-priority Lien on the Aberdeen Property and a first-priority Lien on the Brickchurch Property. The DIP Obligations in excess of the amount of the JGB Judgment are secured by a second-priority lien on the Brickchurch Property and a Lien on the Aberdeen Property that Bay Point asserts is a third-priority Lien and the IRS contends is a fourth-priority Lien (behind the IRS's asserted Lien on the Aberdeen Property).

**Treatment** – Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with

14

respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie,* to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order.

Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11 U.S.C. § 506(b) and the DIP Financing Order.

For the avoidance of doubt, nothing contained herein shall prejudice any right that Debtors may have to challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *provided, however, that* nothing contained herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided that* Debtors' reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; and

081

*further provided that* Debtors' reservation of rights shall not impair Bay Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order.

**Voting** – Class 1 is impaired under the Plan and, therefore, Bay Point is entitled to vote to accept or reject the Plan.

**Class 2:  Secured Claims of New York State Department of Taxation and Finance**

3.2    **Classification** – Class 2 consists of the Secured Claims of the New York State Department of Taxation and Finance.

**Treatment** – The holder of the Allowed Secured Claims of the New York State Department of Taxation and Finance shall be paid in full, in accordance with the provisions of Sections 2.1, 5.8, and 5.9 of the Plan.

**Voting** – Class 2 is unimpaired under the Plan and, therefore, the holder of the New York State Department of Taxation and Finance's Secured Claims is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan.

**Class 3:  Non-Tax Priority Claims**

3.3    **Classification** – Class 3 consists of Priority Claims, other than Priority Tax Claims.

**Treatment** – Bay Point does not believe that there are any Non-Tax Priority Claims. To the extent there are any such Claims, they shall be paid in full from the Sale Proceeds, provided that the aggregate amount of all Allowed Non-Tax Priority Claims does not exceed $5,000 in the aggregate.

**Voting** – Class 3 is unimpaired under the Plan and, therefore, each holder of a Class 3 Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan.

**Class 4:  General Unsecured Claims**

16

3.4     **Classification** – Class 4 consists of all Unsecured Claims.

    **Treatment** – Class 4 will not receive any distributions under the Plan.

    **Voting** – Class 4 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**Class 5:  Equity Interests**

3.5     **Classification** – Class 5 consists of the Equity Interests in the Debtors.

    **Treatment** – Class 5 will not receive any distributions under the Plan.

    **Voting** – Class 5 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1     **Authority to Act / Limitation of Liability.**  Each act and every decision to be made by Debtors under the Plan shall be made at the direction, and shall be completely consistent with such direction, of the Decision Makers, such direction being valid and enforceable only upon the mutual agreement of both Decision Makers. If the Decision Makers are not able to reach a mutual agreement regarding a decision or act of the Debtors, each Decision Maker agrees that either Decision Maker shall be permitted to seek relief from the Bankruptcy Court on shortened notice; *provided that*, for the avoidance of doubt, the discretion of whether to hear any issues raised by such Decision Maker on shortened notice shall remain with the Bankruptcy Court. For the avoidance of doubt, Blouin shall have no authority to act with respect to either of the Debtors and shall completely refrain from taking part in, or interfering with, any of the decisions, processes, or procedures set forth or governed by the Plan. The Decision Makers, solely as a result of their status as a Decision Maker under the Plan, shall not be deemed officers, fiduciaries or agents of the Debtors. The Decision Makers may employ or contract with such third parties as appropriate to

17

assist in the implementation of the Plan; *provided that* the employment of any such person on behalf of the Debtors shall require a decision of the Debtors. The Decision Makers shall have no obligation to file tax returns or similar reports with the appropriate taxing authorities. **The Decision Makers shall not have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan**.

4.2 <u>**Sale Free and Clear of All Claims, Liens, Taxes and Interests.**</u>  The Plan shall be funded through the Sale of the Properties in accordance with the sale process run pursuant to the terms of the Approved Bid Procedures (the "<u>Sale Process</u>"), the funds that were previously distributed by Bay Point to the Debtors pursuant to the DIP Financing Order, and the Section 1146 Funds; *provided that*, for the avoidance of doubt, the Debtors may consummate a Private Sale in accordance with the Approved Bid Procedures.

4.3 **[Reserved].**

4.4 <u>**Provisions Relating to the Sale Process**</u>.

   (a) <u>Approved Bid Procedures</u>.  The Sale Process, including the consummation of one or more Sales, shall be conducted in accordance with the Approved Bid Procedures.

   (b) <u>Free and Clear Sale(s)</u>.  All transfers of the Properties shall be effectuated by one or more Bargain and Sale Deeds, free and clear of all Liens, Claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with such Liens, claims, taxes and interests attaching to the Sale Proceeds of the respective Property in the same order, extent and priority as existed prior to Confirmation.

   (c) <u>Sale Approval Order(s)</u>.  Any proposed Sale, including a Private Sale, shall be subject to the approval of the Bankruptcy Court under 11 U.S.C. 363(b) (i.e., a Sale Approval Order).

084

(d)     <u>Deadline to Close</u>.  The Closing with respect to any Sale that has been approved by the Bankruptcy Court shall close by **February 20, 2024**.

(e)     <u>Payment of Sale Transaction Costs</u>.  The Escrow Agent shall distribute the following amounts from the Gross Sale Proceeds with respect to each Property: (i) subject to any agreement between the Debtors and the Auctioneer, the fees and expenses of the Auctioneer (if any) with respect to such Property; (ii) subject to any agreement between a Broker and the Debtors, the fees and expenses of a Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction; (iii) the fees and expenses of the Escrow Agent (if any) with respect to the Sale involving such Property; (iv) any other closing costs associated with the Sale of such Property; and (e) subject to and without waiving Section 4.6 of the Plan and section 1146(a) of the Bankruptcy Code, any documentary and Transfer Taxes; *provided that*, for the avoidance of doubt, the provisions of this Section 4.4(e) of the Plan shall be subject to any employment and/or listing agreements that have been approved by the Bankruptcy Court in connection with Debtors' request to retain one or more professionals.

(f)     <u>Vesting of Assets</u>.  The Properties shall remain in the Debtors' respective Estates under section 541(a) of the Bankruptcy Code until the Effective Date of a Sale of the same and shall remain subject to all Liens and Claims that exist as of the date of Confirmation.  Upon the closing of a Sale involving one or both Properties, such Properties (or Property) shall vest in the Successful Purchaser, free and clear of all Liens and Claims other than Transferred Encumbrances. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, authorizing and directing the Plan Administrator and any other necessary party to execute or deliver, or to join in the execution or delivery, on the Closing date of the Sale(s), of any instrument required to effect a transfer of Properties (or a respective Property) as required by the Plan, and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan.

4.5     **The Plan Administrator**.

(a)     <u>Plan Administrator Appointment</u>.  The Plan Administrator shall administer the proceeds of the Sale(s) of the Properties through the separate DIP account (the "**Escrow DIP Account**") established by the Debtors at a depository institution that has been previously approved by the UST with the Plan Administrator identified as the sole signatory on such account.[1] The Confirmation Order shall

---

[1] The Plan Administrator, in such role, is defined as the "**Escrow Agent**" in the Auction Agreement and Approved Bid Procedures, and being defined similarly herein.

approve the Debtors' appointment of the Plan Administrator, with the power and duty to administer the Escrow DIP Account.

(b)    <u>Plan Administrator Protections</u>.  The Plan Administrator shall not be deemed an officer, fiduciary or agent of the Debtors. The Plan Administrator may, with the consent of the Debtors, employ or contract with such third parties as appropriate to assist in the performance of its duties under the Plan. The Plan Administrator shall have no obligation to file tax returns or similar reports with the appropriate taxing authorities. The Plan Administrator shall not have, or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, except in the case of gross negligence or willful misconduct.

(c)    <u>No Interference</u>.  No Person, including Debtors, Bay Point, Charles Andros, the holders of any Equity Interests, Kabatoff, and Blouin, shall interfere with the Plan Administrator in the performance of its duties, and any party with notice of the Confirmation Order shall be enjoined from taking any action that could reasonably be deemed to be an intentional interference with the Plan Administrator in the performance of its duties; *provided that*, nothing contained herein shall prohibit or inhibit a Decision Maker from exercising the discretion provided to it under the terms of the Plan and Approved Bid Procedures.

(d)    <u>Execution of Documents</u>. Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtors, the Plan Administrator, and any other necessary party shall be authorized, and shall be directed by the Confirmation Order, to execute any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance, including without limitation, any Lien, Claim or encumbrance not expressly provided for in the Plan, that is necessary for consummation of the Plan, and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide.

(e)    <u>Filing of Documents</u>.  Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

4.6    **Transfer Taxes**.  The Sale of the Properties constitutes the making or delivery of instruments of transfer of property or otherwise, pursuant to or in connection with confirmation of

the Plan, and, therefore, to the maximum extent provided by Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Plan, including an instrument of transfer and deed executed by the Debtors shall not be subject under any law imposing a stamp tax, real estate transfer tax, mansion tax, mortgage recording tax or similar tax (previously defined as the "Transfer Taxes"). Accordingly, the appropriate officials or agents of state or local governmental units, including New York State, Suffolk County and the Town of Southampton, shall forego collection of any such Transfer Taxes and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

4.7    **Allocation**.  In the event of a sale of the Properties as a single lot, the proceeds of the Sale shall be allocated pursuant to agreement between Debtors and Bay Point; *provided that* if Debtors and Bay Point cannot agree on an allocation, Debtors and/or Bay Point may file a motion with the Bankruptcy Court to request that the Court determine such allocation and each of the same agrees that the other party shall be entitled to seek expedited relief with respect to the same.

4.8    **Preservation of Causes of Action.**  Subject to the Liens granted to Bay Point pursuant to the DIP Loan Documents and/or the DIP Financing Order, all claims, causes of action, damages or remedies in favor of the Debtors' respective estates relating to any prior transactions (including all avoidance claims under the Bankruptcy Code or state law) shall be preserved for the benefit of the Debtors' estates and distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court.

4.9    **1031 Exchange Provisions.**  Provided that there is no prejudice or harm to the Debtors' respective estates or to the interests of each Debtor's respective Creditors, including with respect to such Creditors' right to promptly be paid in accordance with the provisions of the Plan,

087

nothing contained herein shall prohibit the Debtors from structuring a Sale in a manner that permits the Sale to qualify under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986 as amended ("Section 1031"), including use of a qualified intermediary. For the avoidance of doubt, nothing contained herein shall (a) permit either Debtor from transferring any Estate property outside of the Estate; and/or (b) permit either Debtor to delay the Sale Process, a Sale, or a Closing for any purpose relating to Section 1031.

4.10    **Filing of Documents.**    Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

4.11    **Preservation of Insurance.**    The Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtor, the Properties (or any individual Property), or any other Person or entity. Likewise, the Plan and the Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or any insurance carrier.

## ARTICLE V

## DISTRIBUTIONS

5.1    **Method of Payment**.    Unless otherwise expressly agreed, in writing, payments to be made pursuant to the Plan shall be made at the times and in the amounts set forth in the Plan by either electronic funds wire transfer or check drawn on a domestic bank.

5.2    **Disputed Claims Reserves**.  No distributions shall be made with respect to any Disputed Claim. Instead, the Debtors shall deposit into one or more segregated accounts (the "Disputed Claims Reserves," each being a "Disputed Claims Reserve") funds equal to 100% of the Cash that would be distributed under the Plan to the holder of a Disputed Claim that would be an Allowed Claim, but for the dispute, including, but not limited to (i) Disputed Secured Claims (ii) Disputed Claims entitled to treatment as Administrative Expenses or as Priority Claims pursuant to sections 503 and 507 of the Bankruptcy Code, (iii) Disputed Claims of Governmental Units for any tax, and (iv) any disputed cure amount. In determining the amount of the Cash to be distributed under the Plan to the holders of Allowed Claims on the Distribution Date, the calculation of the amount to be distributed to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts. The Debtors or any other party in interest shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating the amount of a Disputed Claim, and limiting the amount of Cash that must be so deposited. Any Creditor whose Claim is so estimated and limited shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other entity or property if the Allowed Claim of the Creditor (whose Claim was so estimated and limited) as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims Reserve applicable to such Disputed Claim (on a *pro rata* basis with any other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims associated with that particular Disputed Claims Reserve that are allowed by Final Order; *provided that*, for the avoidance of doubt, any Disputed Claim that is deemed to be an Allowed Claim by a Final

089

Order shall participate in any future distributions as an Allowed Claim. Separate Disputed Claims Reserves shall be set up for Claims of different payment priority under the terms of this Plan.

5.3 **Bankruptcy Fee Reserve.** The Debtors shall utilize the Sale Proceeds and Section 1146 Funds to deposit in a segregated account on the Distribution Date (the "Bankruptcy Fees Reserve"), in accordance with the provisions of the Plan, an amount equal to the Bankruptcy Fees estimated to accrue from and after the Effective Date through the date of dismissal, conversion, or entry of a final decree.

5.3A **Professional Fees Reserve**. The Debtors shall utilize the Sale Proceeds and Section 1146 Funds to deposit in a segregated account on the Distribution Date (the "Professional Fees Reserve") the following amounts for the benefit of the Debtors' Professionals specified below:

| Debtor | Professional | Amount |
|---|---|---|
| Aberdeen | Goldberg Weprin Finkel Goldstein LLP | $100,000.00 |
| Brickchurch | Simmons Legal PLLC | $135,000.00 |
| Brickchurch | Duane Morris LLP | $151,905.95 |

Three (3) Business Days after the Administrative Expense Claim of the Professional becomes an Allowed Claim, funds equal to the amount of the Allowed Claim shall be withdrawn from the Professional Fee Reserve and paid to the Professional. Any funds remaining in the Professional Fee Reserve designated for such Professional shall be released from the Professional Fee Reserve and transferred to the Plan Administrator for distribution in accordance with the provisions of Sections 5.8 and 5.9.

090

5.4    **Prosecution of Objections.**  Debtors shall have the right to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claims. Objections to Claims shall be served and filed on or before the Claims Objection Deadline.

5.5    **Distribution After Allowance.**  Within ten (10) days after entry of a Final Order finding all (or part of) a Disputed Claim to be an Allowed Claim (or as soon thereafter as practicable), the Debtors shall distribute from the funds placed in the Disputed Claims Reserve with respect to such Claim, all Cash, including any interest or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

5.6    **Distribution After Disallowance.**  The balance of a Disputed Claims Reserve remaining after all Disputed Claims have been resolved by Final Order shall be used to satisfy any outstanding Bankruptcy Fees, Claims, and Interests in the order of priority specified in Sections 5.8 and 5.9 of the Plan.

5.7    **Delivery of Distributions.**  Distributions to holders of Allowed Claims shall be made: (i) at the address set forth on the respective Proof(s) of Claim or other request(s) for payment filed by the holder of such Allowed Claim; (ii) at the addresses set forth in any written notices of address change delivered to the Debtors; or (iii) at the address reflected in the Schedules if no Proof of Claim, or other request for payment, is filed and the Debtors have not received a written notice of change of address.

5.8    **Distribution to Allowed Claims Against Aberdeen.**  The Net Sale Proceeds realized from or allocable to, the Aberdeen Property, currently estimated to be in the amount of $43,991,440.00, along with the other assets of the Aberdeen Estate, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(a)    First, the amount of $43,991,440, which is comprised of the Net Sale Proceeds of the Aberdeen Property, shall be distributed in the following order:

091

      (i)     <u>First</u>, $168.20 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Aberdeen;

      (ii)    <u>Second</u>, $16,248,932 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the Morgan Stanley Judgment;

      (iii)   <u>Third</u>, $26,240,899.80 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

(b)    <u>Second</u>, the amount of $1,501,440, which is comprised of the Section 1146 Funds attributable to the Aberdeen Property Sale, shall be distributed in the following order:

      (i)     <u>First</u>, $6.87 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Aberdeen;

      (ii)    <u>Second</u>, up to $300,000 shall be paid towards Bankruptcy Fees;

      (iii)   <u>Third</u>, up to $575,000 shall be paid to the IRS for application to the IRS's Allowed Administrative Expense Claim and/or Priority Tax Claim (subject to the provisions set forth in Section 2.1 of this Plan);

      (iv)   <u>Fourth</u>, up to $100,000 shall be paid to Goldberg Weprin Finkel Goldstein LLP in full payment of its Allowed Professional Fee Claims; and

      (v)    <u>Fifth</u>, any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(c)    <u>Third</u>, the amount of $108,317.25, which is comprised of certain casualty insurance proceeds related to the Aberdeen Property in which Bay Point has a first-priority secured interest, shall be paid to Bay Point for application to the outstanding DIP Loan Obligations;

(d)    <u>Fourth</u>, any remaining monetary assets of Aberdeen shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

5.9    **<u>Distribution to Allowed Claims Against Brickchurch.</u>** The Net Sale Proceeds realized from or allocable to, the Brickchurch Property, currently estimated to be in the amount of $41,755,280, along with the other assets of the Brickchurch Estate, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

092

(a) <u>First</u>, the amount of $41,755,280, which is comprised of the Net Sale Proceeds of the Brickchurch Property, shall be distributed in the following order:

    (i) <u>First</u>, $1,997.79 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Brickchurch;

    (ii) <u>Second</u>, $30,096,479.80 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

    (iii) <u>Third</u>, $10,231,354.21 shall be paid to Bay Point for application to (i) the Indemnification Reserve for claims relating to the DIP Loan Obligations and/or the JGB Assigned Documents, including any of the transactions referred to or referenced herein; and (ii) the outstanding amount of the Allowed DIP Loan Obligation;

(b) <u>Second</u>, the amount of $1,425,280, which is comprised of the Section 1146 Funds attributable to the Brickchurch Property Sale, shall be distributed in the following order:

    (i) <u>First</u>, $154.52 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Brickchurch;

    (ii) <u>Second</u>, up to $300,000 shall be paid towards Bankruptcy Fees;

    (iii) <u>Third</u>, up to $425,000 shall be paid to the IRS for application to the IRS's Allowed Administrative Expense Claim and/or Priority Tax Claim (subject to the provisions set forth in Section 2.1 of this Plan);

    (iv) <u>Fourth</u>, up to $151,905.95 shall be paid to Duane Morris LLP in full payment of its Allowed Professional Fee Claims;

    (v) <u>Fifth</u>, up to $135,000 shall be paid to Simmons Legal PLLC in full payment of its Allowed Professional Fee Claims; and

    (vi) <u>Sixth</u>, any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(c) <u>Third</u>, any remaining monetary assets of Brickchurch shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

5.10 **Creditor's Right to Accept Lesser Payment**.  For the avoidance of doubt, nothing contained herein shall prevent a Creditor or Class of Claims from voluntarily accepting a lesser

amount (or other disparate treatment) than such Creditor or Class of Claims would otherwise be entitled to under the Plan.

5.11    **Estates' Right to Clawback.**  For the avoidance of doubt, distributions to Bay Point under the Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be distributed as Sale Proceeds in accordance with the Plan.

5.12    **Order of Distributions and Allocation of Clawback.**  The distributions required by Sections 5.8 and 5.9 of this Plan, and the clawback provisions of Section 5.11 of the Plan, shall be applied in an order and manner so as to promote the substantial consummation of the Plan; *provided that* for the avoidance of doubt, nothing contained herein shall permit distributions to be paid in a priority inconsistent with Sections 5.8 and 5.9 of the Plan.

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1    **Rejection of Executory Contracts**.  On the Effective Date, all Executory Contracts to which the Debtor is a party shall be deemed rejected.

6.2    **Rejection Damages Claims**.    Allowed Claims arising from the rejection of Executory Contracts of a Debtor pursuant to Section 6.1 of the Plan shall be treated as Unsecured Claims.

6.3    **Bar to Rejection Claims**. A Proof of Claim seeking payment of any Unsecured Claim for damages arising from the rejection of an Executory Contract pursuant to Section 6.1 of the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within thirty (30) days after the Confirmation Date.  Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors and may not be enforced against the Properties, any purchaser of the Properties, or any Creditor under any indirect or equitable legal theory such as unjust enrichment.

## ARTICLE VII

## CONFIRMATION AND CONSUMATION OF THE PLAN

**7.1    Injunction Against Interference with Plan.  Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided that*, for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property.**

7.2    **[Reserved]**.

7.3    **No Discharge**.  Pursuant to section 1141(d)(3) of the Bankruptcy Code, as applicable, the Debtors will not be discharged from debts that arose prior to Confirmation.

7.4    **Liens and Claims.**  All Liens and Claims with respect to the Properties and all other assets of the Debtors shall survive Confirmation and remain attached in their respective order of priority as existed as of the date of Confirmation; *provided that*, as set forth in this Plan, the

Sale(s) of the Properties shall be free and clear of any Liens, Claims, and/or Interests pursuant to Section 363 of the Bankruptcy Code and such Liens, Claims, and/or Interests shall attach to the respective Sale Proceeds in the same order of priority as existed as of the date of the Closing of the Sale.

7.5    **Conditions to Effective Date.**    The Plan will not become effective, and the Effective Date will not occur, unless and until:

  (a)    the Confirmation Order has become a Final Order;

  (b)    the Bankruptcy Court shall have entered the Order approving the Sale Transaction;

  (c)    the Sale Transaction shall have closed;

  (d)    the Debtors shall have received the Section 1146 Funds; and

  (e)    the payments required pursuant to Sections 5.8 and 5.9 of the Plan shall have been made; *provided that* nothing contained herein shall condition the effectiveness of the Plan on payment of any Disputed Claims so long as a Disputed Claims Reserve is established (if so required) pursuant to the terms of the Plan.

7.6    **Binding Effect.**    Subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of the Plan will bind every holder of a Claim against or Interest in one or more of the Debtors and inure to the benefit of and be binding on such holder's respective heirs, successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder accepted the Plan.

## ARTICLE VIII

## RETENTION OF JURISDICTION

8.1    **Retention of Jurisdiction**.    The Bankruptcy Court shall retain post-confirmation jurisdiction over the following matters:

(a)      To issue any orders necessary or appropriate to authorize the sale of substantially all of the assets of the Debtors or Reorganized Debtors, as applicable, pursuant to sections 105(a), 363(b), 363(f), 365, 503, 507, 1123, 1142 and 1146(a) of the Bankruptcy Code.

(b)      To adjudicate any dispute relating to the sale of the Properties;

(c)      To resolve all matters and disputes arising under or relating to the Plan, including, without limitation, (i) disputes relating to the Sale Process; (ii) any disputes relating to, or involving the amount of the allowance of Claims; and (iii) distribution or disbursement of the Sale Proceeds;

(d)      To Allow or disallow in whole or in part any objections to Claims filed prior to the Closing that have not been previously Allowed or disallowed;

(e)      To grant or deny the applications for allowance of final compensation and reimbursement of expenses of Professionals;

(f)      To enter an order or final decree concluding the Cases following the Sale of the Properties, payment of allowed claims, resolution of all disputes, and distribution of all reserves;

(g)      To compel the Debtors, Blouin, the Plan Administrator, or any other person to take such action and execute such documents, or to refrain from such action, as may be necessary to effectuate the Plan;

(h)      To enter Orders that may be necessary or appropriate to implement or consummate the provisions of the Plan and to enforce all Orders, judgments, injunctions, and rulings entered in connection with the Cases;

(i)      Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

(j)     Approve modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, and modifications of the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

(k)     Issue and enforce injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(l)     Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m)     To enter a Sale Approval Order with respect to the Properties regardless of the failure to timely achieve substantial consummation of the Plan and regardless of whether the Plan shall become effective pursuant to Section 7.5 of the Plan;

(n)     Issue any Orders necessary to consummate a sale of the Properties pursuant to 11 U.S.C. 363 or any other applicable provision of the Bankruptcy Code after any failure to timely achieve substantial consummation the Plan and/or any failure of the Plan to become effective pursuant to Section 7.5 of the Plan; and

(o)     Issue any Orders as may be appropriate to convert the Cases to chapter 7 if the Plan is not substantially consummated or otherwise fails to become effective pursuant to Section 7.5 of the Plan.

**ARTICLE IX**

**<u>GENERAL PROVISIONS</u>**

9.1    **<u>Orders in Aid of Consummation</u>.**  Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of

32

Confirmation and/or consummation of the Plan directing the implementation of matters or actions required by the Plan.

9.2    **Compliance with Tax Requirements.**  In connection with the Plan, the Debtors, and where applicable, the Plan Administrator, shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and distributions under the Plan shall be subject to applicable withholding and reporting requirements; *provided, however*, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

9.3    **Due Authorization by Creditors.**  Each and every Creditor who elects to participate in the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

9.4    **Amendments and Modifications.**  The Plan may be altered, amended or modified by Debtors, solely with the consent of Bay Point, at any time before the substantial consummation of the Plan, as provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019; *provided that* Debtors may only modify the Approved Bid Procedures consistent with the terms of such Approved Bid Procedures.

9.5    **Revocation.**  Debtors, solely with the consent of Bay Point, may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii)

prejudice in any manner the rights of the Debtor or any Creditor in any further proceedings involving the Debtors or their Estates.

9.6     **Request for Relief under Section 1129(b).**  If the Plan is accepted by one or more, but not all, classes of Creditors that are found to be impaired by the Plan, Debtors or Bay Point may request confirmation under section 1129(b) of the Bankruptcy Code, subject to any modification of the Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019

9.7     **Filing of Additional Documents.**  Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor or Bay Point may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

9.8     **Headings.**  The headings in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

9.9     **Computation of Time.**  In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.10    **Successors and Assigns.**  The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

9.11    **Notices.**  All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein.

If to Brickchurch Enterprises, Inc.:

    Simmons Legal PLLC
    Camisha L. Simmons, Esq.

34

6060 N. Central Expressway, Suite 500
Dallas, Texas 75206
Camisha@SimmonsLegal.Solutions

If to Aberdeen Enterprises, Inc.:

Goldberg Weprin Finkel Goldstein LLP
Kevin Nash
125 Park Avenue, 12th Floor
New York, New York 10017
knash@gwfglaw.com

If to the holders of the Equity Interests:

Brickchurch Enterprises (BVI) Ltd.
165 Broadway, 23rd Floor
New York, New York 10006
lt@ltbholding.com

-and-

Aberdeen Enterprises (BVI) Ltd.
165 Broadway, 23rd Floor
New York, New York 10006
lt@lbtholding.com

If to Bay Point Capital Partners II, LP:

The Law Offices of John F. Isbell LLC
John F. Isbell, Esq.
3050 Peachtree Road NW, Suite 740
Atlanta, Georgia 30305
John@JFI-Law.com

-and-

Thompson Hine LLP
John C. Allerding, Esq.
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
John.Allerding@ThompsonHine.com

If to any other Creditor:

At (a) the addresses set forth on the applicable Proofs of Claim or other request for
payment filed by such holder, (b) the addresses set forth in any written notices of

address changes delivered to the Debtors, or (c) the address reflected in the Schedules if no Proof of Claim is filed and the Debtors have not received a written notice of a change of address.

<u>If to any entity that has filed a notice of appearance</u>:

At the address set forth on such notice of appearance.

9.12   **Other Actions.**   Nothing contained herein shall prevent any person from taking such actions as may be reasonably necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan; *provided, however,* that no person shall take action expressly prohibited by or contrary to the express provisions of this Plan.

9.13   **Severability.**   In the event any provision of the Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

9.14   **Business Day.**   In the event that the Plan requires an act to be performed on a day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

9.15   **Quarterly Fees**.   All fees payable pursuant to 28 U.S.C. § 1930, together with any applicable interest thereon, shall be paid by the Debtors until the closing of the Cases under 11 U.S.C. §350(a).

9.16   **Post-Confirmation Reports**.   The Debtors shall file quarterly status reports until the Cases are closed.

9.17   **Continuation of the Debtors**.   The Debtors shall continue in existence, duly authorized to carry out the terms of the Plan and the distribution of the Sale Proceeds. The Debtors shall not be dissolved until after the entry of a Final Decree closing the Cases. If the holders of the Equity Interest determine it desirable for the Debtors to exist after the closing of the Cases, and

such continued existence does not prejudice any Creditors, nothing contained herein shall prevent the Equity Interest holders from choosing to continue the corporate existence of the Debtors.

## ARTICLE X

## CLOSING OR CONVERSION OF THE CASE

10.1    **Substantial Consummation.**    Following entry of the Confirmation Order and satisfaction of the conditions in Section 7.5 of the Plan, Debtors shall file a notice with the Bankruptcy Court of the substantial consummation of the Plan. Upon the filing of such notice of substantial consummation, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

10.2    **Closing of the Case.**    Within fourteen (14) days following the full administration of the Debtors' Estates, the Debtors shall file, on notice to the United States Trustee's Office, an application and proposed order seeking a final decree, closing the Cases pursuant to Bankruptcy Rule 3022.

10.3    **Failure to Achieve Substantial Consummation.**    If the Plan is unable to be substantially consummated, then the Debtors shall seek entry by the Bankruptcy Court of a Sale Approval Order (a) authorizing and directing the Debtors to sell the Properties to the Successful Bidder(s), or, if the Successful Bidder with respect to a particular Property shall default under the terms of the asset purchase agreement governing such Sale, to the Backup Bidder, pursuant to 11 U.S.C. § 363(b) and/or any other applicable provision of the Bankruptcy Code provided that the Sale otherwise meets the standard that a debtor must establish for obtaining court approval of transfers under such applicable Bankruptcy Code section(s); (b) ordering the distribution of Sale Proceeds resulting from such Sale to be distributed to the holder(s) of any Secured Claim(s) with respect to the transferred Property/Properties; and (c) ordering that the Sale Proceeds in excess of

those necessary to satisfy such Secured Claims be held in the Debtors' respective Estates pending conversion of the Cases to chapter 7 in accordance with Section 10.4 of the Plan.

      10.4   **<u>Conversion or Dismissal of the Cases Following Plan Failure</u>.**  If the Plan is unable to be substantially consummated, then, after entry of any Sale Approval Orders pursuant to Section 10.3 of the Plan, the Bankruptcy Court shall, upon the request of the Debtors or on its own volition, enter an Order (a) converting the Bankruptcy Cases to chapter 7 cases and appointing a chapter 7 trustee; or (b) dismissing the Bankruptcy Cases.

Dated:   New York, NY
         January 30, 2024


Respectfully submitted,

THOMPSON HINE LLP

By: /s/ John C. Allerding
John C. Allerding (admitted pro hac vice)
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
P: 404.407.3676 / F: 404.541.2905
John.Allerding@ThompsonHine.com

*Counsel for Bay Point Capital Partners II, LP*


BAY POINT CAPITAL PARTNERS II, LP

   By:   Bay Point Advisors LLC, its
         General Partner

         By:  /s/ Charles Andros

EXHIBIT 4: Liquidating Plan objection by IRS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| BRICKCHURCH ENTERPRISES, INC., | ) | Case No. 8-22-70914-ast |
| | ) | |
| Debtor. | ) | Judge Alan S. Trust |
| _____ | ) | |

**CREDITOR INTERNAL REVENUE SERVICE'S OBJECTION TO
DISCLOSURE STATEMENT FOR BAY POINT CAPITAL PARTNERS II, LP'S
PROPOSED FIRST AMENDED PLAN OF LIQUIDATION OF BRICKCHURCH ENTERPRISES, INC.
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE (ECF NO. 288) AND RESPONSE TO
ORDER TO SHOW CAUSE WHY THIS CASE SHOULD NOT BE DISMISSED**

The creditor Internal Revenue Service ("IRS") hereby objects to the Disclosure Statement

(ECF No. 288), and the accompanying proposed First Amended Chapter 11 Plan (ECF No. 287),

filed by Bay Point Capital Partners II LP. Nonetheless, the IRS submits that the case should not

be dismissed because the interests of all creditors, including the IRS, will be better served by

joint administration of this case with the recently filed related case of Aberdeen Enterprises, Inc.

## I.    Background

Debtor Brickchurch Enterprises, Inc. ("Brickchurch") holds title to the real property

located at 366 Gin Lane, Southampton, New York (the "366 Property"). Brickchurch has no

other assets. Another related entity, Aberdeen Enterprises, Inc. ("Aberdeen"), holds title to the

adjacent real property at 376 Gin Lane (the "376 Property"), with the two properties comprising

a single residential compound. Aberdeen has no other assets. Both Aberdeen and Brickchurch

are ultimately owned and controlled by Louise T. Blouin, as are the two real properties.

The IRS recorded notices of federal tax liens ("NFTLs") against both Brickchurch and

Aberdeen as nominees of Ms. Blouin in August 2022. Unbeknownst to the IRS at the time,

Brickchurch was in bankruptcy, and for that reason the NFTLs against Brickchurch were later

withdrawn pursuant to 26 U.S.C. § 6323(j). The NFTLs against Aberdeen were not withdrawn. Aberdeen and Ms. Blouin jointly filed a separate lawsuit in U.S. District Court, challenging the NFTLs and seeking to quiet title to the 376 Property. *See* Case No. 2:22-cv-07190 (E.D.N.Y.). The United States filed a counterclaim for a money judgment against Ms. Blouin based on her tax liabilities. The U.S. District Court lawsuit remains pending.

After belatedly being made aware of this bankruptcy case following the debtor's failure to provide timely notice, the IRS filed its proof of claim (Claim 13-1) on December 1, 2022, which was one month after the bar date and prior to any trustee's final report or the commencement of final distribution. The proof of claim asserts that Brickchurch is liable for tax debts of Ms. Blouin as her nominee or alter ego. In 2018, the IRS assessed trust fund recovery penalties under 26 U.S.C. § 6672 against Ms. Blouin for failing to remit withholding taxes for two companies. The IRS proof of claim shows unsecured priority claims in the amount of $5,685,582.56 for § 6672 liabilities assessed for 25 quarterly periods between 2010 and 2017. The liabilities are entitled to priority under 11 U.S.C. § 507(a)(8)(C). The Claim also includes a $50,000 unsecured general claim. Brickchurch filed an objection to the IRS claim that has been fully briefed, argued, and submitted. ECF Nos. 205, 223, 224, 233, 234.

In December 2022, Ms. Blouin, acting on behalf of Brickchurch and Aberdeen, entered into a loan agreement with Bay Point Capital Partners II LP ("Bay Point") that gave Bay Point a lien against both the 366 Property and the 376 Property. For several months, the IRS has been waiting to see if Brickchurch and Bay Point can reach agreement on a joint Chapter 11 Plan. It is now clear that they cannot.

Bay Point filed its own Chapter 11 Plan and Disclosure Statement on May 17, 2023. ECF Nos. 247, 248. The IRS filed an objection to the disclosure statement, noting that Bay Point's

proposal would not pay anything toward the IRS's priority claim or the capital gains tax on the contemplated sale of the 366 Property. ECF No. 265. Brickchurch has also objected to Bay Point's disclosure statement (ECF No. 277), and filed a motion to dismiss its own bankruptcy case (ECF No. 257). Bay Point has opposed Brickchurch's motion to dismiss. ECF No. 266.

On July 18, 2023, the Court held a status conference and hearing on Bay Point's disclosure statement and Brickchurch's motion to dismiss. Bay Point's counsel recognized that substantial capital gains tax would be due upon sale of the 366 Property and suggested that a plan would not be feasible unless the IRS agreed not to collect the full tax as a priority administrative expense. The Court gave the parties 10 days to file a letter regarding the status of negotiations toward a joint plan, and then until August 9, 2023 to file such plan, otherwise the failure to do so would be treated as an order to show cause why the case should not be dismissed.

Rather than work toward a compromise solution, Bay Point then exercised its purported rights under the loan documents to replace the management of both Brickchurch and Aberdeen. *See* ECF No. 278. Bay Point now appears to take the view that it can act unilaterally with respect to both the 366 Property and the 376 Property. Bay Point and Brickchurch's counsel still filed a bizarre letter on July 31, 2023, suggesting they may yet be able to reach agreement on terms of a joint plan while hastening to add that control of the debtor itself was in dispute. ECF No. 283. The letter indicated that Bay Point would first try to buy the 376 Property in a state court foreclosure and then attempt to re-sell it, along with the 366 Property, through a Chapter 11 plan to be proposed in this bankruptcy case. *See id.*

The illusion of cooperation did not last long, however, as Aberdeen filed its own Chapter 11 petition on August 2, 2023—the day before a state court foreclosure auction of the 376 Property. *See* Case No. 8:23-bk-72834, ECF No. 1. Ms. Blouin's case-opening affidavit in the

3

Aberdeen bankruptcy case acknowledges that the 376 Property is "encumbered by Federal tax liens in the aggregate amount of approximately $4.7 million," with that amount being exclusive of statutory interest that is also due and owing. *Id*. at 7 ¶ 7. Aberdeen's schedules show the IRS as having an undisputed secured claim. *Id*. at 21-22, Schedule D (item 2.4). Bay Point's claim, by contrast, is disputed. *Id*. at 20-21. Ms. Blouin takes the position that while the portion of Bay Point's claim that arises from an alleged assignment of an earlier mortgage may be entitled to priority over the tax liens on the 376 Property (to the extent the mortgage was not satisfied), the additional amount of Bay Point's December 2022 loan is junior to the tax liens. *Id*. at 7-8 ¶¶ 6-8. The IRS agrees that Bay Point's claim is at least partially—if not wholly—junior to the tax liens that have attached to the 376 Property.

Bay Point has moved to dismiss the Aberdeen Chapter 11 case, alleging that Ms. Blouin had no authority to put Aberdeen into bankruptcy. ECF No. 12 in Case No. 8:23-bk-72834. Newly retained counsel for Ms. Blouin's entities have indicated that they will be opposing Bay Point's motion and filing an "adversary proceeding and contempt motion against Bay Point in both cases." ECF No. 18 in Case No. 8:23-bk-72834 and ECF No. 284 in this case.

On August 9 and 10, 2023, Bay Point filed its Amended Plan and Amended Disclosure Statement in the Brickchurch case. ECF Nos. 287 ("Amended Plan") and 288 ("Amended Disclosure Statement"). The sole "Plan Proponent" is Bay Point. Amended Plan § 1.78.

## II.    Argument

Under the circumstances, the Amended Disclosure Statement is not adequate, and confirmation of the Amended Plan should be denied for several reasons.

### A.    The 376 Property Is Not Property of the Brickchurch Bankruptcy Estate

First, the Amended Plan in the Brickchurch bankruptcy case improperly directs the

disposition of the proceeds of an anticipated future state court foreclosure sale of the 376

Property, which is titled to Aberdeen. The fundamental problem with doing that is that the 376

Property is not property of Brickchurch's estate.

Of course, Aberdeen itself is also now in bankruptcy, and it may well make sense to

consolidate the two cases for joint administration of the 366 and 376 Properties. *See infra* Part

II.E. Everyone appears to agree that selling the two properties together is most likely to

maximize the sale proceeds. *See* ECF No. 283 at 2 (agreeing that there is "synergy value" in

selling the properties together). Yet Bay Point is simultaneously taking the self-contradictory

position that Aberdeen's bankruptcy should be dismissed so that the two properties can be sold

separately in sequential steps involving the state court and then the Bankruptcy Court.

Bay Point cannot have it both ways. Either the Bankruptcy Court should administer both

properties, with both title-holding entities in bankruptcy (whether Chapter 11 or Chapter 7), or

else both cases should be dismissed.[1]

### B.    The Principal Purpose of the Plan Is Avoidance of the Tax Claim

Second, Bay Point's counterintuitive proposal to sell the two properties in two separate

steps makes no sense as anything other than an attempt to avoid taxes. Bay Point appears to be

operating under the erroneous assumption that a state court foreclosure sale of the 376 Property

would be free and clear of the federal tax liens. That is not so. The only way to convey clear title

to the 376 Property would be to pay off the federal tax liens and thus satisfy the IRS's priority

claim in the Brickchurch case as well (which is for the same underlying liability).

Nevertheless, Bay Point is trying to forge a path where it can arrogate the entirety of the

---

[1] Both Bay Point and the lawyers for Ms. Blouin and her entities have taken constantly shifting
positions on whether being in or out of bankruptcy is preferable for a given property at a given
time. The IRS has not been consulted about any of this strategic maneuvering.

376 Property sale proceeds for itself, leaving the IRS to collect from the 366 Property only, and only if funds remain after Bay Point's claim is satisfied in full. *See* Amended Plan § 4.1; *see also* Amended Disclosure Statement § II (providing for payment of $74.5 million to Bay Point ahead of any payment to IRS). This would obviously be preferable to Bay Point compared to having the 376 Property sold through the Aberdeen bankruptcy, where the IRS has an undisputed secured claim that may be partly or wholly senior to Bay Point.[2] But it also points to the fact that the only plausible rationale for the sequential sales Bay Point is proposing—an overly complicated procedure that goes against the recognized benefits of selling the properties together—is to avoid having the IRS's claim paid ahead of any portion of Bay Point's claim. Given that the principal purpose of Bay Point's amended plan is avoidance of taxes, confirmation should be denied under 11 U.S.C. § 1129(d).

## C. The Plan Impairs the IRS Priority Claim and Treats It Contrary to the Code

Third, the Amended Plan and Disclosure Statement are wrong to say that the IRS's priority claim is not impaired. *See* Amended Plan § 4.1; Amended Disclosure Statement § VI.A (asserting that "there are no impaired Classes of Claims or Interests under the Plan and the 'best interest test' under section 1129 (a)(7) is not implicated"). The IRS claim is impaired because the Amended Plan unjustifiably alters the IRS's rights (11 U.S.C. § 1124(1)) by automatically disallowing late claims and deferring payment on the claim even though it is no longer disputed.

The fact that the IRS's claim was filed after the bar date does not affect how it must be treated under a confirmed Chapter 11 plan.[3] The claim still should be treated as "allowed" per 11

---

[2] If Bay Point disagrees, then it can file an adversary proceeding to determine the validity, priority, or extent of its and the IRS's respective liens, as required by Bankruptcy Rule 7001(2). Bay Point should not be able to circumvent this adversary proceeding requirement via dismissal.

[3] The IRS's surreply brief in connection to the objection to claim makes this same argument in greater detail. *See* ECF No. 234 at 3-5.

6

U.S.C. § 502. A tardily filed priority claim that would be permitted under 11 U.S.C. § 726(a)(1) is an "allowed" claim, *see* 11 U.S.C. § 502(b)(9), and the same rule holds in Chapter 11 cases, *see* 11 U.S.C. § 103(a). Therefore, the IRS's untimely priority claim is still an allowed claim that has to be paid in full through the Debtor's Chapter 11 plan in accordance with both § 1129(a)(7)(A)(ii) and § 1129(a)(9)(C). The Amended Plan improperly seeks a different result by saying that, "[n]o distribution shall be made on account of any Claims filed after the Bar Date . . . except as specifically allowed by Order of the Court[.]" § 10.15. This provision thus impairs the IRS's legal rights and is contrary to § 1129's requirements.

Furthermore, the Amended Plan wrongly defers payment on the IRS claim on the ground that it is allegedly "disputed" by Ms. Blouin. *See* Amended Plan §§ 1.52, 4.1, 7.3; Amended Disclosure Statement § V.B.5. But as discussed above, Ms. Blouin has now admitted in the Aberdeen bankruptcy filing that the IRS has valid liens that have attached to the 376 Property and that its secured claim in that case is *undisputed*. This admission is necessarily also an admission that the underlying tax is due and owing (otherwise the lien would be in dispute). Accordingly, the IRS's claim for the same taxes in the Brickchurch bankruptcy must be treated as undisputed too. That Ms. Blouin controls both entities and properties (or at least she did prior to Bay Point's recent takeover attempt) is beyond dispute as well. The only other argument advanced in the debtor's objection to the IRS proof of claim was the bar date, and as noted in the preceding paragraph, that argument is irrelevant to the allowance of the claim. For these reasons, the Court should overrule the claim objection, allow the IRS's claim as filed, and require that it be paid in full through any Chapter 11 plan pursuant to § 1129(a)(7)(A)(ii) and § 1129(a)(9)(C).

### D. Capital Gains Taxes Must Be Paid as Administrative Expenses

Fourth, the Amended Plan does not provide for payment of capital gains taxes that would

be incurred upon the sale of either the 366 Property or the 376 Property. These capital gains taxes would be administrative claims entitled to full payment through the Plan. *See* §§ 1129(a)(9)(A) and 503(b). Yet the Amended Plan does not distribute anything toward these likely sizeable tax debts.

Indeed, the Amended Disclosure Statement's section on tax consequences (§ XI) treats the "[g]ain or loss, if any, upon the transfer of the Debtor's assets" as merely one of the "Consequences to Debtor." The apparent goal is to leave the debtor entities as empty shells that are liable for substantial capital gains tax debts that they will be unable to pay. Congress ensured that this cannot occur in a Chapter 11 case, however, by giving administrative priority status to taxes incurred by the estate under § 503(b)(1)(B), which must be paid in full under a confirmed Chapter 11 Plan pursuant to § 1129(a)(9)(A). In other words, IRS cannot be left holding the bag.[4]

Bay Point's refusal to account for capital gains taxes as required by the Code—even after being made well aware of this issue in the IRS's prior objection and at the July 18 hearing—is further evidence that the principal purpose of the Amended Plan is tax avoidance. Confirmation therefore must be denied under § 1129(d).[5]

---

[4] The gimmick of Bay Point acquiring, through a state court foreclosure, only the "rights" to close on a sale of the 376 Property, but purportedly not the property itself, is an attempt to maintain the fiction that there has been no "sale or exchange" (*see* 26 U.S.C. § 1001(c)) sufficient to trigger capital gains tax until after the money is gone and there is nothing left to pay the IRS. But the "Sale Transaction" contemplated by the Amended Plan (§ 1.95) involves both properties, and the plan must pay capital gains tax for both.

[5] There is no basis for subordinating capital gains tax to Bay Point's claim either. Bay Point asserts it has "superpriority" status based only on loan documents that the IRS is not a party to. *See* Amended Dislcosure Statement § V.B.2 ("The DIP Lender Superpriority Claim has priority over all other Administrative claims").

8

E.        **This Case Should Not Be Dismissed**

Finally, with Bay Point's Amended Plan unable to be confirmed for numerous reasons, and with no joint plan having been filed by the previously fixed deadline, we address the Court's order to show cause why this case should not be dismissed. As discussed above, Bay Point appears to be trying to use the state court foreclosure process to avoid paying the IRS, and those efforts would likely continue upon a dismissal. Bay Point, Ms. Blouin and her entities' attorneys also cannot agree on which entity should be in bankruptcy at any given time. Now they cannot even agree on who controls the debtor entities themselves. Dismissal would inevitably result in further litigation that could easily end up back in this Court.

At this point, the best way to cut through the Gordian knot of these cases may be to consolidate both the Brickchurch and Aberdeen Chapter 11 proceedings and appoint a trustee to liquidate both properties in an orderly fashion. This could be done with or without a conversion to Chapter 7.[6] The IRS's priority claim, the capital gains taxes, and the undisputed amount of the Bay Point claim could be paid immediately, with an amount equal to the remainder of the Bay Point claim to be escrowed pending judicial resolution of the Bay Point-Blouin dispute. The IRS has no need to be a part of that proceeding, which seems likely to drag on for a long time.

In sum, we favor consolidation and liquidation in bankruptcy with a Chapter 11 or 7 trustee, as opposed to dismissal, because of the apparent intent to avoid taxes reflected in the Amended Plan. A consolidated bankruptcy that sells both properties and pays associated capital

---

[6] The Amended Disclosure Statement (§ VII.B.3 (second B)) contains a brief and conclusory argument for why Bay Point's Amended Plan would supposedly be better than conversion to Chapter 7, relying chiefly on the specter of having to pay trustee fees. But those fees may be money well spent when the alternative is more prolonged fighting between the attorneys for Bay Point and Ms. Blouin. The tax avoidance schemes that would likely be attempted outside bankruptcy also makes a trustee potentially worth the cost from the IRS's perspective.

gains taxes, while also paying in full the IRS's priority claim in the Brickchurch case (which is for the same liability as the IRS's undisputed secured claim in the Aberdeen case), may be necessary to protect the government's interests. The payment of these taxes would be far from assured outside bankruptcy. Accordingly, the IRS submits that good cause exists not to dismiss this case.

If the Court is not immediately inclined to dismiss this case, then the IRS asks that the Court allow 21 days after the hearing that is scheduled for August 23, 2023, to file a motion to consolidate, to appoint a trustee, and possibly to convert both cases to Chapter 7.

## III.    Conclusion

For the foregoing reasons, the Court should not approve of Bay Point's Amended Disclosure Statement or confirm Bay Point's Amended Chapter 11 Plan, but the Court also should not immediately dismiss this case.

Respectfully submitted,

DAVID A. HUBBERT
Deputy Assistant Attorney General
U.S. Department of Justice, Tax Division

/s/ Edward J. Murphy
EDWARD J. MURPHY
ERIC A. ASHBY II
Trial Attorneys, Tax Division
U.S. Department of Justice
P.O. Box 55
Washington, D.C.  20044
Tel: 202-307-6064 / 202-514-6508
Fax: 202-514-5238
Edward.J.Murphy@usdoj.gov
Eric.A.Ashby@usdoj.gov

### CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of August, 2023, I served the foregoing document

electronically upon all parties of record through the Court's Electronic Case Filing System on

those parties that have consented to such service.

*/s/ Edward J. Murphy*
EDWARD J. MURPHY
Trial Attorney
United States Department of Justice, Tax Division

11

EXHIBIT 5: JGB Judgment of Foreclosure and Sale

22954-
723

Part 17
At an I.A.S. of the Supreme Court of the State
of New York, held in and for the County of
Suffolk, at the Courthouse at One Court Street,
Riverhead, New York    11901   on the
19 day of __January__, 2022

PRESENT: HON. ~~DERRICK J. ROBINSON~~, J.S.C.
CHRISTOPHER MODELEWSKI,

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

----------------------------------------------------------------x

JGB PARTNERS, LP, JGB CAPITAL, LP, JGB
(CAYMAN) ANCONA LTD., and JGB
PLYMOUTH ROCK LLC,

                      Plaintiffs

      - against -

BRICKCHURCH ENTERPRISES, INC.,
ABERDEEN ENTERPRISES, INC., NEW YORK
STATE DEPARTMENT OF TAXATION AND
FINANCE, THE STATE OF NEW YORK, TOWN
OF SOUTHAMPTON TOWN AND SCHOOL
TAX COLLECTOR, THE VILLAGE OF
SOUTHAMPTON VILLAGE TAX COLLECTOR,
SUFFOLK COUNTY WATER AUTHORITY,

                    Defendants.

----------------------------------------------------------------x

Index No.: 623208/2019

**JUDGMENT OF
FORECLOSURE AND SALE**

**ENTERED:**
**AT:**          **FEB - 2 2022**
12:06 pm

No Directive!

UPON the Notice of Pendency of this action filed in the Office of the Clerk of the County

of Suffolk on the 22nd day of November 2019, the Summons and Complaint served herein and

filed in the Office of the Clerk of the County of Suffolk on the 22nd day of November 2019, and

upon due proof that all the defendants, BRICKCHURCH ENTERPRISES, INC., ABERDEEN

ENTERPRISES, INC., NEW YORK STATE DEPARTMENT OF TAXATION AND

FINANCE, THE STATE OF NEW YORK, TOWN OF SOUTHAMPTON TOWN AND

SCHOOL TAX COLLECTOR, THE VILLAGE OF SOUTHAMPTON VILLAGE TAX

COLLECTOR, SUFFOLK COUNTY WATER AUTHORITY ("Defendants"), have been duly

served with said Summons, Complaint and Notice of Pendency; and

UPON the Order of the Honorable Derrick J. Robinson, dated June 1, 2021 granting

plaintiffs JGB PARTNERS, LP, JGB CAPITAL, LP, JGB (CAYMAN) ANCONA LTD., and

JGB PLYMOUTH ROCK LLC's ("Plaintiffs") motion, in all respects, for an order (the

"Order"):

(i)    awarding Plaintiffs default judgment, pursuant to CPLR § 3215 and RPAPL § 1321, on its Complaint against Defendants to, *inter alia*, foreclose all rights, claims, liens, estate and equity of redemption in the premises known as 366 Gin Lane, Southampton, New York, and 376 Gin Lane, Southampton, New York (the "Properties"), based upon the default of the mortgagors, Brickchurch Enterprises, Inc. ("Brickchurch") and Aberdeen Enterprises, Inc. ("Aberdeen"), under the terms of a Note signed by the Brickchurch and Aberdeen and delivered to Plaintiffs on August 18, 2018 (the "Note") and a Mortgage and Security Agreement signed by Brickchurch and Aberdeen and delivered to Plaintiffs on August 18, 2018 (the "Mortgage");

(ii)   striking John Doe Nos. 1-25 from the caption; and

(iii)  appointing Ann Cryan, Esq. as referee (the "Referee") to ascertain and compute the amount due to Plaintiffs under the Note and Mortgage and to ascertain and report whether the Properties be sold in separate parcels; and

UPON all other papers previously filed herein; and upon all proceedings had herein,

from all of which it appears that this action was brought to foreclose a mortgage held by

Plaintiffs on the Properties, that the entire balance of the principal sum secured thereby and all

other sums due thereon are now due and payable; that the Defendants herein have been duly

served with the Summons and Complaint; that no defendant is an infant or incompetent or

absentee person and that the Notice of Pendency filed herein has been on file for twenty (20)

days or more and contains all of the particulars required by law to be stated in such notice; and

UPON the reading and filing the report of said Referee, dated July 27, 2021 (the

"Report") from which Report it appears that the sum of Thirty-Nine Million, Nine Hundred

Sixty-One Thousand, Five Hundred Twenty-One Dollars and Eighty Cents ($39,961,521.80)

was due to Plaintiffs as of July 1, 2021 for principal and interest and otherwise under the Note

and Mortgage, plus Thirteen Thousand Dollars ($13,000) per diem, and that the Properties must

be sold in two parcels; and

UPON the reading of Plaintiffs' notice of motion to confirm the Report and to enter a

judgment of foreclosure (the "Motion"), and the affirmations of Leslie C. Thorne, Greg Kramer,

and Tamika Hardy in support of the Motion; and upon the Court having issued a decision and order dated January 12, 2022 and plaintiff having waived its application for attorney's fees, the said decision and order is hereby modified to the extent that the plaintiff's application for attorneys' fees is withdrawn and no hearing is required thereon;

NOW, upon the plaintiff's Motion, it is

ORDERED, ADJUDGED AND DECREED that the Report be, and the same hereby is

in all respects ratified and confirmed; and it is further

ORDERED, ADJUDGED AND DECREED that the Properties described in the

Complaint in this action and hereinafter described be sold in two parcels at separate public

auctions to the highest bidder at such auctions, which shall be held within ninety (90) days of

the date of the entry of this Order with (i) 366 Gin Lane sold at auction first,

at Southampton Town Hall 116 Hampton Road Southampton, New York 11968, and (ii) 376 Gin

Lane sold at auction after the closing of the sale of 366 Gin Lane at

Southampton Town Hall 116 Hampton Road Southampton, New York 11 968, in each case,

under the direction of Ann Cryan, Esq., who is hereby appointed Referee for that purpose; and

that said Referee give public notice of the time and place of said sale, according to law and the

rules and practices of this Court, by publication in Southampton Press Western Edition.

ORDERED, ADJUDGED AND DECREED that, in the case of each sale, Plaintiffs or

any assignee of Plaintiffs' interests in the Note and the Mortgage (an "Assignee"; the Plaintiffs

or any Assignee being referred to herein as the "Mortgage Holder"), or any other party to this

action may become a purchaser at such sale, and that if the Mortgage Holder becomes such

purchaser, no deposit shall be required; that in the event a party other than the Mortgage Holder

becomes the purchaser they shall be required to tender a deposit of ten percent (10%) in

certified funds and closing shall be had within thirty (30) days; that said Referee execute to the

purchaser or purchasers on such sale a deed or deeds of the Properties sold; that all deed

stamps, transfer taxes and recording fees, if any, shall be paid by the purchaser;

ORDERED, ADJUDGED AND DECREED that said Referee on receiving the proceeds

of each sale, shall forthwith deposit the same in the name of the Referee, as Referee, ~~with~~

in her IOLA account at any local banking

institution insured by the FDIC and the Referee shall thereafter make the following payments therefrom

and the Referee's checks drawn for such purpose shall be paid by such depository, to wit, in the

case of each sale:

FIRST:       The Referee shall pay a sum ~~not to exceed $500~~ of $750.00 the amount allowed by
             Section 8003 of the CPLR to the Referee as the Referee's fee herein.

SECOND:      The Referee shall pay advertising expenses and the expenses of said sale
             as shown on the bills presented and certified by the said Referee to be
             correct.

THIRD:       The Referee shall pay the amount of any lien or liens upon the Properties
             to be sold at the time of such sale together with any and all sums which,
             in each case, may be necessary to redeem the property so sold from any
             and all sales, unpaid taxes, assessments, water rates, and any sums
             expanded for the protection, preservation, security or maintenance of the
             property, including, but not limited to, fire insurance and property
             inspections. The Referee shall pay or refund to the Plaintiffs, if paid by
             it, any of the aforementioned sums upon presentation of proper receipts
             for such payments.

FOURTH:      (A) with respect to the sale of 366 Gin Lane, the Referee shall pay to the
             Mortgage Holder or their attorneys, the sum of
             $   39,961,521.80            , ~~which is comprised of (i)~~ the said
             ~~amount of $39,961,521.80~~ so reported by the Referee to be due as of July

CM
JSC

122

1, 2021 with interest ~~in the total amount of $~~_____accruing at a per diem rate of Thirteen Thousand Dollars ($13,000) from the date July 2, 2021 to date of entry of this judgment as provided in the said Referee's Report, ~~(ii) an award for legal fees incurred or to be incurred by Plaintiffs in prosecuting the foreclosure action, in the amount of $304,316.05 as provided for in the Loan Documents, *plus* any additional legal fees and expenses incurred by Mortgage Holder, including any Assignee, including any Assignee in connection with the foreclosure and sale that are required to be paid by the Borrowers under the Loan Documents,~~ and (iii) an award of costs, disbursements and additional allowances in the amount of $1,125.00 to be taxed by the Clerk of this Court with interest thereon from the date hereof, with interest thereon from the date hereof, together and thereafter interest at the statutory rate thereon, to the date of sale directed herein or to the date of the delivery of the Referee's deed, whichever is later or so much as the purchase money of the mortgaged Properties will pay of the same, and (B) with respect to the sale of 376 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, an amount equal to the judgment of foreclosure and sale amount *less* any amounts paid to the Mortgage Holder from the proceeds of the sale of 366 Gin Lane.

FIFTH:      That, if the Referee intends to apply for a further allowance for the Referee's fee, the Referee may leave on deposit such amount as will cover further order of the Court thereon after application duly made.

SIXTH:      That the said Referee take receipts for the money so paid out by the Referee and file the same with the Referee's report of sale and that the Referee deposit the surplus money, if any, with the ~~Treasurer~~ Comptroller of Suffolk County within five days after the same shall be received and ascertainable, to the credit of this action, to be drawn only on order of this Court, signed by a Justice thereof; and it is further

ORDERED, ADJUDGED AND DECREED, that, in the case of each sale, the said Referee make a report of such sale and file it with the Clerk of the County of Suffolk within 30 days of completing the sale and executing the proper conveyance to the purchaser, and that the purchaser or purchasers at such sale be let into possession upon production of the Referee's deed or deeds; that, if the proceeds of such sale be insufficient to pay the amount so reported due to the Plaintiffs and interest, costs and allowances as aforesaid, said Referee specify the amount of such deficiency in the Referee's report of sale; and it is further

ORDERED, ADJUDGED AND DECREED, that in the case of each sale, in the event

the Mortgage Holder shall become the purchaser of the applicable Property directed to be sold, as aforesaid, or in the event that the rights of the purchaser at said sale, and the terms of sale under this judgment shall be assigned to or acquired by the Mortgage Holder, and a duly executed assignment thereof in writing be filed with the Referee, said Referee shall not require the Mortgage Holder to pay in cash the entire amount bid at said sale, but shall execute and deliver to the Mortgage Holder a deed or deeds of the Properties sold, upon payment to the Referee of the amounts specified above in the paragraphs marked "FIRST", "SECOND" and "THIRD", or in lieu of the payment of the said last mentioned amounts, upon filing with said Referee receipts of the proper municipal authorities showing the payment thereof. That the balance of the amount bid, if any, shall be allowed to the Mortgage Holder, and applied by the paragraph marked "FOURTH" above. That if, after so applying the balance of the amount paid, there shall be a surplus over and above the amounts due to the Mortgage Holder, the Mortgage Holder shall pay to the said Referee, upon delivery to it of the Referee's deed, the amount of such surplus, and the Referee shall then deposit the balance with such depository as herein directed; and it is further

ORDERED, ADJUDGED AND DECREED, that, in the case of each sale, the Referee shall complete the Foreclosure Action Surplus Monies form, signed by Mortgage Holder's representative (bank) and any third-party purchaser, and proof of deposit with the County Comptroller, each to be filed with the Suffolk County Clerk and the Suffolk County Supreme Court Fiduciary Office within thirty (30) days of close of title; and if such form and proof of deposit is not timely filed, the Fiduciary Clerk will notify the assigned Justice within 90 days and the matter will be calendared at the direction of the Justice for whatever action he or she deems appropriate; and it is further

ORDERED, ADJUDGED AND DECREED, that the Defendants in this action, and all persons claiming under them after the filing of the notice of the pendency of this action be, and they are forever barred and foreclosed of all right, title, claim, lien and equity of redemption in the said mortgaged Properties and in each and every part and parcel thereof. The following is a description of the Properties heretofore mentioned:

(See Schedule A annexed
hereto.)

SAID Properties being known as and by the street numbers 366 Gin Lane, Southampton, New York, and 376 Gin Lane, Southampton, New York, and it is further

ORDERED, ADJUDGED AND DECREED that the Properties be sold subject to:

(a)   The state of facts an accurate survey will show;

(b)   All covenants, restrictions, easements, agreements and reservations, if any, of record and to any and all violations thereof;

(c)   Any and all building and zoning regulations, restrictions and ordinances of the municipality in which said Properties are situated, and to any violations of the same, including, but not limited to, reapportionment of lot lines, and vault charges, if any;

(d)   Any and all orders or requirements issued by any governmental body having jurisdiction against or affecting said Properties and violations of the same;

(e)   The physical condition of any buildings or structure on the Properties as of the date of the later to occur of the closing date or the extension of the closing date hereunder;

(f)   Rights of tenants in possession, if any;

(g)   Prior mortgages and judgments, if any, now liens of record, which, solely with respect to the sale of 376 Gin Lane, shall include the first ranking mortgage lien held by Morgan Stanley Private Bank, N.A.;

(h)   Right of Redemption of the United States of America, if any;

(i)   Rights of any defendants pursuant to CPLR Section 317, CPLR

Section 2003 and CPLR Section 5015, if any

(j)    Any and all Hazardous Materials in the Properties including, but not limited to, flammable explosives, radioactive materials, hazardous wastes, asbestos or any material containing asbestos, and toxic substances; and

(k)    Other conditions as set forth in the terms of the sale more particularly to be announced at the sale; and it is further

ORDERED, that by accepting this appointment the Referee certifies that he is in compliance with Part 36 of the Rules of the Chief Judge (22 NYCRR Part 36), including, but not limited to, Section 36.2(c) ("Disqualifications from Appointment") and Section 36.2(d) ("Limitations on Appointments Based upon Compensation"). ; and it is further



Dated:    January    , 2022

ENTER:

HON. DERRICK J. ROBINSON, J.S.C.
CHRISTOPHER MODELEWSKI, JSC

C M
JSC

*ORDERED* that plaintiff shall serve the notice of the foreclosure sale and any adjournments upon the Supreme Court Calendar Clerk; and it is further

*ORDERED* that the referee complete and file the Suffolk County Foreclosure Action Surplus Monies form with the Supreme Court Calendar Clerk and the Suffolk County Clerk within thirty (30) days of the foreclosure sale in accordance with Suffolk County Administrative Order 104-20; and it is further

*ORDERED* that the referee submit proof of deposit of any surplus monies with the Suffolk County Comptroller with the Supreme Court Calendar Clerk and the Suffolk County Clerk within thirty (30) days of the date of closing of title; and it is further

*ORDERED* that if the referee does not conduct the sale within 90 days of the date of the judgment, in accordance with CPLR 2004, the time fixed by RPAPL § 1351(1) is extended for the referee to conduct the sale as soon as reasonably practicable; and it is further

*ORDERED* that in order to schedule a foreclosure sale, the Referee must contact the Court Fiduciary Office via e-mail at SuffAuctions@nycourts.gov with the proposed details of the foreclosure sale (including the title of action and its index number, the town where the auction is to take place, and the requested date and time for the auction) and the Fiduciary Office will either confirm the proposed date, time and place or ask the Referee to re-schedule the sale to prevent multiple auctions from taking place simultaneously at one location; and it is further

*ORDERED* that the Referee must contact the Court Fiduciary Office via e-mail at SuffAuctions@nycourts.gov to advise of any change or cancellation of a scheduled auction; and it is further

*ORDERED* that, in light of the current COVID-19 pandemic, the Referee must ensure that any requirements in effect at the time of the sale regarding social distancing and face coverings are complied with by all participants in the foreclosure auction; and it is further

*ORDERED* that the Referee shall ensure that post-sale paperwork and any other interactions relating to the foreclosure sale take place outdoors to the fullest extent possible and, whether these interactions take place outside or inside the Town Hall, the Referee must enforce any requirements in effect at the time regarding social distancing and face coverings; and it is further

*ORDERED* that should the Referee believe the situation to be unsafe or if there is noncompliance with safety protocols, the Referee may, in his/her discretion, cancel or postpone the auction; and it is further

*ORDERED* that the Referee shall require that the successful bidder immediately execute Terms of Sale for the purchase of the property, and pay to the Referee, in cash or certified or bank check, ten percent (10%) of the sum bid, unless the successful bidder is Plaintiff in which case no deposit against the purchase price shall be required; and it is further

**RED STONE TITLE AGENCY, LLC**
**As Agent for**
**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
**LEGAL DESCRIPTION**

Title No.: **RTNY-36148**

**Parcel I:**
All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of Southampton, Town of Southampton, County of Suffolk, State of New York, more particularly described as follows:

BEGINNING at a point on the southerly side of Gin Lane, distant westerly 65.95 feet as measured along same from the intersection of the southerly side of Gin Lane with the westerly side of Wyandanch Lane;

THENCE along lands now or formerly of Aberdeen Enterprises Inc.:

1. RUNNING THENCE South 20 degrees 05 minutes 50 seconds East 178.57 feet;

2. THENCE South 58 degrees 56 minutes 50 seconds West 50.96 feet;

3. THENCE South 03 degrees 20 minutes 09 seconds East 155.09 feet;

4. THENCE South 16 degrees 20 minutes 00 seconds East 213.89 feet to The Atlantic Ocean;

THENCE along Tie Line which marks the General Shore Line of the Atlantic Ocean, as of January 5, 1982 bearing, South 64 degrees 46 minutes 15 seconds West 129.10 feet to land now or formerly of Susan Wilson;

THENCE along said lands, North 16 degrees 20 minutes 00 seconds West 575.00 feet to a monument in the southerly side of Gin Lane;

THENCE along the southerly side of Gin Lane, North 73 degrees 21 minutes 10 seconds East 200.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as District 0904, Section 029.00 Block 01.00, Lot 017.014, Suffolk County and also known as Parcel I: 366 Gin Lane, Southampton, NY 11968.

**Parcel II:**
All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of Southampton, Town of Southampton, County of Suffolk, State of New York, more particularly described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Gin Lane with the westerly side of Wyandanch Lane;

RUNNING THENCE along the westerly side of Wyandanch Lane, South 30 degrees 54 minutes 10 seconds East 531.00 feet to the Atlantic Ocean;

THENCE along a tie line course which marks the general shoreline of the Atlantic Ocean, as of January 5, 1982 bearing, South 64 degrees 46 minutes 15 seconds West 275.28 feet to land now or formerly of Brickchurch Enterprises Inc.;

THENCE along said lands, the following four courses and distances:

Red Stone Title Agency, LLC
825 Eighth Avenue, Suite 18N
New York, NY 10019
TEL: 212-235-1151  FAX:

Schedule A Description

RTNY-36148

RED STONE TITLE AGENCY, LLC
**As Agent for**
**OLD REPUBLIC NATIONAL TITLE·INSURANCE COMPANY**
**SCHEDULE A continued**

1. North 16 degrees 20 minutes 00 seconds West 213.89 feet;

2. North 03 degrees 20 minutes 09 seconds West 155.09 feet;

3. North 58 degrees 56 minutes 50 seconds East 50.96 feet;

4. North 20 degrees 05 minutes 50 seconds West, 178.57 feet to the southerly side of Gin Lane;

THENCE along the southerly side of Gin Lane, North 73 degrees 21 minutes 10 seconds east 65.95 feet to the westerly side of Wyandanch Lane to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as District 0904, Section 029.00, Block 01.00, Lot 017.013, Suffolk County and also known as Parcel II: 376 Gin Lane, Southampton, NY 11968.

Red Stone Title Agency, LLC
825 Eighth Avenue, Suite 18N
New York, NY 10019
TEL: 212-235-1151  FAX:

Commitment (NY)                                                                                    RTNY-36148

**ORDERED** that no sale shall be deemed final until the full ten percent (10%) deposit has been paid to the Referee and a Memorandum of Sale has been signed, which must be completed immediately following the sale.

Said property is commonly known as PARCEL I: 366 GIN LANE, SOUTHAMPTON, NEW YORK 11968.  PARCEL II: 376 GIN LANE, SOUTHAMPTON, NEW YORK 11968.

The legal description of the mortgaged property referred to herein is annexed hereto as Schedule "A".

**GRANTED**

ENTER

JAN 19 2022

Dated: January 19, 2022

Judith A. Pascale
CLERK OF SUFFOLK COUNTY

HON. CHRISTOPHER MODELEWSKI, J.S.C.

130

FILED

2022 FEB -2 P 12: 06

JUDITH A. PASCALE
SUFFOLK COUNTY CLERK

# FOR

# INFORMATION

# ONLY FROM

# THIS PAGE ON

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

-------------------------------------------------------------x

JGB PARTNERS, LP, JGB CAPITAL, LP, JGB
(CAYMAN) ANCONA LTD., and JGB
PLYMOUTH ROCK LLC,

                                 Plaintiffs

             - against -

BRICKCHURCH ENTERPRISES, INC.,
ABERDEEN ENTERPRISES, INC., NEW YORK
STATE DEPARTMENT OF TAXATION AND
FINANCE, THE STATE OF NEW YORK, TOWN
OF SOUTHAMPTON TOWN AND SCHOOL
TAX COLLECTOR, THE VILLAGE OF
SOUTHAMPTON VILLAGE TAX COLLECTOR,
SUFFOLK COUNTY WATER AUTHORITY,

                              Defendants.

-------------------------------------------------------------x

Index No.: 623208/2019

**BILL OF COSTS**

COST TAXED AT $ 1125.00
TIME _____ DAY OF _____
FEB - 2 2022
JUDITH A. PASCALE
CLERK OF SUFFOLK COUNTY

## COSTS

| | |
|---|---|
| Costs before Note of Issue - CPLR § 8201(1) | $200.00 |
| Costs for Motions - CPLR § 8202 | $100.00 |
| **TOTAL COSTS** | **$245.00** |

$ 400.00

## FEES AND DISBURSEMENTS

| | |
|---|---|
| Fee for Index Number - CPLR § 8018(a) | $210.00 |
| Request for Judicial Intervention - CPLR § 8020(a) | $95.00 |
| Clerk's fee for filing of Notice of Pendency - 8021(a)(10) | $420.00 |
| **TOTAL FEES AND DISBURSEMENTS** | **$725.00** |

total $ 1125.00

133

FILED

2022 FEB -2 P 12: 06

JUDITH A. PASCALE
SUFFOLK COUNTY CLERK

EXHIBIT 6: Memorandum concerning JGB

## D̲uane M̲orris®

DUANE MORRIS LLP
1540 BROADWAY
NEW YORK, NY 10036-4086
PHONE: +1 212 692 1000
FAX: +1 212 692 1020

# MEMORANDUM

## CONFIDENTIAL ATTORNEY/CLIENT PRIVILEGE

|  |  |
|---|---|
| **DATE:** | March 2, 2023 |
| **TO:** | Louise Blouin |
| **FROM:** | Brett L. Messinger |
| **SUBJECT:** | Summary of JGB's Conduct |

This is a summary of the facts and surrounding circumstances of the loan transaction entered between Aberdeen Enterprises, Inc. and Brickchurch Enterprises, Inc., as borrowers on the one side, and JGB Partners, LP, JGB Capital LP, JGB (Cayman) Anocona Ltd., and JGB Plymouth Rock LLC (collectively "***JGB***"), as lenders on the other side.

This Memorandum is confidential to share with law enforcement to redress the conduct of JGB and its principal(s). The facts show a substantial effort by JGB to infuse into the transaction and excessive interest rate – totaling approximately 43% - and to create a situation where the loan simply could not be repaid. Efforts included the illegal interference with the re-sale real estate market and other nefarious conduct. The conduct includes an apparent fraud for profit scheme, and also a "lend to own" transaction.

The victim of these activities is Louise Blouin. She is the upstream owner of the properties that were the subject of JGB's scheme, and has been since 1997. Ms. Blouin desires an investigation in the conduct outlined below, and, to the extent appropriate, for administrative and/or criminal charges to be lodged for the purpose recouping the approximate $36,000,000 she ultimately loss at the hands of JGB, which consistent of the additional loan of $62,000,000 she was required to take out to save her home from foreclosure.

## I. BACKGROUND

Located in Southampton, New York, are two extraordinary *residential* homes that make up a single residential compound. The smaller of the two home 366 Gin Lane and itself contains more than 9,000 square feet of living space. The larger home is 376 Gin Lane, and contains approximately

11,000 square feet of living space. Individual appraisals of the homes valued 366 Gin Lane at $63,000,000 and 376 Gin Lane at $72,000,000. Copies of the appraisals are attached hereto as Exhibits "A" and "B", respectively.

366 Gin Lane is owned by Brickchurch Enterprises, Inc., a Delaware corporation ("Brickchurch DE"). One hundred percent of the stock of Brickchurch DE is owned by Brickchurch Enterprises (BVI), Ltd., a company existing under the law of the British Virgin Islands ("Brickchurch BVI").

376 Gin Lane is owned by Aberdeen Enterprises, Inc., a Delaware corporation ("Aberdeen DE"). One hundred percent of the stock of Aberdeen E is owned by Aberdeen Enterprises (BVI), Ltd., a company existing under the laws of the British Virgin Islands ("Aberdeen BVI").

Both Brickchurch BVI and Aberdeen BVI are owned by another British Virgin Island company called Aberdeen Enterprises Holdings (BVI), Ltd. ("Holdings"). One hundred percent of the shares of Holdings is owned by Louise Blouin .

Louise Blouin is a Canadian citizen, and resident of Switzerland.

In the early part of 2018, the properties were encumbered by a loan in favor of HSBC; with the loan set to mature later that year. At the same time, Louise Blouin was investigating the sale of the property to pay off the HSBC loan, and was assisted by her publicist Melonie Bonvicino. Ms. Bonvicino then presented to Louise Blouin a potential purchaser from Texas named Timothy Barton, who seemed to be keen to purchase the properties for $120 million.

However, the transaction could not be completed before the time the HSBC loan was to mature. Therefore, Ms. Bonvicino introduced Louise Blouin to JGB for the purpose of providing a refinance of the HSBC loan, for a short 18-month "bridge period" so that the offer from Mr. Barton could be further pursued, and to search for other would-be buyers.

As it turned out, Mr. Barton's offer was never bona fide and was not in the position to every buy the property. Later, Mr. Barton was later accused of embezzlement and forced into bankruptcy. *See* https://www.justice.gov/usao-ndtx/pr/dallas-man-charged-26-million-real-estate-scam.

On July 25, 2018, Brickchurch DE and Aberdeen DE entered into a loan transaction with JGB for the refinance of an existing loan in favor of HSBC. The loan was in the face amount of $26,000,000 with a maturity date of October 31, 2019. The loan was secured by, *inter alia,* a mortgage on both 366 and 376 Gin Lane. As to 366 Gin Lane, the JGB loan was a first priority mortgage. As to 376 Gin Lane, the mortgage was recorded against the property as a second priority mortgage behind another mortgage filed by Morgan Stanley Private Bank ("Morgan Stanley"). The face amount of the Morgan Stanley loan is $15,000,000.

It was Ms. Blouin's intent to use the $26,000,000 in loan proceeds for, among other things, to repay the HSBC loan and to provide needed maintenance to the two homes to prepare them for sale at $150,000,000. At the time of the closing of the JGB loan, there was approximately $110,000,000 in equity in the homes.

The Note signed by Brickchurch DE and Aberdeen DE recited a 12% interest rate, that would increase to 18% upon an event of default.  A true and correct copy of the Note and Mortgage is attached hereto as Exhibits "C" and "D", respectively.

JGB's upstream parent is a corporation called JGB Management, Inc., which is headquartered at 21 Charles Street, Westport, Connecticut.  The principle of JGB Management, Inc. is Brett Cohen.

JGB Management is a private hedge fund that, by its own admission, specialized in distressed lending.  "Distressed lending," is fancy-talk for a hard-money lender.  Hard-money lenders are lenders that lend on "hard assets," rather than the financial ability of the borrower; and seeks to recoup its losses in the event of a default, by taking ownership to the collateral securing the loan. Here, the collateral to secure JGB's loan was, improperly, approximately $100,000,000 more than the face-value of the Note and Mortgage (which was only $26,000,000).

Immediately after the origination of the JGB loan, Aberdeen DE and Brickchurch DE began to experience immediately impediments to their plan to sell the property. This caused them to default on their payment due May 31, 2019.

**As will be discussed later in the Memorandum, it appears that JGB orchestrated a fraudulent scheme that killed the market, and made it impossible for Brickchurch DE and Aberdeen DE to sell the property.

After the default on the payment obligation, they received three letters from JGB dated June 4, 2019, June 13, 2019, and July 5, 2019 (the "Default Letters") declaring events of default – see letters attached collectively as Exhibit "E".  Among other things, the letters declared that the interest rate due under the note would increase from 12% to the 18% default rate.

Following the sending of the Notices of Default, Aberdeen DE, Brickchurch DE and JGB entered into a Forbearance Agreement dated as of July 11, 2019.  Among other things, the Forbearance Agreement provided that JGB would forbear on exercising their rights under the Note an Mortgage until October 31, 2019; which is the same date as the maturity date listed in the original Note.  The Forbearance Agreement also provides that if Brickchurch DE and Aberdeen DE were able to pay off the loan before certain strike dates, there would be an Exit Charge due, with the most significant strike date being September 30, 2019, wherein the Exit Charge would be $2,000,000.  In addition to the default rate being increased to 18%, there was added – for a period of less than three months – interest of another $2,000,000.  When added together, this total a default interest rate of approximately 43%![1]  A copy of the Forbearance Agreement is attached hereto as Exhibit "F". Moreover, when viewed objectively, the Forbearance Agreement offered no true benefit.

---

[1]     The Forbearance Agreement provides, in relevant part, as follows:

   4.    Exit Charge.  As additional compensation for the increased risk to Lenders, the Borrowers, shall, as additional interest on the Loan, pay an "Exit Charge" to the Lenders as follows:

*        *        *

3

## II.     THE FORECLOSURE ACTION & BANKRUPTCY FILING

On November 22, 2019, JGB filed a foreclosure action against the Gin Lane properties. Brickchurch DE and Aberdeen DE did not defend the action on the basis of a threat from JGB that they would pursue personal guarantees against Ms. Blouin, and her husband, Mathew Kabatoff, should they defend the action. *See* July 25, 2019 email from Mr. Cohen, attached hereto as Exhibit "G".

On January 30, 2020, JGB filed a Motion for Default Judgment and to appoint a referee (among other things). On June 23, 2021, the Court entered a default against the non-answering defendants, including Brickchurch DE and Aberdeen DE, and appointed Ann Cryan, Esquire as referee, for the purpose to "ascertain and compute the amount due to the Plaintiffs" and to "examine and report whether or not the Premises (as defined in the Complaint) should be sold in parcels. . . ." Ms. Cryan's report included, among other things, a recommendation that the properties be sold in separate parcels, with 366 Gin Lane to be sold first.

The Judge confirmed the referees report, and eventually the foreclosure sale of 366 Gin Lane was scheduled for May 2, 2022. In order to stop the foreclosure sale, on April 30, 2022, Brickchurch DE filed for Bankruptcy under Chapter 11 of the Bankruptcy Code.

In the Bankruptcy case, JGB filed a proof of claim, stating that the sum due on the $26,000,000 loan was $46,947,991.74. See Proof of Claim, attached hereto as Exhibit H". It should be noted, that the Default Letters, sent in the sum of 2019, the amount due as of June 30, 2019 was only $26,000,000 plus $390,000 in "accrued and unpaid interest." *See* Exhibit "E". In other words, with the passage of less than three years, JGB sought an increase of payment of approximately $20,000,000.

During the Bankruptcy, JGB insisted that the Bankruptcy Case should be dismissed and it allowed to proceed with its state court-foreclosure remedy; despite JGB having adequate protection by the significant equity still remaining in the properties. Brickchurch, this time with the supervision of the bankruptcy court, was able to uncover that JGB, since the time of the origination of the loan, engaged in a scheme to prevent and otherwise usurp Aberdeen DE and Brickchurch DE from selling the properties.

## III.     THE "LOAN-TO-OWN" & "FRAUD FOR PROFIT" SCHEME

The uncovered scheme implemented by JGB had as its purpose to quiet and otherwise deflate the market of would-be buyers.

First, beginning in early 2019, prior to the loan falling into the default, JGB began to contact real-estate professionals in the area, seemingly for the purpose of influencing the market. A copy of the notes kept by JGB are attached hereto as Exhibit "I".

---

4.4.     if the Borrower repays the Loan and all of the other outstanding obligations under the Note any time after September 30, 2019, the Exit Charge shall be $2,000,0000.

4

Second, JGB also encouraged Ms. Bonvicino to proceed with the transaction involving fake offer from Mr. Davis, and even offered to pay Ms. Bonvicino $250,000 should be able to close the transaction. *See* Email, Exhibit "J"

Third, JGB failing to cooperate with a refinance lender – Reyl & Cie, Ltd. – to pay off the loan in full, based upon JGB's position that the loan was not bona fide, even after Brickchurch DE and Aberdeen DE provided loan documents that were ready for execution. *See* Exhibit "K". JGB's lack of cooperation and delay caused the loan to fall through. For example, during his deposition, Mr. Cohen refused to participate in efforts by Debtor and Aberdeen to refinance with Reyl & Cie, Ltd, because he thought the transaction was "not real." He further stated, despite being shared the draft agreements with Reyl & Cie, Ltd. that "[it] was the most ridiculous illegitimate joke I can recall seeing as a professional investor." He also pointed to historical reports of tax issues of Reyl & Cie that were resolved many years before Cohen ever even heard of Reyl & Cie. A copy of the deposition Transcript is attached as Exhibit "L".

Fourth, there is an email from JGB it had no interest in providing opportunities for a refinance, as it wanted to pocket the profit from the sale of the properties. A JGB employee said "I actually don't think we should engage on this [valid Blouin refinancing offer], even if it's real. Our position has never been stronger or closer, and we are getting close to $17M of potential pnl from the mark." *See* email, attached hereto as Exhibit "M".

Fifth, within a matter of days after the execution of the Forbearance Agreement, JGB was already requesting Ms. Blouin to sign over the deeds to the homes, and threatened that if a defense was raised to the foreclosure, that JGB would go after the personal guaranties. *See* email, attached hereto as Exhibit "G"

Sixth, prior to there being a default on the forbearance agreement, JGB already began to pressure and request from Ms. Blouin that she provide deeds to both properties to JGB; JGB claiming that the properties could never be sold. Unknown to Ms. Blouin, this is because JGB was taking action to prevent any interested buyers from making an offer on the properties.

Seventh, JGB listed the property with its own broker and seeking the solicitation of lower market prices in order to drive down the market. This marketing of the property attempt to influence the market began as early as September 19, 2018, -- months before the maturity of the loan and any fear of default. See Exhibit "N'.

Eighth, JGB engaged with a known-renter of 366 Gin Lane by: (i) discussing the possibility of financing the renter (Chris Brown) for the purchase of 366 Gin Lane; and (ii) conspiring with Mr. Brown to not allow a showing of the home to potential purchasers, by the changing of alarm codes on the security system, so that realtors were unable to enter the property with potential purchasers.

Ninth, JGB was involved with a realtor who entered 376 Gin Lane in the winter, turned on the water without shutting it off or otherwise winterizing the home. The pipes then froze and caused a flood in the property, making it unavailable to show for possible sale.

Tenth, JGB procured a report and otherwise fraudulently represented that the properties are in disrepair. *See* Exhibit "O." This is contrary to the report by CNBC showing the properties as one of    the    most   extraordinary   properties   in   the   whole   of   the   United   States.    *See*

https://www.cnbc.com/video/2022/10/06/tour-the-most-expensive-home-in-the-hamptons-150000000-la-dune.html

Eleventh, during the court of the bankruptcy, JGB attempted to take the deposition of representative of Bay Point, for the sole purchase of attempting to convince Bay Point to not proceed with the refinance transaction with Aberdeen DE and Brickchurch DE, despite the low risk of the transaction which is fully secured by "hard" assets.  In a recent conversation in a New York City restaurant (where I was also present), one of Bay Point's attorneys stated that JGB's attorney tried to convince him to advise Bay Point to not complete the transaction.

Twelfth, a tenant named Brett Brown, along with realtor Anne Prosser, apparently at the request of JGB changed the code on the security system to prevent the properties from being shown by realtors.

Thirteenth, it was learned after the approval of replacement financing from Bay Point Financial Advisors, discussed below, that when the replacement lender had approved the replacement financing, the attorneys for JGB approached Bay Point's lawyers to discourage them from completing the refinance transaction.

## IV.    THE REPLACEMENT FINANCING

Aberdeen DE and Brickchurch DE were able to secure replacement financing from a company called Bay Point Financial Advisors, in the amount of $62,000,000.  However, that financing was taken out due to the predicament placed upon Aberdeen DE and Brickchurch DE by the fraudulent and predatory conduct of JGB.  In the end, Aberdeen DE and Brickchurch DE were required to pay JGB $44,500,000 in order to stop the foreclosure, and approximately $6,000,000 in origination costs to Bay Point.  *See* Settlement Statement, attached hereto as Exhibit "P".  Unfortunately, Aberdeen DE and Brickchurch DE were required to release JGB from any civil liability.

## V.    RELIEF REQUESTED

As a result of the conduct of JGB, Ms. Blouin wishes for the opening of an appropriate administrative or criminal investigation, and the recoupment of the approximate $36,000,000 of damages she suffered.


BLM

Attachments

DM1\13776121.4

EXHIBIT 7: Bay Point Nefarious Scheme

# BAY POINT – NEFARIOUS SCHEME

## SUMMARY

_____

## INTRODUCTION

Since 1987, in parallel to her corporate and philanthropic activities, Mrs. Louise Blouin has skilfully developed high-end real estate skills, where she has identified and enhanced prime properties and prime locations ahead of the market in key locations such as Courchevel, Paris, London, Lower Manhattan, and the Hamptons.

Mrs. Blouin was named a 'World Leader of Tomorrow' by the World Economic Forum, alongside Bill Gates and Jeff Bezos, and has enjoyed and maintained over the years a pristine record in all her corporate endeavours. Her extensive philanthropic work includes a multi-million dollar cultural rebuild of New Orleans in the wake of Hurricane Katrina.

Mrs. Blouin's nightmare started when she was introduced to the DIP lender Bay Point in 2022. While the main objective of Bay Point's loan was to get the Debtors out of Chapter 11 of the bankruptcy Code (*rf.* e-mail: January 5th, 2023. (Exhibit -35-), refinance the properties with a long-term institutional loan, or sell the properties, instead Bay Point immediately engaged in predatory lending practices by violating the loan agreement. For Bay Point, and its President Charles Andros, it seems that court orders, or respecting terms in a loan agreement, are not within its practices.

The facts show a substantial effort by Bay Point to infuse an excessive element of fees and interest rates into the transaction – totaling approximately 45% - and to create a situation where the depreciation of the asset meant the loan simply could not be repaid or refinanced. Such efforts included illegal interference with the resale real estate market, intimidation with threats to take control, negotiation with an existing lender, and attempting, as early as January, to take control by asking for Mrs. Blouin's deeds. Other nefarious conduct includes an apparent fraud for profit scheme, and also a "lend to own" transaction.

Essentially, a simple bridge loan from Bay Point may ultimately deprive the Debtors and Mrs. Blouin, the upstream owner of the Debtors, of all their equity build over the past 26 years.

## BACKGROUND

In the early part of 2018, the properties were encumbered by a loan in favor of HSBC; with the loan set to mature later that year. The Debtors were investigating the sale of the properties to pay off the HSBC loan.

On July 25, 2018, the Debtors entered into a mortgage loan transaction with JGB Partners, LP, JGB Capital LP, JGB (Cayman) Anocona Ltd., and JGB Plymouth Rock LLC (collectively "JGB") for a short 18-month "bridge period", for the refinance of the existing loan in favor of HSBC and complete the projected sale of the properties. The loan was in the face amount of $26,000,000 with a maturity date of October 31, 2019.

At the time of the closing of the JGB loan, there was approximately $110,000,000 in equity in the homes. To illustrate, a property in Southampton with 9 bedrooms was recently sold to a Nest Seeker buyer for $135,000,000, as compared to the Debtor's homes of 19 bedrooms in a better location. The Debtor missed this opportunity of sale. The latest evaluation of the Debtor's home, carried out by the evaluator Vanderbilt Appraisal Company (accredited by JP Morgan), states that the homes are worth more than $150,000,000 - reconfirmed by the 9-bedroom transaction mentioned above.

The uncovered scheme implemented by JGB had as its purpose to quiet and otherwise deflate the market of would-be buyers. It appears that JGB orchestrated a fraudulent scheme that killed the market and made it impossible for the Debtors to sell the properties. (*rf.* Exhibit -43-, Exhibit -44-).

On November 22, 2019, JGB filed a foreclosure action against the properties. The Debtors were required to pay JGB $44,500,000 in order to stop the foreclosure. In other words, with the passage of less than three years, JGB sought an increase of payment of approximately $21,500,000.

On November 9th, 2022, the Debtors secured a replacement financing from a company called Bay Point Financial Advisors ('Bay Point'), in the amount of $62,000,000 including prepaid interest.

It turned out that Bay Point operates with the same *Modus Operandi* as JGB. Bay Point's lawyer, John Allerding, stated in court that Bay Point and JGB were living the same events with the Debtor. Indeed, that is correct – the difference is the victim is the Debtor. Both are "Lend to Own" lenders (*rf.* Exhibit -45-)

Mrs. Blouin has never been exposed to predatory lenders before. She has made mistakes that cost her a lot of money, and assumes these mistakes, but she is determined to shed light on Bay Point's nefarious scheme and refinance or sell the Debtor's properties at a fair and reasonable market price.

**Bay Point's predatory lending practices have made it difficult, if not impossible, for the Debtors to refinance or sell the properties. Aggressive tactics have been used to steal time and therefore trigger high loan terms to strip the Debtor of equity. While collecting prepaid interest, Bay Point violated the loan agreement from the first month. More specifically, Bay Point:**

- Entered into a Loan and Security Agreement with the Debtors on November 9th, 2022.
- Engaged in abusive and aggressive tactics right after the disbursement of the loan on December 9th, 2023. Bay Point made performance impossible, attempting to take control in December 2022 a few days after the closing.
- Refused to acknowledge the original agreed budget of December 9th, 2022, thus threatening the Debtor to agree to another new budget or put them in default.

- Defaulted the Debtors in December 2022 for having paid 3 preapproved invoices.
- Charged excessive fees, penalties, default interest and legal fees, to an extend of $10,000,000 over and above its original fees and interest – defaults they created through their tactics.
- Asked for the property deeds as a condition for the Debtors to get out of Chapter 11 of the bankruptcy Code. Whilst the loan agreement, and many emails, confirm that the main priority in exchange for the high interest rates of 10%, and opening fee of 9%, was to be out of Chapter 11, instead they forced Aberdeen into Chapter 11 with their tortuous interference of the financing, including misrepresentation as to who was the equity holder, something that was very clear in the loan agreement.
- Is trying to deprive the Debtors of all their equity.
- Refused to authorize funding for the accountant and tax counsel's retainer as per Court's order and left emails unanswered until the last day of the report due date.
- Declined to cooperate with a serious lender, thus preventing Debtors the opportunity to get out of Chapter 11 of the bankruptcy Code.
- Rebuffed the demand to authorize a refundable deposit in escrow in order to obtain a new credit facility commitment that would have allowed the Debtors the opportunity to exit Chapter 11 of the bankruptcy Code.
- Appointed themselves as sole officer and director of the Debtors in July 2023, without the Debtor's knowledge, nor the Court's approval, in violation of the loan agreement.
- Took it a step further (without a Court order and authorization) and tried, in July 2023, to take control of the DIP bank account at Wells Fargo, violating the loan agreement.
- Has engaged in Tortious Interference in the negotiation of a settlement with Morgan Stanley, the existing lender, just when the Debtors were about to refinance with a new lender introduced by the Debtors' attorney, Mr. Nash.
- Misled Morgan Stanley, stating they were sole officer and director of the Debtors, in order to buy their note at full price.
- Has ignored the Court's requirement and started doing parallel selling on its own without a minimum private sale price. (↪ *rf.* Hearing: August 23rd, 2023, p. 56).
- Misled the Court to the effect there was an approved plan in order to delay the restructuring timeline, that could eventually lead to Chapter 7 of the Bankruptcy Code.


**Bay Point intentionally neglected or refused to release the funds from the Debtor's DIP account and from the Debtor's account at Bay Point in order to maintain the property in good condition (wasting 11 months), thus depreciating the property, while knowing they have credit bid rights for the full amount of its allowed claim. Bay Point is trying to depreciate the properties and ultimately take over the ownership. More specifically, Bay Point:**

- Intentionally neglected to authorize emergency funding for December 2022 blizzard damages, violating the loan agreement.
- Refused to authorize an emergency plumbing audit after water pipes burst and toilets backed up that would have prevented further damages to the properties following the blizzard. They decided to pay other expenses that were not a priority.

- Denied, until May 2023, any relevant funding, namely the ones related to the flood, and already allocated in the DIP Account Funds to Brickchurch Enterprises, Inc. ($1,585,733.29) and the Maintenance Reserve Account to Bay Point Capital Partners II, LP ($300,000) as per closing statement of December 9th, 2022. (*rf.* Final settlement statement: Exhibit -31-)
- Only released funds from May to mid-August 2023.
- Therefore, prevented for nine (9) months any viewing of the properties for rent or sale.
- Therefore, prevented any refinance possibilities.
- Stopped releasing any funds, including costs or expenses associated with the maintenance of the properties, after mid-August 2023, which is a clear breach of the terms and conditions stipulated in the Loan Agreement, namely the approved DIP budget.
- Refused Debtors the possibilities to get out of Chapter 11, thus extending the negative impact on the property's value. (*rf.* e-mail: May 18th and August 4th, 2023. (Exhibit -19- and -27-)

**In order to shed light on Bay Point's nefarious scheme, we respectfully submit to the Court the following:**

It is clear that Bay Point's end game is to extend and delay the restructuring timeline and ultimately take possession of the assets, Southampton's real estate crown jewel, through Chapter 7 of the Bankruptcy Code and thus, enrich itself at the expense of Debtors.

Bay Point, a hard-money lender, operates with a clear and specific *Modus Operandi*. Bay Point's scheme includes a "Lend to Own" transaction. Lenders must not encourage default. Intentional violation of the loan agreement should be rendered void:

Law 6-l(10).
Bay Point activities are prohibited under acts including RESPA and FHA.
Deception Practices Act General Business Law 349.
General obligation law 5-501.
Homeownership and Equity Protect Act (HOEPA).
New Banking 6-l (2)(k).
Federal Reserve board regulation z,12,cfr 226.
Federal Truth Lending act TILA.
Real estate Settlement Procedure Act (RESPA) 12USC 2601.
The Deceptive Practices Act General Business Law 349.
Equal Credit Opportunity Act (ECOA).

**Bay Point's conduct must be neither condoned nor tolerated by the judicial system.**

**THEREFORE, FOR THESE REASONS, MAY IT PLEASE THE COURT TO TAKE NOTICE OF THE FOLLOWING:**

1) Bay Point misleads the Court to the effect there was an approved plan in order to delay the restructuring timeline and force the conversion of this Chapter 11 case to a case under Chapter 7 of the Bankruptcy Code:

   a) As of July 31st, and August 23rd, there is no agreement between the Debtor and Bay Point.
   > ↪ *rf.* Hearing: August 23rd, 2023, pp. 11, 12, 13.

   b) The Court did not confirm the plan.
   > ↪ *rf.* Hearing: November 1st, 2023, p. 22, 23.

   c) Bay point admits there is not going to have a confirmed plan anytime soon.
   > ↪ *rf.* Hearing: November 1st, 2023, p. 45.

   d) Camisha Simmons, attorney for the Debtor Brickchurch, signed a plan without the Debtor's instruction nor authorisation.
   > ↪ *rf.* Hearing: August 23rd, 2023, p. 11, 12.

      i) (Exhibit -36-)

2) Contrary to the Court's order, Bay Point voluntarily neglected to authorize the funding of a retainer for the Debtors' tax counsel from Brickchurch's account at Bay Point:

   a) Knowing that the Debtors had committed to the Court they would retain a separate tax counsel and get an analysis to the IRS within 21 days, Bay Point voluntarily neglected to authorize the funding of a retainer for the Debtors' tax counsel.
   > ↪ *rf.* Hearing: November 1st, 2023, pp. 13, 14, 31, 34, 40, 41, 42, 47, 48.

      i) e-mail: November 1st, 2023. (Exhibit -1-)
      ii) e-mail: November 3rd, 2023. (Exhibit -2-)
      iii) e-mail: November 7th, 2023. (Exhibit -3-)
      iv) e-mail: November 10th, 2023. (Exhibit -4-)
      v) e-mail: November 22nd, 2023. (Exhibit -40-)
      > ↪ No answer from Bay Point.

3) Bay Point voluntarily neglected or delayed giving a proper payoff to identify the basis of any capital gain:

      i) e-mail: September 8th, 9th, 12th, 15th, 19th, 20th, - October 11th, 26th, - November 5th, 2023. (Exhibit -5-)
      ii) e-mail: September 9th, 2023. (Exhibit -6-)
      iii) e-mail: September 12th, 2023. (Exhibit -7-)
      iv) e-mail: November 1st, 2023. (Exhibit -1-)

v)   e-mail: November 7th, 2023. (Exhibit -3-)

4)  Bay Point voluntarily neglected to reach an agreement for:

↪  rf. Hearing: August 23rd, 2023, p. 56.

a)  Minimum bid.
b)  Minimum stalking horse bid.
c)  Minimum private sale price.

5)  Following their *Modus Operandi*, Bay Point voluntarily neglected or refused to authorize the broker's contract until November 2023. It became impossible to properly market such a prestigious estate:

↪  *rf.* Hearing: August 23rd, 2023, p. 37, 56, 58.

i)   e-mail: September 9th, 2023. (Exhibit -6- and -9-)
ii)  e-mail: September 10th, 2023. (Exhibit -8- and -10-)

6)  Bay Point misleads the Court by falsely representing that the Parties had reached an agreement to retain a broker:

↪  *rf.* Hearing: November 1st, 2023, p. 20.

↪  flagrant violation of the oath of office.

8)  After Bay Point had put the Debtors in an untenable position, Bay Point pushed its reprehensible behaviour a notch higher by doing parallel selling on its own (without a minimum private sale price) to secure a selling commission, thus killing the market. Consequently, Bay Point has put itself in an obvious conflict of interest:

i)   e-mail: September 9th, 2023. (Exhibit -9-)
ii)  e-mail: September 12th, 2023. (Exhibit -11-)

9)  Bay Point voluntarily delayed the required emergency funding from Brickchurch's account, while funding other irrelevant items:

i)   e-mail: January 3rd, 10th and February 17th, 2023. (Exhibit -12-)
ii)  e-mail: January 12th and 13th, 2023. (Exhibit -13-, -13.1-)
     (a)  rf. Excel sheet: line 41 – Maintenance & Repairs.
iii) e-mail: January 12th, 2023. (Exhibit -14-)
iv)  e-mail: February 12th, 13th, and 17th, 2023. (Exhibit -15- and -16-)
     (a)  Plumbing and property damages could have been avoided. (Exhibit -17-)
v)   e-mail: January 17th, 18th, and 19th, 2023. (Exhibit -18-)

10) Following the blizzard of December 2022, Bay Point voluntarily refused funding for an emergency plumbing audit that would have prevented further damages to the properties:

↪  *rf.* Hearing: August 23rd, 2023, p. 22, 23

a)  Bay Point refused a plumbing audit.

i)   e-mail: January 12th and 13th, 2023. (Exhibit -12-, -13-, -13.1-)

b) Plumbing audit would have been able to identify the issue, preventing further damages to the properties.

    i) e-mail: February 7th, 2023. (Exhibit -17-)

11) Bay Point negotiated in bad faith from the start. Bay Point pretended the original DIP budget was not approved, thus threatening Debtors with the Default Clause of the Loan and Security Agreement:

↬ *rf.* Hearing: August 23rd, 2023, p. 26

    i) e-mail: January 10th, 13th and February 17th, 2023. (Exhibit -12- and -34-)

b) The budget was approved de facto by Bay Point. They did not send any written objection notice within ten (10) days as stipulated in the Loan and Security Agreement (par. 6.1 (a)).

    i) e-mail: January 5th, 2023. (Exhibit -35-)

12) Following the blizzard of December 2022, Bay Point intentionally cut all relevant funding from December 2022 to November 2023. Its reprehensible *Modus Operandi* created extensive damages to the properties and lost opportunities to the Debtors:

a) Because of Bay Point's refusal to authorize in due time the required funding, Debtors was put in a precarious situation and lost 9 months to complete the necessary repairs from the December 2022 blizzard damages, thus being unable to show the properties to potential renters or buyers.

↬ *rf.* Hearing: August 23rd, 2023, p. 23, 26, 27, 36.

b) Debtors lost potential buyers. One of the buyers bought a nearby house for an approximate amount of $ 135 M, knowing that said house needed $ 20 M in renovations.

↬ *rf.* Hearing: August 23rd, 2023, p. 24.

    i) (Exhibit -28-, -30- and -39-)

c) Because of Bay Point's wilful neglect, Debtors lost a $ 4,4 M rental opportunity for the summer 2023.

↬ *rf.* Hearing: August 23rd, 2023, p. 27, 42.

    i) (Exhibit -28- and -32-)

d) All the required blizzard emergency repairs ($700 000) were already accounted for in the DIP budget.

↬ *rf.* Hearing: August 23rd, 2023, p. 25.

13) Bay Point refused an extension for the Morgan Stanley's loan ($ 15 M) which would have prevented the imminent foreclosure by Morgan Stanley, offered a real opportunity to refinance, and avoid the use of Chapter 11 of the Bankruptcy Code. Bay Point's behaviour is often called, viewed, or assimilated to «Tortious Interference»:

↬ *rf.* Hearing: August 23rd, 2023, p. 35.

     i)    e-mail: July 29th, 2023. (Exhibit -22-)

14) Bay Point was getting ready to Credit Bid on the Aberdeen property before the Debtor filed for Chapter 11 protection.

     i)    e-mail: August 2nd, 2023. (Exhibit -42-)

15) Bay Point interfered and stopped the Debtor's negotiation with Morgan Stanley. Furthermore, Bay Point ultimately bought Morgan Stanley's debt at full price, under the false representation of ownership or directorship and without the Debtors' knowledge. Again, this behaviour is often called, viewed, or assimilated to «Tortious Interference»:

                                                                         ↦  *rf.* Hearing: August 23rd, 2023, p. 28, 30, 31.

16) Bay Point pretended they were not talking to Morgan.

     i)    e-mail: July 29th, 2023. (Exhibit -22-)

17) Bay Point refused to cooperate with a serious lender (Reyl – Intesa Sanpaolo), consequently, the Debtors lost another opportunity to get out of Chapter 11 of the Bankruptcy Code:

     i)    e-mail: May 12th, 2023. (Exhibit -37-)
     ii)   Term sheet: May 12th, 2023. (Exhibit -38-)
     iii) e-mail: September 12th, 2023. (Exhibit -23-)

18) After a conference call, Bay Point formally agreed to the refinancing of one (1) of the two (2) properties. Notwithstanding the said agreement, Bay Point refused the refinancing of the said property:

     i)    e-mail: August 1st and 2nd, 2023. (Exhibit -24-)

19) Bay Point refused to authorize a «Refundable Deposit in Escrow» from Debtors accounts, with No risk and through a top firm, Knight Frank Finance, in order to obtain a new credit facility, thus preventing the Debtors from exiting Chapter 11 of the Bankruptcy Code.

     i)    e-mail: September 7th, 2023. (Exhibit -25-)
     ii)   e-mail: September 7th, 2023. (Exhibit -23-)
     iii) e-mail: November 1st, 2023. (Exhibit -26-)
     iv) e-mail: November 1st, 2023. (Exhibit -1-)
     v)  e-mail: November 7th, 2023. (Exhibit -3-)

20) As a subterfuge, Bay Point filed a Notice with the Court to notify the Court that it had purportedly become the record shareholder of the Debtors, and had purportedly removed Debtor's previous

corporate officers and directors and replaced them with Charles Andros, President of Bay Point. The Debtors have opposed the purported change of control. The Court never ordered Bay Point to be in control of the Debtors. Furthermore, Bay Point never disclosed their subterfuge in the DIP motion. It is clear that Bay Point fraudulently tried to seize control of the Debtors:

> ↬ *rf.* Hearing: August 23rd, 2023, pp. 10, 12, 28, 29.

21) Nowhere in the DIP Loan Application or in the Loan Documents are the operative documents that gave the right to exercise rights in the equity interests. There is one brief reference to a pledge agreement in the Loan Agreement. There is no mention of the right to use a proxy to vote out the members, but to have equity retain their shares.

22) In order to enrich themselves at the expenses of the Debtors, Bay Point refused the Debtor the opportunity to exit Chapter 11 of the bankruptcy Code, and instead demanded to get deeds in lieu of foreclosure, thus taking possession of the assets.:

    i)   e-mail: December 8th, 2023. (Exhibit -20-, -21-)

23) Bay Point attorney, John Allerding, advised Morgan Stanley to transfer more than $100,000 of insurance proceed to Bay Point in order to bypass the Debtor Aberdeen - these funds are credit from 3 years ago.

    i)   e-mail: November 20th, 2023. (Exhibit -41-)


**CONCLUSION:**

In light of Bay Point's reprehensible conduct and Predatory Lending Practices with the Courts and with the Debtors, the Debtors respectfully requests that the Court enter an order:

1) Allow the Debtors to refinance as per the Term Sheet provided by the Lender dated October 18th, 2023.

2) Allow the Debtors enough time to comply with Tenn Capital's Term Sheet.

3) Granting such other and further relief as may seem just and proper under the acts.

EXHIBIT 8: Original Aberdeen Objection

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

In re:                                                      Chapter 11

ABERDEEN ENTERPRISES, INC.,                                 Case No. 23-72834-ast
BRICKCHURCH ENTERPRISES, INC.,                              Case No. 22-70914-ast

                                        Debtors.            Jointly Administered
----------------------------------------------------------------x

**OBJECTION OF THE ABERDEEN DEBTOR SEEKING TO REDUCE
AND/OR REALLOCATE THE CLOSING PAYMENTS RECEIVED BY
BAY POINT CAPITAL PARTNERS II, L.P. CONSISTENT WITH THE
ASSIGNED JGB FORECLOSURE JUDGMENT**

The debtor herein, Aberdeen Enterprises Inc. (the "Aberdeen Debtor"), as and for its

Objection seeking to reduce and/or reallocate the closing payments and distributions received by

Bay Point Capital Partners II, L.P. ("Bay Point"), on account of its respective proofs of claim dated

November 29, 2023 (Claim No. 5-1 and Claim No. 6-1) (collectively, the "Claims")[1] consistent

with the assigned JGB Foreclosure Judgment (defined below), respectfully states and alleges as

follows:

**Preliminary Statement**

1.      While there has been a good deal of discussion regarding Bay Point's alleged

entitlement to default interest and late charges, the sale price for the respective properties did not

generate sufficient proceeds to allow Bay Point to recover on these disputed items.  However,

issues still remain with respect to Bay Point's total distributions and allocations from the respective

proceeds of sale.

---

[1] Because Claim No. 5-1 and Claim No. 6-1 are predicated in large part on the refinancing of the JGB Debt,
there is an overlap between the two Claims.  Therefore, this Objection is directed to both Claims, although
Claim No. 6-1 is based solely on the JGB Debt.  Nevertheless, the Claims are overstated and duplicative in
various aspects and should be reduced based on the allocations as between 366 Gin Lane and 376 Gin Lane,
as ordered by the State Court, all as discussed herein.

1

2.      Specifically, this Objection challenges the Claims to the extent that Bay Point misallocates (or, more appropriately, over-allocates) the net proceeds generated from the sale of the Debtor's oceanfront property located at 376 Gin Lane, Southampton, NY (the "<u>Aberdeen Property</u>").   The improper allocation arises out of variances from the assigned Judgment of Foreclosure and Sale (the "<u>JGB Foreclosure Judgment</u>") obtained by JGB Partners, LP and its related companies (collectively "<u>JGB</u>") in Supreme Court, Suffolk County on February 2, 2022.

3.      Under the JGB Foreclosure Judgment, the lion-share of the proceeds (some $39,961,521.80) was allocated <u>first</u> to satisfy the debts owed to JGB from the proceeds of the sale of the Brickchurch Property, with the balance of the JGB debt owing thereafter to be paid from the sale of the Aberdeen Property.   In pertinent part, the JGB Foreclosure Judgment provides in paragraph "Fourth" as follows:

> (A) <u>With respect to the sale of 366 Gin Lane, the Referee shall pay to the Mortgage holder or their attorneys, the sum of $39,961,521.80, so reported by the Referee to be due as of July 1, 2021 with interest accruing at a per diem rate of Thirteen Thousand Dollars ($13,000)</u> from the date July 2, 2021 to date of entry of this judgement [January 19, 2022] as provided in the said Referee's Report, and an award of costs, disbursements and additional allowances in the amount of $1125.00 to be taxes by the Clerk of this Court with interest thereon from the date hereof, with interest thereon from the date hereof, together and thereafter interest at the statutory rate thereon, to the date of sale directed herein or to the date of the delivery of the Referee's deed, whichever is later or so much as the purchase money of the mortgaged Properties will pay of the same, and (B) <u>with respect to the sale of 376 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, an amount equal to the judgment of foreclosure and sale amount *less* any amounts paid to the Mortgage Holder from the proceeds  of the sale of 366 Gin Lane</u>. (emphasis supplied)

4.      The JGB Foreclosure Judgment was assigned to Bay Point under the Brickchurch DIP Loan[2].   At the closings on the Debtors' properties, Bay Point received the sum of $26,892,813.08 on account of the JGB Foreclosure Judgment from the sale of the Aberdeen

---

[2]  The DIP Loan is defined in the Plan at Sections 1.40 – 1.43.

Property alone.  This was done based upon an allocation of the sale proceeds unilaterally made and directed by Bay Point.  The payment of $26,892,813.08, however, contravenes the specific allocations already embedded in the JGB Foreclosure Judgment itself as ordered by the State Supreme Court.

5.      Indeed, because Bay Point insisted upon obtaining an assignment of the JGB Foreclosure Judgment to preserve priority rights, it remains bound by the specific allocations made thereunder which established a completely different allocation scheme.  The allocations directed by the State Court under the JGB Foreclosure Judgment must be carried forward for purposes of distributions under the Plan in accordance with the familiar principles of res judicata, and the requirements of 28 U.S.C. §1738, which provides for the Federal Courts to give preclusive effect to judgments of the State Courts.

6.      Just prior to the adjourned confirmation hearing in these Chapter 11 cases on February 27, 2024, Bay Point filed a document entitled "Schedule A" on February 20, 2024 [ECF No. 221] as a supplement to Bay Point's and the Debtors' Revised and Redlined Second Amended Joint Liquidating Plan dated February 28, 2024 [ECF No. 248] (the "Plan")[3]. Schedule "A" contained an itemized listing of what amounts of "Sources and Uses of Cash" as computed by Bay Point specifying the allocations and pay-outs regarding the respective sales of 366 Gin Lane, Southampton, NY (the "Brickchurch Property") and the Aberdeen Property.

7.      As per Schedule "A", the total sum of $26,892,813.08 was allocated to pay Bay Point on account of the assigned JGB Foreclosure Judgment from of the sale of the Aberdeen Property.  In point of fact, however, this allocation greatly exceeded the allocations directed by the State Court in 2022 pursuant to the express terms of the JGB Foreclosure Judgment.  Copies of

---

[3] The Plan was approved pursuant to Confirmation Order dated March 1, 2024 [ECF No. 248], which attached the updated and final iteration of the Plan in clean and redline versions.

Schedule "A" and the JGB Foreclosure Judgment are annexed hereto as <u>Exhibits</u> "A" and "B" respectively for the Court's ready reference.

8.    As can be readily seen, the State Court allocation was top heavy towards satisfying the JGB debts from the sale of the Brickchurch Property, whereas the allocation made by Bay Point in bankruptcy for purposes of the Plan was not nearly the same.   Under Schedule "A", $26,892,813.08 was allocated by Bay Point on account of the JGB Foreclosure Judgment from the sale of the Aberdeen Property, while $24,444.734.72 was allocated to Bay Point on account of the sale of the Brickchurch Property.  This is contrary to the terms of the JGB Foreclosure Judgment.

9.    Since the sale of the Brickchurch Property netted total proceeds of approximately $40,896,701, there were sufficient sums to pay the entire allocation of $39,961,521 due under the JGB Foreclosure Judgment from the Brickchurch sale, leaving the Aberdeen Debtor's estate responsible for the difference between $44,500,00 and $39,961,521 or, a principal balance of <u>$4,538,479</u>, plus allocable accrued interest (to be determined).[4]

10.    By the Debtor's rough count, if a *pro rata* approach is used, post-judgment interest accrued during the period from the refinancing of JGB via payment of the $44.5 million in December 2022 through the closings on the Debtors' properties on March 6, 2024, a period of about fifteen (15) months at a rate of $34,038 per month [($4,538,479 x .09)/12].  Thus, a principal balance of $4,538,479 was owed under the JGB Foreclosure Judgment, plus total interest charges of $510,579 at the legal rate, for a grand total charge of <u>$5,049,058</u>.

---

[4] Bay Point seems to be charging post-judgment interest relating to the assigned JGB Foreclosure Judgment at the default rate under the DIP Loan Documents retroactively.  In point of fact, post-judgment interest is governed by CPLR 5004 which sets the statutory rate at nine (9%) percent per annum.  Even if the default interest rate under the DIP Loan Documents is used, default interest did not occur until maturity on May 15, 2023 (180 days after entry of the Order approving the DIP Loan, such that the rate of 24% only applies from the period from May 15, 2023 to closing on March 6, 2024, and is not retroactive.

4

11.    Alternatively, if Aberdeen is responsible for all accrued interest on the principal balance of $44.5 million because the interest charges are included in the balance of the debt over the allocation of $39,961,521 to Brickchurch, then in such event, on a worst case basis, the interest from December 2022 through closing at the pre-maturity rate of 10% and the post-maturity rate of 24% is increased as follows: pre-maturity interest of $1,854,167 + default interest of $8,900,000 = $10,754,167.  In this calculation, principal of $4,538,479 plus interest of $10,754,167 yields a total charge of $15,292,646.

12.    Thus, the allocation to the Aberdeen Debtor should range from a best case of $5,049,058 to a worst case of $15,292,646, but is nothing close to $26,892,813.  In turn, the disgorgement is at a high of $21,843,755 and a low of $11,600,167, or somewhere in between.

13.    Legally speaking, the specific allocations dictated by the JGB Foreclosure Judgment are controlling in bankruptcy as to divvying up the sale proceeds under the Plan.  In effect, Bay Point reengineered the allocations to benefit itself and obtain a maximum share of the proceeds without any meaningful discussion or reference to the terms of the actual JGB Foreclosure Judgment.

14.    Additionally, this Objection challenges whether Bay Point is entitled to a mortgage lien against the Aberdeen Property for the entire amount of Brickchurch's DIP Loan in the sum of $62 million.  As part of the DIP financing that was approved in Brickchurch's Chapter 11 case prior to the Chapter 11 filing by the Aberdeen Debtor, Bay Point demanded a mortgage from Aberdeen as co-borrower for the full amount of the DIP loan ($62 million), even though Aberdeen's actual residual obligations owed to JGB based on the allocations under the JGB Foreclosure Judgment were far less.

5

15.     The disparity in allocations created a situation where the Bay Point DIP mortgage had a far greater value to Brickchurch and a far lesser value to Aberdeen.  This disparity sets up the factual predicate for a fraudulence conveyance claim based upon the unequal benefit received from the DIP Loan as between Brickchurch and Aberdeen.  Moreover, the Order approving the DIP  Loan was entered in the Brickchurch case months <u>before</u> Aberdeen ever sought Chapter 11 relief and, thus, any findings regarding the validity of the mortgages, liens etc. in connection with the DIP financing only apply to Brickchurch and not Aberdeen as a non-debtor.

16.     Accordingly, Bay Point's effort to treat the full amount of the DIP Loan as being equally owed by Aberdeen is not supported by fair or reasonably equivalent consideration.  In turn, anything received by Bay Point from the sale of the Aberdeen Property over the specific allocation attributable to the Aberdeen Debtor (*i.e.*, the difference between $44,500,000 and $39,961,521, or principal of $4,538,479, plus allocable interest as may be calculated) should be viewed as an avoidable transfer and fraudulent conveyance which must be disgorged before Bay Point has an allowed claim against the Aberdeen Debtor, pursuant to 11 U.S.C. §502(d).

### Background

17.     The Debtor was the owner of the Aberdeen Property and sought relief under Chapter 11 of the U.S. Bankruptcy Code on August 2, 2023 to stay what was then believed to be an imminent foreclosure sale by Morgan Stanley Private Bank ("<u>Morgan Stanley</u>") as the holder of the first mortgage lien against the Aberdeen Property.  On September 7, 2022, Morgan Stanley obtained a Judgment of Foreclosure and the Referee appointed thereunder scheduled a foreclosure sale for August 3, 2023.  Unbeknownst to the Debtor at the time Bay Point separately acquired the Morgan Stanley Judgment of Foreclosure by assignment, although the commencement of the

intervening Chapter 11 case triggered a stay of a foreclosure sale regardless of the actual holder of the mortgage.

18.     The Debtor is a separate and distinct entity from Brickchurch, with each owning separate but adjoining properties on Gin Lane. While Aberdeen was also subject to the JGB Foreclosure Judgment, it did not initially seek bankruptcy relief.  Instead, Brickchurch commenced a Chapter 11 case on April 30, 2022, and ultimately entered into a DIP Loan agreement with Bay Point to obtain financing in the sum of up to $62 million [Brickchurch, ECF No. 172].  The reason for the Bay Point DIP Loan was to finance the settlement reached with JGB on account of the JGB Foreclosure Judgment.  After various hearings in the Bankruptcy Court, all claims of JGB in bankruptcy were settled and resolved for the total sum of $44,500,000 as announced on the record on October 26, 2022.

19.     In the Order approving the DIP Loan [Brickchurch, ECF No. 172], Bay Point was insistent about obtaining the assignment of the JGB Foreclosure Judgment, which is expressly reference in the Section 3(g) thereof, quoted below at length for continuity:

> i.     Payment of Settlement Amount to JGB at Closing; Priority of the Existing JGB Liens. Pursuant to the global settlement with JGB (Debtor's prepetition secured lenders), as stated on the record at the October 26, 2022 hearing held before the Court, certain of the proceeds of the DIP Facility will be used to pay JGB $44.5 million in cash (the "Settlement Amount"), at closing, in exchange for the Assignment (defined and described below).  Until the Settlement Amount is paid in full to JGB, notwithstanding anything to the contrary in this Order, the Existing JGB Liens will remain in place and have priority to the DIP Liens and the DIP Super-Priority Claims (as those terms are defined herein), or any other liens or claims granted to the DIP Lender under this Order. (emphasis added)

> ii.     Assignment of JGB Loan Documents, State Court Judgment, and JGB Proofs of Claim to DIP Lender. Contemporaneously with the payment of the Settlement Amount to JGB, and pursuant to such other documentation which shall be in a form and substance satisfactory to JGB and the DIP Lender, JGB shall assign to DIP Lender (the "Assignment"): (i) the JGB Loan Documents; (ii) the JGB State Court Judgment; and (iii) the JGB Proofs of Claim (as such terms are defined in this paragraph 3(g)(ii)) (collectively, the "Assigned Documents"):

7

    A.    "JGB Loan Documents" includes: (i) the Secured Promissory Note, dated July 25, 2018 and in the original principal amount of Twenty-Six Million and 00/100 Dollars ($26,000,000.00), executed by Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc., as borrowers, in favor of JGB; (ii) the Mortgage, dated July 25, 2018, granted by Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc., as Mortgagors, to JGB, as Mortgagee, with respect to that certain real property commonly known as 366 and 377 Gin Lane, Southampton, New York 11968; (iii) the Collateral Assignment of 12 Leases and Rents, dated July 25, 2018 and executed in connection with the aforementioned Secured Promissory Note and Mortgage, between Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc., as Assignor, and JGB, as Assignee; and (iv) all other documents and agreements created or contemplated under the foregoing (the loan transaction being referenced to therein being referred to herein as, the "JGB Loan").

    B.    "JGB State Court Judgment" means, collectively, all of JGB's rights, claims, defenses, and causes of action with respect to that certain legal proceeding pending in the Supreme Court for the State of New York, County of Suffolk styled as JGB Partners, LP, et al. v. Brickchurch Enters., Inc., et al., Index No. 6323208/2019 (the "Foreclosure Action");

    C.    "JGB Proofs of Claim" means, collectively, all secured and unsecured proofs of claim filed, whether jointly or severally, by JGB, including Claim Nos. 2 through 9 on the claims registry in the Debtor's above-captioned chapter 11 bankruptcy case.

20.    While Bay Point reserved the right to consolidate the assigned JGB Foreclosure Judgment under the DIP Loan, it never did so and, thus, Bay Point was and continues to be bound by separate allocations under the JGB Foreclosure Judgment.

**The Sale of the Aberdeen Property**

21.    The Aberdeen Debtor's Chapter 11 case was devoted almost entirely to a sale of the Aberdeen Property separately or as a combined lot with the Brickchurch Property.  Early on, Bay Point challenged the corporate authority of Matthew Kabatoff to cause the filing of the Chapter 11 petition based upon a purported change of control engineered by Bay Point in July

8

2023 through the exercise of various purported proxy rights. This dispute was resolved pursuant to a settlement laid out in open Court on August 23, 2023.

22.     Over the ensuing several months, the Aberdeen Debtor and Bay Point pursued a joint plan in conjunction with bid procedures that were ultimately approved by the Bankruptcy Court on November 22, 2023 [ECF No. 104].

23.     The on-line auction was held on January 24, 2024, at which time affiliates under the control of Charles Kim emerged as the successful bidder. An entity known as 376 Gin Lane LLC entered into a contract to purchase the Aberdeen Property for the sum of $44,160,000, plus a bid enhancement of $1,501,440.00, for a total purchase price of $45,661,440.00. Likewise, another affiliate of Charles Kim known as 366 Gin Lane LLC entered into a contract to purchase the Brickchurch Property for the sum of $41,920,000, plus a bid enhancement of $1,425,280.00, for a total purchase price of $43,345,280.00.

24.     The Aberdeen Debtor confirmed the Plan by Order dated March 1, 2024 [ECF No. 248], following a hearing held on February 27, 2024. The sale transactions closed on March 6, 2024, and the Effective Date of the Plan was designated as March 8, 2024, pursuant to Notice dated March 8, 2024 [ECF No. 254].

**The Claims**

25.      Bay Point filed a total of three (3) claims in the Aberdeen bankruptcy case, two of which are subject to this Objection because they share the improper allocation of proceeds that contravenes the terms of the JGB Foreclosure Judgment, although there are in different amounts.

26.     Specifically, Claim No. 5-1 represents the purported balance due and owing by Aberdeen under the DIP Loan Agreements in the total sum of $70,625,940.36. Claim 6-1

9

represents the purported balance due and owning under the JGB Assigned Documents, including the JGB Foreclosure Judgment in the alleged total sum of $53,711,401.77.

27.    Besides the improper allocations, Bay Point's entitlement to interest should be fixed within the range provided above without any further fees or costs, none of which are properly chargeable to the Aberdeen Debtor in any event.

### Legal Support for the Objections

28.    That Bay Point insisted on the assignment of the JGB Foreclosure Judgment has legal consequence relating to the allocations of the sale proceeds.  As a matter of basic Federal practice, State Court judgments are given full force and effect for purposes of an ensuing bankruptcy under principals of res judicata and 28 U.S.C. § 1738.  As the Supreme Court has instructed:

> though the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state–court judgments whenever the courts of the State from which the judgments emerged would do so:

> "[J]udicial proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State...." 28 U.S.C. § 1738

*Allen v McCurry*, 449 US 90, 96, 101 S Ct 411, 415-16 (1980).

29.    Moreover, Bay Point, as the assignee of the JGB Foreclosure Judgment remains subject to the terms of the underlying judgment and has no greater rights than those of JGB itself. *See, Rojas v Cigna Health and Life Ins. Co.*, 793 F.3d 253, 258-59 (2d Cir. 2015) ("An assignee acquires no greater rights . . . than his assignor.  If an assignee seeking relief in court stands in the place of an assignor, there has been a substitution rather than an expansion of the parties.") (internal quotation marks and citations omitted).

10

30.    Here, the State Court, by force of the FGB Foreclosure Judgment, established the allocation of proceeds as between 366 Gin Lane and 376 Gin Lane.  This judgment was never modified or vacated, and remains binding on Bay Point.  In fact, Bay Point filed a formal assignment of judgment which gave Bay Point a second priority position against the Aberdeen Property, albeit for the balance of the JGB debt after the first $39,961,521 is paid by Brickchurch. A copy of the assignment is annexed hereto as Exhibit "C".  The same allocation must be applied in bankruptcy to reduce the Claims against the Aberdeen Debtor.

### The Unequal Allocations under the JGB Foreclosure Judgment Create Different Obligations and Benefits to the Aberdeen Estate and Provide a Predicate for Avoidance and Claw Back Claims

31.    That the Aberdeen Debtor's liability under the JGB Foreclosure Judgment is limited to a balance after the first payment of $39,961,521 by Brickchurch also brings into consideration whether the mortgages placed on the Aberdeen Property for the full amount of the DIP Loan constitute fraudulent conveyances due to the unequal allocation structure.  There is no conceivable scenario in which Aberdeen would be liable to pay proceeds equal to the settlement amount of $44,500,000 given that Brickchurch had significant assets and was responsible for the first $39,961,521 under the express terms of the JGB Foreclosure Judgement.  Accordingly, any proceeds received by Bay Point from Aberdeen over the balance is challengeable as a voidance transfer.

32.    From the Aberdeen Debtor's estate's perspective, the DIP Loan was only needed to satisfy the balance of the JGB claim and any amount above that is avoidable.  Accordingly, the mortgage emanating out of the DIP Loan should be scaled back to the balance owed under the JGB Foreclosure Judgment, plus allocable interest.  Unless this is done, Bay Point has received a windfall fraudulent conveyance from the Aberdeen Debtor.

33.    More specifically, Section 502(d) of the Bankruptcy Code provides that no distribution may be made to a creditor who has received an avoidable transfer, until such time as the avoidable transfer is returned.   As the Hon. Robert D. Drain explained:

> The plain language of section 502(d) does not condition disallowance on the transferee's failure to satisfy a judgment; instead, it states that "the court shall disallow any claim of any entity from which property *is recoverable* ... under section 550...." 11 U.S.C. § 502(d) (emphasis added).

> As noted by *Collier,* section 502(d) of the Bankruptcy Code does not even necessarily require the entry of a judgment, let alone the failure to enforce one, for a claim to be disallowed: "To assure the effectuation of the purpose of this section, a claim may be disallowed at least temporarily and for certain purposes, subject to reconsideration, simply upon the allegation of an avoidable transfer . . .."

*In re Red Dot Scenic, Inc.*, 313 BR 181, 185-86 (Bankr. S.D.N.Y. 2004).

### Claw Back Provisions Under the Plan

34.    The Plan contains specific provisions regarding the right to object to claims.  To begin with, the Claims Objection Deadline set in Section 1.31 was modified to include the Debtors and any party in interest, with the deadline extended until 30 days after the Effective Date.  With an Effective Date of March 8, 2024, the Claims Objection Deadline is now fixed as April 8, 2024

35.    Second, pursuant to Section 4.8 of the Plan, all causes of action, including avoidance claims are preserved for the benefit of the Debtors' respective estates, subject to the lien of Bay Point pursuant to the DIP Loan agreements, with proceeds therefrom to be distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court after payment of reasonable attorneys' fees.

36.    Pursuant to Section 5.11, all distributions to Bay Point are subject to the estates' right to claw back, with all funds returned to be redistributed <u>without</u> further payment to Bay Point in accordance with the priority provisions of the Bankruptcy Code.

12

37.    Thus, Bay Point should be made to disgorge the funds improperly obtained through the overallocation and return the excess funds to the Aberdeen Debtor (after deducting the principal balance plus accrued interest) for re-distribution under the Plan.  This should be done without additional payments on account of the Bay Point DIP mortgage, which is not supported by fair or adequate consideration.  Alternatively, under 5.11, all funds disgorged are subject to redistribution without further payment to Bay Point.  In either event, the disgorgement belongs to the estate of the Aberdeen Debtor without further obligations to Bay Point and substantial additional funds will then be available to other creditors, with the IRS first in line after all administrative expenses are paid in full.

WHEREFORE, the Aberdeen Debtor respectfully prays for the entry of an Order consistent with the foregoing and granting such other relief as is just and proper.

Dated: New York, New York
        April 8, 2024

Goldberg Weprin Finkel Goldstein LLP
*Counsel for Aberdeen Enterprises, Inc.*
125 Park Avenue, 12th Floor
New York, New York 10017
(212) 221-5700
knash@gwfglaw.com

By:    /s/ Kevin J. Nash, Esq.

13

# EXHIBIT 9: Procedural Validity of Appeal

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF NEW YORK**

**Case No. 24 CV 7744 - GRB  - Bankruptcy Appeal**
——————————————————————X

**In re:**

**ABERDEEN ENTERPRISES, INC.,**

**DEBTOR.**

**LOUISE BLOUIN AND ABERDEEN**

**ENTERPRISES(BVI)LTB,**

**APPELANTS,**

**( SOLE CREDITOR , SOLE SHAREHOLDER AND SOLE DIRECTOR,**

**V**

**BAY POINT CAPITAL PARTNERS II,**

**L.P. AND ABERDEEN ENTERPRISES,**

**INC.,**

**APPELLEES.**

——————————————————————X

The Honorable Judge Brown,


**RESPONSE: BAY POINT CAPITAL PARTNER II, LP's MOTION TO DISMISS APPEAL**


**INTRODUCTION:**

**AFFIRMING MY APPEAL AND ADDRESSING SYSTEMATIC VIOLATIONS OF BANKRUPTCY LAW, JUDGMENT TERMS, AND PLAN PROVISIONS**

I, Louise Blouin, submit this statement affirming the procedural validity of my appeal and addressing the systematic violations of bankruptcy law, the terms of judgment, and a non-respect of plan provisions . My actions have been fully compliant with the procedural rules and timelines as established by the Federal Rules of Bankruptcy Procedure and supported by relevant case law.

# 1. Procedural Validity of the Appeal

### A. Timely Filing Under Bankruptcy Rule 8002:

I filed my notice of appeal on November 2, 2024 ( see below ), with the Bankruptcy Court, within the 14-day deadline required under Bankruptcy Rule 8002. This filing was acknowledged and approved by Judge Trust, confirming my compliance with the procedural requirements.

• **Key Case Law Supporting Timely Filing:**

• *In re Blumer*, 66 B.R. 109 (B.A.P. 9th Cir. 1986): Filing the notice of appeal with the bankruptcy court initiates the appellate process.

• *In re Sweet Transfer & Storage, Inc.*, 896 F.2d 1189 (9th Cir. 1990): Timely filing preserves the appellant's right to appeal, even if subsequent procedural steps are necessary.

### B. Equitable Tolling Principles:

Any procedural delays or instructions provided by the court warrant equitable tolling, as I relied in good faith on the guidance provided.

• **Case Law on Equitable Tolling:**

• *United States v. Wong*, 575 U.S. 402 (2015): Equitable tolling applies when procedural delays are caused by judicial instructions, not applicable but just for information.

• *Bowles v. Russell*, 551 U.S. 205 (2007): Judicial guidance impacting procedural timelines may warrant relief under equitable principles.

# 2. Jurisdiction and Transmission of the Appeal

### A. Filing in the Bankruptcy Court:

Filing the notice of appeal with the bankruptcy court is the proper procedural step under Bankruptcy Rule 8003. The court is responsible for transmitting the notice of appeal and

related documentation to the appellate court, preserving my substantive rights during this process.

**• Key Case Law on Jurisdiction:**

• *In re Michael*, 699 F.3d 305 (3d Cir. 2012): Filing a notice of appeal with the bankruptcy court is the required first step.

• *In re Burns*, 322 F.3d 421 (6th Cir. 2003): Procedural steps for transferring jurisdiction do not impact the validity of the appeal if the filing was timely.

**B. Good Faith Compliance with Instructions:**
After filing my appeal, I promptly followed all additional instructions provided by the court, including the filing of supplementary documentation. This demonstrates my diligence and commitment to preserving my rights.

## 3. Equitable Principles Favoring Substantive Resolution

**Courts prioritize resolving cases on their merits rather than dismissing appeals based on procedural technicalities.The deadline was met -let the truth prevail for myself and for the next victim – this is my mission after being torture myself and my unwell husband .**

**• Key Case Law on Equitable Treatment:**

• *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993): Courts favor resolving cases on their merits and excusing minor procedural errors when the appellant's intent is clear.

• *In re Bellamy*, 962 F.2d 176 (2d Cir. 1992): Minor procedural defects should not prevent the appeal from being heard if deadlines were met.

## 4. Addressing Potential Challenges

If any party challenges the validity of my appeal based on procedural grounds, I rely on the following points:

1. **Timeliness:** My appeal was filed within the required deadline, meeting the requirements of Bankruptcy Rule 8002.
2. **Jurisdiction:** Filing in the bankruptcy court initiated the appellate process, and jurisdiction transferred to the appellate court upon transmission of the notice.

3. **Good Faith:** I have complied with all court instructions in a timely and diligent manner.

4. **Equitable Principles:** Courts favor substance over procedural technicalities when deadlines are met, and the intent to appeal is evident. Even if in this case the filing was done on time

## 5. Conclusion

My timely filing with the Bankruptcy Court on November 2, 2024, preserves my right to appeal. Under Bankruptcy Rule 8002 and the supporting case law, my appeal is valid, and procedural requirements for transmission or additional filings do not negate my substantive rights. I respectfully request that my appeal be affirmed and allowed to proceed.

Dated: December 28, 2024
**Respectfully submitted,**

**By:** /s/ Louise Blouin
**Email:** lt@ltbholding.com

**Proof of Filing below:**

The blessing from Judge Trust's office below and the confirmation of Mrs. Blouin's filing are provided below. Why would Bay Point focus on procedural checks before addressing the merits, relying on administrative technicalities that do not even exist? Is it to avoid resolving the case on its merits? Instead, they rely on nonexistent administrative technicalities to ensure that the lies and defamation they have already spread to the press in three papers are justified, allowing them to further victimize another party and to use Mrs. Blouin name to climb .

   **From:** NYEB_DropBox <NYEB_DropBox@nyeb.uscourts.gov>
.

**Sent:** Monday, November 4, 2024 7:42 PM
**To:** Louise Blouin <lt@ltbholding.com>
**Subject:** RE:

Good afternoon,

Please refer to the court's website for information regarding appeals. You may also reach out to our Court' Pro Se Law Clerk pertaining to procedural questions on how to properly file an appeal. Please find her contact information listed below, as well the link to the appeals procedure from the court's website.


Thank you.


Elise Kanter- 347-394-1738


https://www.nyeb.uscourts.gov/usbc-edny-appeals-process-revised-3918


**From:** Louise Blouin <lt@ltbholding.com>
**Sent:** Saturday, November 2, 2024 4:43 PM
**To:** NYEB_DropBox <NYEB_DropBox@nyeb.uscourts.gov>
**Subject:**

**CAUTION - EXTERNAL:**


Your Honor,
I respectfully request clarification on the timing for filing my appeal, as the deadline is today, November 2nd , 2024
Given the circumstances surrounding the recent orders, I want to ensure that I comply with all court
requirements. Thank you for your guidance on this matter. I have a copy see below  of the relevant documents,
but I am unsure about the next steps to take
If you allow me to file, here is my final submission, which I hope will be the last forever .


UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
In re: Chapter 11
ABERDEEN ENTERPRISES, INC., Case No. 23-72834-AST
BRICKCHURCH ENTERPRISES, INC. Case No. 22-70914-AST
Debtors. Jointly Administered
Honorable Judge Trust:
**Formal Appeal Request**
This document serves as a formal request for an appeal concerning the Court's oral ruling issued on
October 9, 2024, which overruled the Objection filed by Aberdeen Enterprises, Inc. (the "Aberdeen
Debtor") on April 4, 2024, regarding the closing payments received by Bay Point Capital Partners II, L.P.
consistent with the Assigned JGB Foreclosure Judgment [D.I. 280].
**Background:**
Bay Point has been paid in full under the plan, only awaiting the debtor clawback provision . However,
Bay Point Capital, through CEO Charles Andros and legal counsel John Alerding, is misallocating funds
across my two different entities, contrary to the JGB judgment, which may also lead to tax complications.

*The motive behind using the proceeds from Aberdeen and Brickchurch to pay the IRS (with no connection between RIS and Brickchurch) appears to be to manipulate their ranking rather than honor the full lien of RIS as per previous agreements.*

*The misallocation is not the only issue; it reflects a broader strategy to avoid respecting the full lien payment. Additionally, Bay Point Capital allegedly paid a cash bribe from the distribution proceeds to the IRS to secure a favorable outcome by eliminating the lien that was meant to be honored. This non-refundable payment, which is not due, has allowed Bay Point to achieve preferential ranking and has not even been allocated toward the IRS hearing, the timing of which remains uncertain—essentially a cash check to get out of the way.*

*Bay Point Capital must also respect the 9 percent interest as outlined in Mr. Nash's objection and in my numerous filings. We would kindly appreciate a ruling on this aspect of Mr. Nash's objection. Please see the comments below.*

### .*Payment and Allocation Issues:*

*Bay Point has been paid in full under the plan, which included a debtor clawback provision. Concerns about the allocation of proceeds were raised as early as February, emphasizing the need for strict adherence to the outlined specifications during the auction process to ensure that the lien is honored and fully paid, and to respect all payment allocations in accordance with the JGB judgment.*

### *Attorney's Warning and Recommendations:*

*Attorney Warren advised the court to avoid conflicts related to allocation issues and recommended escrow for disputed claims until resolved, respecting the JGB judgment.*

### *Allegations of Misallocation and Preferential Treatment:*

*The preferential ranking exerted by Bay Point raises concerns about its detrimental impact on the sole creditor.*

*Allegations of a bribe further complicate the situation and challenge the fairness of the allocation process and ranking privileges .*

### *Interest Discrepancies:*

*The interest specified in the JGB judgment is 9 percent, contradicting Bay Point's claim of 24 percent. This discrepancy was highlighted by Mr. Nash objection  and echoed by sole creditor and its attorney  but not in your judgment your Honor maybe  Nash was focusing more at the misallocation  that would wipe out  part of the interest .See Nash objection comments below  which included the 9 percent interest versus the 24 %*

*If we respect the contract allocation and the interest of 9 percent as stated above, the remaining gap for the misallocation is approximately $8,721,433.  The objection presented by Mr. Nash, who argued about the allocation amount without taking into account the 9 percent interest as per the JGB judgment.*

*Your Honor, it is essential to rule on the respect for the 9 percent interest, as you precisely mentioned in your last ruling—the interest being 9 percent for JGB not 24 percent . Additionally, the misallocation should be reviewed under a different light, which reduces the amount considerably  . With this amount, I*

respectfully request that the full lien of $5.7 million for the RIS be paid, and that the $1 million be returned to ensure the integrity of the processes established in all filed proceedings.

*OBJECTION OF THE ABERDEEN DEBTOR SEEKING TO REDUCE AND/OR REALLOCATE THE CLOSING PAYMENTS RECEIVED BY BAY POINT CAPITAL PARTNERS II, L.P. CONSISTENT WITH THE ASSIGNED JGB FORECLOSURE JUDGMENT*

*" Bay Point seems to be charging post-judgment interest relating to the assigned JGB Foreclosure Judgment at the default rate under the DIP Loan Documents retroactively. In point of fact, post-judgment interest is governed by CPLR 5004 which sets the statutory rate at nine (9%) percent per annum"*

### Definition of "JGB Judgment":

Defined as the Judgment of Foreclosure and Sale in favor of JGB Partners, LP, entered on February 2, 2022,

and assigned to Bay Point.

*"JGB Judgment" shall mean that certain Judgment of Foreclosure and Sale entered in favor of JGB Partners, LP and its related companies by the Supreme Court of the State of New York, County of Suffolk on February 2, 2022 in the case styled as JGB Partners, LP, et al. v. Brickchurch Enterprises, Inc., et al., Index No. 623208/2019, the same having been assigned to Bay Point and constituting one of the JGB Assigned Documents*

https://acrobat.adobe.com/id/urn:aaid:sc:EU:51abb1e7-c5d1-490f-8b25-          9706913d917a

*See the attachment contract – JGB judgment with allocation instruction*
https://acrobat.adobe.com/id/urn:aaid:sc:EU:5e3a63e6-e37b-4175-b191-237d25bbf423    *See the attached order approving bid procedures attachment 2023.11 27 – lien must be paid or set aside if not due*

### Clawback Provisions in Chapter 11:

The potential for clawback provisions to address misallocations between Chapter 11 debtors is pertinent, particularly if one creditor receives preferential treatment.

### Specific Allegations Against Bay Point:

Allegations suggest that Bay Point secured an inflated allocation by circumventing a $5.7 million IRS lien, raising serious concerns about the fairness and legality of the allocation process.

### Conclusion:

*Given the aforementioned concerns regarding misallocation, preferential treatment, and potential misconduct, we respectfully request that the Court reconsider its October 9 ruling. The integrity of the allocation process and adherence to the JGB judgment are paramount, warranting further legal scrutiny as more light has been shed on this matter .*

*We respectfully request as well that the Court:*

*Honor the JGB assignment at the interest rate of 9 percent, as stipulated, and not the 24 percent claimed by Bay Point.*

*Ensure that the allocation respects the IRS lien of $5.7 million in full, which must be maintained in the Aberdeen bank account.*

*I respectfully request the approval of a CPA/ tax lawyer to present the numbers to the court, as they are material and require proper certification , the final task .*

***Respectfully submitted,***

*Louise Blouin*
*Sole Director ,Sole Shareholder ,Sole creditor*

***Background:***

*Notes and legal cases ;*

*In Chapter 11 bankruptcy, the concept of a **clawback** can indeed be applicable in cases involving misallocation of proceeds between two Chapter 11 debtors, especially when one creditor is favored to the detriment of others.*

***Misallocation of Proceeds**:*

*If proceeds from a sale or other assets were misallocated between two Chapter 11 companies, this can be challenged under clawback provisions. If one company received a disproportionately high allocation at the expense of the other, particularly linked to a bribe intended to improve their ranking, it could be viewed as preferential treatment.*

*Current Allocation Breakdown:*

   ***Total Proceeds**: $45,661,440*

***Bay Point's Allocation**:*

   ***Aberdeen Principal**:*

   *Morgan: $15,478,000*

   *JGB:      $26,900,000 (only $4,500,000 allowed plus statutory interest on the remaining period) real number at 9 % interest is*

   *IRS**:       $0 (bribed of $ 1 million  with corporate funds that are nonrefundable and not due)- highlighted*

            *by Attorney Mr.Warden*

      ***Subtotal**: $42,300,000*

**Proposed Fair Allocation if Ranking and JGB Allocation are Respected according to contract with no bribe ;**

*Aberdeen Principal*:

Morgan: $15,478,000

JGB:        $4,500,000 (plus statutory interest earned and the amount to be redeposited or paid by Bay Point)

IRS:        $5,700,000 (amount to be deposited in Mrs Blouin account with a lien until the ruling will be made )

*Revised Subtotal*:    $25,678,000

*Difference*:        $43,100,000 - $25,678,000 = $17,422,,000

This analysis demonstrates the significant discrepancy in allocations and underscores the need for Bay Point to rectify this situation to uphold equitable treatment for all creditors.

Bay Point must repay the full lien owed to the IRS and adhere to the interest rate of 9 percent, rather than the claimed 24 percent. Furthermore, they are required to allocate funds in accordance with the terms of the JGB assignment.

Which reduces considerably the allocation gap

## Key Legal Concepts

*Fraudulent Transfers*:

Under **11 U.S.C. § 548**, a transfer can be avoided if it was made with the intent to hinder, delay, or defraud creditors. If a bribe was disguised as a legitimate payment within a confirmed plan, it could be seen as a fraudulent transfer.

*Preferential Treatment*:

**11 U.S.C. § 547** allows for the recovery of transfers made to prefer one creditor over others within a certain time frame before filing. If the plan favored a creditor through a disguised bribe, it could be challenged as a preferential transfer.

*Breach of Fiduciary Duty*:

Debtors-in-possession and their representatives have a fiduciary duty to act in the best interests of all creditors. If a plan is found to have included a bribe, it could be argued that the fiduciary duty was breached.

## Relevant Case Law

**In re DSI Renal Holdings, LLC**, 2021 WL 3641231 (Bankr. D. Del. 2021)

**Overview**: This case involved disputes over improper allocations and payments made to insiders that were seen as disguised transfers.

**Significance**: The court underscored that misallocation and fraudulent transfers could be challenged, particularly when they appear to favor specific parties without legitimate justification.

*Favoring a Creditor*: If it can be demonstrated that one debtor paid off a creditor's lien with the proceeds of the sales ( sole creditor s money )specifically to secure a greater allocation for itself, this raises significant legal concerns. Such actions could be characterized as:

*Preferential Transfers*: Under **11 U.S.C. § 547**, a transfer that allows a creditor to receive more than they

9

would in a Chapter    7 liquidation can be clawed back if it was made within 90 days before the bankruptcy filing (or one    year for insiders)

**Fraudulent Transfers**: Under **11 U.S.C. § 548**, if the transfer was made with the intent to hinder, delay, or defraud other creditors, it may also be subject to clawback.

# Key Principles of Assignment in Mortgage Law

**Assignment of Mortgage**:

> The assignment of a mortgage occurs when the mortgagee (lender) transfers their rights and interests in the mortgage to another party. This must typically be documented in writing and executed according to state laws.

# Responsibilities of the New Lender (Assignee)

**Rights and Obligations**: Upon assignment, the new lender acquires the rights to receive payments, enforce the terms of the mortgage, and initiate foreclosure proceedings if necessary. The assignee steps into the shoes of the assignor and is subject to the same terms of the original mortgage.

**Duty to Act in Good Faith**: The new lender has a duty to act in good faith toward the borrower and must adhere to the terms of the original mortgage agreement.

**Compliance with Laws**: The assignee must comply with all applicable laws, including those governing mortgage servicing and foreclosure procedures.

**Liability for Breach**: If the new lender fails to comply with the mortgage terms or applicable laws, they may be liable for breach of contract or violations of consumer protection laws.

**In re M. Fabrikant & Sons, Inc.**, 2010 WL 5300901 (Bankr. S.D.N.Y. 2010):

> **Overview**: This case involved the obligations of an assignee to comply with the terms of the original mortgage. The court scrutinized the actions of the lender and the compliance with statutory requirements.

> **Significance**: It underscored that assignees are bound by the same terms as the original lender and can be held liable for breaching those terms.

**In re Hurst**, 2013 WL 3778882 (Bankr. S.D. Ind. 2013):

> **Overview**: This case dealt with the enforcement of mortgage rights by an assignee and discussed what constitutes a breach of contract when the terms of the mortgage are not respected.

> **Significance**: The court ruled that the assignee must act in accordance with the original mortgage's provisions and that failure to do so could lead to legal consequences.

**Pinnacle v. Capitol Hill**, 2014 WL 3515397 (N.Y. Sup. Ct. 2014):

> **Overview**: In this case, the court addressed the allocation of mortgage payments and how the lender's failure to respect the agreed allocation impacted the borrower.

*__Significance__: The decision reinforced the idea that lenders must adhere to the allocation terms set forth in the mortgage agreement.*

Respectfully Submitted,

Louise Blouin
lt@ltbholding.com
December 29,2024

*In re: Chapter 11*
*ABERDEEN ENTERPRISES, INC., Case No. 23-72834-AST*
*BRICKCHURCH ENTERPRISES, INC. Case No. 22-70914-AST*

11

# EXHIBIT 10: Claw back Clause

amount (or other disparate treatment) than such Creditor or Class of Claims would otherwise be entitled to under the Plan.

5.11    **Estates' Right to Clawback.**  For the avoidance of doubt, distributions to Bay Point under the Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be distributed as Sale Proceeds in accordance with the Plan.

5.12    **Order of Distributions and Allocation of Clawback.**  The distributions required by Sections 5.8 and 5.9 of this Plan, and the clawback provisions of Section 5.11 of the Plan, shall be applied in an order and manner so as to promote the substantial consummation of the Plan; *provided that* for the avoidance of doubt, nothing contained herein shall permit distributions to be paid in a priority inconsistent with Sections 5.8 and 5.9 of the Plan.

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1    <u>**Rejection of Executory Contracts**</u>.  On the Effective Date, all Executory Contracts to which the Debtor is a party shall be deemed rejected.

6.2    <u>**Rejection Damages Claims**</u>.    Allowed Claims arising from the rejection of Executory Contracts of a Debtor pursuant to Section 6.1 of the Plan shall be treated as Unsecured Claims.

179

EXHIBIT 11: Bay Point Distribution A

| | | entry of a final decree. The Debtors shall use the Sale Proceeds and/or Section 1146 Funds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan. | | |
|---|---|---|---|---|
| 1 | Secured Claims of Bay Point | Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie,* to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order. | $88,699,991.70, plus interest and other amounts to which Bay Point is entitled under the Bay Point Loan Documents that has accrued since September 19, 2023. For the avoidance of doubt, the Debtors dispute whether Bay Point is entitled to certain amounts that have been included in the above-referenced estimate and reserve all of their rights with respect to the same. | $82,928,317.25 |

8

EXHIBIT 12: Bay Point Distribution B

| | | | | |
|---|---|---|---|---|
| | | entry of a final decree.<br><br>The Debtors shall use the Sale Proceeds and/or Section 1146 Funds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan. | | |
| 1 | Secured Claims of Bay Point | Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie,* to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order. | $88,699,991.70, plus interest and other amounts to which Bay Point is entitled under the Bay Point Loan Documents that has accrued since September 19, 2023.<br><br>For the avoidance of doubt, the Debtors dispute whether Bay Point is entitled to certain amounts that have been included in the above-referenced estimate and reserve all of their rights with respect to the same. | $82,928,317.25 |

EXHIBIT 13: Plan Distribution – Schedule A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **ABERDEEN ENTERPRISES, INC.** | **Case No. 23-72834-AST** |
| **BRICKCHURCH ENTERPRISES, INC.** | **Case No. 22-70914-AST** |
| **Debtors.** | **Jointly Administered** |

**NOTICE OF FILING OF SCHEDULE A TO BAY POINT CAPITAL PARTNERS II,
LP'S AND THE DEBTORS' SECOND AMENDED JOINT LIQUIDATING PLAN
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PLEASE TAKE NOTICE OF THE FOLLOWING:

Bay Point Capital Partners II, LP has filed the attached document as Schedule A to *Bay Point Capital Partners II, LP's and the Debtors' Second Amended Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code* [D.I. 215] (the "Second Amended Joint Plan"). Schedule A was inadvertently left off the Second Amended Joint Plan when the Second Amended Joint Plan was originally filed.

Dated:    February 20, 2024

Respectfully submitted,

THOMPSON HINE LLP

/s/ John C. Allerding
John C. Allerding (admitted pro hac vice)
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
P: 404.407.3676 / F: 404.541.2905
John.Allerding@ThompsonHine.com
*Counsel for Bay Point Capital Partners II, LP*

185

## Schedule A

**(to Bay Point Capital Partners II, LP's and the Debtors' Second Amended Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code)**

| | Brickchurch (366 Gin Lane) | Aberdeen (376 Gin Lane) |
|---|---|---|
| Sale Price + Buyer's Premium | $43,345,280.00 | $45,661,440.00 |
| Listing Broker Fee Reserve | $192,500.00 | $202,500.00 |
| Buyer's Broker Fee Reserve | $385,000.00 | $405,000.00 |
| Auctioneer Fee Reserve | $770,000.00 | $810,000.00 |
| Auctioneer Expenses Reserve | $46,681.60 | $46,681.60 |
| State of New York (Secured Debt) | $1,997.79 | $168.20 |
| Bay Point (Morgan Stanley Debt) | | $16,248,932.00 |
| Bay Point (JGB Debt) | $29,444,734.72 | $26,892,813.08 |
| Bay Point (DIP Debt) | $11,451,967.17 | |
| US Trustee | $250,000.00 | $250,000.00 |
| Escrow Agent Reserve | $25,000.00 | $25,000.00 |
| IRS Administrative Expense Claim | $425,000.00 | $575,000.00 |
| State of New York Administrative Expense Claims | $154.52 | $6.87 |
| Duane Morris Administrative Expense Claim | $151,905.95 | |
| Simmons Legal Reserve | $135,000.00 | |
| Goldberg Weprin Finkel Goldstein LLP Reserve | | $140,000.00 |
| Mathew Kabatoff Fee Reserve | $30,000.00 | $30,000.00 |
| Accountant Fee Reserve | $10,000.00 | $10,000.00 |
| Law Offices of Avrum Rosen, PLLC Reserve | $25,338.25 | $25,338.25 |
| | $43,345,280.00 | $45,661,440.00 |

EXHIBIT 14:

Blouin Objection to Bay Point Joint Liquidating Plan

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Louise Blouin*
1350 Broadway, 11th Fl.
New York, NY  10018
212.216.8000
Scott Markowitz, Esq. (smarkowitz@tarterkrinsky.com)
David H. Wander, Esq. (dwander@tarterkrinsky.com)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ABERDEEN ENTERPRISES, INC., | Case No. 23-72834 -AST |
| BRICKCHURCH ENTERPRISES, INC., | Case No. 22-70914-AST |
| Debtors. | (Jointly Administered) |

**OBJECTION BY LOUISE BLOUIN TO (I) BAY POINT
CAPITAL PARTNERS II, LP'S AND THE DEBTORS' FIRST
AMENDED JOINT LIQUIDATING PLAN UNDER
CHAPTER 11 OF THE BANKRUPTCY CODE; AND (II)
THE RELATED JOINT DISCLOSURE STATEMENT**

Louise Blouin ("**Blouin**"), by her attorneys, Tarter Krinsky & Drogin LLP, submits this

objection to (i) Bay Point Capital Partners II, LP's ("**Bay Point**") and the Debtors' First Amended

Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code (the **"Plan"**), and (ii) the related

Disclosure Statement, and represents and states as follows:

1.      Blouin submits, both for herself as a Class 5 equity holder, and for Class 4

unsecured creditors, of which she is one, the Plan should not be confirmed.

2.      The Plan is good for Bay Point and no one else. It's undeniable these chapter 11

cases have benefited no stakeholder of the Debtors' estates except for Bay Point, a predatory

lender. That is a simple and undeniable fact. Bay Point will obtain an inflated return on its DIP

investment under the Plan, if it is allowed default interest of 14% and a late fee of 10%, along with

a roll up of the pre-petition judgments purchased by, and assigned to, Bay Point. Upon information

and belief, the obligations evidenced by the assigned JGB judgment to Bay Point were never consolidated under the DIP Loan and/or the DIP Loan Documents.

3.      Among additional deficiencies with the Plan, the treatment of the IRS' disputed claim is unsupportable, to the extent the IRS may receive $1 million more than its allowed claim. Any payment to the IRS should be included in the disputed claim reserve or, otherwise, subject to disgorgement, the same as being done with Bay Point's disputed secured claim.

4.      There may be insufficient funds to pay all administrative expenses. Notably, the administrative claims bar date will be 30 days after the Effective Date.

5.      If the Plan is confirmed, Bay Point should only receive the undisputed portion of its secured claim and the disputed portion should be included in the disputed claim reserve.

6.      The Plan cannot satisfy the best interest of creditors test because, on the one hand, a chapter 7 trustee could do no worse for Class 4 (unsecured creditors), and Class 5 (equity) than the Plan does for them and, in addition, a chapter 7 trustee has a reasonable likelihood of being able to liquidate the Debtors' estates in a manner that results in a distribution to Class 4 unsecured creditors and additional benefits to Class 5 equity holders. The Disclosure Statement does not contain a liquidation analysis but only general statements regarding compliance with § 1129(a)(7) of the Bankruptcy Code. See page 36 of Disclosure Statement.

7.      The Plan, in effect, treats these two jointly administered cases as being substantively consolidated, without satisfying, or even trying to satisfy, the well-known required criteria for substantive consolidation under Second Circuit caselaw.

8.      There are insufficient funds reserved for tax attorneys and accountants for the Debtors post-confirmation to perform necessary post-confirmation work.

2

9.      The Plan needs to state, in unequivocable terms, the rights of the Debtor and Blouin to object to Bay Point's claims are preserved without any restriction or limitation whatsoever.

10.      The part of Section 4.1 of the Plan that states "Blouin…shall completely refrain from taking part in … any of the decisions, processes, or procedures set forth or governed by the Plan" must be stricken, as being wholly improper, unconstitutional, unenforceable, meanspirited, and not even in the best interests of the Debtors' estates. Bay Point, in effect, is asking this Court to impose a gag order on Blouin, the largest unsecured credit (albeit a claim that is subject to dispute) and, indirectly, the sole equity holder.

11.      In addition to the foregoing, the Plan proponents cannot meet their burden of satisfying all of the elements of § 1129(a) and (b) of the Bankruptcy Code.

12.      For all of the foregoing reasons, the Court should deny confirmation of the Plan and should not approve the related Disclosure Statement.

13.      In the alternative, the Court should adjourn the confirmation hearing to permit the parties an opportunity to attempt to resolve these deficiencies.

14.      Blouin, with the Court's permission, reserves her rights to assert additional objections at the confirmation hearing.

Dated: New York, New York
      February 26, 2024

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Louise Blouin*

By: /s/ David H. Wander
      David H. Wander, Esq.
      Scott Markowitz, Esq.
      1350 Broadway
      New York, NY 10018
      212-216-8000
      dwander@tarterkrinsky.com
      atiktin@tarterkrinsky.com

3