UNITED STATES DISTRICT COURT 01/26/2025
EASTERN DISTRICT OF NEW YORK

**Case No. 24 CV 7744 - GRB - Bankruptcy Appeal**

—————————————————————x

**In re:**
**ABERDEEN ENTERPRISES, INC.,**

**DEBTOR.**

**LOUISE BLOUIN AND ABERDEEN ENTERPRISES(BVI)LTB,**
**APPELANTS**
***(SOLE CREDITOR , SOLE SHAREHOLDER AND SOLE DIRECTOR)***

**V**

**BAY POINT CAPITAL PARTNERS II, L.P. AND ABERDEEN ENTERPRISES, INC.,**

**APPELLEES.**

—————————————————————x

**Filed**
January 26, 2025 at 8:50 PM via Pro Se Electronic Document Submission
**U.S. District Court**
**Eastern District of New York**

RECEIVED
January 27, 2024
EDNY CI PRO SE OFFICE

**Response: Amended Motion to Appeal**
**OBJECTION OF THE ABERDEEN DEBTOR SEEKING TO REDUCE THE CLOSING PAYMENTS RECEIVED BY BAY POINT CAPITAL PARTNERS II, L.P. CONSISTENT WITH THE ASSIGNED JGB FORECLOSURE JUDGMENT**

Your Honor,

This appeal seeks to ensure that the Plan, the Disclosure Statement, the JGB Judgment, and the DIP Loan (including the overcharging of JGB by $25 million—double counting or applying the wrong interest rate, and not taking into account the prepaid interest and fees of $11,271,223.42) are adhered to in a manner consistent with the binding legal agreements and principles of res judicata. We are here today to enforce these agreements and claw back the amounts unjustly taken by Bay Point, as explicitly outlined in the Disclosure Statement and the Plan.

## Summary of Issues:

**Clawback Rights**:
The Disclosure Statement (Page 8) and the Plan both provide unequivocal language granting the right to claw back any amounts that Bay Point has wrongfully received. This provision must be enforced. Bay Point has failed to respect this clause, and by doing so, is engaging in fraudulent conveyance.

**Interest Rate Violations**:
The JGB Judgment explicitly stipulates a 9% interest rate, which is binding under res judicata principles. Bay Point has repeatedly violated this provision by charging interest three times, including double-charging interest on the JGB debt (see Bay Point Payoff attachment)—once outside the DIP, another time inside the $62 million old DIP loan, and improperly applying prepaid interest from the escrow account as a third instance of interest charging. This behavior constitutes a violation of the binding terms and must be corrected.

**Bay Point's Bad-Faith Conduct**:
Bay Point has intentionally delayed critical processes, including the approval of an auction contract and withholding renovation funds, which led to defaults and unnecessary financial damages. These actions, executed in bad faith, disqualify Bay Point from claiming any interest accrued during these delays (10 months of delays).

**Payoff Disclosures and Transparency**:
Bay Point has failed to provide clear and detailed disclosure of how funds have been allocated, particularly with regard to interest, fees, and expenses. We are working on a fake fraudulent payoff that double counts the JGB interest (see attachment 8). An $11 million prepaid amount remains unaccounted for, and Bay Point's lack of transparency has prevented the Debtors from closing their books and fulfilling tax requirements.

**Adherence to Res Judicata**:
All agreements, including the Disclosure Statement, the Reorganization Plan, the JGB Judgment, and the DIP Loan, must be respected and applied consistently, without selective enforcement of provisions. Bay Point cannot cherry-pick favorable terms while disregarding others.

## Relief Requested:

We respectfully request that the Court:

- Order Bay Point to comply with the terms of the JGB Judgment, including the 9% interest rate as specified (if earned).
- Evaluate whether Bay Point is entitled to the interest it claims, considering the delays and bad-faith actions outlined above.
- Compel Bay Point to provide full and transparent disclosure of the allocation of funds, including interest, fees, and expenses associated with the JGB Judgment and DIP Loan.
- Enforce the clawback provisions in the Disclosure Statement and the Plan, ensuring Bay Point returns any overpaid amounts as determined by the Court.

## Legal Basis:

This appeal is grounded in well-established principles of res judicata and contract law. In particular, the following legal precedents reinforce the need for adherence to the binding agreements and judgments:

- *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137 (2009): Confirms that bankruptcy court orders must be followed and cannot be selectively disregarded.
- *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010): Reinforces the binding nature of a confirmed bankruptcy plan.

## Background of the Dispute:

The properties in question are two prestigious estates located on Jim Lane in Southampton, each covering approximately 11,000 square feet with 19 bedrooms. These estates were placed into Chapter 11 proceedings not due to mismanagement, but as a result of predatory lending practices by Bay Point. The initial agreement with Bay Point included a $62 million DIP loan, with prepaid interest and fees. Additionally, the JGB judgment was treated as a separate assignment with a principal amount of $44.5 million and a 9% interest rate. Bay Point has attempted to consolidate the JGB debt with the DIP loan, but has failed to adhere to the agreed terms.

## Specific Financial Discrepancies:

**Sale Proceeds**:
The total sale proceeds amounted to $89,006,720, of which Bay Point received $84,038,446.97, plus prepaid interest and fees of $11,271,223.42 received at the time of signing the DIP Loan. However, the maximum they should be entitled to, including interest, is $69,719,055.45 million. Bay Point's claims of $96,370,047.40 million exceed the allowable amount by $26,650,991.95 million, depending on the interpretation of the relevant agreements and whether they are entitled to any interest, considering delays caused by Bay Point (7 months for selling at auction when it should have taken a maximum of 3 weeks).

**Escrow and Prepaid Amounts**:
The $11 million prepaid to Bay Point was not accounted for in the disbursement of sale proceeds. This misallocation of funds needs to be corrected.

**Excessive Interest Charges**:
Bay Point's failure to comply with the 9% interest rate stipulated in the JGB Judgment has resulted in overcharges. This includes double-charging interest on the JGB debt and the inappropriate application of prepaid interest from the escrow account.

## Conclusion:

Your Honor, the matter before the Court is of significant importance, and we present our case with the utmost seriousness and respect. The violations committed by Bay Point are not merely technical

but reflect a pattern of conduct that undermines the integrity of the agreements, the trust between the parties, and the principles of fairness.

First, Bay Point's failure to abide by binding contractual terms is indisputable, as is their misrepresentation of financial disclosures. These actions have led to unjust enrichment, which cannot be ignored by this Court. The clawback provisions must be enforced without delay to rectify this injustice. We request that Bay Point not only return the overcharged amounts but also be held accountable for their bad faith conduct throughout these proceedings.

Furthermore, we note that the allocation issue, as ruled on by Judge Trust, is not central to our concerns at this stage. Our focus now is on ensuring that the contractual terms are honored in a manner consistent with the doctrine of res judicata. The agreements that were previously adjudicated should stand, and any amounts paid in excess should be adjusted accordingly.

Additionally, the actions of Bay Point in publicly disparaging me through media outlets like *Vanity Fair*, *The New York Times*, and *The Wall Street Journal* are both defamatory and highly damaging. These insinuations of my financial instability, particularly in light of ongoing proceedings, further highlight the lack of good faith on their part and warrant the Court's attention.

In closing, we respectfully request that the Court uphold the principles of justice by enforcing the necessary corrective measures, compelling full financial transparency, and ensuring that Bay Point is held accountable for both the financial discrepancies and their harmful public statements.

We trust the Court will give this appeal the favorable consideration it deserves.

**The right to appeal :** the timely filing of my appeal, which was filed with the bankruptcy court on the 2nd of November , in accordance with the deadline set by the applicable rules.

Although there was a **two-day delay** between the bankruptcy court's acknowledgment of my filing and the transfer of the appeal to this court, I respectfully assert that my filing was **timely** and in full compliance with all applicable rules, due to the following:

1. **Timely Filing with the Bankruptcy Court**:
   I filed my appeal with the bankruptcy court on the deadline date and requested permission to proceed due to a 90-day period during which I was unable to file. The bankruptcy court acknowledged my request and granted me permission to file the appeal.
2. **Court's Acknowledgment**:
   The bankruptcy court explicitly granted me permission to file and subsequently transferred the case to this appellate court, which affirms that my filing was **acknowledged and accepted** by the bankruptcy court as timely and valid, despite the two-day transfer .
3. **Equitable Tolling Consideration**:
   The delay in transfer was procedural and outside my control. Given the bankruptcy court's acknowledgment and approval of my filing, I request that this court apply **equitable tolling** principles to preserve the timeliness of my appeal.

1. **Equitable Tolling Doctrine**

- The principle of **equitable tolling** allows deadlines to be extended when a party is **prevented from filing** due to circumstances beyond their control, such as procedural delays caused by the bankruptcy court's actions.

In light of these factors, I respectfully request that this court confirm the appeal and proceed with the review of the merits of the case,

**On the Timing we asked and filed on the deadline date with Judge trust that guided us to file to appeal court and approved**

The objective of this appeal is straightforward: to ensure that the plan, the disclosure statement, the JGB judgment, and the DIP loan are all respected. They are all interlinked These are binding agreements governed by res judicata , and they cannot be selectively applied or ignored.

We also want to make it very clear that we are here today to **claw back any amounts as stated on page 8 of the disclosure statement and in the Plan and nothing more** . The disclosure statement explicitly provides that any of the $88 million—or any other amounts—can be clawed back. It is unequivocal in granting the right to retrieve amounts that Bay Point has touched. The key issue is to deal with the actual reduction of the amount over paid ( we are actually dealing with issues where JGB overstated interest not one but 3 times the DIP loan interest was paid twice .with an overwhelming payoff with claw back of 96 million while it should be
We are here to have Bay Point respect the reservation of rights from page 8 of the disclosure statement see details below all our rights our reserved for all amounts ,Bay Point by not respecting this clause is engaging in fraudulent conveyance .

*Extract of the disclosure statement page 8 – we can claw back we were even against distributing and no putting in escrow – see Wander objection last attachment – they Baypoint insisted to take all the money but it is not time the change the clauses*

**$88,699,991.70, plus interest and other amounts to which Bay Point is entitled under the Bay Point Loan Documents that has accrued since September 19, 2023.**
**For the avoidance of doubt, the Debtors dispute whether Bay Point is entitled to certain amounts that have been included in the above-referenced estimate and reserve all of their rights with respect to the same.**

**Extract of the Bay point Plan section 5.11 page 28**
**Estates' Right to Clawback.** For the avoidance of doubt, distributions to Bay Point under the Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim

shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be distributed as Sale Proceeds in accordance with the Plan.

Summary of Issues

1. Application of the Correct Interest Rate
Not charging 2 times interest at over 24 % on the JGB judgment - The JGB assignment stipulates a 9% interest rate, and this must be respected under res judicata. Any deviation from this agreed-upon rate constitutes a violation of binding legal principles.

2. Evaluation of Earned Interest

The central question is whether Bay Point has even earned the interest it claims. Their conduct has been riddled with delays that they themselves caused, including:

• Taking over six months to approve a basic auction contract, a process that should take no more than two days.

• Withholding renovation funds until the loan's maturity, preventing necessary work from being completed and leading to default.

• Failing to release funds to address critical issues, such as a burst pipe that caused major damage.

These delays were intentional and constitute bad faith. Bay Point cannot be allowed to benefit from interest on periods they themselves deliberately extended through their inefficiency and refusal to cooperate. At most, a single month of interest may be justified, but beyond that, their actions negate any entitlement to further interest claims.

3. Payoff Disclosure and Transparency

The lack of a detailed payoff disclosure from Bay Point has created significant issues for the Debtors-Appellants. Specifically:

• An undeclared $11 million remains unaccounted for, despite being prepaid.

• Bay Point has not disclosed how they allocated interest, fees, and expenses, making it impossible to verify their claims.

This lack of transparency prevents the Debtors-Appellants from closing their books, completing tax returns, or performing proper accounting. It appears to be a deliberate attempt by Bay Point to obscure overcharges and avoid accountability.

4. Respect for Res Judicata



6

All agreements governed by res judicata principles—including the disclosure statement, the reorganization plan, the JGB judgment, and the DIP loan—must be respected. Bay Point cannot selectively adhere to favorable provisions while disregarding obligations imposed by these binding agreements.

Relief Requested

We respectfully request the court to:

1. Order Bay Point to respect the JGB judgment and not double counting or overstating interest .

2. Evaluate whether Bay Point is even entitled to claim interest, given their deliberate delays and bad-faith conduct.

3. Compel Bay Point to provide a detailed and transparent payoff disclosure, including the allocation of interest, fees, and expenses, to ensure the proper resolution of this matter.

Background

The properties at issue are two distinguished estates located on Jim Lane in Southampton, representing one of the largest estates in the Hamptons. Each property spans approximately 11,000 square feet with 19 bedrooms. These estates were placed into Chapter 11 proceedings during the COVID-19 pandemic, not due to financial mismanagement, but due to predatory lending practices by Bay Point.

The initial loan agreement with Bay Point included a $62 million DIP loan, which encompassed prepaid interest, opening fees, and additional costs at the choice and wish of Bay Point they decided to remove the JGB judgment of $44.5 million to be treated as a separate assignment, with a 9% interest rate explicitly stipulated.

Bay Point initially sought to consolidate the JGB assignment with the DIP loan but later opted to treat the JGB portion as a separate assignment. Despite this, Bay Point has failed to adhere to the terms of the assignment, attempting instead to cherry-pick favorable provisions while disregarding the binding obligations.

Bay Point's bad-faith conduct includes significant delays, coercion, and threats designed to prolong proceedings and create defaults. For example:

• Bay Point delayed approving a simple auction contract by six months, an action that should take no more than two days.

• Funds for critical property renovations were withheld until the loan's maturity, leading to significant damage, such as burst pipes.

• Debtors-Appellants were threatened with immediate default if they did not agree to specific terms dictated by Bay Point.

Additionally, Bay Point has failed to provide transparency regarding the payoff amounts. An $11 million prepaid amount remains unaccounted for, and there is no disclosure of how interest and fees were allocated. This lack of transparency has prevented the Debtors-Appellants from closing their books or filing tax returns.

Legal Basis

The principles of res judicata and binding contract law require adherence to the terms set forth in the disclosure statement, reorganization plan, the JGB judgment, and the DIP loan ( JGB portion ). Relevant case law includes:

1. Stern v. Marshall, 564 U.S. 462 (2011)

• Establishes the importance of respecting bankruptcy court rulings as final judgments.

2. Travelers Indemnity Co. v. Bailey, 557 U.S. 137 (2009)

• Confirms that bankruptcy court orders must be followed and cannot be selectively disregarded.

3. United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260 (2010)

• Reinforces the binding nature of a confirmed bankruptcy plan.

Bay Point's actions in disregarding these principles, delaying proceedings, and failing to provide transparency violate these legal standards.



8

Respectfully submitted,

LOUISE BLOUIN on behalf of:

Louise Blouin, Aberdeen Enterprises Holdings
BVI

By: /s/ Louise Blouin

Paris France
P: +41 79 789 86 95
lt@ltbholding.com

**Attachment 1** :JGB judgment principal and interest (res judicata ) max statutory interest is 9 %

The interest on page 5 of the judgment is very clear see extract below ,please see the below calculation

(A) with respect to the sale of 366 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, the sum of $__39,961,521.80________, ~~which is comprised of (i)~~ the said amount ~~of $39,961,521.80~~ so reported by the Referee to be due as of July 1, 2021 with interest ~~in the total amount of $________~~ accruing at a per diem rate of Thirteen Thousand Dollars ($13,000) from the date July 2, 2021 to date of entry of this judgment as provided in the said Referee's Report, ~~(ii) an award for legal fees incurred or to be incurred by Plaintiffs in prosecuting the foreclosure action, in the amount of $304,316.05 as provided for in the Loan Documents, *plus* any additional legal fees and expenses incurred by Mortgage Holder, including any Assignee, including any Assignee in connection with the foreclosure and sale that are required to be paid by the Borrowers under the Loan Documents~~, and (iii) an award of costs, disbursements and additional allowances in the amount of $1125.00 to be taxed by the Clerk of this Court with interest thereon from the date hereof, with interest thereon from the date hereof, together and thereafter interest at the statutory rate thereon, to the date of sale directed herein or to the date of the delivery of the Referee's deed, whichever is later or so much as the purchase money of the mortgaged Properties will pay of the same, and (B) with respect to the sale of 376 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, an amount equal to the judgment of foreclosure and sale amount *less* any amounts paid to the Mortgage Holder from the proceeds of the sale of 366 Gin Lane.

*Extract of the Objection to secure filed by Mr. Nash attachment 4 , detailing the calculation of the allowed JGB amount on Aberdeen which is part of the claw able amount from the Disclosure statement that is ver explicit*

By the Debtor's rough count, if a *pro rata* approach is used, post-judgment interest accrued during the period from the refinancing of JGB via payment of the $44.5 million in December 2022 through the closings on the Debtors' properties on March 6, 2024, a period of about fifteen (15) months at a rate of $34,038 per month [($4,538,479 x .09)/12]. Thus, a principal balance of $4,538,479 was owed under the JGB Foreclosure Judgment, plus total interest charges of $510,579 at the legal rate, for a grand total charge of $5,049,058.

**Attachment 2:** *Schedule A* Total proceeds for the sale $89,006,720. Bay point received for JGB is $ 29,444,734.72 and $26,892= **$56,337,547.72** the maximum they are entitled to is $ 44,5 plus $ 510,579 = **$45 million** (interest see above according to maximum owed by Aberdeen and debt to Aberdeen was maxed to $5,049,058 )

**Attachment 3** : Closing escrow proof of pre-paid Disbursed to Baypoint for pre-paid fees interest at the original closing see **closing escrow** statement of $11 ,080,000 paid to Bay Point and the $44,5 million from JGB is identified clearly on the closing escrow $11 080 000 from prepaid closing of $62 ,045,000 **see attachment 2 schedule A of distribution owed to the creditor $ 11 million** ( it vanished )

**Attachment 4** Objection from Counsel Nash for Aberdeen – never presented the second part which is the reduction of the amount and you will as well read about the clear wish for Bay point to have JGB stand alone to benefit from second rank , what is a concern is to allow themselves any amount on Aberdeen and to get ride of the irs obkjection they bribed them with the money of the proceeds without consent see Wander attachment 9 , objecting to IRS as well as objecting to pay bay point the disputed claims to avoid wasting time like what we are doing in an appeal and now they are pretending like we can not clawback

**Attachment 5**: **JGB judgment**

**Attachment 6 : Bay Point Disclosure Statement**



**Attachment 7 :Payoff it is the only one we got from January 24 overstating and double counting interest**

**Attachment 8 : Counsel for Sole creditor ( sole shareholder )**

**Attachment 9 Bay Point Plan**

**Attachment 10 : These numbers are being audited by forensic accounting from a top five Accounting firm excess paid in the order of $28 million approximately**

**Attachment 1** :JGB judgment principal and interest (res judicata ) max statutory interest is 9 %

The interest on page 5 of the judgment is very clear see extract below ,please see the below calculation

(A) with respect to the sale of 366 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, the sum of $__39,961,521.80__________, ~~which is comprised of (i)~~ the said amount ~~of $39,961,521.80~~ so reported by the Referee to be due as of July

1, 2021 with interest ~~in the total amount of $______________~~ accruing at a per diem rate of Thirteen Thousand Dollars ($13,000) from the date July 2, 2021 to date of entry of this judgment as provided in the said Referee's Report, ~~(ii) an award for legal fees incurred or to be incurred by Plaintiffs in prosecuting the foreclosure action, in the amount of $304,316.05 as provided for in the Loan Documents, *plus* any additional legal fees and expenses incurred by Mortgage Holder, including any Assignee, including any Assignee in connection with the foreclosure and sale that are required to be paid by the Borrowers under the Loan Documents~~, and (iii) an award of costs, disbursements and additional allowances in the amount of $1125.00 to be taxed by the Clerk of this Court with interest thereon from the date hereof, with interest thereon from the date hereof, together and thereafter interest at the statutory rate thereon, to the date of sale directed herein or to the date of the delivery of the Referee's deed, whichever is later or so much as the purchase money of the mortgaged Properties will pay of the same, and (B) with respect to the sale of 376 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, an amount equal to the judgment of foreclosure and sale amount *less* any amounts paid to the Mortgage Holder from the proceeds of the sale of 366 Gin Lane.

*Extract of the Objection to secure filed by Mr. Nash attachment 4 , detailing the calculation of the allowed JGB amount on Aberdeen which is part of the claw able amount from the Disclosure statement that is ver explicit*

By the Debtor's rough count, if a *pro rata* approach is used, post-judgment interest accrued during the period from the refinancing of JGB via payment of the $44.5 million in December 2022 through the closings on the Debtors' properties on March 6, 2024, a period of about fifteen (15) months at a rate of $34,038 per month [($4,538,479 x .09)/12]. Thus, a principal balance of $4,538,479 was owed under the JGB Foreclosure Judgment, plus total interest charges of $510,579 at the legal rate, for a grand total charge of $5,049,058.

22954-723

At an I.A.S. Part 17 of the Supreme Court of the State of New York, held in and for the County of Suffolk, at the Courthouse at One Court Street, Riverhead, New York 11901 on the 19 day of January, 2022

PRESENT: HON. ~~DERRICK J. ROBINSON~~ CHRISTOPHER MODELEWSKI, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

| | |
|---|---|
| JGB PARTNERS, LP, JGB CAPITAL, LP, JGB (CAYMAN) ANCONA LTD., and JGB PLYMOUTH ROCK LLC,<br><br>Plaintiffs<br><br>- against -<br><br>BRICKCHURCH ENTERPRISES, INC., ABERDEEN ENTERPRISES, INC., NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, THE STATE OF NEW YORK, TOWN OF SOUTHAMPTON TOWN AND SCHOOL TAX COLLECTOR, THE VILLAGE OF SOUTHAMPTON VILLAGE TAX COLLECTOR, SUFFOLK COUNTY WATER AUTHORITY,<br><br>Defendants. | Index No.: 623208/2019<br><br>**JUDGMENT OF FORECLOSURE AND SALE**<br><br>ENTERED:<br>AT: 1204 pm FEB - 2 2022 |

No Directive.

UPON the Notice of Pendency of this action filed in the Office of the Clerk of the County of Suffolk on the 22nd day of November 2019, the Summons and Complaint served herein and filed in the Office of the Clerk of the County of Suffolk on the 22nd day of November 2019, and upon due proof that all the defendants, BRICKCHURCH ENTERPRISES, INC., ABERDEEN ENTERPRISES, INC., NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, THE STATE OF NEW YORK, TOWN OF SOUTHAMPTON TOWN AND SCHOOL TAX COLLECTOR, THE VILLAGE OF SOUTHAMPTON VILLAGE TAX

COLLECTOR, SUFFOLK COUNTY WATER AUTHORITY ("Defendants"), have been duly served with said Summons, Complaint and Notice of Pendency; and

UPON the Order of the Honorable Derrick J. Robinson, dated June 1, 2021 granting plaintiffs JGB PARTNERS, LP, JGB CAPITAL, LP, JGB (CAYMAN) ANCONA LTD., and JGB PLYMOUTH ROCK LLC's ("Plaintiffs") motion, in all respects, for an order (the "Order"):

(i) awarding Plaintiffs default judgment, pursuant to CPLR § 3215 and RPAPL § 1321, on its Complaint against Defendants to, *inter alia*, foreclose all rights, claims, liens, estate and equity of redemption in the premises known as 366 Gin Lane, Southampton, New York, and 376 Gin Lane, Southampton, New York (the "Properties"), based upon the default of the mortgagors, Brickchurch Enterprises, Inc. ("Brickchurch") and Aberdeen Enterprises, Inc. ("Aberdeen"), under the terms of a Note signed by the Brickchurch and Aberdeen and delivered to Plaintiffs on August 18, 2018 (the "Note") and a Mortgage and Security Agreement signed by Brickchurch and Aberdeen and delivered to Plaintiffs on August 18, 2018 (the "Mortgage");

(ii) striking John Doe Nos. 1-25 from the caption; and

(iii) appointing Ann Cryan, Esq. as referee (the "Referee") to ascertain and compute the amount due to Plaintiffs under the Note and Mortgage and to ascertain and report whether the Properties be sold in separate parcels; and

UPON all other papers previously filed herein; and upon all proceedings had herein, from all of which it appears that this action was brought to foreclose a mortgage held by Plaintiffs on the Properties, that the entire balance of the principal sum secured thereby and all other sums due thereon are now due and payable; that the Defendants herein have been duly served with the Summons and Complaint; that no defendant is an infant or incompetent or absentee person and that the Notice of Pendency filed herein has been on file for twenty (20) days or more and contains all of the particulars required by law to be stated in such notice; and

UPON the reading and filing the report of said Referee, dated July 27, 2021 (the "Report") from which Report it appears that the sum of Thirty-Nine Million, Nine Hundred

Sixty-One Thousand, Five Hundred Twenty-One Dollars and Eighty Cents ($39,961,521.80) was due to Plaintiffs as of July 1, 2021 for principal and interest and otherwise under the Note and Mortgage, plus Thirteen Thousand Dollars ($13,000) per diem, and that the Properties must be sold in two parcels; and

UPON the reading of Plaintiffs' notice of motion to confirm the Report and to enter a judgment of foreclosure (the "Motion"), and the affirmations of Leslie C. Thorne, Greg Kramer, and Tamika Hardy in support of the Motion; and upon the Court having issued a decision and order dated January 12, 2022 and plaintiff having waived its application for attorney's fees, the said decision and order is hereby modified to the extent that the plaintiff's application for attorneys' fees is withdrawn and no hearing is required thereon;

NOW, upon the plaintiff's Motion, it is

ORDERED, ADJUDGED AND DECREED that the Report be, and the same hereby is in all respects ratified and confirmed; and it is further

ORDERED, ADJUDGED AND DECREED that the Properties described in the Complaint in this action and hereinafter described be sold in two parcels at separate public auctions to the highest bidder at such auctions, which shall be held within ninety (90) days of the date of the entry of this Order with (i) 366 Gin Lane sold at auction first, at Southampton Town Hall 116 Hampton Road Southampton, New York 11968, and (ii) 376 Gin Lane sold at auction after the closing of the sale of 366 Gin Lane at Southampton Town Hall 116 Hampton Road Southampton, New York 11968, in each case, under the direction of Ann Cryan, Esq., who is hereby appointed Referee for that purpose; and that said Referee give public notice of the time and place of said sale, according to law and the rules and practices of this Court, by publication in Southampton Press Western Edition.

CM
JSC

ORDERED, ADJUDGED AND DECREED that, in the case of each sale, Plaintiffs or any assignee of Plaintiffs' interests in the Note and the Mortgage (an "Assignee"; the Plaintiffs or any Assignee being referred to herein as the "Mortgage Holder"), or any other party to this

action may become a purchaser at such sale, and that if the Mortgage Holder becomes such purchaser, no deposit shall be required; that in the event a party other than the Mortgage Holder becomes the purchaser they shall be required to tender a deposit of ten percent (10%) in certified funds and closing shall be had within thirty (30) days; that said Referee execute to the purchaser or purchasers on such sale a deed or deeds of the Properties sold; that all deed stamps, transfer taxes and recording fees, if any, shall be paid by the purchaser;

ORDERED, ADJUDGED AND DECREED that said Referee on receiving the proceeds of each sale, shall forthwith deposit the same in the name of the Referee, as Referee, ~~with~~ in her IOLA account at any local banking institution insured by the FDIC and the Referee shall thereafter make the following payments therefrom and the Referee's checks drawn for such purpose shall be paid by such depository, to wit, in the case of each sale:

FIRST: The Referee shall pay a sum ~~not to exceed $500~~ of $750.00 the amount allowed by Section 8003 of the CPLR to the Referee as the Referee's fee herein.

SECOND: The Referee shall pay advertising expenses and the expenses of said sale as shown on the bills presented and certified by the said Referee to be correct.

THIRD: The Referee shall pay the amount of any lien or liens upon the Properties to be sold at the time of such sale together with any and all sums which, in each case, may be necessary to redeem the property so sold from any and all sales, unpaid taxes, assessments, water rates, and any sums expanded for the protection, preservation, security or maintenance of the property, including, but not limited to, fire insurance and property inspections. The Referee shall pay or refund to the Plaintiffs, if paid by it, any of the aforementioned sums upon presentation of proper receipts for such payments.

FOURTH: (A) with respect to the sale of 366 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, the sum of $ 39,961,521.80, ~~which is comprised of (i)~~ the said amount ~~of $39,961,521.80~~ so reported by the Referee to be due as of July

CM/JSC

1, 2021 with interest ~~in the total amount of $___________~~ accruing at a per diem rate of Thirteen Thousand Dollars ($13,000) from the date July 2, 2021 to date of entry of this judgment as provided in the said Referee's Report, ~~(ii) an award for legal fees incurred or to be incurred by Plaintiffs in prosecuting the foreclosure action, in the amount of $304,316.05 as provided for in the Loan Documents, *plus* any additional legal fees and expenses incurred by Mortgage Holder, including any Assignee, including any Assignee in connection with the foreclosure and sale that are required to be paid by the Borrowers under the Loan Documents~~, and (iii) an award of costs, disbursements and additional allowances in the amount of $1125.00 to be taxed by the Clerk of this Court with interest thereon from the date hereof, with interest thereon from the date hereof, together and thereafter interest at the statutory rate thereon, to the date of sale directed herein or to the date of the delivery of the Referee's deed, whichever is later or so much as the purchase money of the mortgaged Properties will pay of the same, and (B) with respect to the sale of 376 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, an amount equal to the judgment of foreclosure and sale amount *less* any amounts paid to the Mortgage Holder from the proceeds of the sale of 366 Gin Lane.

FIFTH: That, if the Referee intends to apply for a further allowance for the Referee's fee, the Referee may leave on deposit such amount as will cover further order of the Court thereon after application duly made.

SIXTH: That the said Referee take receipts for the money so paid out by the Referee and file the same with the Referee's report of sale and that the Referee deposit the surplus money, if any, with the ~~Treasurer~~ Comptroller of Suffolk County within five days after the same shall be received and ascertainable, to the credit of this action, to be drawn only on order of this Court, signed by a Justice thereof; and it is further

CM JSC

ORDERED, ADJUDGED AND DECREED, that, in the case of each sale, the said Referee make a report of such sale and file it with the Clerk of the County of Suffolk within 30 days of completing the sale and executing the proper conveyance to the purchaser, and that the purchaser or purchasers at such sale be let into possession upon production of the Referee's deed or deeds; that, if the proceeds of such sale be insufficient to pay the amount so reported due to the Plaintiffs and interest, costs and allowances as aforesaid, said Referee specify the amount of such deficiency in the Referee's report of sale; and it is further

ORDERED, ADJUDGED AND DECREED, that in the case of each sale, in the event

the Mortgage Holder shall become the purchaser of the applicable Property directed to be sold, as aforesaid, or in the event that the rights of the purchaser at said sale, and the terms of sale under this judgment shall be assigned to or acquired by the Mortgage Holder, and a duly executed assignment thereof in writing be filed with the Referee, said Referee shall not require the Mortgage Holder to pay in cash the entire amount bid at said sale, but shall execute and deliver to the Mortgage Holder a deed or deeds of the Properties sold, upon payment to the Referee of the amounts specified above in the paragraphs marked "FIRST", "SECOND" and "THIRD", or in lieu of the payment of the said last mentioned amounts, upon filing with said Referee receipts of the proper municipal authorities showing the payment thereof. That the balance of the amount bid, if any, shall be allowed to the Mortgage Holder, and applied by the paragraph marked "FOURTH" above. That if, after so applying the balance of the amount paid, there shall be a surplus over and above the amounts due to the Mortgage Holder, the Mortgage Holder shall pay to the said Referee, upon delivery to it of the Referee's deed, the amount of such surplus, and the Referee shall then deposit the balance with such depository as herein directed; and it is further

ORDERED, ADJUDGED AND DECREED, that, in the case of each sale, the Referee shall complete the Foreclosure Action Surplus Monies form, signed by Mortgage Holder's representative (bank) and any third-party purchaser, and proof of deposit with the County Comptroller, each to be filed with the Suffolk County Clerk and the Suffolk County Supreme Court Fiduciary Office within thirty (30) days of close of title; and if such form and proof of deposit is not timely filed, the Fiduciary Clerk will notify the assigned Justice within 90 days and the matter will be calendared at the direction of the Justice for whatever action he or she deems appropriate; and it is further

ORDERED, ADJUDGED AND DECREED, that the Defendants in this action, and all persons claiming under them after the filing of the notice of the pendency of this action be, and they are forever barred and foreclosed of all right, title, claim, lien and equity of redemption in the said mortgaged Properties and in each and every part and parcel thereof. The following is a description of the Properties heretofore mentioned:

(See Schedule A annexed hereto.)

SAID Properties being known as and by the street numbers 366 Gin Lane, Southampton, New York, and 376 Gin Lane, Southampton, New York, and it is further

ORDERED, ADJUDGED AND DECREED that the Properties be sold subject to:

(a) The state of facts an accurate survey will show;

(b) All covenants, restrictions, easements, agreements and reservations, if any, of record and to any and all violations thereof;

(c) Any and all building and zoning regulations, restrictions and ordinances of the municipality in which said Properties are situated, and to any violations of the same, including, but not limited to, reapportionment of lot lines, and vault charges, if any;

(d) Any and all orders or requirements issued by any governmental body having jurisdiction against or affecting said Properties and violations of the same;

(e) The physical condition of any buildings or structure on the Properties as of the date of the later to occur of the closing date or the extension of the closing date hereunder;

(f) Rights of tenants in possession, if any;

(g) Prior mortgages and judgments, if any, now liens of record, which, solely with respect to the sale of 376 Gin Lane, shall include the first ranking mortgage lien held by Morgan Stanley Private Bank, N.A.;

(h) Right of Redemption of the United States of America, if any;

(i) Rights of any defendants pursuant to CPLR Section 317, CPLR

Section 2003 and CPLR Section 5015, if any

(j) Any and all Hazardous Materials in the Properties including, but not limited to, flammable explosives, radioactive materials, hazardous wastes, asbestos or any material containing asbestos, and toxic substances; and

(k) Other conditions as set forth in the terms of the sale more particularly to be announced at the sale; and it is further

ORDERED, that by accepting this appointment the Referee certifies that he is in compliance with Part 36 of the Rules of the Chief Judge (22 NYCRR Part 36), including, but not limited to, Section 36.2(c) ("Disqualifications from Appointment") and Section 36.2(d) ("Limitations on Appointments Based upon Compensation"). ; and it is further

~~Dated: January , 2022~~

~~ENTER:~~

~~HON. DERRICK J. ROBINSON, J.S.C.~~
~~CHRISTOPHER MODELEWSKI, JSC~~

CM
JSC

***ORDERED*** that plaintiff shall serve the notice of the foreclosure sale and any adjournments upon the Supreme Court Calendar Clerk; and it is further

***ORDERED*** that the referee complete and file the Suffolk County Foreclosure Action Surplus Monies form with the Supreme Court Calendar Clerk and the Suffolk County Clerk within thirty (30) days of the foreclosure sale in accordance with Suffolk County Administrative Order 104-20; and it is further

***ORDERED*** that the referee submit proof of deposit of any surplus monies with the Suffolk County Comptroller with the Supreme Court Calendar Clerk and the Suffolk County Clerk within thirty (30) days of the date of closing of title; and it is further

***ORDERED*** that if the referee does not conduct the sale within 90 days of the date of the judgment, in accordance with CPLR 2004, the time fixed by RPAPL § 1351(1) is extended for the referee to conduct the sale as soon as reasonably practicable; and it is further

***ORDERED*** that in order to schedule a foreclosure sale, the Referee must contact the Court Fiduciary Office via e-mail at SuffAuctions@nycourts.gov with the proposed details of the foreclosure sale (including the title of action and its index number, the town where the auction is to take place, and the requested date and time for the auction) and the Fiduciary Office will either confirm the proposed date, time and place or ask the Referee to re-schedule the sale to prevent multiple auctions from taking place simultaneously at one location; and it is further

***ORDERED*** that the Referee must contact the Court Fiduciary Office via e-mail at SuffAuctions@nycourts.gov to advise of any change or cancellation of a scheduled auction; and it is further

***ORDERED*** that, in light of the current COVID-19 pandemic, the Referee must ensure that any requirements in effect at the time of the sale regarding social distancing and face coverings are complied with by all participants in the foreclosure auction; and it is further

***ORDERED*** that the Referee shall ensure that post-sale paperwork and any other interactions relating to the foreclosure sale take place outdoors to the fullest extent possible and, whether these interactions take place outside or inside the Town Hall, the Referee must enforce any requirements in effect at the time regarding social distancing and face coverings; and it is further

***ORDERED*** that should the Referee believe the situation to be unsafe or if there is noncompliance with safety protocols, the Referee may, in his/her discretion, cancel or postpone the auction; and it is further

***ORDERED*** that the Referee shall require that the successful bidder immediately execute Terms of Sale for the purchase of the property, and pay to the Referee, in cash or certified or bank check, ten percent (10%) of the sum bid, unless the successful bidder is Plaintiff in which case no deposit against the purchase price shall be required; and it is further

**RED STONE TITLE AGENCY, LLC**
**As Agent for**
**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
**LEGAL DESCRIPTION**

Title No.: **RTNY-36148**

**Parcel I:**
All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of Southampton, Town of Southampton, County of Suffolk, State of New York, more particularly described as follows:

BEGINNING at a point on the southerly side of Gin Lane, distant westerly 65.95 feet as measured along same from the intersection of the southerly side of Gin Lane with the westerly side of Wyandanch Lane;

THENCE along lands now or formerly of Aberdeen Enterprises Inc.:

1. RUNNING THENCE South 20 degrees 05 minutes 50 seconds East 178.57 feet;

2. THENCE South 58 degrees 56 minutes 50 seconds West 50.96 feet;

3. THENCE South 03 degrees 20 minutes 09 seconds East 155.09 feet;

4. THENCE South 16 degrees 20 minutes 00 seconds East 213.89 feet to The Atlantic Ocean;

THENCE along Tie Line which marks the General Shore Line of the Atlantic Ocean, as of January 5, 1982 bearing, South 64 degrees 46 minutes 15 seconds West 129.10 feet to land now or formerly of Susan Wilson;

THENCE along said lands, North 16 degrees 20 minutes 00 seconds West 575.00 feet to a monument in the southerly side of Gin Lane;

THENCE along the southerly side of Gin Lane, North 73 degrees 21 minutes 10 seconds East 200.00 feet to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as District 0904, Section 029.00 Block 01.00, Lot 017.014, Suffolk County and also known as Parcel I: 366 Gin Lane, Southampton, NY 11968.

**Parcel II:**
All that certain plot, piece or parcel of land situate, lying and being in the Incorporated Village of Southampton, Town of Southampton, County of Suffolk, State of New York, more particularly described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Gin Lane with the westerly side of Wyandanch Lane;

RUNNING THENCE along the westerly side of Wyandanch Lane, South 30 degrees 54 minutes 10 seconds East 531.00 feet to the Atlantic Ocean;

THENCE along a tie line course which marks the general shoreline of the Atlantic Ocean, as of January 5, 1982 bearing, South 64 degrees 46 minutes 15 seconds West 275.28 feet to land now or formerly of Brickchurch Enterprises Inc.;

THENCE along said lands, the following four courses and distances:

## SCHEDULE A continued

1. North 16 degrees 20 minutes 00 seconds West 213.89 feet;

2. North 03 degrees 20 minutes 09 seconds West 155.09 feet;

3. North 58 degrees 56 minutes 50 seconds East 50.96 feet;

4. North 20 degrees 05 minutes 50 seconds West, 178.57 feet to the southerly side of Gin Lane;

THENCE along the southerly side of Gin Lane, North 73 degrees 21 minutes 10 seconds east 65.95 feet to the westerly side of Wyandanch Lane to the point or place of BEGINNING.

Note: Address, Block & Lot shown for informational purposes only

Designated as District 0904, Section 029.00, Block 01.00, Lot 017.013, Suffolk County and also known as Parcel II: 376 Gin Lane, Southampton, NY 11968.

***ORDERED*** that no sale shall be deemed final until the full ten percent (10%) deposit has been paid to the Referee and a Memorandum of Sale has been signed, which must be completed immediately following the sale.

Said property is commonly known as PARCEL I: 366 GIN LANE, SOUTHAMPTON, NEW YORK 11968. PARCEL II: 376 GIN LANE, SOUTHAMPTON, NEW YORK 11968.

The legal description of the mortgaged property referred to herein is annexed hereto as Schedule "A".

ENTER

GRANTED

JAN 19 2022

Judith A. Pascale
CLERK OF SUFFOLK COUNTY

Dated: January 19, 2022

HON. CHRISTOPHER MODELEWSKI, J.S.C.

Judith A. Pascale

FILED

2022 FEB -2 P 12:06

JUDITH A. PASCALE
SUFFOLK COUNTY CLERK

# FOR INFORMATION ONLY FROM THIS PAGE ON

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF SUFFOLK

---------------------------------------------------------------x

JGB PARTNERS, LP, JGB CAPITAL, LP, JGB (CAYMAN) ANCONA LTD., and JGB PLYMOUTH ROCK LLC,

Plaintiffs

- against -

BRICKCHURCH ENTERPRISES, INC., ABERDEEN ENTERPRISES, INC., NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, THE STATE OF NEW YORK, TOWN OF SOUTHAMPTON TOWN AND SCHOOL TAX COLLECTOR, THE VILLAGE OF SOUTHAMPTON VILLAGE TAX COLLECTOR, SUFFOLK COUNTY WATER AUTHORITY,

Defendants.

---------------------------------------------------------------x

Index No.: 623208/2019

**BILL OF COSTS**

COST TAXED AT $ 1125.00
TI[illegible] ______ DAY OF ______
FEB - 2 2022
JUDITH A. PASCALE
CLERK OF SUFFOLK COUNTY

**COSTS**

| | |
|---|---|
| Costs before Note of Issue - CPLR § 8201(1) | $200.00 |
| Costs for Motions - CPLR § 8202 | $100.00 |
| **TOTAL COSTS** | ~~**$245.00**~~ $400.00 |

**FEES AND DISBURSEMENTS**

| | |
|---|---|
| Fee for Index Number - CPLR § 8018(a) | $210.00 |
| Request for Judicial Intervention - CPLR § 8020(a) | $95.00 |
| Clerk's fee for filing of Notice of Pendency - 8021(a)(10) | $420.00 |
| **TOTAL FEES AND DISBURSEMENTS** | **$725.00** |

total $1125.00

FILED

2022 FEB -2 P 12: 06

JUDITH A. PASCALE
SUFFOLK COUNTY CLERK

**Attachment 2:** *Schedule A* Total proceeds for the sale $89,006,720. Bay point received for JGB is $ 29,444,734.72 and $26,892= **$56,337,547.72** the maximum they are entitled to is $ 44,5 plus $ 510,579 = **$45 million** (interest see above according to maximum owed by Aberdeen and debt to Aberdeen was maxed to $5,049,058 )

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **ABERDEEN ENTERPRISES, INC.**<br>**BRICKCHURCH ENTERPRISES, INC.** | **Case No. 23-72834-AST**<br>**Case No. 22-70914-AST** |
| **Debtors.** | **Jointly Administered** |

**NOTICE OF FILING OF SCHEDULE A TO BAY POINT CAPITAL PARTNERS II, LP'S AND THE DEBTORS' SECOND AMENDED JOINT LIQUIDATING PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

PLEASE TAKE NOTICE OF THE FOLLOWING:

Bay Point Capital Partners II, LP has filed the attached document as Schedule A to *Bay Point Capital Partners II, LP's and the Debtors' Second Amended Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code* [D.I. 215] (the "Second Amended Joint Plan"). Schedule A was inadvertently left off the Second Amended Joint Plan when the Second Amended Joint Plan was originally filed.

Dated: February 20, 2024

Respectfully submitted,

THOMPSON HINE LLP

/s/ John C. Allerding
John C. Allerding (admitted pro hac vice)
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
P: 404.407.3676 / F: 404.541.2905
John.Allerding@ThompsonHine.com
*Counsel for Bay Point Capital Partners II, LP*

## Schedule A

**(to Bay Point Capital Partners II, LP's and the Debtors' Second Amended Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code)**

| | Brickchurch (366 Gin Lane) | Aberdeen (376 Gin Lane) |
|---|---|---|
| Sale Price + Buyer's Premium | $43,345,280.00 | $45,661,440.00 |
| Listing Broker Fee Reserve | $192,500.00 | $202,500.00 |
| Buyer's Broker Fee Reserve | $385,000.00 | $405,000.00 |
| Auctioneer Fee Reserve | $770,000.00 | $810,000.00 |
| Auctioneer Expenses Reserve | $46,681.60 | $46,681.60 |
| State of New York (Secured Debt) | $1,997.79 | $168.20 |
| Bay Point (Morgan Stanley Debt) | | $16,248,932.00 |
| Bay Point (JGB Debt) | $29,444,734.72 | $26,892,813.08 |
| Bay Point (DIP Debt) | $11,451,967.17 | |
| US Trustee | $250,000.00 | $250,000.00 |
| Escrow Agent Reserve | $25,000.00 | $25,000.00 |
| IRS Administrative Expense Claim | $425,000.00 | $575,000.00 |
| State of New York Administrative Expense Claims | $154.52 | $6.87 |
| Duane Morris Administrative Expense Claim | $151,905.95 | |
| Simmons Legal Reserve | $135,000.00 | |
| Goldberg Weprin Finkel Goldstein LLP Reserve | | $140,000.00 |
| Mathew Kabatoff Fee Reserve | $30,000.00 | $30,000.00 |
| Accountant Fee Reserve | $10,000.00 | $10,000.00 |
| Law Offices of Avrum Rosen, PLLC Reserve | $25,338.25 | $25,338.25 |
| | $43,345,280.00 | $45,661,440.00 |

**Attachment 3 :** Closing escrow proof of pre-paid Disbursed to Baypoint for pre-paid fees interest at the original closing see **closing escrow** statement of $11 ,080,000 paid to Bay Point and the $44,5 million from JGB is identified clearly on the closing escrow $11 080 000 from prepaid closing of $62 ,045,000 **see attachment 2 schedule A of distribution owed to the creditor $ 11 million** ( it vanished )

| American Land Title Association | FINAL ALTA Settlement Statement - Borrower<br>Adopted 05-01-2015 |
|---|---|

File No./Escrow No.: R-22NY4472
Officer/Escrow Officer:

**Certified Title Agency**
**11459 Cronhill Drive, Suite M**
**Owings Mills, MD 21117**

| | |
|---|---|
| Property Address: | 366 GIN LANE<br>SOUTHAMPTON, NY 11968 (SUFFOLK)<br><br>376 GIN LANE<br>SOUTHAMPTON, NY 11968 (SUFFOLK) |
| Borrower: | BRICKCHURCH ENTERPRISES, INC., A DELAWARE CORPORATION<br><br>ABERDEEN ENTERPRISES, INC., A DELAWARE CORPORATION |
| Seller: | |
| Lender: | Bay Point Capital Partners II, LP, a Delaware limited partnership<br>3050 Peachtree Road, Suite 740, Atlanta, GA 30305 |
| Settlement Date: | 12/9/2022 |
| Disbursement Date: | 12/9/2022 |

| Description | Borrower | | |
|---|---|---|---|
| | P.O.C. | Debit | Credit |
| **Deposits, Credits, Debits** | | | |
| Administrative Deposit to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $25,000.00 | |
| Escrow reserve for Recording to Certified Title Corp-Misc Escrow #2 Account | | $200,000.00 | |
| Interest Reserve to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $3,100,000.00 | |
| Maintenance Reserve Account to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $300,000.00 | |
| Undisbursed Funds held by to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $2,387,038.30 | |
| Expense Deposit from Bay Point Capital Partners II, LP, a Delaware limited partnership | | | $45,000.00 |
| **Payoffs** | | | |
| Payoff IRS Lien to Internal Revenue Service | | $37,645.67 | |
| Principal: $37,645.67 | | | |
| Mechanic's Lien (Taconic and MFP) to Certified Title Corp-Misc Escrow #2 Account | | $193,019.35 | |
| Payment to JGB PARTNERS, LP, JGB CAPITAL, LP, JGB (CAYMAN) ANCONA LTD. AND JGB PLYMOUTH RO | | $44,500,000.00 | |
| Morgan Stanley Payment | | $2,600,000.00 | |
| Mechanic's Lien (Dreamworks) to Certified Title Corp-Misc Escrow #2 Account | | $94,012.98 | |
| **New Loans** | | | |
| Principal amount of new loan | | | $62,000,000.00 |
| Loan Origination Fee 9.0000% to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $5,580,000.00 | |
| Appraisal Fee to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $3,500.00 | |
| Lender's Counsel Fees to Thompson Hine LLP | | $475,000.00 | |
| Legal Fees to JFI Law | | $202,421.32 | |
| Broker Fee to Nathan Capital Group | | $310,000.00 | |
| Due Diligence Fee to Clifton Property Trust | | $50,000.00 | |
| Hazard Insurance Premium to Colston & Associates Inc. | | $85,502.11 | |
| Endorsement on Policy (Fire) to Colston & Associates Inc. | | $5,188.50 | |
| Endorsement on Policy (Flood) to Colston & Associates Inc. | | $1,057.00 | |
| Service Fee to Colston & Associates Inc. | | $1,750.00 | |
| **Title Charges** | | | |
| Lender's coverage $36,000,000.00 Premium $93,392.00 to Certified Title Agency | | $93,392.00 | |
| TIRSA 9 Restrictions, Encroachments, Minerals Endorsement(s) to Certified Title Agency | | $9,340.00 | |
| TIRSA EPL 8.1 Environmental Protection Lien Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Residential Mortgage Endorsement(s) to Certified Title Agency | | $100.00 | |
| Standard New York Endorsement - Loan Policy Endorsement(s) to Certified Title Agency | | | |
| TIRSA Access Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Cluster Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA First Loss Endorsement Endorsement(s) to Certified Title Agency | | $9,340.00 | |
| TIRSA Land Same As Survey Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Mortgage Tax Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Policy Authentication Endorsement(s) to Certified Title Agency | | | |
| TIRSA Tax Parcel (more than one tax lot) Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Waiver of Arbitration Endorsement(s) to Certified Title Agency | | $100.00 | |
| Abstract or title search to First American Title Insurance Company | | $2,645.00 | |
| Title examination to Certified Title Agency | | $25,000.00 | |
| Closing/Notary Fee to Certified Title Agency | | $1,250.00 | |
| Disbursement Fee to Chicago Title Insurance Company | | $2,500.00 | |

| | P.O.C. | Debit | Credit |
|---|---|---|---|
| Municipal Lien Search to Certified Title Agency | | $250.00 | |
| **Government Recording and Transfer Charges** | | | |
| Security Instruments (Mortgages 2) | | $1,810.00 | |
| Release $670.50 | | $670.50 | |
| Mortgage $288,000.00 | | $288,000.00 | |
| State Mortgage Tax to Suffolk County Clerk (POC $90,000.00 by Bay Point Advisors, LLC) | $90,000.00 | | |
| Recording Fee - UCC-3 Delaware x2 to Delaware Secretary of State | | $300.00 | |
| Assignments of Leases and Rents (2) to Suffolk County Clerk | | $1,810.00 | |
| Recording Fee - UCC1 County x2 to Suffolk County Clerk | | $80.00 | |
| Recording Fee - UCC1 State x2 to New York Department of State | | $80.00 | |
| Assignment of Mortgage (JGB) to Suffolk County Clerk | | $905.00 | |
| Assignment of Collateral ASLR (JGB) to Suffolk County Clerk | | $905.00 | |
| **Additional Settlement Charges** | | | |
| (Parcel 1- 366 Gin) 2018-2019 County Tax to Suffolk County Comptroller | | $88,942.24 | |
| (Parcel 1- 366 Gin) 2019-2020 County Tax to Suffolk County Comptroller | | $76,805.90 | |
| (Parcel 1- 366 Gin) 2020-2021 County Tax to Suffolk County Comptroller | | $70,205.12 | |
| (Parcel 1- 366 Gin) 2021-2022 County Tax to Suffolk County Comptroller | | $59,644.44 | |
| (Parcel 1- 366 Gin) 2019-2020 Villiage Tax to Village of Southhampton | | $58,793.33 | |
| (Parcel 1- 366 Gin) 2020-2021 Villiage Tax to Village of Southhampton | | $55,394.82 | |
| (Parcel 1- 366 Gin) 2021-2022 Villiage Tax to Village of Southhampton | | $49,276.16 | |
| (Parcel 1- 366 Gin) 2022-2023 Villiage Tax to Village of Southhampton | | $43,582.68 | |
| (Parcel 1 -366 Gin) Water to Suffolk County Water Authority | | $23,505.72 | |
| (Parcel 2 -376 Gin) Water to Suffolk County Water Authority | | $13,831.83 | |
| (Parcel 1 -366 Gin) Water - LIEN to Suffolk County Water Authority | | $7,393.49 | |
| (Parcel 2- 376 Gin) 2021 LIEN Amount to Suffolk County Comptroller | | $1,946.47 | |
| (Parcel 2- 376 Gin) 2021-2022 County Tax to Suffolk County Comptroller | | $67,713.94 | |
| (Parcel 2- 376 Gin) 2022-2023 Village Tax to Village of Southhampton | | $31,121.40 | |
| (Parcel 2 -376 Gin) Water -LIEN to Suffolk County Water Authority | | $56,629.73 | |
| Borrower's Counsel Legal Fees to Duane Morris LLP | | $300,000.00 | |
| Legal Fees to Simmons Legal PLLC | | $180,000.00 | |
| Legal Fees Collas Crill | | $10,000.00 | |
| BK Trustee Fees to | | $250,000.00 | |
| Legal Fees to Bedell Cristin to | | $10,000.00 | |
| | **P.O.C.** | **Debit** | **Credit** |
| **Subtotals** | $90,000.00 | $62,045,000.00 | $62,045,000.00 |
| Due From Borrower | | | $0.00 |
| **Totals** | $90,000.00 | $62,045,000.00 | $62,045,000.00 |

## Acknowledgement

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Certified Title Agency to cause the funds to be disbursed in accordance with this statement.

**BORROWER(S)**

Brickchurch Enterprises, Inc., a Delaware corporation

By: [signature] Date 12/09/2022
Matthew Kabatoff, Director

Aberdeen Enterprises, Inc., a Delaware corporation

By: [signature] Date 12/09 2022
Matthew Kabatoff, Director



File # R-22NY4472

Printed on 12/9/2022 at 2:56 PM

**Attachment 4** Objection from Counsel Nash for Aberdeen – never presented the second part which is the reduction of the amount and you will as well read about the clear wish for Bay point to have JGB stand alone to benefit from second rank , what is a concern is to allow themselves any amount on Aberdeen and to get ride of the irs obkjection they bribed them with the money of the proceeds without consent see Wander attachment 9 , objecting to IRS as well as objecting to pay bay point the disputed claims to avoid wasting time like what we are doing in an appeal and now they are pretending like we can not clawback

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| ABERDEEN ENTERPRISES, INC.,<br>BRICKCHURCH ENTERPRISES, INC., | Case No. 23-72834-ast<br>Case No. 22-70914-ast |
| Debtors. | Jointly Administered |

---------------------------------------------------------------x

**OBJECTION OF THE ABERDEEN DEBTOR SEEKING TO REDUCE AND/OR REALLOCATE THE CLOSING PAYMENTS RECEIVED BY BAY POINT CAPITAL PARTNERS II, L.P. CONSISTENT WITH THE ASSIGNED JGB FORECLOSURE JUDGMENT**

The debtor herein, Aberdeen Enterprises Inc. (the "Aberdeen Debtor"), as and for its Objection seeking to reduce and/or reallocate the closing payments and distributions received by Bay Point Capital Partners II, L.P. ("Bay Point"), on account of its respective proofs of claim dated November 29, 2023 (Claim No. 5-1 and Claim No. 6-1) (collectively, the "Claims")[1] consistent with the assigned JGB Foreclosure Judgment (defined below), respectfully states and alleges as follows:

**Preliminary Statement**

1. While there has been a good deal of discussion regarding Bay Point's alleged entitlement to default interest and late charges, the sale price for the respective properties did not generate sufficient proceeds to allow Bay Point to recover on these disputed items. However, issues still remain with respect to Bay Point's total distributions and allocations from the respective proceeds of sale.

[1] Because Claim No. 5-1 and Claim No. 6-1 are predicated in large part on the refinancing of the JGB Debt, there is an overlap between the two Claims. Therefore, this Objection is directed to both Claims, although Claim No. 6-1 is based solely on the JGB Debt. Nevertheless, the Claims are overstated and duplicative in various aspects and should be reduced based on the allocations as between 366 Gin Lane and 376 Gin Lane, as ordered by the State Court, all as discussed herein.

2. Specifically, this Objection challenges the Claims to the extent that Bay Point misallocates (or, more appropriately, over-allocates) the net proceeds generated from the sale of the Debtor's oceanfront property located at 376 Gin Lane, Southampton, NY (the "Aberdeen Property"). The improper allocation arises out of variances from the assigned Judgment of Foreclosure and Sale (the "JGB Foreclosure Judgment") obtained by JGB Partners, LP and its related companies (collectively "JGB") in Supreme Court, Suffolk County on February 2, 2022.

3. Under the JGB Foreclosure Judgment, the lion-share of the proceeds (some $39,961,521.80) was allocated first to satisfy the debts owed to JGB from the proceeds of the sale of the Brickchurch Property, with the balance of the JGB debt owing thereafter to be paid from the sale of the Aberdeen Property. In pertinent part, the JGB Foreclosure Judgment provides in paragraph "Fourth" as follows:

> (A) With respect to the sale of 366 Gin Lane, the Referee shall pay to the Mortgage holder or their attorneys, the sum of $39,961,521.80, so reported by the Referee to be due as of July 1, 2021 with interest accruing at a per diem rate of Thirteen Thousand Dollars ($13,000) from the date July 2, 2021 to date of entry of this judgement [January 19, 2022] as provided in the said Referee's Report, and an award of costs, disbursements and additional allowances in the amount of $1125.00 to be taxes by the Clerk of this Court with interest thereon from the date hereof, with interest thereon from the date hereof, together and thereafter interest at the statutory rate thereon, to the date of sale directed herein or to the date of the delivery of the Referee's deed, whichever is later or so much as the purchase money of the mortgaged Properties will pay of the same, and (B) with respect to the sale of 376 Gin Lane, the Referee shall pay to the Mortgage Holder or their attorneys, an amount equal to the judgment of foreclosure and sale amount *less* any amounts paid to the Mortgage Holder from the proceeds of the sale of 366 Gin Lane. (emphasis supplied)

4. The JGB Foreclosure Judgment was assigned to Bay Point under the Brickchurch DIP Loan[2]. At the closings on the Debtors' properties, Bay Point received the sum of $26,892,813.08 on account of the JGB Foreclosure Judgment from the sale of the Aberdeen

[2] The DIP Loan is defined in the Plan at Sections 1.40 – 1.43.

Property alone. This was done based upon an allocation of the sale proceeds unilaterally made and directed by Bay Point. The payment of $26,892,813.08, however, contravenes the specific allocations already embedded in the JGB Foreclosure Judgment itself as ordered by the State Supreme Court.

5. Indeed, because Bay Point insisted upon obtaining an assignment of the JGB Foreclosure Judgment to preserve priority rights, it remains bound by the specific allocations made thereunder which established a completely different allocation scheme. The allocations directed by the State Court under the JGB Foreclosure Judgment must be carried forward for purposes of distributions under the Plan in accordance with the familiar principles of res judicata, and the requirements of 28 U.S.C. §1738, which provides for the Federal Courts to give preclusive effect to judgments of the State Courts.

6. Just prior to the adjourned confirmation hearing in these Chapter 11 cases on February 27, 2024, Bay Point filed a document entitled "Schedule A" on February 20, 2024 [ECF No. 221] as a supplement to Bay Point's and the Debtors' Revised and Redlined Second Amended Joint Liquidating Plan dated February 28, 2024 [ECF No. 248] (the "Plan")[3]. Schedule "A" contained an itemized listing of what amounts of "Sources and Uses of Cash" as computed by Bay Point specifying the allocations and pay-outs regarding the respective sales of 366 Gin Lane, Southampton, NY (the "Brickchurch Property") and the Aberdeen Property.

7. As per Schedule "A", the total sum of $26,892,813.08 was allocated to pay Bay Point on account of the assigned JGB Foreclosure Judgment from of the sale of the Aberdeen Property. In point of fact, however, this allocation greatly exceeded the allocations directed by the State Court in 2022 pursuant to the express terms of the JGB Foreclosure Judgment. Copies of

---

[3] The Plan was approved pursuant to Confirmation Order dated March 1, 2024 [ECF No. 248], which attached the updated and final iteration of the Plan in clean and redline versions.

Schedule "A" and the JGB Foreclosure Judgment are annexed hereto as Exhibits "A" and "B" respectively for the Court's ready reference.

8. As can be readily seen, the State Court allocation was top heavy towards satisfying the JGB debts from the sale of the Brickchurch Property, whereas the allocation made by Bay Point in bankruptcy for purposes of the Plan was not nearly the same. Under Schedule "A", $26,892,813.08 was allocated by Bay Point on account of the JGB Foreclosure Judgment from the sale of the Aberdeen Property, while $24,444.734.72 was allocated to Bay Point on account of the sale of the Brickchurch Property. This is contrary to the terms of the JGB Foreclosure Judgment.

9. Since the sale of the Brickchurch Property netted total proceeds of approximately $40,896,701, there were sufficient sums to pay the entire allocation of $39,961,521 due under the JGB Foreclosure Judgment from the Brickchurch sale, leaving the Aberdeen Debtor's estate responsible for the difference between $44,500,00 and $39,961,521 or, a principal balance of $4,538,479, plus allocable accrued interest (to be determined).[4]

10. By the Debtor's rough count, if a *pro rata* approach is used, post-judgment interest accrued during the period from the refinancing of JGB via payment of the $44.5 million in December 2022 through the closings on the Debtors' properties on March 6, 2024, a period of about fifteen (15) months at a rate of $34,038 per month [($4,538,479 x .09)/12]. Thus, a principal balance of $4,538,479 was owed under the JGB Foreclosure Judgment, plus total interest charges of $510,579 at the legal rate, for a grand total charge of $5,049,058.

---

[4] Bay Point seems to be charging post-judgment interest relating to the assigned JGB Foreclosure Judgment at the default rate under the DIP Loan Documents retroactively. In point of fact, post-judgment interest is governed by CPLR 5004 which sets the statutory rate at nine (9%) percent per annum. Even if the default interest rate under the DIP Loan Documents is used, default interest did not occur until maturity on May 15, 2023 (180 days after entry of the Order approving the DIP Loan, such that the rate of 24% only applies from the period from May 15, 2023 to closing on March 6, 2024, and is not retroactive.

11. Alternatively, if Aberdeen is responsible for all accrued interest on the principal balance of $44.5 million because the interest charges are included in the balance of the debt over the allocation of $39,961,521 to Brickchurch, then in such event, on a worst case basis, the interest from December 2022 through closing at the pre-maturity rate of 10% and the post-maturity rate of 24% is increased as follows: pre-maturity interest of $1,854,167 + default interest of $8,900,000 = $10,754,167. In this calculation, principal of $4,538,479 plus interest of $10,754,167 yields a total charge of $15,292,646.

12. Thus, the allocation to the Aberdeen Debtor should range from a best case of $5,049,058 to a worst case of $15,292,646, but is nothing close to $26,892,813. In turn, the disgorgement is at a high of $21,843,755 and a low of $11,600,167, or somewhere in between.

13. Legally speaking, the specific allocations dictated by the JGB Foreclosure Judgment are controlling in bankruptcy as to divvying up the sale proceeds under the Plan. In effect, Bay Point reengineered the allocations to benefit itself and obtain a maximum share of the proceeds without any meaningful discussion or reference to the terms of the actual JGB Foreclosure Judgment.

14. Additionally, this Objection challenges whether Bay Point is entitled to a mortgage lien against the Aberdeen Property for the entire amount of Brickchurch's DIP Loan in the sum of $62 million. As part of the DIP financing that was approved in Brickchurch's Chapter 11 case prior to the Chapter 11 filing by the Aberdeen Debtor, Bay Point demanded a mortgage from Aberdeen as co-borrower for the full amount of the DIP loan ($62 million), even though Aberdeen's actual residual obligations owed to JGB based on the allocations under the JGB Foreclosure Judgment were far less.

15. The disparity in allocations created a situation where the Bay Point DIP mortgage had a far greater value to Brickchurch and a far lesser value to Aberdeen. This disparity sets up the factual predicate for a fraudulence conveyance claim based upon the unequal benefit received from the DIP Loan as between Brickchurch and Aberdeen. Moreover, the Order approving the DIP Loan was entered in the Brickchurch case months <u>before</u> Aberdeen ever sought Chapter 11 relief and, thus, any findings regarding the validity of the mortgages, liens etc. in connection with the DIP financing only apply to Brickchurch and not Aberdeen as a non-debtor.

16. Accordingly, Bay Point's effort to treat the full amount of the DIP Loan as being equally owed by Aberdeen is not supported by fair or reasonably equivalent consideration. In turn, anything received by Bay Point from the sale of the Aberdeen Property over the specific allocation attributable to the Aberdeen Debtor (*i.e.*, the difference between $44,500,000 and $39,961,521, or principal of $4,538,479, plus allocable interest as may be calculated) should be viewed as an avoidable transfer and fraudulent conveyance which must be disgorged before Bay Point has an allowed claim against the Aberdeen Debtor, pursuant to 11 U.S.C. §502(d).

**Background**

17. The Debtor was the owner of the Aberdeen Property and sought relief under Chapter 11 of the U.S. Bankruptcy Code on August 2, 2023 to stay what was then believed to be an imminent foreclosure sale by Morgan Stanley Private Bank ("<u>Morgan Stanley</u>") as the holder of the first mortgage lien against the Aberdeen Property. On September 7, 2022, Morgan Stanley obtained a Judgment of Foreclosure and the Referee appointed thereunder scheduled a foreclosure sale for August 3, 2023. Unbeknownst to the Debtor at the time Bay Point separately acquired the Morgan Stanley Judgment of Foreclosure by assignment, although the commencement of the

intervening Chapter 11 case triggered a stay of a foreclosure sale regardless of the actual holder of the mortgage.

18. The Debtor is a separate and distinct entity from Brickchurch, with each owning separate but adjoining properties on Gin Lane. While Aberdeen was also subject to the JGB Foreclosure Judgment, it did not initially seek bankruptcy relief. Instead, Brickchurch commenced a Chapter 11 case on April 30, 2022, and ultimately entered into a DIP Loan agreement with Bay Point to obtain financing in the sum of up to $62 million [Brickchurch, ECF No. 172]. The reason for the Bay Point DIP Loan was to finance the settlement reached with JGB on account of the JGB Foreclosure Judgment. After various hearings in the Bankruptcy Court, all claims of JGB in bankruptcy were settled and resolved for the total sum of $44,500,000 as announced on the record on October 26, 2022.

19. In the Order approving the DIP Loan [Brickchurch, ECF No. 172], Bay Point was insistent about obtaining the assignment of the JGB Foreclosure Judgment, which is expressly reference in the Section 3(g) thereof, quoted below at length for continuity:

> i. Payment of Settlement Amount to JGB at Closing; Priority of the Existing JGB Liens. Pursuant to the global settlement with JGB (Debtor's prepetition secured lenders), as stated on the record at the October 26, 2022 hearing held before the Court, certain of the proceeds of the DIP Facility will be used to pay JGB $44.5 million in cash (the "Settlement Amount"), at closing, in exchange for the Assignment (defined and described below). <u>Until the Settlement Amount is paid in full to JGB, notwithstanding anything to the contrary in this Order, the Existing JGB Liens will remain in place and have priority to the DIP Liens and the DIP Super-Priority Claims (as those terms are defined herein), or any other liens or claims granted to the DIP Lender under this Order</u>. (emphasis added)
>
> ii. Assignment of JGB Loan Documents, State Court Judgment, and JGB Proofs of Claim to DIP Lender. Contemporaneously with the payment of the Settlement Amount to JGB, and pursuant to such other documentation which shall be in a form and substance satisfactory to JGB and the DIP Lender, JGB shall assign to DIP Lender (the "Assignment"): (i) the JGB Loan Documents; (ii) the JGB State Court Judgment; and (iii) the JGB Proofs of Claim (as such terms are defined in this paragraph 3(g)(ii)) (collectively, the "Assigned Documents"):

A. "JGB Loan Documents" includes: (i) the Secured Promissory Note, dated July 25, 2018 and in the original principal amount of Twenty-Six Million and 00/100 Dollars ($26,000,000.00), executed by Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc., as borrowers, in favor of JGB; (ii) the Mortgage, dated July 25, 2018, granted by Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc., as Mortgagors, to JGB, as Mortgagee, with respect to that certain real property commonly known as 366 and 377 Gin Lane, Southampton, New York 11968; (iii) the Collateral Assignment of 12 Leases and Rents, dated July 25, 2018 and executed in connection with the aforementioned Secured Promissory Note and Mortgage, between Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc., as Assignor, and JGB, as Assignee; and (iv) all other documents and agreements created or contemplated under the foregoing (the loan transaction being referenced to therein being referred to herein as, the "JGB Loan").

B. "JGB State Court Judgment" means, collectively, all of JGB's rights, claims, defenses, and causes of action with respect to that certain legal proceeding pending in the Supreme Court for the State of New York, County of Suffolk styled as JGB Partners, LP, et al. v. Brickchurch Enters., Inc., et al., Index No. 6323208/2019 (the "Foreclosure Action");

C. "JGB Proofs of Claim" means, collectively, all secured and unsecured proofs of claim filed, whether jointly or severally, by JGB, including Claim Nos. 2 through 9 on the claims registry in the Debtor's above-captioned chapter 11 bankruptcy case.

20. While Bay Point reserved the right to consolidate the assigned JGB Foreclosure Judgment under the DIP Loan, it never did so and, thus, Bay Point was and continues to be bound by separate allocations under the JGB Foreclosure Judgment.

**The Sale of the Aberdeen Property**

21. The Aberdeen Debtor's Chapter 11 case was devoted almost entirely to a sale of the Aberdeen Property separately or as a combined lot with the Brickchurch Property. Early on, Bay Point challenged the corporate authority of Matthew Kabatoff to cause the filing of the Chapter 11 petition based upon a purported change of control engineered by Bay Point in July

2023 through the exercise of various purported proxy rights. This dispute was resolved pursuant to a settlement laid out in open Court on August 23, 2023.

22. Over the ensuing several months, the Aberdeen Debtor and Bay Point pursued a joint plan in conjunction with bid procedures that were ultimately approved by the Bankruptcy Court on November 22, 2023 [ECF No. 104].

23. The on-line auction was held on January 24, 2024, at which time affiliates under the control of Charles Kim emerged as the successful bidder. An entity known as 376 Gin Lane LLC entered into a contract to purchase the Aberdeen Property for the sum of $44,160,000, plus a bid enhancement of $1,501,440.00, for a total purchase price of $45,661,440.00. Likewise, another affiliate of Charles Kim known as 366 Gin Lane LLC entered into a contract to purchase the Brickchurch Property for the sum of $41,920,000, plus a bid enhancement of $1,425,280.00, for a total purchase price of $43,345,280.00.

24. The Aberdeen Debtor confirmed the Plan by Order dated March 1, 2024 [ECF No. 248], following a hearing held on February 27, 2024. The sale transactions closed on March 6, 2024, and the Effective Date of the Plan was designated as March 8, 2024, pursuant to Notice dated March 8, 2024 [ECF No. 254].

**The Claims**

25. Bay Point filed a total of three (3) claims in the Aberdeen bankruptcy case, two of which are subject to this Objection because they share the improper allocation of proceeds that contravenes the terms of the JGB Foreclosure Judgment, although there are in different amounts.

26. Specifically, Claim No. 5-1 represents the purported balance due and owing by Aberdeen under the DIP Loan Agreements in the total sum of $70,625,940.36. Claim 6-1

represents the purported balance due and owning under the JGB Assigned Documents, including the JGB Foreclosure Judgment in the alleged total sum of $53,711,401.77.

27. Besides the improper allocations, Bay Point's entitlement to interest should be fixed within the range provided above without any further fees or costs, none of which are properly chargeable to the Aberdeen Debtor in any event.

**Legal Support for the Objections**

28. That Bay Point insisted on the assignment of the JGB Foreclosure Judgment has legal consequence relating to the allocations of the sale proceeds. As a matter of basic Federal practice, State Court judgments are given full force and effect for purposes of an ensuing bankruptcy under principals of res judicata and 28 U.S.C. § 1738. As the Supreme Court has instructed:

> though the federal courts may look to the common law or to the policies supporting res judicata and collateral estoppel in assessing the preclusive effect of decisions of other federal courts, Congress has specifically required all federal courts to give preclusive effect to state–court judgments whenever the courts of the State from which the judgments emerged would do so:
>
> "[J]udicial proceedings [of any court of any State] shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State...." 28 U.S.C. § 1738

*Allen v McCurry*, 449 US 90, 96, 101 S Ct 411, 415-16 (1980).

29. Moreover, Bay Point, as the assignee of the JGB Foreclosure Judgment remains subject to the terms of the underlying judgment and has no greater rights than those of JGB itself. *See, Rojas v Cigna Health and Life Ins. Co.*, 793 F.3d 253, 258-59 (2d Cir. 2015) ("An assignee acquires no greater rights . . . than his assignor. If an assignee seeking relief in court stands in the place of an assignor, there has been a substitution rather than an expansion of the parties.") (internal quotation marks and citations omitted).

30. Here, the State Court, by force of the FGB Foreclosure Judgment, established the allocation of proceeds as between 366 Gin Lane and 376 Gin Lane. This judgment was never modified or vacated, and remains binding on Bay Point. In fact, Bay Point filed a formal assignment of judgment which gave Bay Point a second priority position against the Aberdeen Property, albeit for the balance of the JGB debt after the first $39,961,521 is paid by Brickchurch. A copy of the assignment is annexed hereto as Exhibit "C". The same allocation must be applied in bankruptcy to reduce the Claims against the Aberdeen Debtor.

**The Unequal Allocations under the JGB Foreclosure Judgment Create Different Obligations and Benefits to the Aberdeen Estate and Provide a Predicate for Avoidance and Claw Back Claims**

31. That the Aberdeen Debtor's liability under the JGB Foreclosure Judgment is limited to a balance after the first payment of $39,961,521 by Brickchurch also brings into consideration whether the mortgages placed on the Aberdeen Property for the full amount of the DIP Loan constitute fraudulent conveyances due to the unequal allocation structure. There is no conceivable scenario in which Aberdeen would be liable to pay proceeds equal to the settlement amount of $44,500,000 given that Brickchurch had significant assets and was responsible for the first $39,961,521 under the express terms of the JGB Foreclosure Judgement. Accordingly, any proceeds received by Bay Point from Aberdeen over the balance is challengeable as a voidance transfer.

32. From the Aberdeen Debtor's estate's perspective, the DIP Loan was only needed to satisfy the balance of the JGB claim and any amount above that is avoidable. Accordingly, the mortgage emanating out of the DIP Loan should be scaled back to the balance owed under the JGB Foreclosure Judgment, plus allocable interest. Unless this is done, Bay Point has received a windfall fraudulent conveyance from the Aberdeen Debtor.

33. More specifically, Section 502(d) of the Bankruptcy Code provides that no distribution may be made to a creditor who has received an avoidable transfer, until such time as the avoidable transfer is returned. As the Hon. Robert D. Drain explained:

> The plain language of section 502(d) does not condition disallowance on the transferee's failure to satisfy a judgment; instead, it states that "the court shall disallow any claim of any entity from which property *is recoverable* ... under section 550...." 11 U.S.C. § 502(d) (emphasis added).
>
> As noted by *Collier,* section 502(d) of the Bankruptcy Code does not even necessarily require the entry of a judgment, let alone the failure to enforce one, for a claim to be disallowed: "To assure the effectuation of the purpose of this section, a claim may be disallowed at least temporarily and for certain purposes, subject to reconsideration, simply upon the allegation of an avoidable transfer . . .."

*In re Red Dot Scenic, Inc.*, 313 BR 181, 185-86 (Bankr. S.D.N.Y. 2004).

**Claw Back Provisions Under the Plan**

34. The Plan contains specific provisions regarding the right to object to claims. To begin with, the Claims Objection Deadline set in Section 1.31 was modified to include the Debtors and any party in interest, with the deadline extended until 30 days after the Effective Date. With an Effective Date of March 8, 2024, the Claims Objection Deadline is now fixed as April 8, 2024

35. Second, pursuant to Section 4.8 of the Plan, all causes of action, including avoidance claims are preserved for the benefit of the Debtors' respective estates, subject to the lien of Bay Point pursuant to the DIP Loan agreements, with proceeds therefrom to be distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court after payment of reasonable attorneys' fees.

36. Pursuant to Section 5.11, all distributions to Bay Point are subject to the estates' right to claw back, with all funds returned to be redistributed without further payment to Bay Point in accordance with the priority provisions of the Bankruptcy Code.

37. Thus, Bay Point should be made to disgorge the funds improperly obtained through the overallocation and return the excess funds to the Aberdeen Debtor (after deducting the principal balance plus accrued interest) for re-distribution under the Plan. This should be done without additional payments on account of the Bay Point DIP mortgage, which is not supported by fair or adequate consideration. Alternatively, under 5.11, all funds disgorged are subject to redistribution without further payment to Bay Point. In either event, the disgorgement belongs to the estate of the Aberdeen Debtor without further obligations to Bay Point and substantial additional funds will then be available to other creditors, with the IRS first in line after all administrative expenses are paid in full.

WHEREFORE, the Aberdeen Debtor respectfully prays for the entry of an Order consistent with the foregoing and granting such other relief as is just and proper.

Dated: New York, New York
April 8, 2024

Goldberg Weprin Finkel Goldstein LLP
*Counsel for Aberdeen Enterprises, Inc.*
125 Park Avenue, 12th Floor
New York, New York 10017
(212) 221-5700
knash@gwfglaw.com

By: /s/ Kevin J. Nash, Esq.

**Attachment 6 : Bay Point Disclosure Statement**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

| | |
|---|---|
| In re: | Chapter 11 |
| ABERDEEN ENTERPRISES, INC.,<br>BRICKCHURCH ENTERPRISES, INC. | Case No. 23-72834-AST<br>Case No. 22-70914-AST |
| Debtors. | Jointly Administered |

-----------------------------------------------------------x

**BAY POINT CAPITAL PARTNERS II, LP'S**
**DISCLOSURE STATEMENT**

******************************************************************************

**THIS PROPOSED DISCLOSURE STATEMENT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT UNDER SECTION 1125(b) OF THE BANKRUPTCY CODE, WHICH APPROVAL WILL BE SOUGHT IN CONJUNCTION WITH CONFIRMATION OF BAY POINT CAPITAL PARTNERS II, LP'S DISCLOSURE STATEMENT FILED CONTEMPORANEOUSLY HEREWITH PURSUANT TO A COMBINED HEARING AS PERMITTED BY 11 U.S.C. § 105(d)(2)**

******************************************************************************

## I. INTRODUCTION

Bay Point Capital Partners II, LP ("Bay Point") has filed a Plan of Liquidation (as may be amended, modified or supplemented, the "Plan")[1] for Aberdeen Enterprises, Inc. ("Aberdeen") and Brickchurch Enterprises, Inc. ("Brickchurch") (each a "Debtor", and collectively, the "Debtors") with the United States Bankruptcy Court for the Eastern District of New York (the "Bankruptcy Court"), which sets forth the manner in which claims against and interests in the Debtors will be treated. In essence, the Plan is predicated upon an auction of the Properties and the distribution of the proceeds of the sale to creditors. Bay Point submits this Disclosure Statement (as may be amended, modified or supplemented, the "Disclosure Statement") pursuant to 11 U.S.C. § 1125 in support of the Plan to all known holders of Claims against, or Interests in, either or both of the Debtors in order to adequately disclose information deemed to be material, important and necessary for creditors to make a reasonably informed decision whether to accept or reject the Plan.

### A. Summary of the Plan

The Plan provides for the means of liquidating the assets of the Debtors and distributing the proceeds thereof through a coordinated auction sale (the "Sale") of their valuable and iconic

[1] Unless otherwise defined, all capitalized terms have the meanings ascribed to them in the Plan.

contiguous ocean front properties located at 366 and 376 Gin Lane, Southampton, New York (collectively, the "Properties", each being a "Property"). Bay Point believes that the Plan presents the best means currently available for their orderly liquidation and distribution of the resulting proceeds to the holders of Allowed Claims. The auction was held on January 24, 2024, at which time a High Bid (as such term is defined in the Approved Bid Procedures) was selected with respect to both Properties.

A hearing to confirm the Sale and the Plan is scheduled for **February 13, 2024**, and the Closing is expected to occur on or before **February 20, 2024**. Although Bay Point believes the Sale will provide the maximum possible recovery for creditors and equity security holders, the Net Sale Proceeds will not be sufficient to pay all Allowed Claims in full. As a result, holders of Claims in Classes 1 and 4, and Equity Interests in Class 5, will be impaired, and holders of certain Administrative Expense Claims will be asked to accept less than full payment in order to provide the maximum recovery available to them. The Debtors will not receive a discharge under the Plan.

### B. The Scope of this Disclosure Statement

As noted above, the purpose of this Disclosure Statement is to provide Creditors and other parties-in-interest with relevant information regarding the Debtors' current financial affairs and their respective treatment under the Plan. Bay Point shall seek approval of the Disclosure Statement by the Bankruptcy Court as containing adequate information within the meaning of 11 U.S.C. § 1125 at a combined hearing as noted below. The Bankruptcy Court's approval of the Disclosure Statement, however, does not constitute an endorsement of the Plan. Instead, creditors are urged to review the Plan in its entirety to make an informed decision to accept or reject the Plan.

### C. Combined Hearing

The combined hearing pursuant to 11 U.S.C. § 105(d)(2) to consider approval of the Disclosure Statement and confirmation of the Plan under 11 U.S.C. § 1129 shall be held, in person, on **February 13, 2024 at 10:00 a.m.** (prevailing New York time) before the Honorable Alan S. Trust, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Courtroom 960, Central Islip, New York 11722 (the "Combined Hearing"). The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan or approval of the Disclosure Statement shall be filed in writing through the Court's ECF system on or before **February 6, 2024**. The Combined Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjournment date made at the Combined Hearing via notice on the docket.

## II.

## DISCLAIMERS

**ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE**

**TO THE PLAN, ANY AND ALL SUPPLEMENTS TO THE PLAN AND ANY EXHIBITS ANNEXED TO THE PLAN AND THIS DISCLOSURE STATEMENT.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS RELATING TO THE SALE OF THE PROPERTIES. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF PROVIDING CREDITORS AND OTHER PARTIES IN INTEREST WITH INFORMATION IN CONNECTION WITH BAY POINT'S REQUEST FOR CONFIRMATION OF THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON OR ENTITY FOR ANY OTHER PURPOSE. THE FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE DESCRIPTION OF THE DEBTORS, THE PROPERTIES AND EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES, HAS BEEN OBTAINED FROM VARIOUS DOCUMENTS, AGREEMENTS AND PRIOR COURT FILINGS. NEITHER BAY POINT NOR ANY OTHER PARTY MAKE ANY REPRESENTATION OR WARRANTY REGARDING SUCH INFORMATION.**

**THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

**AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION OR WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS, BAY POINT, OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE LIQUIDATION AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS.**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED**

**ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREIN IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

## III.

## SUMMARY OF THE TREATMENT OF CLAIMS AND INTERESTS

The table below briefly summarizes the specific classification and treatment of Claims and Interests under the Plan. As provided in the Plan, Administrative Expense Claims (including Professional Fee Claims), Priority Tax Claims, and Bankruptcy Fees have not been classified and are excluded from classification in accordance with Section 1123(a)(1) of the Bankruptcy Code:

| Class | Type of Claim or Interest | Treatment | Estimated Claim Amount (By Class) | Estimated Recovery |
|---|---|---|---|---|
| N/A | DIP Lender Superpriority Claim | Bay Point shall be paid from the Section 1146 Funds, on account of its DIP Lender Superpriority Claim, an amount not less than $989,652.66 on the Distribution Date. | $14,766,703.83[2] | 6.75% |
| N/A | IRS Administrative Expense Claim | Subject to Section 5.2 of the Plan with respect to Disputed Claims, the IRS shall be paid from the Section 1146 Funds, on account of any Allowed Administrative Expense Claim, the amount of $1,000,000 on the Distribution Date. | N/A | N/A |
| N/A | IRS Priority Tax Claim | Subject to Section 5.2 of the Plan with respect to Disputed Claims, the IRS shall be paid from the Section 1146 Funds, on account of any Priority Tax Claim, the amount of $1,000,000 on the Distribution Date; *provided*, that the amount of the distribution on any IRS Priority Tax Claim will be reduced by the | N/A | N/A |

[2] The estimated claim amount of the DIP Lender Superpriority Claim assumes payment of $66,468,902.01 to Bay Point on account of its Class 1 Allowed Secured Claim.

| | | | | |
|---|---|---|---|---|
| | | amount of the distribution on any IRS Allowed Administrative Expense Claim. | | |
| N/A | State of New York Priority Tax Claim | The New York State Department of Taxation and Finance has asserted Unsecured Priority Tax Claims in the total amount of $161.39 (the "**Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance**"). *See* Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834; *see also* Am. Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914. The Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance shall be paid in full from the Section 1146 Funds on the Effective Date. | $161.39 | 100% |
| N/A | Professional Fee Claims | All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. No later than three (3) Business Days prior to the Confirmation Hearing, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through Confirmation, and (c) a good faith estimate of any expected post-confirmation fees and expenses. Each holder of a | Brickchurch: $286,905.95<br><br>Aberdeen: $100,000 | 100% |

| | | | | |
|---|---|---|---|---|
| | | Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request. No later than three (3) Business Days prior to the Effective Date, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through the Effective Date, and (c) a good faith estimate of any expected post-Effective Date fees and expenses (if any). Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request; *provided*, *however*, the Allowed Professional Fee Claim of Simmons Legal PLLC shall not exceed $135,000, the Allowed Professional Fee Claim of Goldberg Weprin Finkel Goldstein LLP shall not exceed $100,000, and the Allowed Professional Fee Claim of Duane Morris shall not exceed $151,905.95.<br><br>Each holder of an Allowed Professional Fee Claim shall be paid, in full satisfaction of its Allowed Administrative Expense Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan upon the later of (a) the Distribution Date and (b) the date | | |

| | | | | |
|---|---|---|---|---|
| | | upon which the Order Allowing such Professional Fee Claim becomes a Final Order. Payments made to a Professional in accordance with the provisions of Section 2.1 shall constitute payment in full of the Professional's Allowed Professional Fee Claim, and the Professional shall have no further recourse against the Plan Administrator, the Debtors, or Bay Point for such Claim. | | |
| N/A | Bankruptcy Fees | The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 from the Effective Date through the date of dismissal, conversion or entry of a final decree, shall be paid from the Bankruptcy Fees Reserve.<br><br>The Bankruptcy Fees payable to the Plan Administrator shall be paid within five (5) business days, or as soon as reasonably practicable thereafter, after the date that such Claim is Allowed by Final Order of the Bankruptcy Court. No later than twenty-one (21) Business Days prior to the hearing on the allowance of such Claim, the Plan Administrator shall serve upon counsel for Debtors, the United States Trustee, Bay Point, and any other Creditor requesting such information: (a) the current amount of its unpaid Bankruptcy Fees, and (b) a good faith estimate of its expected | $500,000 - $600,000 | 100% |

| | | | | |
|---|---|---|---|---|
| | | unpaid Bankruptcy Fees (if any) through dismissal, conversion or entry of a final decree.<br><br>The Debtors shall use the Sale Proceeds and/or Section 1146 Funds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan. | | |
| 1 | Secured Claims of Bay Point | Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie,* to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order. | $88,699,991.70, plus interest and other amounts to which Bay Point is entitled under the Bay Point Loan Documents that has accrued since September 19, 2023.<br><br>For the avoidance of doubt, the Debtors dispute whether Bay Point is entitled to certain amounts that have been included in the above-referenced estimate and reserve all of their rights with respect to the same. | $82,928,317.25 |

| | | | | |
|---|---|---|---|---|
| | | Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11 U.S.C. § 506(b) and the DIP Financing Order.<br><br>For the avoidance of doubt, nothing contained herein shall prejudice any right that Debtors may have to challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *provided, however, that* nothing contained herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided that* Debtors' reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; and *further provided that* Debtors' reservation of rights shall not impair Bay | | |

| | | | | |
|---|---|---|---|---|
| | | Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order. | | |
| 2 | Secured Claims of New York State Department of Taxation and Finance | The holder of the Allowed Secured Claims of the New York State Department of Taxation and Finance shall be paid in full, in accordance with the priority provision set forth in Sections 5.8 and 5.9 of the Plan, from the Sale Proceeds at Closing.<br><br>Class 2 is unimpaired under the Plan and, therefore, the holder of the New York State Department of Taxation and Finance's Secured Claims is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan. | $2,165.99<br><br>This amount includes: (i) the secured portion Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834, in the amount of $168.20; and (ii) the secured portion of Amended Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914, in the amount of $1,997.79. | 100% |
| 3 | Non-Tax Priority Claims | Bay Point does not believe there are any Non-Tax Priority Claims. To the extent there are any such Claims, they shall be paid in full from the Sale Proceeds, provided that the aggregate amount of all Allowed Non-Tax Priority Claims does not exceed $5,000. | $0 | 100% |
| 4 | General Unsecured Claims | Class 4 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. | $10,863,863, which includes (i) the disputed insider claim of Louise Blouin, (ii) the disputed Unsecured Claim of $250,000 filed | 0% |

| | | | | |
|---|---|---|---|---|
| | | | by the IRS, (iii) the $94,012.98 Claim of Dream Yard Landscaping, and (iv) filed and scheduled Claims totaling approximately $100,000. | |
| 5 | Equity Interests | Class 5 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code. | N/A | N/A |

**IV.**

**RELEVANT BACKGROUND INFORMATION**

Louise Blouin ("Ms. Blouin") acquired the Properties at 366 Gin Lane, Southampton, NY (the "Brickchurch Property") and 376 Gin Lane, Southampton, NY (the "Aberdeen Property") in 1998 through separate real estate holding companies in which Ms. Blouin is ultimately the beneficial owner. The corporate structure is as follows:

Louise Blouin

Aberdeen Holdings (BVI) LTD

Aberdeen Enterprises (BVI) LTD — Brickchurch Enterprises (BVI) LTD

Aberdeen Enterprises Inc. — Brickchurch Enterprises Inc.

376 Gin Lane, Southampton, NY — 366 Gin Lane, Southampton, NY

Gin Lane is in the estate section of Southampton Village, which has historically been home to wealthy and influential people including members of the Ford, Du Pont, Eisenhower, Vanderbilt and Morgan families. The Properties, although separately zoned as 2-acre lots, form a 4-acre compound with 400 feet of bulkhead beach front on the Atlantic Ocean. The 376 Property consists of the main house, designed in 1890 by Stanford White. The cottage on the 366 Property was torn down in 2002 and replaced with a 13-room home, featuring a pool, cinema, and tennis court.

### A. The Events Leading to the Brickchurch Bankruptcy Case

On or about July 25, 2018, JGB Partners LP and certain of its affiliates (collectively, "JGB") loaned Debtors $29 million dollars, which debt was evidenced by a note executed by Debtors in favor of JGB (the "JGB Note"). To secure Debtors' obligations under the JGB Note, Debtors granted JGB a mortgage on the Properties (collectively, the "JGB Mortgage"). The JGB Mortgage is a first-priority lien on the Brickchurch Property and a second-priority lien on the Aberdeen Property junior to a mortgage lien originally held by Morgan Stanley Private Bank, National Association ("Morgan Stanley" or "MSPBNA"). Debtors defaulted under the terms of the JGB Note and, as a result of a cross-default under the Morgan Stanley mortgage, MSPBNA initiated suit against Debtors, among others, pursuant to which JGB sought a foreclosure sale of the Properties. JGB obtained a judgment against Debtors, jointly and severally, on the JGB Note in the amount of $39,961,521.80, plus costs and interest (the "JGB Judgment") and an order of foreclosure entitling it to sell the Brickchurch Property and then the Aberdeen Property.

On April 30, 2022, Brickchurch commenced its Chapter 11 case (the "Brickchurch Bankruptcy Case") to forestall the foreclosure sale of the Brickchurch Property, refinance its secured debt and/or sell the Properties in an orderly fashion with the benefit of the protections of the Bankruptcy Code. In the Brickchurch Bankruptcy Case, the Court established (i) July 11, 2022, as the general proof of claim bar date, and (ii) October 31, 2022, as the governmental proof of claim bar date. *In re Brickchurch Enterprises, Inc*., Case No. 22-70914, D.I. 7.

### B. The DIP Loan

On October 21, 2022, Brickchurch filed a motion (the "Refinancing Motion") seeking authorization from the Court to refinance the outstanding original amount owed to JGB pursuant to a settlement agreement reached between the Debtor and JGB. Payment to JGB was to be financed through a post-petition debtor-in-possession loan (the "DIP Loan") from Bay Point, pursuant to a certain Loan and Security Agreement (the "DIP Loan Agreement").

On November 16, 2022, the Court entered its *Order (I) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Liens and Super-Priority Claims* (the "DIP Financing Order"), pursuant to which it, among other things, (i) authorized Debtors to obtain a loan (the "DIP Loan"), in the original principal amount of $62 million, from Bay Point under the terms of the DIP Loan Documents with the proceeds of the DIP Loan to be used for, among other things, the payment of $44.5 million to JGB, a payment to Morgan Stanley as consideration for its agreement to forbear from exercising its rights as a first lienholder against the Aberdeen Property, payment of certain mechanics liens, interest reserves, and payment of related fees and expenses; (ii) authorized an assignment by JGB, without recourse, of all of its loan documents, the JGB Judgment, and its proofs of claim to Bay Point (collectively, the "JGB Assignment"); (iii) granted Bay Point superpriority administrative claims and non-priming liens on the DIP Collateral (as defined in the DIP Loan Agreement) in accordance with section 364 of the Bankruptcy Code; (iv) authorized the Debtor to borrow under the DIP Loan Documents; and (v) provided additional time for the Debtors to market the Properties. On December 12, 2022, the Debtor filed a Notice confirming that the DIP Loan had closed.

For the next six months, the Properties were listed for sale on the MLS system for a combined price of $150 million ($85 million (Aberdeen Property) and $65 million (Brickchurch Property), respectively). The asking price was determined pursuant to independent third-party appraisals and/or broker price opinions that were obtained in or around August 2022. During the six months after the funding of the DIP Loan, the Debtors utilized certain proceeds of the DIP Loan to make additional improvements to the Properties.

On June 9, 2023, the Debtors defaulted on the DIP Loan by failing to pay the amounts due thereunder (the "Event of Default"). After the Event of Default, Bay Point and Debtors continued negotiations regarding a consensual plan of reorganization and/or other process by which the Properties could be sold, refinanced, and/or by which Brickchurch could exit bankruptcy.

### C. The Disputed IRS Claims

Prior to the commencement of the Brickchurch Bankruptcy Case, the IRS assessed disputed penalties against Ms. Blouin in connection with Ms. Blouin's ownership of a business unrelated to the Properties or to any of the other companies identified above in the Debtors' corporate structure.

On August 17, 2022, the IRS filed a Notice of Federal Tax Lien against Brickchurch in which the IRS asserted that Brickchurch was the "nominee" of Blouin. After a dispute arose between Brickchurch, Bay Point, and the IRS regarding whether the filing of the lien against Brickchurch was void as a violation of the automatic stay, the IRS agreed to withdraw such lien. As such, any Claim that the IRS may hold against Brickchurch is unsecured.

On February 17, 2023, the IRS filed a Notice of Federal Tax Lien against Aberdeen in which the IRS asserted that Aberdeen was the "nominee" of Blouin.

Both the underlying tax assessment against Blouin and the tax lien filed against the Aberdeen Property are in dispute following the commencement of litigation in the District Court for the Eastern District of New York entitled *Aberdeen Enterprises, Inc. and Louise Blouin v. United States of America*, 2:22-cv-07190-LDH-AYS and related Bankruptcy Court objections (the "IRS Claim Litigation").

### D. The Events Leading to the Aberdeen Bankruptcy Case

On or about December 30, 2011, MSPBNA loaned Aberdeen's ultimate beneficial owner Louise Blouin ("Blouin") $15 million dollars, which debt was evidenced by a note executed by Blouin in favor of MSPBNA (the "MSPBNA Note"). To secure Blouin's obligations under the MSPBNA Note, Aberdeen granted MSPBNA a mortgage on the Aberdeen Properties (the "MSPBNA Mortgage"). The MSPBNA Mortgage is a first-priority lien on the Aberdeen Property. Debtors defaulted under the terms of the MSPBNA Note and, as a result, MSPBNA initiated suit against Blouin and Aberdeen, among others, pursuant to which MSPBNA sought a foreclosure sale of the Aberdeen Property. MSPBNA obtained a judgment against Blouin and Aberdeen on the MSPBNA Note in the amount of $16,522,340.23, plus costs and interest, and an order of foreclosure entitling it to sell the Aberdeen Property.

As referenced above, MSPBNA agreed (the "MSPBNA Forbearance Agreement") to forbear on its right to foreclose on the Aberdeen Property until June 9, 2023 as a result of a $2.6 million payment made to MSPBNA from the DIP Loan proceeds. On June 9, 2023, Aberdeen defaulted under the terms of the MSPBNA Forbearance Agreement and MSPBNA scheduled a foreclosure sale of the Aberdeen Property for August 3, 2023.

On August 2, 2023, Aberdeen commenced its Chapter 11 case (the "Aberdeen Bankruptcy Case") to forestall the foreclosure sale of the Aberdeen Property, refinance its secured debt and/or sell the Properties in an orderly fashion with the benefit of the protections of the Bankruptcy Code. In the Aberdeen Bankruptcy Case, the Court established (i) November 30, 2023, as the general proof of claim bar date, and (ii) January 29, 2024, as the governmental proof of claim bar date. *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834, D.I. 73

The Aberdeen Bankruptcy Case is now being jointly administered with the Brickchurch Bankruptcy Case pursuant to this Court's *Order Granting Motion for Joint Administration* entered on September 6, 2023.

### E. MSPBNA Assigns the MSPBNA Judgment and Related Documents to Bay Point

On August 2, 2023, MSPBNA assigned the MSPBNA Judgment, the MSPBNA Mortgage, and related instruments and documents (the "MSPBNA Assignment") to Bay Point. As such, Bay Point is the holder of all rights and claims that were part of the MSPBNA Assignment, including the right to enforce the MSPBNA Judgment.

### F. The Dispute Regarding Control of the Debtors

Prior to the commencement of the Aberdeen Bankruptcy Case, Bay Point alleges to have taken actions authorized under the DIP Loan Documents and applicable law to remove the officer(s) and director(s) and replace the same with Bay Point's chosen officer and director. Debtors, Aberdeen Enterprises (BVI) LTD, and Brickchurch Enterprises (BVI) LTD dispute that the actions of Bay Point effectuated the removal and replacement of Debtors' officers and directors. The issue of who is/are the authorized director(s) and officer(s) of Debtors is currently pending before the Bankruptcy Court. However, the Debtors have filed the Plan and Disclosure Statement with the consent of Bay Point in the hope that the Debtors can effectuate Sales of the Properties without the need for judicial determination of the control issue. Pursuant to the terms of the Plan, decisions of the Debtors will be made by the joint decision of Bay Point and Mathew Kabatoff ("Kabatoff").

### G. The Sale Process

On September 5, 2023, the Debtors filed a *Joint Motion Seeking Entry of an Order Under Bankruptcy Code Sections 363(a), (b), (f), and (m) and Bankruptcy Rules 2002, 6004, and 9004: (I) Authorizing Debtors to Sell to the Highest and Best Bidder at an Auction Sale the Estates' Interest in the Real Properties Known as (a) 366 Gin Lane, Southampton, New York 11968 and (b) 376 Gin Lane, Southampton, New York 11968; and (II) Scheduling a Hearing to Approve Such Sale to the Highest and Best Bidder; and (III) Approving Certain Bidding Procedures; and (IV) Approving the Manner and Extent of Notice of Such Auction Hearing* [D.I. 46] (the "Sale Motion").

On November 22, 2023, the Court entered that certain *Order Approving Bid Procedures* [D.I. 104] (the "Sale Order"). Among other things, the Sale Order granted the Sale Motion and authorized and approved those certain *Bidding Procedures* [D.I. 67-1], which were subsequently modified pursuant to those certain *First Amended Approved Bidding Procedures* [D.I. 116] (the "Approved Bid Procedures").

On January 12, 2024, the Debtors and Bay Point filed a *Joint Application and Motion for an Order (I) Authorizing the Retention of Concierge Auctions, LLC as Auctioneer, and (II) Modifying or Granting Relief from E.D.N.Y. LBR 6005-1(C)* [D.I. 140] (the "Application to Employ"). Among other things, the Application to Employ sought Court authorization for the Debtors to employ and retain Concierge Auctions, LLC to market the Properties through the conclusion of the Live Auction, and (ii) conduct and hold the Live Auction. The Application to Employ was granted by Order entered January 26, 2024 [D.I. 163].

Pursuant to the Approved Bid Procedures, the Debtors sought to offer the Properties for Sale, collectively and individually, contemporaneously through a Private Sale Process and an Auction Process (as those terms are defined in the Approved Bidding Procedures). Pursuant to the Private Sale Process, the deadline for the Debtors to accept a Qualified Offer (as such term is defined in the Approved Bid Procedures) was January 14, 2024. Contemporaneously with the Private Sale Process, the Debtors offered the Properties for Sale, collectively and individually, via a no reserve auction (the "Auction"). The Auction was conducted via digital bidding and concluded at a live auction at the Sotheby's Auction House on January 24, 2024 (the "Live Auction").

### H. Results of The Live Auction

#### a) The Aberdeen Property

At the Live Auction, the High Bid for the Aberdeen Property was $40,500,000. The Buyer's Premium (as that term is defined in the Approved Bidding Procedures) was $3,660,000. Thus, the expected Gross Sale Proceeds from the Sale of the Aberdeen Property will be $44,160,000. The bid enhancement applicable to the Aberdeen Property is $1,501,440 (i.e., 3.4% of the Gross Sale Proceeds) (the "**Aberdeen Property Bid Enhancement**"), which amount shall constitute the portion of the Section 1146 Funds arising from the Sale of such Property. The Debtors anticipate that the following costs and expenses incurred in connection with the Sale will be satisfied from the Gross Sale Proceeds: (i) $405,000 for the Listing Broker's Fee, (ii) $405,000 for the Buyer's Broker's Fee, (iii) $810,000 for the Auctioneer's Fee, and (iv) up to $50,000 for the Auctioneer's expenses (collectively, the "**Aberdeen Sale Expenses**"). The Aberdeen Sale Expenses shall be paid upon entry of the Sale Approval Order. Article V.(D) of this Disclosure Statement provides details on the distribution of the Net Sale Proceeds under the Plan.

#### b) The Brickchurch Property

At the Live Auction, the High Bid for the Brickchurch Property was $38,500,000. The Buyer's Premium (as that term is defined in the Approved Bidding Procedures) was $3,420,000. Thus, the expected Gross Sale Proceeds from the Sale of the Brickchurch Property will be $41,920,000. The bid enhancement applicable to the Brickchurch Property is $1,425,280 (i.e., 3.4% of the Gross Sale Proceeds) (the "**Brickchurch Property Bid Enhancement**"), which

amount shall constitute the portion of the Section 1146 Funds arising from the Sale of such Property. The Debtors anticipate that the following costs and expenses incurred in connection with the Sale will be satisfied from the Gross Sale Proceeds: (i) $385,000 for the Listing Broker's Fee, (ii) $385,000 for the Buyer's Broker's Fee, (iii) $770,000 for the Auctioneer's Fee, and (iv) up to $50,000 for the Auctioneer's expenses (collectively, the "**Brickchurch Sale Expenses**"). The Brickchurch Sale Expenses shall be paid upon entry of the Sale Approval Order. Article V.(D) of this Disclosure Statement provides details on the distribution of the Net Sale Proceeds under the Plan.

### I. Hearing to Confirm the Sale and Confirm the Plan

A hearing to confirm the Sale and the Plan is scheduled for **February 13, 2024**, and the Closing is expected to occur on or before **February 20, 2024**. Although Bay Point believes the Sale provides the maximum possible recovery for creditors and equity security holders, the Net Sale Proceeds will not be sufficient to pay all Allowed Claims in full. As a result, holders of Claims in Classes 1 and 4, and Equity Interests in Class 5, will be impaired, and holders of certain Administrative Expense Claims will be asked to accept less than full payment in order to provide the maximum recovery available to them. The Debtors will not receive a discharge under the Plan.

## V.
## SUMMARY OF THE PLAN OF LIQUIDATION

### A. UNCLASSIFIED CLAIMS

Pursuant to Section 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims (including Professional Fee Claims), Priority Tax Claims, or Bankruptcy Fees, all of which shall be paid in full or such other amount as agreed upon with the holders of such unclassified Claims.

**Administrative Expense Claims**. Each holder of an Allowed Administrative Expense Claim—other than the DIP Lender Superpriority Claim, Bankruptcy Fees and any Allowed Administrative Expense Claim held by the IRS—shall be paid in full satisfaction of its Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan. Payment shall be made on (a) the later of (i) the Distribution Date, (ii) the date payment of such Claim is due under the terms thereof or applicable law, and (iii) three (3) Business Days after such Claim becomes an Allowed Claim; or (b) upon such other terms as may be agreed to, in writing, between the Debtors and the holder of such Claim.

Except as otherwise set forth herein, requests for payment of Administrative Expense Claims not previously Allowed must be filed no later than the Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims not previously Allowed that do not file requests for payment of Administrative Expense Claims on or before the Administrative Expense Claim Bar Date shall be forever barred from asserting such Claims against the Debtors or the Properties.

**Professional Fees and Broker Commissions**. All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the

date that is thirty (30) days after the Effective Date. No later than three (3) Business Days prior to the Confirmation Hearing, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through Confirmation, and (c) a good faith estimate of any expected post-confirmation fees and expenses. Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request. No later than three (3) Business Days prior to the Effective Date, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through the Effective Date, and (c) a good faith estimate of any expected post-Effective Date fees and expenses (if any). Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request; *provided, however,* the Allowed Professional Fee Claim of Simmons Legal PLLC shall not exceed $135,000, the Allowed Professional Fee Claim of Goldberg Weprin Finkel Goldstein LLP shall not exceed $100,000, and the Allowed Professional Fee Claim of Duane Morris shall not exceed $151,905.95.

Each holder of an Allowed Professional Fee Claim shall be paid, in full satisfaction of its Allowed Administrative Expense Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan, upon the later of (i) the Distribution Date and (ii) the date upon which the Order Allowing such Professional Fee Claim becomes a Final Order. Payments made to a Professional in accordance with the provisions of Section 2.1 shall constitute payment in full of the Professional's Allowed Professional Fee Claim, and the Professional shall have no further recourse against the Plan Administrator, the Debtors, or Bay Point for such Claim.

**Priority Tax Claims**. The New York State Department of Taxation and Finance has asserted Unsecured Priority Tax Claims in the total amount of $161.39 (the "**Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance**"). *See* Claim No. 1-1, *In re Aberdeen Enterprises, Inc.*, Case No. 23-72834; *see also* Am. Claim No. 1-3, *In re Brickchurch Enterprises, Inc.*, Case No. 22-70914. The Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance shall be paid in full on the Effective Date.

Subject to Section 5.2 of the Plan with respect to Disputed Claims, the IRS shall receive up to $1 million for payment of the IRS's Administrative Expense Claim arising from income taxes on the capital gains (if any) that result from the Sale; *provided*, *however*, that if the IRS's Administrative Expense Claim is less than $1 million, then the difference shall be applied to the IRS's Priority Tax Claim.

**Bankruptcy Fees**. The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtor under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C.

§ 1930 from the Effective Date through the date of dismissal, conversion or entry of a final decree, shall be paid from the Bankruptcy Fees Reserve.

The Bankruptcy Fees payable to the Plan Administrator shall be paid within five (5) business days, or as soon as reasonably practicable thereafter, after the date that such Claim is Allowed by Final Order of the Bankruptcy Court. No later than twenty-one (21) Business Days prior to the hearing on the allowance of such Claim, the Plan Administrator shall serve upon counsel for Debtors, the United States Trustee, Bay Point, and any other Creditor requesting such information: (a) the current amount of its unpaid Bankruptcy Fees, and (b) a good faith estimate of its expected unpaid Bankruptcy Fees (if any) through dismissal, conversion or entry of a final decree.

The Debtors shall use the Sale Proceeds and/or Section 1146 Funds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan.

## B. CLASSIFICATION AND TREATMENT OF CLAIMS

The Plan classifies Claims and Interests against the Debtors consistent with the applicable provisions of the Bankruptcy Code.

**Summary**. Pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, the Plan classifies Claims and Interests as summarized below:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims of Bay Point | Yes | Yes |
| Class 2 | Secured Claims of New York State Department of Taxation and Finance | No | No |
| Class 3 | Non-Tax Priority Claims | No | No |
| Class 4 | General Unsecured Claims | Yes | No |
| Class 5 | Equity Interests | Yes | No |

**Class 1: Secured Claims of Bay Point**

**Classification** – Class 1 consists of the Bay Point Debt, including (a) the DIP Loan Obligations; (b) the JGB Judgment, *provided that*, for the avoidance of doubt, Bay Point is obligated to credit all amounts collected pursuant to the JGB Judgment to the outstanding DIP Obligations; and (c) the Morgan Stanley Judgment. The Morgan Stanley Judgment is secured by a first-priority Lien on the Aberdeen Property. The JGB Judgment is secured by a second-priority Lien on the Aberdeen Property and a first-priority Lien on the Brickchurch Property. The DIP Obligations in excess of the amount of the JGB Judgment are secured by a second-priority lien on the Brickchurch Property and a Lien on the Aberdeen Property that Bay Point asserts is a third-priority Lien and the IRS contends is a fourth-priority Lien (behind the IRS's asserted Lien on the Aberdeen Property).

**Treatment** – Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted

in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie*, to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order.

Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11 U.S.C. § 506(b) and the DIP Financing Order.

For the avoidance of doubt, nothing contained herein shall prejudice any right that Debtors may have to challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *provided, however*, that nothing contained herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided* that Debtors' reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; *and further provided* that Debtors' reservation of rights shall not impair Bay Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order.

**Voting** – Class 1 is impaired under the Plan and, therefore, Bay Point is entitled to vote to accept or reject the Plan.

**Class 2: Secured Claims of New York State Department of Taxation and Finance**

**Classification** – Class 2 consists of the Secured Claims of the New York State Department of Taxation and Finance.

**Treatment** – The holder of the Allowed Secured Claims of the New York State Department of Taxation and Finance shall be paid in full, in accordance with the provisions of Sections 2.1, 5.8, and 5.9 of the Plan.

**Voting** – Class 2 is unimpaired under the Plan and, therefore, the holder of the New York State Department of Taxation and Finance's Secured Claims are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan.

**Class 3 Non-Tax Priority Claims**

**Classification** – Class 3 consists of Priority Claims, other than Priority Tax Claims.

**Treatment** – Bay Point does not believe there are any Non-Tax Priority Claims. To the extent there are any such Claims, they shall be paid in full from the Sale Proceeds, provided that the aggregate amount of all Allowed Non-Tax Priority Claims does not exceed [$5,000] in the aggregate.

**Voting** – Class 3 is unimpaired under the Plan and, therefore, each holder of a Class 3 Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan.

**Class 4: General Unsecured Claims**

**Classification** – Class 4 consists of all Unsecured Claims.

**Treatment** – Class 4 will not receive any distributions under the Plan.

**Voting** – Class 4 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**Class 5: Equity Interests**

**Classification** – Class 5 consists of the Equity Interests in the Debtors.

**Treatment** – Class 5 will not receive any distributions under the Plan.

**Voting** – Class 5 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

## C. MEANS FOR IMPLEMENTATION OF THE PLAN

**Authority to Act / Limitation of Liability.** Each act and every decision to be made by Debtors under the Plan shall be made at the direction, and shall be completely consistent with such direction, of Bay Point and Kabatoff (the "Decision Makers"), such direction being valid and enforceable only upon the mutual agreement of both Decision Makers. If the Decision Makers are not able to reach a mutual agreement regarding a decision or act of the Debtors, each Decision Maker agrees that either Decision Maker shall be permitted to seek relief from the Bankruptcy Court on shortened notice; *provided that*, for the avoidance of doubt, the discretion of whether to hear any issues raised by such Decision Maker on shortened notice shall remain with the Bankruptcy Court. For the avoidance of doubt, Blouin shall have no authority to act with respect to either of the Debtors and shall completely refrain from taking part in, or interfering with, any of the decisions, processes, or procedures set forth or governed by the Plan. The Decision Makers, solely as a result of their status as a Decision Maker under the Plan, shall not be deemed officers, fiduciaries or agents of the Debtors. The Decision Makers may employ or contract with such third parties as appropriate to assist in the implementation of the Plan; *provided that* the employment of any such person on behalf of the Debtors shall require a decision of the Debtors. The Decision Makers shall have no obligation to file tax returns or similar reports with the appropriate taxing authorities. **The Decision Makers shall not have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation,**

**preparation, dissemination, confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan**.

**Sale Free and Clear of All Claims, Liens, Taxes and Interests.** The Plan shall be funded through the Sale of the Properties in accordance with the sale process run pursuant to the terms of the Approved Bid Procedures (the "Sale Process"), the funds that were previously distributed by Bay Point to the Debtors pursuant to the DIP Financing Order and the Section 1146 Funds; *provided that*, for the avoidance of doubt, the Debtors may consummate a Private Sale in accordance with the Approved Bid Procedures. The following is a summary of Sale Process, which is more fully described in the Plan and the Approved Bid Procedures:

(i) Free and Clear Sale(s). All transfers of the Properties shall be effectuated by one or more Bargain and Sale Deeds, free and clear of all Liens, Claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with such Liens, claims, taxes and interests attaching to the Sale Proceeds of the respective Property in the same order, extent and priority as existed prior to Confirmation.

(ii) Sale Approval Order(s). Any proposed Sale, including a Private Sale, shall be subject to the approval of the Bankruptcy Court under 11 U.S.C. 363(b) (i.e., a Sale Approval Order).

(iii) Deadline to Close. The Closing with respect to any Sale that has been approved by the Bankruptcy Court shall close by **February 20, 2024**.

(iv) Payment of Sale Transaction Costs. The Escrow Agent shall distribute the following amounts from the Gross Sale Proceeds with respect to each Property: (i) subject to any agreement between the Debtors and the Auctioneer, the fees and expenses of the Auctioneer (if any) with respect to such Property; (ii) subject to any agreement between a Broker and the Debtors, the fees and expenses of a Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction; (iii) the fees and expenses of the Escrow Agent (if any) with respect to the Sale involving such Property; (iv) any other closing costs associated with the Sale of such Property; and (e) subject to and without waiving Section 4.6 of the Plan and section 1146(a) of the Bankruptcy Code, any documentary and Transfer Taxes; *provided that*, for the avoidance of doubt, the provisions of this Section 4.4(e) of the Plan shall be subject to any employment and/or listing agreements that have been approved by the Bankruptcy Court in connection with Debtors' request to retain one or more professionals.

(v) Vesting of Assets. The Properties shall remain in the Debtors' respective Estates under section 541(a) of the Bankruptcy Code until the Effective Date of a Sale of the same and shall remain subject to all Liens and Claims that exist as of the date of Confirmation. Upon the closing of a Sale involving one or both Properties,

such Properties (or Property) shall vest in the Successful Purchaser, free and clear of all Liens and Claims other than Transferred Encumbrances. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, authorizing and directing the Plan Administrator and any other necessary party to execute or deliver, or to join in the execution or delivery, on the Closing date of the Sale(s), of any instrument required to effect a transfer of Properties (or a respective Property) as required by the Plan, and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan.

Transfer Taxes. The Sale of the Properties constitutes the making or delivery of instruments of transfer of property or otherwise, pursuant to or in connection with confirmation of the Plan, and, therefore, to the maximum extent provided by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Plan, including an instrument of transfer and deed executed by the Debtors or the Plan Administrator (on behalf of Debtors) shall not be subject under any law imposing a stamp tax, real estate transfer tax, mansion tax, mortgage recording tax or similar tax (previously defined as the "Transfer Taxes"). Accordingly, the appropriate officials or agents of state or local governmental units, including New York State, Suffolk County and the Town of Southampton, shall forego collection of any such Transfer Taxes and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

**Allocation**. In the event of a sale of the Properties as a single lot, the proceeds of the Sale shall be allocated pursuant to agreement between Debtors and Bay Point; *provided that* if Debtors and Bay Point cannot agree on an allocation, Debtors and/or Bay Point may file a motion with the Bankruptcy Court to request that the Court determine such allocation and each of the same agrees that the other party shall be entitled to seek expedited relief with respect to the same.

**Preservation of Causes of Action**. Subject to the Liens granted to Bay Point pursuant to the DIP Loan Documents and/or the DIP Financing Order, all claims, causes of action, damages or remedies in favor of the Debtors' respective estates relating to any prior transactions (including all avoidance claims under the Bankruptcy Code or state law) shall be preserved for the benefit of the Debtors' estates and distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court.

**1031 Exchange Provisions**. Provided that there is no prejudice or harm to the Debtors' respective estates or to the interests of each Debtor's respective Creditors, including with respect to such Creditors' right to promptly be paid in accordance with the provisions of the Plan, nothing contained herein shall prohibit the Debtors from structuring a Sale in a manner that permits the Sale to qualify under the exchange provisions of Section 1031, including use of a qualified intermediary. For the avoidance of doubt, nothing contained herein shall (a) permit either Debtor from transferring any Estate property outside of the Estate; and/or (b) permit either Debtor to delay the Sale Process, a Sale, or a Closing for any purpose relating to Section 1031.

## D. DISTRIBUTIONS

**Method of Payment.** Unless otherwise expressly agreed, in writing, payments to be made pursuant to the Plan shall be made at the times and in the amounts set forth in the Plan by either electronic funds wire transfer or check drawn on a domestic bank.

**Disputed Claims Reserves.** No distributions shall be made with respect to any Disputed Claim. Instead, the Debtors shall deposit into one or more segregated accounts (the "Disputed Claims Reserves," each being a "Disputed Claims Reserve") funds equal to 100% of the Cash that would be distributed under the Plan to the holder of a Disputed Claim that would be an Allowed Claim, but for the dispute. In determining the amount of the Cash to be distributed under the Plan to the holders of Allowed Claims on the Distribution Date, the calculation of the amount to be distributed to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts. The Debtors or any other party in interest shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating the amount of a Disputed Claim, and limiting the amount of Cash that must be so deposited. Any Creditor whose Claim is so estimated and limited shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other entity or property if the Allowed Claim of the Creditor (whose Claim was so estimated and limited) as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims Reserve applicable to such Disputed Claim (on a *pro rata* basis with any other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims associated with that particular Disputed Claims Reserve that are allowed by Final Order; *provided that*, for the avoidance of doubt, any Disputed Claim that is deemed to be an Allowed Claim by a Final Order shall participate in any future distributions as an Allowed Claim. Separate Disputed Claims Reserves shall be set up for Claims of different payment priority under the terms of this Plan.

**Distribution After Allowance.** Within ten (10) days after entry of a Final Order finding all (or part of) a Disputed Claim to be an Allowed Claim (or as soon thereafter as practicable), the Debtors shall distribute from the funds placed in the Disputed Claims Reserve with respect to such Claim, all Cash, including any interest or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

**Distribution after Disallowance.** The balance of a Disputed Claims Reserve remaining after all Disputed Claims have been resolved by Final Order shall be used to satisfy any outstanding Bankruptcy Fees, Claims, and Interests in the order of priority specified in Sections 5.8 and 5.9 of the Plan.

**Bankruptcy Fee Reserve.** The Debtors shall utilize the Sale Proceeds and Section 1146 Funds to deposit in a segregated account on the Distribution Date (the "Bankruptcy Fees Reserve"), in accordance with the provisions of the Plan, an amount equal to the Bankruptcy Fees estimated to accrue from and after the Effective Date through the date of dismissal, conversion, or entry of a final decree.

**Professional Fees Reserve**. The Debtors shall utilize the Sale Proceeds and Section 1146 Funds to deposit in a segregated account on the Distribution Date (the "Professional Fees Reserve") the following amounts for the benefit of the Debtors' Professionals specified below:

| Debtor | Professional | Amount |
|---|---|---|
| Aberdeen | Goldberg Weprin Finkel Goldstein LLP | $100,000.00 |
| Brickchurch | Simmons Legal PLLC | $135,000.00 |
| Brickchurch | Duane Morris LLP | $151,905.95 |

Three (3) Business Days after the Administrative Expense Claim of the Professional becomes an Allowed Claim, funds equal to the amount of the Allowed Claim shall be withdrawn from the Professional Fee Reserve and paid to the Professional. Any funds remaining in the Professional Fee Reserve designated for such Professional shall be released from the Professional Fee Reserve and transferred to the Plan Administrator for distribution in accordance with the provisions of Sections 5.8 and 5.9 of the Plan.

**Distribution to Allowed Claims Against Aberdeen**. The Net Sale Proceeds realized from or allocable to, the Aberdeen Property, currently estimated to be in the amount of $43,991,440.00, along with the other assets of the Aberdeen Estate, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(i) First, the amount of $43,991,440, which is comprised of the Net Sale Proceeds of the Aberdeen Property, shall be distributed in the following order:

a. First, $168.20 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Aberdeen;

b. Second, $16,248,932 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the Morgan Stanley Judgment;

c. Third, $26,240,899.80 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

(ii) Second, the amount of $1,501,440, which is comprised of the Section 1146 Funds attributable to the Aberdeen Property Sale, shall be distributed in the following order:

a. First, $6.87 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Aberdeen;

b. Second, up to $300,000 shall be paid towards Bankruptcy Fees;

c. Third, up to $575,000 shall be paid to the IRS for application to the IRS's Allowed Administrative Expense Claim and/or Priority Tax

Claim (subject to the provisions set forth in Section 2.1 of this Plan);

d. Fourth, up to $100,000 shall be paid Goldberg Weprin Finkel Goldstein LLP in full payment of its Allowed Professional Fee Claims; and

e. Fifth, any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(iii) Third, the amount of $108,317.25, which is comprised of certain casualty insurance proceeds related to the Aberdeen Property in which Bay Point has a first-priority secured interest, shall be paid to Bay Point for application to the outstanding DIP Loan Obligations;

(iv) Fourth, any remaining monetary assets of Aberdeen shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

**Distribution to Allowed Claims Against Brickchurch**. The Net Sale Proceeds realized from or allocable to, the Brickchurch Property, currently estimated to be in the amount of $41,755,280, along with the other assets of the Brickchurch Estate, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(i) First, the amount of $41,755,280, which is comprised of the Net Sale Proceeds of the Brickchurch Property, shall be distributed in the following order:

a. First, $1,997.79 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Brickchurch;

b. Second, $30,096,479.80 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

c. Third, $10,231,354.21 shall be paid to Bay Point for application to (i) the Indemnification Reserve for claims relating to the DIP Loan Obligations and/or the JGB Assigned Documents, including any of the transactions referred to or referenced herein; and (ii) the outstanding amount of the Allowed DIP Loan Obligation;

(ii) Second, the amount of $1,425,280, which is comprised of the Section 1146 Funds attributable to the Brickchurch Property Sale, shall be distributed in the following order:

a. First, $154.52 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Brickchurch;

b. Second, up to $300,000 shall be paid towards Bankruptcy Fees;

c. Third, up to $425,000 shall be paid to the IRS for application to the IRS's

Allowed Administrative Expense Claim and/or Priority Tax Claim (subject to the provisions set forth in Section 2.1 of this Plan);

d. Fourth, up to $151,905.95 shall be paid to Duane Morris in full payment of its Allowed Professional Fee Claims;

e. Fifth, up to $135,000 shall be paid to Simmons Legal PLLC in full payment of its Allowed Professional Fee Claims; and

f. Sixth, any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(iii) Third, any remaining monetary assets of Brickchurch shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

**Creditor's Right to Accept Lesser Payment.** For the avoidance of doubt, nothing contained herein shall prevent a Creditor or Class of Claims from voluntarily accepting a lesser amount (or other disparate treatment) than such Creditor or Class of Claims would otherwise be entitled to under the Plan.

**Estates' Right to Clawback.** For the avoidance of doubt, distributions to Bay Point under the Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be distributed as Sale Proceeds in accordance with the Plan.

**Order of Distributions and Allocation of Clawback.** The distributions required by Sections 5.8 and 5.9 of this Plan, and the clawback provisions of Section 5.11 of the Plan, shall be applied in an order and manner so as to promote the substantial consummation of the Plan; *provided that* for the avoidance of doubt, nothing contained herein shall permit distributions to be paid in a priority inconsistent with Sections 5.8 and 5.9 of the Plan.

## E. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

On the Effective Date, all Executory Contracts to which the Debtor is a party shall be deemed rejected. Allowed Claims arising from the rejection of Executory Contracts of a Debtor pursuant to Section 6.1 of the Plan shall be treated as Unsecured Claims. A Proof of Claim seeking payment of any Unsecured Claim for damages arising from the rejection of an Executory Contract pursuant to Section 6.1 of the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within thirty (30) days after the Confirmation Date. Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors and may not be enforced against the Properties, any purchaser of the Properties, or any Creditor under any indirect or equitable legal theory such as unjust enrichment.

## F. INJUNCTIONS

**Injunctions Against Interference with Plan. Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided that*, for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property.**

## G. [Reserved]

## H. NO DISCHARGE; LIENS AND CLAIMS

**No Discharge.** Pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors will not be discharged from debts that arose prior to Confirmation.

**Liens and Claims.** All Liens and Claims with respect to the Properties and all other assets of the Debtors shall survive Confirmation and remain attached in their respective order of priority as existed as of the date of Confirmation; *provided that*, as set forth in this Plan, the Sale(s) of the Properties shall be free and clear of any Liens, Claims, and/or Interests pursuant to Section 363 of the Bankruptcy Code and such Liens, Claims, and/or Interests shall attach to the respective Sale Proceeds in the same order of priority as existed as of the date of the Closing of the Sale.

## I. MODIFICATION OR REVOCATION OF THE PLAN

**Modification.** The Plan may be altered, amended or modified by Bay Point, at any time before the substantial consummation of the Plan, as provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019.

**Revocation.** Bay Point may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii) prejudice in any manner the rights of the Debtor or any Creditor in any further proceedings involving the Debtors or their Estates.

## J. CONDITIONS TO EFFECTIVENESS

The Plan will not become effective and the Effective Date will not occur, unless and until:

(i) the Confirmation Order has become a Final Order;

(ii) the Bankruptcy Court shall have entered the Order approving the Sale;

(iii) the Sale shall have closed;

(iv) the Debtors shall have received the Section 1146 Funds; and

(v) the payments required pursuant to Sections 5.8 and 5.9 of the Plan shall have been made; *provided that* nothing contained herein shall condition the effectiveness of the Plan on payment of any Disputed Claims so long as a Disputed Claims Reserve is established (if so required) pursuant to the terms of the Plan.

### K. BINDING EFFECT

Subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of the Plan will bind every holder of a Claim against or Interest in one or more of the Debtors and inure to the benefit of and be binding on such holder's respective heirs, successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder accepted the Plan.

## VI.

## CONFIRMATION PROCEDURE

### A. NOTICE TO HOLDERS OF CLAIMS AND EQUITY INTERESTS

At the Confirmation Hearing, the Bankruptcy Court will be asked to find that the Disclosure Statement contains information of a kind and in sufficient and adequate detail to have enabled holders of Claims to make an informed judgment whether to accept or reject the Plan. SUCH FINDINGS DO NOT CONSTITUTE EITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR THEREIN OR AN ENDORSEMENT OF THE PLAN BY THE BANKRUPTCY COURT.

IF THE PLAN IS APPROVED BY THE REQUISITE VOTE OF HOLDERS OF CLAIMS ENTITLED TO VOTE AND IS SUBSEQUENTLY CONFIRMED BY THE BANKRUPTCY COURT, THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AGAINST, AND EQUITY INTERESTS IN, THE DEBTORS, WHETHER OR NOT THEY WERE ENTITLED TO VOTE OR DID VOTE TO ACCEPT OR REJECT THE PLAN, AND WHETHER OR NOT THEY RECEIVE OR RETAIN ANY DISTRIBUTIONS OR PROPERTY UNDER THE PLAN. THUS, ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ARE ENCOURAGED TO READ THIS PLAN CAREFULLY AND IN ITS ENTIRETY BEFORE DECIDING TO VOTE EITHER TO ACCEPT OR REJECT THE PLAN.

THIS DISCLOSURE STATEMENT IS THE ONLY DOCUMENT AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. No solicitation of votes may be made except after distribution of this Disclosure Statement, and no person has been authorized to distribute any information concerning the Debtors other than the information contained herein. No information aside from that included in the Disclosure Statement should be relied upon in making a determination to vote to accept or reject the Plan.

## B. VOTING RIGHTS

**Who May Vote to Accept or Reject the Plan**. Pursuant to the Bankruptcy Code, only holders of Claims and Equity Interests in classes that are (i) "impaired" by the Plan within the meaning of section 1124 of the Bankruptcy Code, and (ii) entitled to receive a distribution under the Plan, are entitled to vote on the Plan. In these Chapter 11 Cases, Classes 2 and 3 are unimpaired. Thus, Classes 2 and 3, and the holders of Claims in such Classes, are conclusively deemed to accept the Plan and are not entitled to vote. Classes 1, 4, and 5 are impaired. However, Classes 4 and 5 will not receive any distributions under the Plan. Thus, the holders of Claims in Class 4 and Equity Interests in Class 5 are deemed not to have accepted the Plan. Class 1 is impaired and entitled to vote.

**Who is Not Entitled to Vote**. The following types of Claims and Equity Interests are not entitled to vote:

(i) Claims that have been disallowed;

(ii) Claims in unimpaired Classes;

(iii) Claims entitled to priority pursuant to Bankruptcy Code Section 507(a)(2) and (a)(8); and

(iv) Claims that are unliquidated, contingent, or disputed, unless temporarily allowed by the Bankruptcy Court solely for voting purposes as discussed herein.

Claims in unimpaired Classes are not entitled to vote because such classes are deemed to have accepted the Plan. Claims entitled to priority pursuant to Bankruptcy Code Sections 507(a)(2) and 507(a)(8) are not entitled to vote because such Claims are not placed in Classes, and they are required to receive certain treatment specified by the Bankruptcy Code.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

EVEN IF YOUR CLAIM IS OF THE TYPE DESCRIBED ABOVE, YOU MAY STILL HAVE A RIGHT TO OBJECT TO THE CONFIRMATION OF THE PLAN.

## C. SOLICITATION MATERIALS

In soliciting votes for the Plan, Bay Point, will send to holders of Claims and Equity Interests who are entitled to vote copies of (i) the Plan, (ii) the notice of, among other things, (a) the date, time, and place of the hearing to consider confirmation of the Plan and related matters, and (b) the deadline for voting and filing objections to confirmation of the Plan (the "Confirmation Hearing Notice"), (iii) one or more ballots (and return envelopes) to be used in voting to accept or to reject the Plan, and (iv) other materials as authorized by the Bankruptcy Court.

If you are the holder of a Claim who is entitled to vote, but you did not receive a ballot, or if your ballot is damaged or illegible, or if you have any questions concerning voting procedures, you may contact the following:

John C. Allerding
THOMPSON HINE LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326

## D. VOTING PROCEDURES, BALLOTS, AND VOTING DEADLINE

You should carefully review the Disclosure Statement, the Plan, and the detailed instructions accompanying your ballot. Only after you review these materials, should you make a decision as to whether to vote to accept or reject the Plan. On the accompanying ballot, you should complete and sign your original ballot (copies will not be accepted) and return it as instructed in the envelope provided.

IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE PROPERLY COMPLETED, AS SET FORTH ABOVE AND IN ACCORDANCE WITH THE VOTING INSTRUCTIONS ON THE BALLOT. ALSO, YOUR BALLOT MUST BE RECEIVED NO LATER THAN 5:00 P.M. (PREVAILING EASTERN TIME) ON **FEBRUARY 6, 2024** (THE "**VOTING DEADLINE**") BY THE DEBTORS. COMPLETED BALLOTS MUST BE SIGNED, DATED, AND RETURNED WITH AN ORIGINAL SIGNATURE:

**Voting Via First-Class Mail, Postage Prepaid:**

John C. Allerding
THOMPSON HINE LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326

**Voting Via Hand Delivery or Overnight Mail:**

John C. Allerding
THOMPSON HINE LLP
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326

BALLOTS MUST BE RECEIVED BY THE VOTING DEADLINE. FAXED BALLOTS AND BALLOTS SENT VIA ELECTRONIC TRANSMISSION (I.E., E-MAIL) WILL NOT BE ACCEPTED. BALLOTS THAT ARE RECEIVED BUT NOT SIGNED WILL NOT BE COUNTED. BALLOTS THAT ARE SIGNED BUT DO NOT SPECIFY WHETHER THE HOLDER ACCEPTS OR REJECTS THE PLAN, OR THAT BOTH ACCEPTS AND REJECTS THE PLAN, WILL BE COUNTED AS AN ACCEPTANCE. DO NOT RETURN ANY EVIDENCE OF YOUR CLAIM WITH YOUR BALLOT.

If you have any questions about (i) the procedure for voting your Claim, (ii) the packet of materials that you have received, or (iii) the amount of your Claim, or if you wish to obtain, at your own expense an additional copy of the Plan or Disclosure Statement or any appendices or exhibits to such documents, please contact Bay Point's counsel.

BAY POINT URGES ALL HOLDERS OF CLAIMS ENTITLED TO VOTE TO EXERCISE THEIR VOTING RIGHT BY COMPLETING THEIR BALLOTS AND RETURNING THEM BY THE VOTING DEADLINE.

## E. THE CONFIRMATION HEARING AND DEADLINE FOR OBJECTIONS TO CONFIRMATION

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a Confirmation Hearing. The Confirmation Hearing has been scheduled for **February 13, 2024, at 10:00 AM** (EDT) before the Honorable Alan S. Trust, United States Bankruptcy Judge, United States Bankruptcy Court for the Eastern District of New York, 290 Federal Plaza, Central Islip, New York 11722. The Confirmation Hearing will be conducted in person, and may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the objector's Claim. Any such objection must be filed with the Bankruptcy Court and served so that it is received by the Bankruptcy Court and the following parties on or before **February 6, 2024**:

| | |
|---|---|
| Brickchurch Enterprises, Inc.: | Camisha L. Simmons, Esq.<br>Simmons Legal PLLC<br>1330 Avenue of the Americas, Suite 23A<br>New York, New York 10019<br>camisha@simmonslegal.solutions |
| Aberdeen Enterprises, Inc.: | Kevin Nash, Esq.<br>Goldberg Weprin Finkel Goldstein LLP<br>125 Park Avenue, 12th Floor<br>New York, New York 10017<br>knash@gwfglaw.com |
| Bay Point Capital Partners II, LP: | John F. Isbell, Esq.<br>The Law Offices of John F. Isbell LLC<br>3050 Peachtree Road NW, Suite 740<br>Atlanta, Georgia 30305<br>john@jfi-law.com<br><br>*-and-*<br><br>John C. Allerding, Esq.<br>Thompson Hine LLP |

| | |
|---|---|
| | 3560 Lennox Road NE, Suite 1600<br>Atlanta, Georgia 30326<br>John.Allerding@ThompsonHine.com |
| Internal Revenue Service: | Edward J. Murphy<br>U.S. Department of Justice, Tax Division<br>P.O. Box 55<br>Washington, D.C. 20044<br>Edward.J.Murphy@usdoj.gov |
| Office of the United States Trustee: | Office of the United States Trustee<br>Alfonse D'Amato Federal Courthouse<br>560 Federal Plaza<br>Central Islip, New York 11722<br>Attn: William Birmingham, Esq |

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014 and orders of the Bankruptcy Court.

## F. CONFIRMATION REQUIREMENTS

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met. A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, and the plan meets the "cramdown" requirements set forth in Bankruptcy Code section 1129(b). Bankruptcy Code section 1129(b) requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.

Here, to the extent that any impaired Class rejects the Plan or is deemed to have rejected the Plan, Bay Point seeks confirmation pursuant to section 1129(b) of the Bankruptcy Code. This Plan shall constitute a motion for such relief. Bay Point reserves the right to alter, amend modify, revoke, or withdraw the Plan and any exhibit or supplement thereto, including the right to amend or modify the Plan, to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

A plan does not "discriminate unfairly" if (a) the legal rights of a nonaccepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are similar to those of the nonaccepting class and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. Bay Point believes that, under the Plan, all impaired Classes of Claims are treated in a manner that is consistent with the treatment of other Classes of Claims that are similarly situated, if any, and no Class of Claims will receive payments or property with an aggregate value greater than the aggregate value of the Allowed Claims in such Class. Accordingly, Bay Point believes that the Plan does not discriminate unfairly as to any Impaired Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

(a) Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens attaching to the proceeds of the sale and the treatment of such liens must be consistent with clause (i) or (ii) above.

(b) Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

(c) Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, Bay Point believes that the treatment provided under the Plan to holders of Secured Claims, Unsecured Claims, and Equity Interests is "fair and equitable" to each such Class.

**Acceptance**

In these Chapter 11 Cases, Classes 2 and 3 are unimpaired. Thus, Classes 2 and 3, and the holders of Claims in such Classes, are conclusively deemed to accept the Plan and are not entitled to vote. Classes 1, 4, and 5 are impaired. However, Classes 4 and 5 are not entitled to any distributions under the Plan. Thus, Classes 4 and 5 are deemed to not have accepted the Plan. Class 1 is entitled to vote to accept or reject the Plan, and its vote shall be solicited with respect to the Plan.

In accordance with section 1126(c) of the Bankruptcy Code, an impaired Class of Claims will have accepted the Plan if (i) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Claims actually voting in the Class have voted to accept the Plan, and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code or any insider as defined in section 101(31) of the Bankruptcy Code.

In accordance with section 1126(d) of the Bankruptcy Code, an impaired Class of Equity Interests will have accepted the Plan if (i) the holders of at least two-thirds (2/3) in dollar amount of the Allowed Equity Interests actually voting in the Class have voted to accept the Plan, not counting the vote of any holder designated under section 1126(e) of the Bankruptcy Code.

**Feasibility**

The Bankruptcy Code requires a plan proponent to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. Here, the Plan contemplates the liquidation of all of the assets of the Debtors. In order to accomplish such liquidation, the Plan requires the Debtors to make distributions from the Sale Proceeds pursuant to Sections 5.8 and 5.9 of the Plan.

**Best Interests Test**

With respect to each impaired Class of Claims and Equity Interests, confirmation of the Plan requires that each holder of an Allowed Claim or Equity Interest within the Class either (i) accept the Plan, or (ii) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. To determine what holders of Unsecured Claims and Equity Interests in each impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the dollar amount that would be generated from the liquidation of the Debtors' assets and properties in the context of a chapter 7 liquidation case. The cash amount that would be available for satisfaction of Unsecured Claims and Equity Interests would consist of the net proceeds resulting from the disposition of the assets and properties of the Debtors, after satisfaction of secured debt, augmented by the unencumbered cash held by the Debtors at the time of the commencement of the liquidation case. Such cash amount would be reduced by the amount of the costs and expenses of the liquidation and by such additional administrative expense and priority claims that might result from the termination of the Debtors' businesses (if any) and the use of chapter 7 for the purposes of liquidation.

The Debtors' costs of liquidation under chapter 7 would include the fees payable to a chapter 7 trustee, as well as those fees and expenses that might be payable to attorneys and other professionals that such a trustee might engage. Those fees and expenses, as well as other claims that might arise in a liquidation case or result from the pending Chapter 11 Cases, including any unpaid fees and expenses incurred by the Debtors during the Chapter 11 Cases, would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay pre-petition Unsecured Claims.

To determine if the Plan is in the best interests of each impaired Class of Unsecured Claims and Interests, the present value of the distributions from the proceeds of a chapter 7 liquidation of the Debtor's assets are then compared with the value of the property offered to such Classes of Claims and Interests under the Plan. In this case, the value of distributions to the holders of Unsecured Claims and Interests from a chapter 7 liquidation will not be greater than the value to be realized from the Sale(s) contemplated by the Plan.

There is no reason to believe that a chapter 7 liquidation will result in a higher Sale price than the proposed chapter 11 liquidation. Because of the substantial secured debt that encumbers the Properties, which continues to accrue interest, the secured debt will undoubtedly be greater through a chapter 7 liquidation (which is expected to take significantly longer than the chapter 11 liquidation proposed as part of the Plan), resulting in a lower (or at least no greater) recovery for Unsecured Claims. This is in addition to chapter 7 trustee fees, which are anticipated to be several million dollars, and legal fees that would be incurred by the chapter 7 trustee in administering the bankruptcy estate. All of these fees will be avoided by having the Properties sold in accordance with the provisions of the Plan. Moreover, the sale will almost certainly be completed in substantially less time than a sale in a chapter 7 liquidation.

## VII.

## ALTERNATIVES TO CONFIRMATION & CONSUMMATION OF THE PLAN

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) a Sale of one or more of the Properties under 11 U.S.C. § 363 outside of a plan of reorganization/liquidation; (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code, and (iii) an alternative plan of reorganization.

### A. SALE OF THE PROPERTIES UNDER 11 U.S.C. § 363

If the Plan is not confirmed, the Bankruptcy Court may order the Properties to be sold under 11 U.S.C. § 363 ("Section 363") outside of a plan of reorganization/liquidation – which would not be subject to the requirements of 11 U.S.C. § 1129. So long as the Court found that the Sale(s) of the Properties (or Property) met the requirements for entry of a Sale Approval Order under Section 363, the Debtors could consummate the Sale(s) for the same price as would have otherwise been paid under the Plan. After payment of necessary claims (including the Secured Claims secured by the respective Property) any remaining sale proceeds would be distributed to the Debtors' Estates. The Debtors would likely then convert the Bankruptcy Cases to a case under chapter 7 of the Bankruptcy Code, which would result in the appointment of a chapter 7 trustee to distribute the proceeds and any remaining assets in accordance with the priority provisions set forth in the Bankruptcy Code (which mirror the distribution priority provisions set forth in the Plan). As discussed above, the chapter 7 trustee would be entitled to fees in accordance with the Bankruptcy Code and would almost certainly have legal counsel that would incur fees associated with the administration of the Debtors' Estates. Those fees would come out of the funds that would otherwise flow to Creditors under the Plan, thereby reducing the expected recovery for Unsecured Creditors.

### B. LIQUIDATION UNDER CHAPTER 7

If the Plan is not confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be selected to liquidate the Debtors' remaining assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code. As discussed above, Bay Point believes that liquidation under chapter 7 would result in smaller distributions being made to Creditors than those provided for in the Plan.

## C. ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different plan. There would, however, be significant delay associated with the proposal of any different plan and, as noted above, the Secured Claims continue to accrue interest (and the Administrative Expense Claims continue to grow). Bay Point believes that the Plan provides the optimal balance of maximizing the value of the Debtors' assets while doing so in an efficient manner so as to minimize the Secured Claims and Administrative Expense Claims that must be paid prior to distributions to holders of Unsecured Claims.

# VIII.

# CERTAIN RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS AND EQUITY INTERESTS IN THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE). THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A. CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### Risk of Non-Confirmation of the Plan

Although Bay Point believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications of the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes to accept or reject the Plan.

### Risk of Non-Occurrence of the Effective Date

Although Bay Point believes that all of the conditions to the Effective Date will occur after the entry of the Confirmation Order, there can be no assurance as to the timing of the Effective Date or that such conditions will ever occur.

### Acceptance by Impaired Classes

Section 1129(a)(10) of the Bankruptcy Code requires as a condition of confirmation that at least one impaired Class of Claims entitled to vote has accepted the Plan, determined without including any acceptance of the Plan by an insider. There is no assurance that the Plan will be accepted by at least one impaired Class of Claims entitled to vote on the Plan. In the event that any impaired Class of Claims or Equity Interests rejects this Plan or is deemed to have rejected this Plan, Bay Point intends, without any delay in the occurrence of the Confirmation Hearing or Effective Date, to seek confirmation pursuant to section 1129(b) of the Bankruptcy Code with

respect to such non-accepting Class(es). However, there is no assurance that the Court will confirm the Plan under section 1129(b).

**Parties May Object to the Classification of Claims and Equity Interests**

Bay Point believes that its classification of Claims and Equity Interests under the Plan complies with the Bankruptcy Code's requirements. However, there is no certainty that the Bankruptcy Court will agree.

## B. RISK FACTORS THAT COULD AFFECT DISTRIBUTIONS

**Recovery Estimations**

There can be no assurance that the recovery from assets that have not been liquidated as of the date of this Plan will meet or exceed the amounts assumed in arriving at any recovery estimations set forth herein and/or in the Plan.

**Claims Estimations**

There can be no assurance that the estimated Claim amounts set forth herein and/or in the Plan are correct. The actual Allowed amount of Claims may differ in some respect from the estimates, potentially materially. The estimated amounts are subject to certain risks, uncertainties, and assumptions. Should one or more of these risks or uncertainties materialize, or should underlying assumptions prove incorrect, the actual Allowed amount of Claims may vary materially from those estimated by Bay Point.

## C. ADDITIONAL FACTORS TO BE CONSIDERED

**Bay Point Has no Duty to Update**

The statements contained in this Disclosure Statement are made by Bay Point as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. Bay Point has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

**No Representations Outside this Disclosure Statement are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.

**No Legal or Tax Advice is Provided to You by this Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business or tax advice. Each holder of a Claim or Equity Interest should consult his, her, or its own legal counsel and accountant as to legal, tax and other matters concerning his, her, or its Claim or Equity Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine whether to accept or reject the Plan or object to Confirmation of the Plan.

## IX.

## SECURITIES LAWS MATTERS

The Plan does not contemplate the issuance of any securities.

## X.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

### A. GENERAL

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and holders of certain Claims against the Debtors. This discussion does not address the U.S. federal income tax consequences of the implementation of the Plan to holders of Claims that are unimpaired or otherwise entitled to payment in full in cash under the Plan.

The discussion of U.S. federal income tax consequences set forth below is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), U.S. Department of Treasury regulations promulgated or proposed thereunder, judicial authorities, published positions of the Internal Revenue Service ("IRS") and other applicable authorities, all as in effect on the date of this document and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or any other tax authority, or an opinion of counsel, with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or such other authorities. Thus, no assurance can be given that the IRS or such other authorities would not assert, or that a court would not sustain, a different position from any discussed herein.

Except as specifically stated otherwise, this summary assumes that a holder holds a Claim or an existing Equity Interest as a capital asset for U.S. federal income tax purposes. This summary does not address foreign, state or local tax consequences of the contemplated transactions, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (e.g., foreign persons or entities, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, holders that are, or hold Claims or existing Equity Interests through pass-through entities, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, and persons holding claims or existing Equity Interests as a hedge against, or that is hedged against, currency risk or as part of a straddle, constructive sale or conversion transaction).

The discussion does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the consideration issued pursuant to the Plan through means other than directly participating in the exchange. If a partnership (or another entity that is treated as a partnership for U.S. federal income tax purposes) holds Claims or existing Equity Interests, the tax treatment of a partner (or other equity owner) generally will depend upon the status of such partner (or other owner) and upon the activities of the partnership (or other entity). This discussion is based on currently available information regarding the Plan terms and may not reflect the actual terms of the Plan upon its implementation. The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a holder of Claims or existing Equity Interests.

**Consequences to the Debtors**

The contemplated Sale(s) include a taxable sale of the assets of each Debtor. Gain or loss, if any, upon the transfer of a Debtor's assets will be recognized based on the difference between the tax basis in the assets that were disposed of and the sale price allocable to such assets.

Additional income tax consequences may arise with respect to the Debtors' respective Equity Interest holders in connection with any liquidation (actual or deemed) of the Debtors after the Sale(s) are consummated.

**Consequences to Claim Holders**

The federal income tax consequences of the implementation of the Plan to the Holders of Allowed Claims will depend, among other things, on the consideration to be received by the Holder, whether the Holder reports income on the accrual or cash method, whether the Holder's Claim is Allowed or Disputed on the Effective Date, and whether the Holder has taken a bad debt deduction or a worthless security deduction with respect to its Claim.

**Recognition of Gain or Loss**

In general, a Holder of an Allowed Claim or Interest should recognize gain or loss equal to the amount realized under the plan in respect of its claim less the Holder's tax basis in the claim. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the allowed claim and the Holder, the length of time the Holder held the claim and whether the claim was acquired at a market discount. If the Holder realizes a capital loss, the Holder's deduction of the loss may be subject to limitation. The Holder's tax basis for any property received under the plan generally will equal the amount realized.

**Bad Debt or Worthless Security Deduction**

A Holder who receives in respect of an Allowed Claim an amount less than the Holder's tax basis in the Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under section 166(a) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt deductions place considerable emphasis

on the facts and circumstances of the Holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Allowed Claims, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. BAY POINT DOES NOT PURPORT, THROUGH THIS DISCLOSURE STATEMENT, TO ADVISE ANY CREDITOR OR INTEREST HOLDER REGARDING THE TAX CONSEQUENCES OF THE PLAN. ALL HOLDERS OF CLAIMS OR EXISTING EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES APPLICABLE TO THEM, INCLUDING WITH RESPECT TO CAPITAL GAINS TAXES, IF ANY.**

## XI.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in the Disclosure Statement, Bay Point believes that confirmation and consummation of the Plan is preferable to all other alternatives.

Dated: New York, NY
January 30, 2024

Respectfully submitted,

THOMPSON HINE LLP

By: /s/ John C. Allerding
John C. Allerding (admitted pro hac vice)
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
P: 404.407.3676 / F: 404.541.2905
John.Allerding@ThompsonHine.com

*Counsel for Bay Point Capital Partners II, LP*

BAY POINT CAPITAL PARTNERS II, LP

By: Bay Point Advisors LLC, its
General Partner

By: /s/ Charles Andros f

**Attachment 7 :Payoff it is the only one we got from January 24 overstating and double counting interest**

# BAY POINT CAPITAL PARTNERS II, LP

3050 Peachtree Road NW, STE 740 Atlanta, Georgia 30305

January 24, 2024

*Via U.S. Mail and Email*

Brickchurch Enterprises, Inc.
One Liberty Plaza
165 Broadway, 23rd Floor
accounts@ltbholding.com

Aberdeen Enterprises, Inc.
One Liberty Plaza
165 Broadway, 23rd Floor
accounts@ltbholding.com

Re: Payoff Request regarding (i) that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered on September 7, 2022 in favor of Morgan Stanley Private Bank, National Association in the case captioned as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.* pending in the Supreme Court of the State of New York, Suffolk County (the "MSPBNA Judgment"), the MSPBNA having been assigned to Bay Point Capital Partners II, LP ("Lender"); and (ii) that certain Loan and Security Agreement, dated as of November 9, 2022, by and between Lender, on one hand, and Brickchurch Enterprises, Inc. and Aberdeen Enterprises, Inc. (collectively, "Borrowers," and each a "Borrower"), on the other hand (the "Loan Agreement" and collectively with all related documents, the "BPCP Loan Documents"); the MSPBNA Judgment and the BPCP Loan Documents being collectively referred to herein as the "Debt Documents."[1]

Dear Borrowers:

You have requested the amount necessary to satisfy the outstanding obligations currently due under the Debt Documents. In response to your request, please find the following breakdown of the outstanding obligations currently due under the respective Debt Documents (the "Payoff Amount"):

| | | |
|---|---|---|
| **MSPBNA Judgment** | | |
| Judgment: | $ | 15,478,000.37 |
| Post-Judgment Interest:[2] | $ | 667,886.32 |
| **Subtotal** | **$** | **16,145,886.69** |
| | | |
| **JGB Judgment** | | |
| Judgment | $ | 39,961,521.80 |
| Fees and Costs | $ | 1,125.00 |
| Post-Judgment Interest:[3] | $ | 12,168,200.00 |
| Forbearance Exit Charge | $ | 2,000,000.00 |
| Late Charge | $ | 1,527,183.00 |
| Miscellaneous Expenses | $ | 98,623.56 |
| Real Estate Taxes | $ | 229,796.95 |
| **Subtotal** | **$** | **55,986,450.31** |

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Loan Agreement.
[2] Post-judgment interest is calculated at nine percent (9.00%) per annum under New York law. NY CPLR § 5004.
[3] Post-judgment interest is calculated at nine percent (9.00%) per annum under New York law. NY CPLR § 5004.

| | | |
|---|---|---|
| **DIP Loan** | | |
| Principal: | $ | 61,916,114.53 |
| Interest:[4] | $ | 3,907,294.72 |
| Default Interest:[5] | $ | 5,470,212.61 |
| Late Fee:[6] | $ | 6,056,195.81 |
| Legal/Professional (Est.): | $ | 2,771,298.11 |
| **Subtotal** | **$** | **80,121,115.78** |
| **Total:** | **$** | **96,267,002.47** |

The above-referenced Payoff Amount is good through January 24, 2024 (the "Payoff Calculation Date"). Additional interest and fees (including legal/professional) will continue to accrue for each day after the Payoff Calculation Date. In addition, Lender may make additional protective advances after the Payoff Calculation Date for which it is entitled to reimbursement under the BPCP Loan Documents. Lender reserves all of its rights under the Debt Documents, and the documents, instruments, and security documents referenced therein or related thereto, and the above-referenced Payoff Amount is not a waiver of any rights, claims, or defenses available to Lender, including, without limitation, any rights of indemnity that may currently exist under the Debt Documents or which may arise and/or exist in the future.

The above amounts may be wired as follows:

| | |
|---|---|
| Bank: | BMO HARRIS BANK NA |
| Bank Address: | 111 W. Monroe St.,<br>Chicago, IL 60603 |
| ABA No.: | 071000288 |
| Account Name: | BAY POINT CAPITAL PARTNERS II, LP |
| Account Number: | 1834688 |
| Reference: | Brickchurch |

Should you have additional questions, please feel free to contact me.

[4] Interest calculated at ten percent (10.00%) per annum pursuant to Section 2.4(a) of the Loan Agreement.
[5] Default interest calculated at fourteen percent (14.00%) per annum pursuant to Section 2.4(b) of the Loan Agreement.
[6] Late fee calculated at ten percent (10.00%) of the outstanding principal balance of the Loan due on the Maturity Date pursuant to Section 2.8 of the Loan Agreement.

Sincerely,

**BAY POINT CAPITAL PARTNERS II, LP**

By: BAY POINT ADVISORS, LLC, its
General Partner

DocuSigned by:
By: Charles Andros
AEF31A8C84EB43C...
Name: Charles Andros
Title: Manager
Phone: 404-512-1648
Email: charlesandros@baypointadvisors.com

**Attachment 8 : Counsel for Sole creditor ( sole shareholder )**

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Louise Blouin*
1350 Broadway, 11th Fl.
New York, NY 10018
212.216.8000
Scott Markowitz, Esq. (smarkowitz@tarterkrinsky.com)
David H. Wander, Esq. (dwander@tarterkrinsky.com)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ABERDEEN ENTERPRISES, INC.,<br>BRICKCHURCH ENTERPRISES, INC., | Case No. 23-72834 -AST<br>Case No. 22-70914-AST |
| Debtors. | (Jointly Administered) |

**OBJECTION BY LOUISE BLOUIN TO (I) BAY POINT CAPITAL PARTNERS II, LP'S AND THE DEBTORS' FIRST AMENDED JOINT LIQUIDATING PLAN UNDER CHAPTER 11 OF THE BANKRUPTCY CODE; AND (II) THE RELATED JOINT DISCLOSURE STATEMENT**

Louise Blouin ("**Blouin**"), by her attorneys, Tarter Krinsky & Drogin LLP, submits this objection to (i) Bay Point Capital Partners II, LP's ("**Bay Point**") and the Debtors' First Amended Joint Liquidating Plan Under Chapter 11 of the Bankruptcy Code (the **"Plan"**), and (ii) the related Disclosure Statement, and represents and states as follows:

1. Blouin submits, both for herself as a Class 5 equity holder, and for Class 4 unsecured creditors, of which she is one, the Plan should not be confirmed.

2. The Plan is good for Bay Point and no one else. It's undeniable these chapter 11 cases have benefited no stakeholder of the Debtors' estates except for Bay Point, a predatory lender. That is a simple and undeniable fact. Bay Point will obtain an inflated return on its DIP investment under the Plan, if it is allowed default interest of 14% and a late fee of 10%, along with a roll up of the pre-petition judgments purchased by, and assigned to, Bay Point. Upon information

and belief, the obligations evidenced by the assigned JGB judgment to Bay Point were never consolidated under the DIP Loan and/or the DIP Loan Documents.

3. Among additional deficiencies with the Plan, the treatment of the IRS' disputed claim is unsupportable, to the extent the IRS may receive $1 million more than its allowed claim. Any payment to the IRS should be included in the disputed claim reserve or, otherwise, subject to disgorgement, the same as being done with Bay Point's disputed secured claim.

4. There may be insufficient funds to pay all administrative expenses. Notably, the administrative claims bar date will be 30 days after the Effective Date.

5. If the Plan is confirmed, Bay Point should only receive the undisputed portion of its secured claim and the disputed portion should be included in the disputed claim reserve.

6. The Plan cannot satisfy the best interest of creditors test because, on the one hand, a chapter 7 trustee could do no worse for Class 4 (unsecured creditors), and Class 5 (equity) than the Plan does for them and, in addition, a chapter 7 trustee has a reasonable likelihood of being able to liquidate the Debtors' estates in a manner that results in a distribution to Class 4 unsecured creditors and additional benefits to Class 5 equity holders. The Disclosure Statement does not contain a liquidation analysis but only general statements regarding compliance with § 1129(a)(7) of the Bankruptcy Code. See page 36 of Disclosure Statement.

7. The Plan, in effect, treats these two jointly administered cases as being substantively consolidated, without satisfying, or even trying to satisfy, the well-known required criteria for substantive consolidation under Second Circuit caselaw.

8. There are insufficient funds reserved for tax attorneys and accountants for the Debtors post-confirmation to perform necessary post-confirmation work.

9. The Plan needs to state, in unequivocable terms, the rights of the Debtor and Blouin to object to Bay Point's claims are preserved without any restriction or limitation whatsoever.

10. The part of Section 4.1 of the Plan that states "Blouin…shall completely refrain from taking part in … any of the decisions, processes, or procedures set forth or governed by the Plan" must be stricken, as being wholly improper, unconstitutional, unenforceable, meanspirited, and not even in the best interests of the Debtors' estates. Bay Point, in effect, is asking this Court to impose a gag order on Blouin, the largest unsecured credit (albeit a claim that is subject to dispute) and, indirectly, the sole equity holder.

11. In addition to the foregoing, the Plan proponents cannot meet their burden of satisfying all of the elements of § 1129(a) and (b) of the Bankruptcy Code.

12. For all of the foregoing reasons, the Court should deny confirmation of the Plan and should not approve the related Disclosure Statement.

13. In the alternative, the Court should adjourn the confirmation hearing to permit the parties an opportunity to attempt to resolve these deficiencies.

14. Blouin, with the Court's permission, reserves her rights to assert additional objections at the confirmation hearing.

Dated: New York, New York
February 26, 2024

**TARTER KRINSKY & DROGIN LLP**
*Attorneys for Louise Blouin*

By: /s/ David H. Wander
David H. Wander, Esq.
Scott Markowitz, Esq.
1350 Broadway
New York, NY 10018
212-216-8000
dwander@tarterkrinsky.com
atiktin@tarterkrinsky.com

**Attachment 9 Bay Point Plan**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| ABERDEEN ENTERPRISES, INC.,<br>BRICKCHURCH ENTERPRISES, INC. | Case No. 23-72834-AST<br>Case No. 22-70914-AST |
| Debtors. | Jointly Administered |

**BAY POINT CAPITAL PARTNERS II, LP'S**
**CHAPTER 11 LIQUIDATING PLAN**

Bay Point Capital Partners II, LP ("Bay Point") hereby proposes the following Chapter 11 liquidating plan of Aberdeen Enterprises, Inc. ("Aberdeen") and Brickchurch Enterprises, Inc. ("Brickchurch") (each a "Debtor", and collectively, the "Debtors").

The Debtors have pursued a Sale of their valuable and iconic, contiguous ocean front properties (as defined herein). The bid procedures governing the Sale were the subject of a separate application filed by the Debtors, were approved by the Bankruptcy Court (the "Approved Bid Procedures") pursuant to an Order entered on November 22, 2023 [D.I. 104], were amended by the Debtors on December 15, 2023 [D.I. 116], and shall be deemed incorporated by reference for purposes of the Plan.

A dispute (the "Control Dispute") currently exists between Debtors and their senior secured lender, Bay Point, as to the identity of the authorized officers and directors of Debtors. This Plan is intended to provide an efficient and effective method for generating proceeds sufficient to repay Debtors' creditors without the need of incurring the cost of litigating the Control Dispute. For that purpose, as set forth herein, Debtors (jointly managed and operated by Mathew Kabatoff ("Kabatoff") and Bay Point) shall collectively make decisions as set forth herein, under the Plan

and each agree that both parties shall be entitled to seek expedited relief from the Bankruptcy Court in the situation where an agreement cannot be reached; *unless otherwise provided herein*.

**ARTICLE I**

**DEFINITIONS**

All capitalized terms used herein shall have the meanings set forth below.

1.1 "**Aberdeen**" shall have the meaning ascribe to such term in the introductory section of the Plan.

1.2 "**Aberdeen Administrative Expense Claim**" means an Administrative Expense Claim against Aberdeen.

1.3 "**Aberdeen Priority Claim**" means a Priority Claim against Aberdeen.

1.4 "**Aberdeen Property**" means the real property, and improvements thereon, located at and commonly known as 376 Gin Lane, Southampton, New York 11968.

1.5 "**Aberdeen Unsecured Claim**" means an Unsecured Claim against Aberdeen.

1.6 "**Administrative Expense Claims Bar Date**" shall mean the first Business Day that is thirty (30) days after the Confirmation Date.

1.7 "**Administrative Expense Claim**" means a Claim for the costs and expenses of administering the respective Cases under §§ 327, 330, 331, 364(c)(1), 503(b), 507(a)(2), 507(b) of the Bankruptcy Code, including, without limitation: (a) the actual and necessary costs and expenses of maintaining and preserving the Properties; and (b) Professional Fee Claims.

1.8 "**Allowed**" means, (a) with respect to any Claim other than an Administrative Expense Claim, a Claim for which a proof of claim was timely and properly filed or, if no proof of Claim was filed, that has been scheduled by the Debtors as being liquidated and undisputed, and as to which: (i) no objection to allowance has been interposed within the applicable period fixed by the Plan; or (ii) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; and (b) with respect to any Administrative Expense Claim, a Claim for which (i) a request for payment of such Administrative Expense Claim has been timely and properly filed and (A) no objection to allowance has been interposed within the applicable period fixed by the Plan; or (B) an objection has been interposed and such Claim has been allowed, in whole or in part, by a Final Order; or (ii) has been otherwise allowed by the Bankruptcy Court.

1.9 "**Approved Bid Procedures**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.10 "**Auction**" shall have the meaning as ascribed to such term in the Approved Bid Procedures.

1.11 "**Bankruptcy Cases**" means, collectively, the above-captioned cases, each being a "**Bankruptcy Case**."

1.12 "**Bankruptcy Code**" means title 11 of the United States Code, as amended from time to time and effective as to cases filed on the respective Petition Date of each Debtor.

1.13 "**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of New York.

1.14 "**Bankruptcy Fees**" means (i) all fees and charges against the Estate under section 1930 of title 28 of the United States Code, and (ii) a Claim for reasonable compensation for services rendered, and reimbursement of actual and necessary expenses incurred, by the Plan Administrator as awarded by a Final Order of the Bankruptcy Court.

1.15 "**Bankruptcy Fees Reserve**" means the segregated account established pursuant to Section 5.3 of the Plan.

1.16 "**Bay Point**" shall have the meaning ascribe to such term in the introductory section of the Plan.

1.17 "**Bay Point Collateral Documents**" means (i) each security instrument, mortgage, deed of trust, document, pledge agreement, subordination agreement, account control agreement, or any other agreement pursuant to which either Debtor or any other Person granted Bay Point a Lien to secure repayment of the DIP Loan Obligations; and (ii) each of the JGB Assigned Documents.

1.18 "**Bay Point Debt**" shall have the meaning ascribed to such term in Section 3.1 of the Plan.

1.19 "**Bay Point Loan Documents**" means, collectively, the DIP Loan Documents, the Morgan Stanley Judgment, and each of the documents related to the debt referenced in the Morgan Stanley Judgment that were assigned to Bay Point.

1.20 "**Blouin**" means Louise Blouin, indirect upstream beneficial equity holder and Creditor of the Debtors.

1.21 "**Brickchurch**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.22 "**Brickchurch Administrative Expense Claim**" is an Administrative Expense Claim against Brickchurch.

1.23 "**Brickchurch Priority Claim**" means a Priority Claim against Brickchurch.

1.24 "**Brickchurch Property**" means the real property, and improvements thereon, located at and commonly known as 366 Gin Lane, Southampton, New York 11968.

1.25 "**Brickchurch Unsecured Claim**" means an Unsecured Claim against Brickchurch.

1.26 "**Broker**" means the person or firm engaged by the Debtors, with consent of both Decision Makers, and approved by the Bankruptcy Court to market and sell the Properties.

1.27 "**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close, or other Legal Holiday.

1.28 "**Cases**" means, collectively, the above-captioned, jointly administered Chapter 11 cases commenced by the Debtors in the Bankruptcy Court, each being a "**Case**."

1.29 "**Cash**" means lawful currency of the United States of America.

1.30 "**Claim**" has the meaning ascribed to such term in 11 U.S.C. § 101(5), as the same has been, or may be, asserted against one or more of the Debtors.

1.31 "**Claims Objection Deadline**" shall mean (A) for Administrative Expense Claims, the later of (i) thirty (30) days after a request for payment, or Proof of Claim, seeking allowance of the Claim is filed, and (ii) one (1) Business Day prior to the Effective Date of the Plan, or such other date fixed by the Bankruptcy Court, and (B) for all Claims other than Administrative Expense Claims, one (1) business day prior to the Effective Date of the Plan.

1.32 "**Closing**," means that time at which the Debtors, after and pursuant to a Sale Approval Order, consummate one or more Sales of the Properties.

1.33 "**Confirmation**" means the entry of the Confirmation Order.

1.34 "**Confirmation Hearing**" means the hearing or hearings before the Bankruptcy Court to consider confirmation of the Plan.

1.35 "**Confirmation Order**" means an order of the Bankruptcy Court confirming the Plan pursuant to 11 U.S.C. § 1129.

1.36 "**Control Dispute**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.37 "**Credit Bid**" means the right of Bay Point pursuant to 11 U.S.C. §363(k) to bid its Secured Claims at the Auction.

1.38 "**Creditor**" means the holder of a Claim against one or both of the Debtors.

1.39 "**Debtors**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.40 "**Decision Makers**" means, collectively, Bay Point and Kabatoff, each being a "**Decision Maker**;" *provided that*, notwithstanding anything to the contrary herein, Bay Point shall have the right, in its sole and absolute discretion, to withdraw as a Decision Maker. In the event that Bay Point withdraws as a Decision Maker, the terms "Decision Makers" and "Decision Maker" shall refer only to Kabatoff.

1.41 "**DIP Financing Order**" means the Order (I) Authorizing Debtor to Obtain Post-Petition Secured Financing Pursuant to 11 U.S.C. §§ 105, 361, 362 and 364, and (II) Granting Liens and Super-Priority Claims, entered by the Bankruptcy Court on November 17, 2022 in Case No. 22-70914-AST (ECF No. 172).

1.42 "**DIP Lender Superpriority Claim**" means that Allowed Administrative Claim in the amount of the DIP Loan Obligations, granted to Bay Point pursuant to section 364(c)(1) of the Bankruptcy Code, with priority over all other Administrative Expense Claims, adequate protection and other diminution claims, Unsecured Claims, and all other Claims against the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including Administrative Expense Claims or other Claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503, 507, 546, 726, 1113, and 1114 of the Bankruptcy Code, or any other section of the Bankruptcy Code, whether or not such Administrative Expense Claims or Claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment.

1.43 "**DIP Loan Documents**" means (i) the Loan and Security Agreement, dated November 9, 2022, by and among Debtor, Aberdeen, and Bay Point (the "**DIP Loan Agreement**"), and (ii) each of the Bay Point Collateral Documents.

1.44 "**DIP Loan Obligations**" shall have the same meaning as is ascribed to the term "DIP Obligations" in the DIP Financing Order.

1.45 "**Disclosure Statement**" means the Disclosure Statement for the Plan, including all exhibits, attachments, or amendments thereto, approved by Order of the Bankruptcy Court.

1.46 "**Disputed Claims Reserves**" means, collectively, the segregated account(s) established pursuant to Section 5.2 of the Plan for the payment of Disputed Claims to the extent such Disputed Claims are Allowed by a Final Order, each being a "**Disputed Claims Reserve**."

1.47 "**Disputed**" means, with respect to a Claim, (a) any Claim that is listed in the Schedules as disputed, contingent or unliquidated and with respect to which no Proof of Claim has been timely filed; (b) any Claim that has not been disallowed and with respect to which an objection to the allowance thereof, in whole or in part, has been interposed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, to the extent that

any such objection has not been resolved by a Final Order; *provided however, that* until the earlier of (i) the filing of an objection to a Proof of Claim or (ii) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in its entirety if: (A) any corresponding Claim listed in the Schedules has been scheduled as disputed, contingent or unliquidated; or (B) no corresponding Claim has been listed in the Schedules; *and further provided that* until the earlier of (I) the filing of an objection to a Proof of Claim or (II) the last date to file objections to Claims as established by the Plan or by Final Order, a Claim shall be deemed to be a Disputed Claim in that amount by which the amount specified in the Proof of Claim exceeds the amount of any corresponding Claim listed in the Schedules. Claims arising from the rejection of Executory Contracts will be treated as Disputed Claims unless and until such Claims have been settled, withdrawn, or determined by a Final Order. Notwithstanding the foregoing, any Claims held by Bay Point shall not be Disputed Claims, but shall be subject to the clawback provisions set forth in Section 5.11.

1.48 "**Distribution Date**" means the Effective Date or such other date as soon as reasonably practicable as may be set by the Debtors for the distribution of Sale Proceeds in accordance with the terms of the Plan.

1.49 "**Effective Date**" means, as it relates to (i) a Sale, the date upon which a Closing occurs; (ii) the Confirmation of the Plan, the date upon which all of the conditions to effectiveness of the Plan as set forth in Section 7.5 of the Plan have been satisfied.

1.50 "**Equity Interests**" means the ownership interests of Aberdeen Enterprises (BVI) Ltd. and Brickchurch Enterprises (BVI) Ltd. in the respective Debtors.

1.51 "**Escrow Agent**" means that person selected by Debtors to hold the Bankruptcy Fees Reserve and/or Disputed Claims Reserves pending disbursements from the same in accordance with the Plan.

1.52 "**Estates**" means, collectively, the bankruptcy estate of Brickchurch and the bankruptcy estate of Aberdeen, each as created on the respective Petition Date pursuant to section 541 of the Bankruptcy Code, each of the Estates being an "**Estate**."

1.53 **[Reserved].**

1.54 **[Reserved].**

1.55 "**Executory Contracts**" shall mean "executory contracts" and "unexpired leases" of the Debtor as such terms are used in section 365 of the Bankruptcy Code.

1.56 **[Reserved].**

1.57 **[Reserved].**

1.58 "**Federal Tax Liens**" means, collectively, (a) that certain Lien filed by the IRS on August 17, 2022 against the Aberdeen Property with the Suffolk County Clerk (Recording No: LFED00034063); and (b) that certain Lien filed by the IRS on February 17, 2023 against the Aberdeen Property with the Suffolk County Clerk (Recording No. LFED00034390), each being a "**Federal Tax Lien**;" *provided that,* nothing contained herein shall be an admission or an acknowledgement of the validity of above-referenced Federal Tax Liens, nor shall anything herein prejudice any person's (including either Debtor's or Bay Point's) right to challenge the validity of any Lien asserted against either Property by the IRS.

1.59 "**Final Order**" means a judgment, order, ruling or other decree issued and entered by the Bankruptcy Court or by any state or other federal court or other tribunal located in one of the states, territories or possessions of the United States or the District of Columbia, that has not been stayed, reversed, or vacated, and that is no longer subject to appeal, certiorari proceeding, or other proceeding for review or rehearing. The possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to an order will not cause it not to be a Final Order.

1.60 **[Reserved].**

1.61 "**Governmental Unit**" means the United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory a municipality, or a foreign state; or other foreign or domestic government.

1.62 "**Gross Sale Proceeds**" means the gross amount realized from a Sale (excluding the amount of any Credit Bid made pursuant to section 363(k) of the Bankruptcy Code).

1.63 "**Indemnification Reserves**" shall mean Cash held by Bay Point is one or more segregated accounts in an amount reasonably calculated to fully satisfy any potential indemnification obligations that any person has under each of the Bay Point Loan Documents.

1.64 "**IRS**" means the United States Internal Revenue Service.

1.65 "**JGB Assigned Documents**" shall have the same meaning as is ascribed to the term "Assigned Documents" in the DIP Financing Order.

1.66 "**JGB Judgment**" shall mean that certain Judgment of Foreclosure and Sale entered in favor of JGB Partners, LP and its related companies by the Supreme Court of the State of New York, County of Suffolk on February 2, 2022 in the case styled as *JGB Partners, LP, et al. v. Brickchurch Enterprises, Inc., et al.*, Index No. 623208/2019, the same having been assigned to Bay Point and constituting one of the JGB Assigned Documents.

1.67 "**Plan**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.68 "**Kabatoff**" shall have the meaning ascribed to such term in the introductory section of the Plan.

1.69 "**Lien**" has the same meaning as is ascribed to such term in 11 U.S.C. § 101(37), and includes charges, bills, encumbrances, mortgages, deeds of trust, security interests, and any other legally cognizable security device of any kind.

1.70 "**Morgan Stanley Judgment**" shall mean that certain Order Confirming Referee Report and Judgment of Foreclosure and Sale entered in favor of Morgan Stanley Private Bank, National Association by the Supreme Court of the State of New York, County of Suffolk on September 7, 2022 in the case styled as *Morgan Stanley Private Bank, National Association v. Aberdeen Enterprises, Inc., et al.*, Index No. 623196/2019, the same having been assigned to Bay Point.

1.71 "**Net Sale Proceeds**" means the Gross Sale Proceeds, less the costs and expenses incurred in connection with a Sale chargeable to the seller, including without limitation, brokerage fees, closing costs, and documentary costs, if any; *provided that*, for the avoidance of doubt, Net Sale Proceeds shall not include the non-cash amount of any Credit Bid made pursuant to section 363(k) of the Bankruptcy Code or otherwise; and *further provided that* nothing contained herein shall require a Debtor or any other person to pay any Transfer Taxes where such payment is otherwise excused by the Bankruptcy Code.

1.72 **[Reserved].**

1.73 "**Petition Date**" means April 30, 2022 for Brickchurch and August 2, 2023 for Aberdeen, the dates on which the respective voluntary petitions commencing these Chapter 11 cases were filed.

1.74 "**Plan Administrator**" means such person appointed by the Decision Makers to serve as the administrator of the Plan and Chief Liquidating Officer of the Debtors in accordance with Section 4.5 of the Plan.

1.75 "**Priority Claim**" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, including each Priority Tax Claim.

1.76 "**Priority Tax Claim**" means any Allowed Unsecured Claim of a federal, state or local taxing authority that is entitled to priority under 11 U.S.C. § 507(a)(8).

1.77 "**Private Sale**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.78 "**Professional**" means a professional employed by a Debtor under section 11 U.S.C. §327.

1.79 "**Professional Fee Claim**" means a Claim for compensation for services rendered, and reimbursement of expenses incurred by a Professional as awarded by a Final Order of the Bankruptcy Court; *provided that*, for the avoidance of doubt, the fees of the Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction shall be paid directly from Gross Sale Proceeds without further order of the Bankruptcy Court and shall not be deemed to have a Professional Fee Claim; *and further provided that* a Broker whose retention has been approved by the Bankruptcy Court that does not solicit an offer that results in a consummated Sale of a Property may have a Professional Fee Claim in accordance with the approved retention application, subject to the rights of Debtors and any party in interest to object to the same.

1.80 "**Professional Fees Reserve**" shall have the meaning ascribed to it under Section 5.3A of the Plan.

1.81 "**Proof of Claim**" means a proof of Claim filed pursuant to section 501 of the Bankruptcy Code and Part III of the Bankruptcy Rules.

1.82 "**Properties**" means collectively the Aberdeen Property and the Brickchurch Property, each being a "**Property**."

1.83 "**Qualified Bidder**" has the meaning ascribed to such term in the Approved Bid Procedures, and shall, for the avoidance of doubt, include Bay Point by virtue of its Credit Bid rights.

1.84 **[Reserved].**

1.85 **[Reserved].**

1.86 **[Reserved].**

1.87 "**Reorganized Debtors**" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

1.88 "**Sale**" shall mean a sale of the Properties, whether through a single transaction or multiple transactions, pursuant to one or more Sale Approval Orders.

1.89 "**Sale Approval Order**" means an order of the Bankruptcy Court authorizing and directing the sale of one or more of the Properties pursuant to 11 U.S.C. § 363 or any other applicable provision of the Bankruptcy Code.

1.90 "**Sale Proceeds**" means the Net Sale Proceeds available from a Sale of a Property.

1.91 "**Sale Process**" shall have the meaning ascribed to such term in Section 4.2 of the Plan.

1.92 "**Schedules**" means the schedules of assets and liabilities and statement of financial affairs filed by the Debtors with the Bankruptcy Court in accordance with section 521(a)(1) of the Bankruptcy Code and Rule 1007 of the Bankruptcy Rules and any amendments thereto.

1.93 "**Section 1031**" shall have the meaning ascribed to such term in Section 4.7 of the Plan.

1.94 "**Section 1146 Funds**" means an amount equal to (i) 3.4% of the Gross Sale Price of each Property sold to a Successful Bidder(s), other than Bay Point, or (ii) 3.4% of Bay Point's Credit Bid, if it is the Successful Bidder, that is paid by a Successful Bidder, other than Bay Point, following entry of the Sale Approval Order and the Confirmation Order.

1.95 "**Secured Claim**" means an Allowed Claim, including all amounts, if any, allowed pursuant to section 506(b) of the Bankruptcy Code, to the extent that it is secured by a Lien on property in which either Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

1.96 "**Successful Bid(s)**" shall mean the highest and best bid for one or both of the Properties as (i) collectively recommended by Debtors and Bay Point and approved by the Bankruptcy Court; or (ii) as decided by the Bankruptcy Court after notice and hearing of the same if Debtors and Bay Point are not able to agree on the same.

1.97 "**Successful Bidder**" shall mean the Qualified Bidder that submits a Successful Bid.

1.98 "**Transfer Taxes**" means, without limitation, (a) Suffolk County or other applicable local real property transfer taxes, including but not limited to the Peconic Bay transfer tax; (b) New York state TP 584 deed and transfer taxes; and (c) any and all other stamp taxes, similar taxes, or mansion taxes, which, but for the applicability of § 1146(a) of the Bankruptcy Code, would be applicable to any transfer made in accordance with, pursuant to, or in furtherance of the Plan.

1.99 "**Transferred Encumbrances**" shall have the meaning ascribed to such term in the Approved Bid Procedures.

1.100 "**Unsecured Claim**" means an Allowed Claim which is not an Administrative Claim, a Bankruptcy Fee, a Priority Claim, a Post-Petition Administrative Tax Claim, or a Secured Claim.

1.101 "**Unsecured Creditor**" means the holder of an Allowed Unsecured Claim against one or both of the Debtors.

## ARTICLE II

## UNCLASSIFIED CLAIMS

Pursuant to Section 1123(a) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims, Priority Tax Claims, or Bankruptcy Fees, all of which shall be paid in full, or such other amount as agreed upon with the holders of such unclassified Claims.

2.1 **Administrative Expense Claims**. Each holder of an Allowed Administrative Expense Claim—other than the DIP Lender Superpriority Claim, Bankruptcy Fees and any Allowed Administrative Expense Claim held by the IRS—shall be paid in full satisfaction of its Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan. Payment shall be made on (a) the later of (i) the Distribution Date, (ii) the date payment of such Claim is due under the terms thereof or applicable law, and (iii) three (3) Business Days after such Claim becomes an Allowed Claim; or (b) upon such other terms as may be agreed to, in writing, between the Debtors and the holder of such Claim.

Except as otherwise set forth herein, requests for payment of Administrative Expense Claims not previously Allowed must be filed no later than the Administrative Expense Claim Bar Date. Holders of Administrative Expense Claims not previously Allowed that do not file requests for payment of Administrative Expense Claims on or before the Administrative Expense Claim Bar Date shall be forever barred from asserting such Claims against the Debtors or the Properties.

2.2 **Professional Fees**. All Professionals seeking an award by the Bankruptcy Court of a Professional Fee Claim shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date. No later than three (3) Business Days prior to the Confirmation Hearing, each entity holding a Professional Fee Claim shall serve via email upon

counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through Confirmation, and (c) a good faith estimate of any expected post-confirmation fees and expenses. Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request. No later than three (3) Business Days prior to the Effective Date, each entity holding a Professional Fee Claim shall serve via email upon counsel for Debtors, Bay Point, and any other Creditor requesting such information, (a) the current amount of its unpaid Professional Fee Claim, (b) a good faith estimate of its expected unpaid Professional Fee Claim through the Effective Date, and (c) a good faith estimate of any expected post-Effective Date fees and expenses (if any). Each holder of a Professional Fee Claim shall provide updated estimates via email to counsel for Debtors, Bay Point, and any other Creditor requesting such information upon request; *provided*, *however*, the Allowed Professional Fee Claim of Simmons Legal PLLC shall not exceed $135,000, the Allowed Professional Fee Claim of Goldberg Weprin Finkel Goldstein LLP shall not exceed $100,000, and the Allowed Professional Fee Claim of Duane Morris LLP shall not exceed $151,905.95.

Each holder of an Allowed Professional Fee Claim shall be paid, in full satisfaction of its Allowed Administrative Expense Claim, the amounts specified in Sections 5.8 and 5.9 of the Plan upon the later of (a) the Distribution Date and (b) the date upon which the Order Allowing such Professional Fee Claim becomes a Final Order. Payments made to a Professional in accordance with the provisions of Section 2.1 shall constitute payment in full of the Professional's Allowed Professional Fee Claim, and the Professional shall have no further recourse against the Plan Administrator, the Debtors, or Bay Point for such Claim.

2.3 **Priority Tax Claims**. The New York State Department of Taxation and Finance has asserted Unsecured Priority Tax Claims in the total amount of $161.39 (the "**Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance**"). *See* Claim No. 1-1, *In re Aberdeen Enterprises, Inc*., Case No. 23-72834; *see also* Am. Claim No. 1-3, *In re Brickchurch Enterprises, Inc*., Case No. 22-70914. The Unsecured Priority Tax Claims of the New York State Department of Taxation and Finance shall be paid in full on the Effective Date.

Subject to Section 5.2 of the Plan with respect to Disputed Claims, the IRS shall receive up to $1 million for payment of the IRS's Administrative Expense Claim arising from income taxes on the capital gains (if any) that result from the Sale; *provided*, *however*, that if the IRS's Administrative Expense Claim is less than $1 million, then the difference shall be applied to the IRS's Priority Tax Claim.

2.4 **Bankruptcy Fees**.

(a) Quarterly United States Trustee Fees. The Debtors shall pay, on the Effective Date, all Bankruptcy Fees assessed against the Debtor under 28 U.S.C. § 1930 and any applicable interest due thereon as of the Effective Date. All remaining Bankruptcy Fees assessed against the Debtors under 28 U.S.C. § 1930 from the Effective Date through the date of dismissal, conversion or entry of a final decree, shall be paid from the Bankruptcy Fees Reserve.

(b) Plan Administrator Fees. The Bankruptcy Fees payable to the Plan Administrator shall be paid within five (5) business days, or as soon as reasonably practicable thereafter, after the date that such Claim is Allowed by Final Order of the Bankruptcy Court. No later than twenty-one (21) Business Days prior to the hearing on the allowance of such Claim, the Plan Administrator shall serve upon counsel for Debtors, the United States Trustee, Bay Point, and any other Creditor requesting such information: (a) the current amount of its unpaid Bankruptcy Fees, and (b) a good faith estimate of its expected unpaid Bankruptcy Fees (if any) through dismissal, conversion or entry of a final decree.

(c) Funding. The Debtors shall use the Sale Proceeds and/or Section 1146 Funds to pay Bankruptcy Fees assessed against the Debtors on the Effective Date, and to fund the Bankruptcy Fees Reserve in accordance with the provisions of Sections 5.8 and 5.9 of the Plan.

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS

Pursuant to Sections 1122 and 1123(a)(l) of the Bankruptcy Code, the Plan classifies Claims and Interests as summarized below:

| Class | Designation | Impaired | Entitled to Vote |
|---|---|---|---|
| Class 1 | Secured Claims of Bay Point | Yes | Yes |
| Class 2 | Secured Claims of New York State Department of Taxation and Finance | No | No |
| Class 3 | Non-Tax Priority Claims | No | No |
| Class 4 | General Unsecured Claims | Yes | No |
| Class 5 | Equity Interests | Yes | No |

**Class 1: Secured Claims of Bay Point**

3.1 **Classification** – Class 1 consists of the Secured Claims of Bay Point, which include the following: (a) the DIP Loan Obligations; (b) the JGB Judgment, *provided that*, for the avoidance of doubt, Bay Point is obligated to credit all amounts collected pursuant to the JGB Judgment to the outstanding DIP Obligations; and (c) the Morgan Stanley Judgment (collectively, the "Bay Point Debt"). The Morgan Stanley Judgment is secured by a first-priority Lien on the Aberdeen Property. The JGB Judgment is secured by a second-priority Lien on the Aberdeen Property and a first-priority Lien on the Brickchurch Property. The DIP Obligations in excess of the amount of the JGB Judgment are secured by a second-priority lien on the Brickchurch Property and a Lien on the Aberdeen Property that Bay Point asserts is a third-priority Lien and the IRS contends is a fourth-priority Lien (behind the IRS's asserted Lien on the Aberdeen Property).

**Treatment** – Bay Point shall be paid in accordance with the priority provisions set forth in Sections 5.8 and 5.9 of the Plan, up to the full amount of the Bay Point Debt (as asserted in good faith by Bay Point at the time of the Closing) from the Sale Proceeds at Closing. Bay Point's assertion of a Claim in the amount of principal and interest (default and non-default with

respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), plus all fees and expenses as provided by the Bay Point Loan Documents, plus the Indemnification Reserves shall be deemed, *prima facie,* to be asserted in good faith despite any pending objection by any person with respect to the same. If the Bankruptcy Court shall subsequently issue a Final Order establishing that the amount of Bay Point's Claim is less than the amount Bay Point was paid pursuant to the Plan, Bay Point shall return the excess amount that it received to the proper Debtor's Estate within thirty (30) days of the entry of such Final Order.

Bay Point shall be entitled to collect post-petition interest (default interest and non-default interest with respect to the DIP Loan Obligations and at the statutory rate with respect to the Morgan Stanley Judgment), along with those fees, costs, or charges as provided for under the Bay Point Loan Documents and the DIP Financing Order, as part of its Secured Claim pursuant to 11 U.S.C. § 506(b) and the DIP Financing Order.

For the avoidance of doubt, nothing contained herein shall prejudice any right that Debtors may have to challenge the amount of the Bay Point Debt, including Bay Point's right to default interest and late fees under the DIP Loan Documents; *provided, however, that* nothing contained herein shall alter or amend the Bay Point Loan Documents or the DIP Financing Order, shall not waive or release any claims or defenses that Bay Point may have, including those arising under the Bay Point Loan Documents or the DIP Financing Order, or grant Debtors (or any other person) any right to challenge the amount of the Bay Point Debt (or any part thereof) that did not exist prior to the entry of the Confirmation Order; *and further provided that* Debtors' reservation of rights shall not impair, impact, or otherwise affect Bay Point's right to Credit Bid absent the entry of Final Order by the Bankruptcy Court reducing the amount of Bay Point's Secured Claim; and

*further provided that* Debtors' reservation of rights shall not impair Bay Point's indemnification rights under the Bay Point Loan Documents and the DIP Financing Order.

**Voting** – Class 1 is impaired under the Plan and, therefore, Bay Point is entitled to vote to accept or reject the Plan.

**Class 2: Secured Claims of New York State Department of Taxation and Finance**

3.2 **Classification** – Class 2 consists of the Secured Claims of the New York State Department of Taxation and Finance.

**Treatment** – The holder of the Allowed Secured Claims of the New York State Department of Taxation and Finance shall be paid in full, in accordance with the provisions of Sections 2.1, 5.8, and 5.9 of the Plan.

**Voting** – Class 2 is unimpaired under the Plan and, therefore, the holder of the New York State Department of Taxation and Finance's Secured Claims is deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, and is not entitled to vote to accept or reject the Plan.

**Class 3: Non-Tax Priority Claims**

3.3 **Classification** – Class 3 consists of Priority Claims, other than Priority Tax Claims.

**Treatment** – Bay Point does not believe that there are any Non-Tax Priority Claims. To the extent there are any such Claims, they shall be paid in full from the Sale Proceeds, provided that the aggregate amount of all Allowed Non-Tax Priority Claims does not exceed $5,000 in the aggregate.

**Voting** – Class 3 is unimpaired under the Plan and, therefore, each holder of a Class 3 Non-Tax Priority Claim is not entitled to vote to accept or reject the Plan.

**Class 4: General Unsecured Claims**

3.4 **Classification** – Class 4 consists of all Unsecured Claims.

**Treatment** – Class 4 will not receive any distributions under the Plan.

**Voting** – Class 4 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.

**Class 5: Equity Interests**

3.5 **Classification** – Class 5 consists of the Equity Interests in the Debtors.

**Treatment** – Class 5 will not receive any distributions under the Plan.

**Voting** – Class 5 will not receive any distributions under the Plan and is therefore deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code

## ARTICLE IV

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1 **Authority to Act / Limitation of Liability.** Each act and every decision to be made by Debtors under the Plan shall be made at the direction, and shall be completely consistent with such direction, of the Decision Makers, such direction being valid and enforceable only upon the mutual agreement of both Decision Makers. If the Decision Makers are not able to reach a mutual agreement regarding a decision or act of the Debtors, each Decision Maker agrees that either Decision Maker shall be permitted to seek relief from the Bankruptcy Court on shortened notice; *provided that*, for the avoidance of doubt, the discretion of whether to hear any issues raised by such Decision Maker on shortened notice shall remain with the Bankruptcy Court. For the avoidance of doubt, Blouin shall have no authority to act with respect to either of the Debtors and shall completely refrain from taking part in, or interfering with, any of the decisions, processes, or procedures set forth or governed by the Plan. The Decision Makers, solely as a result of their status as a Decision Maker under the Plan, shall not be deemed officers, fiduciaries or agents of the Debtors. The Decision Makers may employ or contract with such third parties as appropriate to

assist in the implementation of the Plan; *provided that* the employment of any such person on behalf of the Debtors shall require a decision of the Debtors. The Decision Makers shall have no obligation to file tax returns or similar reports with the appropriate taxing authorities. **The Decision Makers shall not have or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation, or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan**.

4.2 **Sale Free and Clear of All Claims, Liens, Taxes and Interests.** The Plan shall be funded through the Sale of the Properties in accordance with the sale process run pursuant to the terms of the Approved Bid Procedures (the "Sale Process"), the funds that were previously distributed by Bay Point to the Debtors pursuant to the DIP Financing Order, and the Section 1146 Funds; *provided that*, for the avoidance of doubt, the Debtors may consummate a Private Sale in accordance with the Approved Bid Procedures.

4.3 **[Reserved].**

4.4 **Provisions Relating to the Sale Process.**

(a) Approved Bid Procedures. The Sale Process, including the consummation of one or more Sales, shall be conducted in accordance with the Approved Bid Procedures.

(b) Free and Clear Sale(s). All transfers of the Properties shall be effectuated by one or more Bargain and Sale Deeds, free and clear of all Liens, Claims, taxes and interests pursuant to 11 U.S.C. §§ 363(b) and (f) and 1123(a)(5), with such Liens, claims, taxes and interests attaching to the Sale Proceeds of the respective Property in the same order, extent and priority as existed prior to Confirmation.

(c) Sale Approval Order(s). Any proposed Sale, including a Private Sale, shall be subject to the approval of the Bankruptcy Court under 11 U.S.C. 363(b) (i.e., a Sale Approval Order).

(d) Deadline to Close. The Closing with respect to any Sale that has been approved by the Bankruptcy Court shall close by **February 20, 2024**.

(e) Payment of Sale Transaction Costs. The Escrow Agent shall distribute the following amounts from the Gross Sale Proceeds with respect to each Property: (i) subject to any agreement between the Debtors and the Auctioneer, the fees and expenses of the Auctioneer (if any) with respect to such Property; (ii) subject to any agreement between a Broker and the Debtors, the fees and expenses of a Broker whose retention has been approved by the Bankruptcy Court and who solicits (a) an offer that directly results in a consummated Private Sale of such Property, or (b) a Qualified Bid from a Qualified Bidder that eventually becomes the Successful Bidder with respect to such Property at the Auction; (iii) the fees and expenses of the Escrow Agent (if any) with respect to the Sale involving such Property; (iv) any other closing costs associated with the Sale of such Property; and (e) subject to and without waiving Section 4.6 of the Plan and section 1146(a) of the Bankruptcy Code, any documentary and Transfer Taxes; *provided that*, for the avoidance of doubt, the provisions of this Section 4.4(e) of the Plan shall be subject to any employment and/or listing agreements that have been approved by the Bankruptcy Court in connection with Debtors' request to retain one or more professionals.

(f) Vesting of Assets. The Properties shall remain in the Debtors' respective Estates under section 541(a) of the Bankruptcy Code until the Effective Date of a Sale of the same and shall remain subject to all Liens and Claims that exist as of the date of Confirmation. Upon the closing of a Sale involving one or both Properties, such Properties (or Property) shall vest in the Successful Purchaser, free and clear of all Liens and Claims other than Transferred Encumbrances. The Confirmation Order shall contain appropriate provisions, consistent with section 1142 of the Bankruptcy Code, authorizing and directing the Plan Administrator and any other necessary party to execute or deliver, or to join in the execution or delivery, on the Closing date of the Sale(s), of any instrument required to effect a transfer of Properties (or a respective Property) as required by the Plan, and to perform any act, including the satisfaction of any Lien, that is necessary for the consummation of the Plan.

4.5 **The Plan Administrator**.

(a) Plan Administrator Appointment. The Plan Administrator shall administer the proceeds of the Sale(s) of the Properties through the separate DIP account (the "**Escrow DIP Account**") established by the Debtors at a depository institution that has been previously approved by the UST with the Plan Administrator identified as the sole signatory on such account.[1] The Confirmation Order shall

[1] The Plan Administrator, in such role, is defined as the "**Escrow Agent**" in the Auction Agreement and Approved Bid Procedures, and being defined similarly herein.

approve the Debtors' appointment of the Plan Administrator, with the power and duty to administer the Escrow DIP Account.

(b) Plan Administrator Protections. The Plan Administrator shall not be deemed an officer, fiduciary or agent of the Debtors. The Plan Administrator may, with the consent of the Debtors, employ or contract with such third parties as appropriate to assist in the performance of its duties under the Plan. The Plan Administrator shall have no obligation to file tax returns or similar reports with the appropriate taxing authorities. The Plan Administrator shall not have, or incur any liability to any entity for any action taken or omitted to be taken in connection with or related to the formulation, preparation, dissemination, confirmation or consummation of the Plan, the Disclosure Statement or any contract, instruction, release or other agreement or document created or entered into, or any other action taken or omitted to be taken in connection with the Plan, except in the case of gross negligence or willful misconduct.

(c) No Interference. No Person, including Debtors, Bay Point, Charles Andros, the holders of any Equity Interests, Kabatoff, and Blouin, shall interfere with the Plan Administrator in the performance of its duties, and any party with notice of the Confirmation Order shall be enjoined from taking any action that could reasonably be deemed to be an intentional interference with the Plan Administrator in the performance of its duties; *provided that*, nothing contained herein shall prohibit or inhibit a Decision Maker from exercising the discretion provided to it under the terms of the Plan and Approved Bid Procedures.

(d) Execution of Documents. Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, the Debtors, the Plan Administrator, and any other necessary party shall be authorized, and shall be directed by the Confirmation Order, to execute any estoppel certificate, or any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance, including without limitation, any Lien, Claim or encumbrance not expressly provided for in the Plan, that is necessary for consummation of the Plan, and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation, and the Confirmation Order shall expressly so provide.

(e) Filing of Documents. Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

4.6 **Transfer Taxes**. The Sale of the Properties constitutes the making or delivery of instruments of transfer of property or otherwise, pursuant to or in connection with confirmation of

the Plan, and, therefore, to the maximum extent provided by Section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of any security and the making or delivery of any instrument of transfer under the Plan, including an instrument of transfer and deed executed by the Debtors shall not be subject under any law imposing a stamp tax, real estate transfer tax, mansion tax, mortgage recording tax or similar tax (previously defined as the "Transfer Taxes"). Accordingly, the appropriate officials or agents of state or local governmental units, including New York State, Suffolk County and the Town of Southampton, shall forego collection of any such Transfer Taxes and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such Transfer Taxes.

4.7 **Allocation**. In the event of a sale of the Properties as a single lot, the proceeds of the Sale shall be allocated pursuant to agreement between Debtors and Bay Point; *provided that* if Debtors and Bay Point cannot agree on an allocation, Debtors and/or Bay Point may file a motion with the Bankruptcy Court to request that the Court determine such allocation and each of the same agrees that the other party shall be entitled to seek expedited relief with respect to the same.

4.8 **Preservation of Causes of Action.** Subject to the Liens granted to Bay Point pursuant to the DIP Loan Documents and/or the DIP Financing Order, all claims, causes of action, damages or remedies in favor of the Debtors' respective estates relating to any prior transactions (including all avoidance claims under the Bankruptcy Code or state law) shall be preserved for the benefit of the Debtors' estates and distributed in accordance with the priority structure set forth in the Bankruptcy Code and/or applicable Order of the Court.

4.9 **1031 Exchange Provisions.** Provided that there is no prejudice or harm to the Debtors' respective estates or to the interests of each Debtor's respective Creditors, including with respect to such Creditors' right to promptly be paid in accordance with the provisions of the Plan,

nothing contained herein shall prohibit the Debtors from structuring a Sale in a manner that permits the Sale to qualify under the exchange provisions of Section 1031 of the Internal Revenue Code of 1986 as amended ("Section 1031"), including use of a qualified intermediary. For the avoidance of doubt, nothing contained herein shall (a) permit either Debtor from transferring any Estate property outside of the Estate; and/or (b) permit either Debtor to delay the Sale Process, a Sale, or a Closing for any purpose relating to Section 1031.

4.10 **Filing of Documents.** Pursuant to sections 105, 1141(c) and 1142(b) of the Bankruptcy Code, each and every federal, state and local government agency or department shall be directed to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transactions contemplated by the Plan, and any and all notices of satisfaction, release or discharge or assignment of any Lien, Claim or encumbrance not expressly preserved by the Plan.

4.11 **Preservation of Insurance.** The Plan shall not diminish or impair the enforceability of any insurance policy, right or claim that may cover Claims against the Debtor, the Properties (or any individual Property), or any other Person or entity. Likewise, the Plan and the Confirmation Order shall not impair any insurance carrier's rights, claims, defenses or disputes under any policy and shall not act to increase or extend any rights of the Debtors or any insurance carrier.

## ARTICLE V

## DISTRIBUTIONS

5.1 **Method of Payment**. Unless otherwise expressly agreed, in writing, payments to be made pursuant to the Plan shall be made at the times and in the amounts set forth in the Plan by either electronic funds wire transfer or check drawn on a domestic bank.

5.2 **Disputed Claims Reserves**. No distributions shall be made with respect to any Disputed Claim. Instead, the Debtors shall deposit into one or more segregated accounts (the "Disputed Claims Reserves," each being a "Disputed Claims Reserve") funds equal to 100% of the Cash that would be distributed under the Plan to the holder of a Disputed Claim that would be an Allowed Claim, but for the dispute, including, but not limited to (i) Disputed Secured Claims (ii) Disputed Claims entitled to treatment as Administrative Expenses or as Priority Claims pursuant to sections 503 and 507 of the Bankruptcy Code, (iii) Disputed Claims of Governmental Units for any tax, and (iv) any disputed cure amount. In determining the amount of the Cash to be distributed under the Plan to the holders of Allowed Claims on the Distribution Date, the calculation of the amount to be distributed to each holder of an Allowed Claim in such class shall be made as if all Disputed Claims in the applicable class were Allowed Claims in their respective face amounts. The Debtors or any other party in interest shall have the right to seek an Order of the Bankruptcy Court, after notice and a hearing, estimating the amount of a Disputed Claim, and limiting the amount of Cash that must be so deposited. Any Creditor whose Claim is so estimated and limited shall have no recourse to any assets theretofore distributed on account of any Allowed Claim, or any other entity or property if the Allowed Claim of the Creditor (whose Claim was so estimated and limited) as determined by Final Order exceeds the amount so deposited. Instead, such Creditor shall have recourse only to the undistributed assets in the Disputed Claims Reserve applicable to such Disputed Claim (on a *pro rata* basis with any other Creditors of the same Class who are similarly situated) that exceed the aggregate amount of all Disputed Claims associated with that particular Disputed Claims Reserve that are allowed by Final Order; *provided that*, for the avoidance of doubt, any Disputed Claim that is deemed to be an Allowed Claim by a Final

Order shall participate in any future distributions as an Allowed Claim. Separate Disputed Claims Reserves shall be set up for Claims of different payment priority under the terms of this Plan.

5.3 **Bankruptcy Fee Reserve.** The Debtors shall utilize the Sale Proceeds and Section 1146 Funds to deposit in a segregated account on the Distribution Date (the "Bankruptcy Fees Reserve"), in accordance with the provisions of the Plan, an amount equal to the Bankruptcy Fees estimated to accrue from and after the Effective Date through the date of dismissal, conversion, or entry of a final decree.

5.3A **Professional Fees Reserve.** The Debtors shall utilize the Sale Proceeds and Section 1146 Funds to deposit in a segregated account on the Distribution Date (the "Professional Fees Reserve") the following amounts for the benefit of the Debtors' Professionals specified below:

| Debtor | Professional | Amount |
|---|---|---|
| Aberdeen | Goldberg Weprin Finkel Goldstein LLP | $100,000.00 |
| Brickchurch | Simmons Legal PLLC | $135,000.00 |
| Brickchurch | Duane Morris LLP | $151,905.95 |

Three (3) Business Days after the Administrative Expense Claim of the Professional becomes an Allowed Claim, funds equal to the amount of the Allowed Claim shall be withdrawn from the Professional Fee Reserve and paid to the Professional. Any funds remaining in the Professional Fee Reserve designated for such Professional shall be released from the Professional Fee Reserve and transferred to the Plan Administrator for distribution in accordance with the provisions of Sections 5.8 and 5.9.

5.4 **Prosecution of Objections.** Debtors shall have the right to file, settle, compromise, withdraw or litigate to judgment objections to Disputed Claims. Objections to Claims shall be served and filed on or before the Claims Objection Deadline.

5.5 **Distribution After Allowance.** Within ten (10) days after entry of a Final Order finding all (or part of) a Disputed Claim to be an Allowed Claim (or as soon thereafter as practicable), the Debtors shall distribute from the funds placed in the Disputed Claims Reserve with respect to such Claim, all Cash, including any interest or proceeds thereof, to which a holder is then entitled with respect to any Disputed Claim that has become an Allowed Claim.

5.6 **Distribution After Disallowance.** The balance of a Disputed Claims Reserve remaining after all Disputed Claims have been resolved by Final Order shall be used to satisfy any outstanding Bankruptcy Fees, Claims, and Interests in the order of priority specified in Sections 5.8 and 5.9 of the Plan.

5.7 **Delivery of Distributions.** Distributions to holders of Allowed Claims shall be made: (i) at the address set forth on the respective Proof(s) of Claim or other request(s) for payment filed by the holder of such Allowed Claim; (ii) at the addresses set forth in any written notices of address change delivered to the Debtors; or (iii) at the address reflected in the Schedules if no Proof of Claim, or other request for payment, is filed and the Debtors have not received a written notice of change of address.

5.8 **Distribution to Allowed Claims Against Aberdeen.** The Net Sale Proceeds realized from or allocable to, the Aberdeen Property, currently estimated to be in the amount of $43,991,440.00, along with the other assets of the Aberdeen Estate, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(a) First, the amount of $43,991,440, which is comprised of the Net Sale Proceeds of the Aberdeen Property, shall be distributed in the following order:

(i) First, $168.20 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Aberdeen;

(ii) Second, $16,248,932 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the Morgan Stanley Judgment;

(iii) Third, $26,240,899.80 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

(b) Second, the amount of $1,501,440, which is comprised of the Section 1146 Funds attributable to the Aberdeen Property Sale, shall be distributed in the following order:

(i) First, $6.87 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Aberdeen;

(ii) Second, up to $300,000 shall be paid towards Bankruptcy Fees;

(iii) Third, up to $575,000 shall be paid to the IRS for application to the IRS's Allowed Administrative Expense Claim and/or Priority Tax Claim (subject to the provisions set forth in Section 2.1 of this Plan);

(iv) Fourth, up to $100,000 shall be paid to Goldberg Weprin Finkel Goldstein LLP in full payment of its Allowed Professional Fee Claims; and

(v) Fifth, any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(c) Third, the amount of $108,317.25, which is comprised of certain casualty insurance proceeds related to the Aberdeen Property in which Bay Point has a first-priority secured interest, shall be paid to Bay Point for application to the outstanding DIP Loan Obligations;

(d) Fourth, any remaining monetary assets of Aberdeen shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

5.9 **Distribution to Allowed Claims Against Brickchurch.** The Net Sale Proceeds realized from or allocable to, the Brickchurch Property, currently estimated to be in the amount of $41,755,280, along with the other assets of the Brickchurch Estate, shall be distributed on the Distribution Date to the holders of Allowed Claims and Interests in the following order:

(a) First, the amount of $41,755,280, which is comprised of the Net Sale Proceeds of the Brickchurch Property, shall be distributed in the following order:

(i) First, $1,997.79 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Allowed Secured Claim against Brickchurch;

(ii) Second, $30,096,479.80 shall be paid to Bay Point for application to the amounts due and owing to Bay Point under the JGB Judgment;

(iii) Third, $10,231,354.21 shall be paid to Bay Point for application to (i) the Indemnification Reserve for claims relating to the DIP Loan Obligations and/or the JGB Assigned Documents, including any of the transactions referred to or referenced herein; and (ii) the outstanding amount of the Allowed DIP Loan Obligation;

(b) Second, the amount of $1,425,280, which is comprised of the Section 1146 Funds attributable to the Brickchurch Property Sale, shall be distributed in the following order:

(i) First, $154.52 shall be paid to the New York State Department of Taxation and Finance for payment in full of its Priority Tax Claim against Brickchurch;

(ii) Second, up to $300,000 shall be paid towards Bankruptcy Fees;

(iii) Third, up to $425,000 shall be paid to the IRS for application to the IRS's Allowed Administrative Expense Claim and/or Priority Tax Claim (subject to the provisions set forth in Section 2.1 of this Plan);

(iv) Fourth, up to $151,905.95 shall be paid to Duane Morris LLP in full payment of its Allowed Professional Fee Claims;

(v) Fifth, up to $135,000 shall be paid to Simmons Legal PLLC in full payment of its Allowed Professional Fee Claims; and

(vi) Sixth, any remaining funds shall be paid to Bay Point for application to the DIP Lender Superpriority Claim.

(c) Third, any remaining monetary assets of Brickchurch shall be distributed in accordance with the priority scheme set forth in the Bankruptcy Code.

5.10 **Creditor's Right to Accept Lesser Payment**. For the avoidance of doubt, nothing contained herein shall prevent a Creditor or Class of Claims from voluntarily accepting a lesser

amount (or other disparate treatment) than such Creditor or Class of Claims would otherwise be entitled to under the Plan.

5.11 **Estates' Right to Clawback.** For the avoidance of doubt, distributions to Bay Point under the Plan shall be made in the full amount of the Claim asserted by Bay Point and no amounts related to a Bay Point Claim shall be held in the Disputed Claims Reserve. To the extent that it is later determined by a Final Order that the amount distributed to Bay Point under the Plan resulted in an overpayment of Bay Point's Claims, Bay Point shall return the amount of such overpayment to the respective Estate that made such overpayment within ten (10) Business Days of the entry of such Final Order. The funds so returned by Bay Point (if any) shall be distributed as Sale Proceeds in accordance with the Plan.

5.12 **Order of Distributions and Allocation of Clawback.** The distributions required by Sections 5.8 and 5.9 of this Plan, and the clawback provisions of Section 5.11 of the Plan, shall be applied in an order and manner so as to promote the substantial consummation of the Plan; *provided that* for the avoidance of doubt, nothing contained herein shall permit distributions to be paid in a priority inconsistent with Sections 5.8 and 5.9 of the Plan.

## ARTICLE VI

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1 **Rejection of Executory Contracts.** On the Effective Date, all Executory Contracts to which the Debtor is a party shall be deemed rejected.

6.2 **Rejection Damages Claims.** Allowed Claims arising from the rejection of Executory Contracts of a Debtor pursuant to Section 6.1 of the Plan shall be treated as Unsecured Claims.

6.3 **Bar to Rejection Claims.** A Proof of Claim seeking payment of any Unsecured Claim for damages arising from the rejection of an Executory Contract pursuant to Section 6.1 of the Plan shall not be timely filed unless it is filed with the Bankruptcy Court and served so that it is received by the Debtors within thirty (30) days after the Confirmation Date. Any such Claim not timely filed and served shall be forever barred from assertion and may not be enforced against the Debtors and may not be enforced against the Properties, any purchaser of the Properties, or any Creditor under any indirect or equitable legal theory such as unjust enrichment.

## ARTICLE VII

## CONFIRMATION AND CONSUMATION OF THE PLAN

7.1 **Injunction Against Interference with Plan. Upon entry of the Confirmation Order, all holders of Claims against or Interests in the Debtors and other parties in interest, and any other Person with notice (actual or constructive) of the Confirmation Order, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan; *provided that*, for the avoidance of doubt, nothing contained herein shall limit any rights previously granted to Bay Point under the DIP Financing Order and the DIP Loan Documents in relation to non-Debtor property.**

7.2 **[Reserved].**

7.3 **No Discharge.** Pursuant to section 1141(d)(3) of the Bankruptcy Code, as applicable, the Debtors will not be discharged from debts that arose prior to Confirmation.

7.4 **Liens and Claims.** All Liens and Claims with respect to the Properties and all other assets of the Debtors shall survive Confirmation and remain attached in their respective order of priority as existed as of the date of Confirmation; *provided that*, as set forth in this Plan, the

Sale(s) of the Properties shall be free and clear of any Liens, Claims, and/or Interests pursuant to Section 363 of the Bankruptcy Code and such Liens, Claims, and/or Interests shall attach to the respective Sale Proceeds in the same order of priority as existed as of the date of the Closing of the Sale.

7.5 **Conditions to Effective Date.** The Plan will not become effective, and the Effective Date will not occur, unless and until:

(a) the Confirmation Order has become a Final Order;

(b) the Bankruptcy Court shall have entered the Order approving the Sale Transaction;

(c) the Sale Transaction shall have closed;

(d) the Debtors shall have received the Section 1146 Funds; and

(e) the payments required pursuant to Sections 5.8 and 5.9 of the Plan shall have been made; *provided that* nothing contained herein shall condition the effectiveness of the Plan on payment of any Disputed Claims so long as a Disputed Claims Reserve is established (if so required) pursuant to the terms of the Plan.

7.6 **Binding Effect.** Subject to the occurrence of the Effective Date, on and after entry of the Confirmation Order, the provisions of the Plan will bind every holder of a Claim against or Interest in one or more of the Debtors and inure to the benefit of and be binding on such holder's respective heirs, successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder accepted the Plan.

## ARTICLE VIII

## RETENTION OF JURISDICTION

8.1 **Retention of Jurisdiction**. The Bankruptcy Court shall retain post-confirmation jurisdiction over the following matters:

(a) To issue any orders necessary or appropriate to authorize the sale of substantially all of the assets of the Debtors or Reorganized Debtors, as applicable, pursuant to sections 105(a), 363(b), 363(f), 365, 503, 507, 1123, 1142 and 1146(a) of the Bankruptcy Code.

(b) To adjudicate any dispute relating to the sale of the Properties;

(c) To resolve all matters and disputes arising under or relating to the Plan, including, without limitation, (i) disputes relating to the Sale Process; (ii) any disputes relating to, or involving the amount of the allowance of Claims; and (iii) distribution or disbursement of the Sale Proceeds;

(d) To Allow or disallow in whole or in part any objections to Claims filed prior to the Closing that have not been previously Allowed or disallowed;

(e) To grant or deny the applications for allowance of final compensation and reimbursement of expenses of Professionals;

(f) To enter an order or final decree concluding the Cases following the Sale of the Properties, payment of allowed claims, resolution of all disputes, and distribution of all reserves;

(g) To compel the Debtors, Blouin, the Plan Administrator, or any other person to take such action and execute such documents, or to refrain from such action, as may be necessary to effectuate the Plan;

(h) To enter Orders that may be necessary or appropriate to implement or consummate the provisions of the Plan and to enforce all Orders, judgments, injunctions, and rulings entered in connection with the Cases;

(i) Resolve any and all controversies, suits, or issues that may arise in connection with the consummation, interpretation, or enforcement of the Plan or any entity's obligations incurred in connection with the Plan;

(j) Approve modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, and modifications of the Disclosure Statement or any contract, instrument, release or other agreement or document created in connection with the Plan or Disclosure Statement;

(k) Issue and enforce injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation or enforcement of the Plan;

(l) Enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

(m) To enter a Sale Approval Order with respect to the Properties regardless of the failure to timely achieve substantial consummation of the Plan and regardless of whether the Plan shall become effective pursuant to Section 7.5 of the Plan;

(n) Issue any Orders necessary to consummate a sale of the Properties pursuant to 11 U.S.C. 363 or any other applicable provision of the Bankruptcy Code after any failure to timely achieve substantial consummation the Plan and/or any failure of the Plan to become effective pursuant to Section 7.5 of the Plan; and

(o) Issue any Orders as may be appropriate to convert the Cases to chapter 7 if the Plan is not substantially consummated or otherwise fails to become effective pursuant to Section 7.5 of the Plan.

## ARTICLE IX

## <u>GENERAL PROVISIONS</u>

9.1 **<u>Orders in Aid of Consummation</u>.** Pursuant to sections 105, 1141, 1142 and 1143 of the Bankruptcy Code, the Bankruptcy Court may enter one or more Orders in aid of

Confirmation and/or consummation of the Plan directing the implementation of matters or actions required by the Plan.

9.2 **Compliance with Tax Requirements.** In connection with the Plan, the Debtors, and where applicable, the Plan Administrator, shall comply with all withholding and reporting requirements imposed by federal, state and local taxing authorities, and distributions under the Plan shall be subject to applicable withholding and reporting requirements; *provided, however*, that the transfer of any Cash, property or other interest hereunder shall not be subject to any federal, state or local tax to the fullest extent provided under section 1146 of the Bankruptcy Code.

9.3 **Due Authorization by Creditors.** Each and every Creditor who elects to participate in the distributions provided for under the Plan warrants that it is the lawful owner of such Claim and is authorized to accept the distributions provided for in the Plan and that there are no outstanding Liens, encumbrances, commitments, agreements, or understandings, express or implied, that may or can in any way defeat or modify the rights released, or modified by the Plan, or obligations undertaken by such Creditor under the Plan.

9.4 **Amendments and Modifications.** The Plan may be altered, amended or modified by Debtors, solely with the consent of Bay Point, at any time before the substantial consummation of the Plan, as provided in sections 1101 and 1127 of the Bankruptcy Code and Bankruptcy Rule 3019; *provided that* Debtors may only modify the Approved Bid Procedures consistent with the terms of such Approved Bid Procedures.

9.5 **Revocation.** Debtors, solely with the consent of Bay Point, may revoke or withdraw the Plan at any time prior to the Confirmation Date. If the Plan is revoked or withdrawn, or if no Confirmation Order is entered, the Plan shall be null and void, and nothing contained in the Plan shall (i) constitute a waiver or release of any Claims by or against the Debtors, or (ii)

prejudice in any manner the rights of the Debtor or any Creditor in any further proceedings involving the Debtors or their Estates.

9.6 **Request for Relief under Section 1129(b).** If the Plan is accepted by one or more, but not all, classes of Creditors that are found to be impaired by the Plan, Debtors or Bay Point may request confirmation under section 1129(b) of the Bankruptcy Code, subject to any modification of the Plan pursuant to section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019

9.7 **Filing of Additional Documents.** Except as otherwise provided in the Plan, on or before the Effective Date, the Debtor or Bay Point may file with the Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

9.8 **Headings.** The headings in the Plan are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan.

9.9 **Computation of Time.** In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

9.10 **Successors and Assigns.** The rights, benefits and obligations of any entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

9.11 **Notices.** All notices and other communications to be given or made hereunder shall be in writing and shall be deemed to have been given or made when mailed or as otherwise set forth herein.

If to Brickchurch Enterprises, Inc.:

Simmons Legal PLLC
Camisha L. Simmons, Esq.

6060 N. Central Expressway, Suite 500
Dallas, Texas 75206
Camisha@SimmonsLegal.Solutions

If to Aberdeen Enterprises, Inc.:

Goldberg Weprin Finkel Goldstein LLP
Kevin Nash
125 Park Avenue, 12th Floor
New York, New York 10017
knash@gwfglaw.com

If to the holders of the Equity Interests:

Brickchurch Enterprises (BVI) Ltd.
165 Broadway, 23rd Floor
New York, New York 10006
lt@ltbholding.com

*-and-*

Aberdeen Enterprises (BVI) Ltd.
165 Broadway, 23rd Floor
New York, New York 10006
lt@lbtholding.com

If to Bay Point Capital Partners II, LP:

The Law Offices of John F. Isbell LLC
John F. Isbell, Esq.
3050 Peachtree Road NW, Suite 740
Atlanta, Georgia 30305
John@JFI-Law.com

*-and-*

Thompson Hine LLP
John C. Allerding, Esq.
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
John.Allerding@ThompsonHine.com

If to any other Creditor:

At (a) the addresses set forth on the applicable Proofs of Claim or other request for payment filed by such holder, (b) the addresses set forth in any written notices of

address changes delivered to the Debtors, or (c) the address reflected in the Schedules if no Proof of Claim is filed and the Debtors have not received a written notice of a change of address.

If to any entity that has filed a notice of appearance:

At the address set forth on such notice of appearance.

9.12 **Other Actions.** Nothing contained herein shall prevent any person from taking such actions as may be reasonably necessary to consummate the Plan, although such actions may not specifically be provided for within the Plan; *provided, however,* that no person shall take action expressly prohibited by or contrary to the express provisions of this Plan.

9.13 **Severability.** In the event any provision of the Plan is determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any or all other provisions of the Plan.

9.14 **Business Day.** In the event that the Plan requires an act to be performed on a day that is not a Business Day, such act shall be performed on the first Business Day thereafter.

9.15 **Quarterly Fees**. All fees payable pursuant to 28 U.S.C. § 1930, together with any applicable interest thereon, shall be paid by the Debtors until the closing of the Cases under 11 U.S.C. §350(a).

9.16 **Post-Confirmation Reports**. The Debtors shall file quarterly status reports until the Cases are closed.

9.17 **Continuation of the Debtors**. The Debtors shall continue in existence, duly authorized to carry out the terms of the Plan and the distribution of the Sale Proceeds. The Debtors shall not be dissolved until after the entry of a Final Decree closing the Cases. If the holders of the Equity Interest determine it desirable for the Debtors to exist after the closing of the Cases, and

such continued existence does not prejudice any Creditors, nothing contained herein shall prevent the Equity Interest holders from choosing to continue the corporate existence of the Debtors.

## ARTICLE X

## CLOSING OR CONVERSION OF THE CASE

10.1 **Substantial Consummation.** Following entry of the Confirmation Order and satisfaction of the conditions in Section 7.5 of the Plan, Debtors shall file a notice with the Bankruptcy Court of the substantial consummation of the Plan. Upon the filing of such notice of substantial consummation, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

10.2 **Closing of the Case.** Within fourteen (14) days following the full administration of the Debtors' Estates, the Debtors shall file, on notice to the United States Trustee's Office, an application and proposed order seeking a final decree, closing the Cases pursuant to Bankruptcy Rule 3022.

10.3 **Failure to Achieve Substantial Consummation.** If the Plan is unable to be substantially consummated, then the Debtors shall seek entry by the Bankruptcy Court of a Sale Approval Order (a) authorizing and directing the Debtors to sell the Properties to the Successful Bidder(s), or, if the Successful Bidder with respect to a particular Property shall default under the terms of the asset purchase agreement governing such Sale, to the Backup Bidder, pursuant to 11 U.S.C. § 363(b) and/or any other applicable provision of the Bankruptcy Code provided that the Sale otherwise meets the standard that a debtor must establish for obtaining court approval of transfers under such applicable Bankruptcy Code section(s); (b) ordering the distribution of Sale Proceeds resulting from such Sale to be distributed to the holder(s) of any Secured Claim(s) with respect to the transferred Property/Properties; and (c) ordering that the Sale Proceeds in excess of

those necessary to satisfy such Secured Claims be held in the Debtors' respective Estates pending conversion of the Cases to chapter 7 in accordance with Section 10.4 of the Plan.

10.4 **Conversion or Dismissal of the Cases Following Plan Failure.** If the Plan is unable to be substantially consummated, then, after entry of any Sale Approval Orders pursuant to Section 10.3 of the Plan, the Bankruptcy Court shall, upon the request of the Debtors or on its own volition, enter an Order (a) converting the Bankruptcy Cases to chapter 7 cases and appointing a chapter 7 trustee; or (b) dismissing the Bankruptcy Cases.

Dated: New York, NY
January 30, 2024

Respectfully submitted,

THOMPSON HINE LLP

By: /s/ John C. Allerding
John C. Allerding (admitted pro hac vice)
3560 Lenox Road NE, Suite 1600
Atlanta, Georgia 30326
P: 404.407.3676 / F: 404.541.2905
John.Allerding@ThompsonHine.com

*Counsel for Bay Point Capital Partners II, LP*

BAY POINT CAPITAL PARTNERS II, LP

By: Bay Point Advisors LLC, its
General Partner

By: /s/ Charles Andros

**Attachment 10 : These numbers are being audited by forensic accounting from a top five Accounting firm excess paid in the order of $28 million approximately**

| Due to Creditor | 9 % Interest on JGB and DIP Loan | | As per BayPoint Schedule -96M | | | As per JGB Judgement | | |
|---|---|---|---|---|---|---|---|---|
| Descripton | Amount $ | Amount $ | Amount $ | Amount $ | Excess Amount Amount $ | Amount $ | Amount $ | Excess Amount Amount $ |
| Sale Proceeds | | 89,006,720.00 | | 89,006,720.00 | | | 89,006,720.00 | |
| Less : Sales related expenses and Reserves | | 4,968,273.03 | | 4,968,273.03 | | | 4,968,273.03 | |
| Net Amount to Bay Point | | 84,038,446.97 | | 84,038,446.97 | - | | 84,038,446.97 | |
| **Escrow Amount** | | | | | | | | |
| Interest Reserve | 3,100,000.00 | | | | | 3,100,000.00 | | |
| Origination Fee | 5,580,000.00 | | | | | 5,580,000.00 | | |
| Reserve Funds | 2,591,223.42 | | | | | 2,591,223.42 | | |
| | | 11,271,223.42 | | | | | 11,271,223.42 | |
| **Total Proceeds** | | 95,309,670.39 | | 84,038,446.97 | -11,271,223.42 | | 95,309,670.39 | -11,271,223.42 |
| Principal - Morgan Loan -Aberdeen (376 Gin Lane) | 15,478,000.00 | | 15,478,000.00 | | | 15,478,000.00 | | |
| Interest - Morgan | 770,931.62 | | 770,931.62 | | | 770,931.62 | | |
| **Total Morgan** | | 16,248,931.62 | | 16,248,931.62 | - | | 16,248,931.62 | - |
| JGB - Loan | 39,961,521.80 | | 39,961,521.80 | | | 39,961,521.80 | | |
| Post Judgement Interest | 4,538,478.20 | | 4,538,478.20 | | | 4,538,478.20 | | |
| Total Amount paid to JGB towards Closing | 44,500,000.00 | | 44,500,000.00 | | | 44,500,000.00 | | |
| JGB Interest (Jan 2023 to Feb 2024) @9% 14 Months | 4,672,500.00 | | 11,486,450.31 | | 6,813,950.31 | 476,540.21 | | 11,009,910.10 |
| | | 49,172,500.00 | | 55,986,450.31 | 6,813,950.31 | | 44,976,540.21 | 11,009,910.10 |
| **DIP Loan^^ (Including JGB)** | 6,228,776.58 | | 17,416,116.78 | | | 6,228,776.58 | | |
| Interest on DIP Loan @ 24% for 7 Months | 872,028.72 | | 6,718,548.69 | ** | | 872,028.72 | | |
| | | 7,100,805.30 | | 24,134,665.47 | 17,033,860.17 | | 7,100,805.30 | 17,033,860.17 |
| Construction Line - No interest as there is delay in disbursement | | 1,392,778.32 | | | -1,392,778.32 | | 1,392,778.32 | -1,392,778.32 |
| **Total Payable** | | 73,915,015.24 | | 96,370,047.40 | | | 69,719,055.45 | |
| Balance Due to Creditor | | 21,394,655.15 | | | | | 25,590,614.94 | |

**^^DIP Loan Amount**

| Bay Point - Real DIP Loan amount | Amount ($) |
|---|---|
| Alleged Principal: | 62,000,000.00 |
| IGB - Assignment: Principal: | -44,500,000.00 |
| Sub-total | 17,500,000.00 |
| Prepaid interest - as per Bay Point | (3,100,000) |
| Origination Fee - as per Bay Point | (5,580,000) |
| Administrative Deposit to Bay Point Capital Partners II, LP, a Delaware limited partnership | (25,000) |
| DIP Account Funds to Brickchurch Enterprises, Inc., a Delaware corporation | (300,000) |
| Expense Deposit from Bay Point Capital Partners II, LP, a Delaware limited partnership - **Construction Line** | (1,585,773) |
| Expense Deposit from Bay Point Capital Partners II, LP, a Delaware limited partnership | 50,000 |
| Insurance Reserve to Bay Point Capital Partners II, LP, a Delaware limited partnership | (22,429) |
| Lender's Counsel Fees to Thompson Hine LLP | (500,000) |
| Legal Fees to JFI Law | (208,021) |
| Total Amount Retained by Bay Point ^^ | (11,271,223) |
| Disbursed to Debtors: | 6,228,777 |

**DIP Amount**

| Bay Point - Real DIP Loan amount | Amount ($) |
|---|---|
| **Total Amount** | **96,267,002.47** |
| Morgan Loan | 15,478,000.37 |
| Interest on Morgan | 667,886.32 |
| **Total Morgan** | **16,145,886.69** |
| Balance After Morgan | **80,121,115.78** |
| **JGB** | |
| Judgment | 39,961,521.80 |
| Fees and Costs | 1,125.00 |
| Post-Judgment Interest:3 | 12,168,200.00 |
| Forbearance Exit Charge | 2,000,000.00 |
| Late Charge | 1,527,183.00 |
| Miscellaneous Expenses | 98,623.56 |
| Real Estate Taxes | 229,796.95 |
| Total JGB | **55,986,450.31** |
| **DIP Loan as per Bay Point** | **24,134,665.47** |

| | 9 % interest on JGB and DIP Loan | As per BayPoint Schedule - 96M | As per JGB Judgement |
|---|---|---|---|
| Descripton | Amount $ | Amount $ | Amount $ |
| Interest for JGB | 4,672,500 | 11,486,450 | 476,540 |
| Interest on DIP Loan | 872,029 | 6,718,549 | 872,029 |
| Total Interest and Legal Fees | 5,544,529 | 18,204,999 | 1,348,569 |
| Excess Interest | 12,660,470 | | 16,856,430 |
| % | 228% | | 1250% |

American Land Title Association | FINAL ALTA Settlement Statement - Borrower Adopted 05-01-2015

File No./Escrow No.: R-22NY4472
Officer/Escrow Officer:

Certified Title Agency
11459 Cronhill Drive, Suite M
Owings Mills, MD 21117

Property Address: 366 GIN LANE
SOUTHAMPTON, NY 11968 (SUFFOLK)
376 GIN LANE
SOUTHAMPTON, NY 11968 (SUFFOLK)
Borrower: BRICKCHURCH ENTERPRISES, INC., A DELAWARE CORPORATION ABERDEEN ENTERPRISES, INC., A DELAWARE CORPORATION
Seller:
Lender: Bay Point Capital Partners II, LP, a Delaware limited partnership 3050 Peachtree Road, Suite 740, Atlanta, GA 30305
Settlement Date: 12/9/2022 Disbursement Date: 12/9/2022

| Description | Borrower | | |
|---|---|---|---|
| | P.O.C. | Debit | Credit |
| **Deposits, Credits, Debits** | | | |
| Administrative Deposit to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $25,000.00 | |
| Escrow reserve for Recording to Certified Title Corp-Misc Escrow #2 Account | | $200,000.00 | |
| Interest Reserve to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $3,100,000.00 | |
| Maintenance Reserve Account to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $300,000.00 | |
| DIP Account Funds to Brickchurch Enterprises, Inc., a Delaware corporation | | $1,585,773.29 | |
| Expense Deposit from Bay Point Capital Partners II, LP, a Delaware limited partnership | | | $50,000.00 |
| Insurance Reserve to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $22,428.81 | |
| **Payoffs** | | | |
| Payoff IRS Lien to Internal Revenue Service | | $37,645.67 | |
| Principal: $37,645.67 | | | |
| Mechanic's Lien (Taconic and MFP) to Certified Title Corp-Misc Escrow #2 Account | | $193,019.35 | |
| Payment to JGB PARTNERS, LP, JGB CAPITAL, LP, JGB (CAYMAN) ANCONA LTD. AND JGB PLYMOUTH RO | | $44,500,000.00 | |
| Morgan Stanley Payment | | $2,600,000.00 | |
| Mechanic's Lien (Dreamworks) to Certified Title Corp-Misc Escrow #2 Account | | $94,012.98 | |
| | | | |
| DIP Creditor PSEG to | | $0.00 | |
| | | | |
| | | | |
| | | | |
| | | | |
| **New Loans** | | | |
| Principal amount of new loan | | | $62,000,000.00 |
| Loan Origination Fee 9.0000% to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $5,580,000.00 | |
| Appraisal Fee to Bay Point Capital Partners II, LP, a Delaware limited partnership | | $3,500.00 | |
| Lender's Counsel Fees to Thompson Hine LLP | | $500,000.00 | |
| Legal Fees to JFI Law | | $208,021.32 | |
| Broker Fee to Nathan Capital Group | | $310,000.00 | |
| Due Diligence Fee to Clifton Property Trust | | $50,000.00 | |
| Hazard Insurance Premium to Colston & Associates Inc. | | $85,502.11 | |
| Endorsement on Policy (Fire) to Colston & Associates Inc. | | $5,188.50 | |
| Endorsement on Policy (Flood) to Colston & Associates Inc. | | $1,057.00 | |
| Service Fee to Colston & Associates Inc. | | $1,750.00 | |
| **Title Charges** | | | |
| Lender's coverage $36,000,000.00 Premium $93,392.00 to Certified Title Agency | | $93,392.00 | |
| TIRSA 9 Restrictions, Encroachments, Minerals Endorsement(s) to Certified Title Agency | | $9,340.00 | |
| TIRSA EPL 8.1 Environmental Protection Lien Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Residential Mortgage Endorsement(s) to Certified Title Agency | | $100.00 | |
| Standard New York Endorsement - Loan Policy Endorsement(s) to Certified Title Agency | | | |
| TIRSA Access Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Cluster Endorsement(s) to Certified Title Agency | | $100.00 | |

| | | | |
|---|---|---|---|
| TIRSA First Loss Endorsement Endorsement(s) to Certified Title Agency | | $9,340.00 | |
| TIRSA Land Same As Survey Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Mortgage Tax Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Policy Authentication Endorsement(s) to Certified Title Agency | | | |
| TIRSA Tax Parcel (more than one tax lot) Endorsement(s) to Certified Title Agency | | $100.00 | |
| TIRSA Waiver of Arbitration Endorsement(s) to Certified Title Agency | | $100.00 | |
| Abstract or title search to First American Title Insurance Company | | $2,645.00 | |
| Title examination to Certified Title Agency | | $25,000.00 | |
| Closing/Notary Fee to Certified Title Agency | | $1,250.00 | |
| Disbursement Fee to Chicago Title Insurance Company | | $2,500.00 | |
| Municipal Lien Search to Certified Title Agency | | $250.00 | |
| **Government Recording and Transfer Charges** | | | |
| Security Instruments (Mortgages 2) | | $1,810.00 | |
| Release $670.50 | | $670.50 | |
| Mortgage Tax (Borrower pd) $288,000.00 | | $288,000.00 | |
| State Mortgage Tax to Suffolk County Clerk (POC $90,000.00 by Bay Point Advisors, LLC) | $90,000.00 | | |
| Recording Fee - UCC-3 Delaware x2 to Delaware Secretary of State | | $300.00 | |
| Assignments of Leases and Rents (2) to Suffolk County Clerk | | $1,810.00 | |
| Recording Fee - UCC1 County x2 to Suffolk County Clerk | | $80.00 | |
| Recording Fee - UCC1 State x2 to New York Department of State | | $80.00 | |
| Assignment of Mortgage (JGB) to Suffolk County Clerk | | $905.00 | |
| Assignment of Collateral ASLR (JGB) to Suffolk County Clerk | | $905.00 | |
| **Additional Settlement Charges** | | | |
| (Parcel 1- 366 Gin) 2019 Town Tax - Del. pd to County to Suffolk County Comptroller | | $83,907.77 | |
| (Parcel 1- 366 Gin) 2020 Town Tax - Del. pd to County to Suffolk County Comptroller | | $75,964.45 | |
| (Parcel 1- 366 Gin) 2021 Town Tax - Del. pd to County to Suffolk County Comptroller | | $69,779.35 | |
| (Parcel 1- 366 Gin) 2022 Town Tax to Town of Southampton | | $60,937.10 | |
| (Parcel 1- 366 Gin) 2019-2020 Villiage Tax to Village of Southhampton | | $55,882.44 | |
| (Parcel 1- 366 Gin) 2020-2021 Villiage Tax to Village of Southhampton | | $52,691.15 | |
| (Parcel 1- 366 Gin) 2021-2022 Villiage Tax to Village of Southhampton | | $46,913.43 | |
| (Parcel 1- 366 Gin) 2022-2023 Villiage Tax to Village of Southhampton | | $41,492.94 | |
| (Parcel 1 -366 Gin) Water to Suffolk County Water Authority | | $23,505.72 | |
| (Parcel 1 -366 Gin) Water to Suffolk County Water Authority | | $5,778.81 | |
| (Parcel 2 -376 Gin) Water to Suffolk County Water Authority | | $53,424.27 | |
| DIP Creditor Craig Robbins Esq. to Certified Title Corp-Misc Escrow #2 Account | | $32,000.00 | |
| (Parcel 2- 376 Gin) 2021 Town Tax - Del. pd to County to Suffolk County Comptroller | | $1,940.23 | |
| (Parcel 2- 376 Gin) 2022 Town Tax to Town of Southampton to Certified Title Corp.-Misc Escrow #2 Account | | $111,991.78 | |
| (Parcel 2- 376 Gin) 2022-2023 Village Tax to Village of Southhampton | | $29,359.81 | |
| Borrower's Counsel Legal Fees to Duane Morris LLP | | $450,000.00 | |
| Legal Fees to Simmons Legal PLLC | | $180,000.00 | |
| Legal Fees Collas Crill | | $10,000.00 | |
| BK Trustee Fees to United States Trustee | | $250,000.00 | |
| Legal Fees to Bedel Cristin to Certified Title Corp-Misc Escrow #2 Account. | | $17,109.37 | |
| Property Maintenance to Nest Seekers | | $0.00 | |
| Electric - Current bill Aberdeen to PSE&G | | $8,564.11 | |
| Legal Fees to Barrett, Bonaaci & VanWee | | $4,952.95 | |
| Fees to Barrett, Bonaaci & VanWee for backflow plans for 376 Gin Lane | | $0.00 | |
| Natural Gas - Aberdeen to | | $7,984.19 | |
| Natural Gas - Brickchurch to | | $32,115.08 | |
| DIP Creditor SSRGA to Certified Title Corp-Misc Escrow #2 Account | | $37,843.04 | |
| DIP Creditor - Nest Seekers December 2022 Past Charges - BEI/AIE August - to Certified Title Corp.-Misc. Escrow #2 Account | | $328,012.14 | |
| Electric - 366 Gin to PSE&G | | $37,194.16 | |
| Electric - 376 Gin to PSE&G | | $19,685.57 | |
| Legal Fees to Belowich & Walsh LLP | | $7,857.50 | |
| Peconic Gate - 366 Gate Repair | | $0.00 | |
| (Parcel 2 - 376 Gin) 2021 Town Tax - Del. Pd to County to Suffolk County Comptroller | | $71,136.11 | |
| | **P.O.C.** | **Debit** | **Credit** |
| **Subtotals** | $90,000.00 | $61,978,863.89 | $62,050,000.00 |
| Due From Borrower | | | $0.00 |
| **Totals** | $90,000.00 | $61,978,863.89 | $62,050,000.00 |

**Acknowledgement**

We/I have carefully reviewed the ALTA Settlement Statement and find it to be a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction and further certify that I have received a copy of the ALTA Settlement Statement. We/I authorize Certified Title Agency to cause the funds to be disbursed in accordance with this statement.

**BORROWER(S)**

Brickchurch Enterprises, Inc., a Delaware corporation

By: ____________________ Date:______ Matthew Kabatoff, Director

Aberdeen Enterprises, Inc., a Delaware corporation

By: ____________________ Date:______ Matthew Kabatoff, Director

| Description | Brickchurch (366 Gin Lane) | Aberdeen (376 Gin Lane) | Total |
|---|---|---|---|
| **Total Sale Consideration** | **$ 43,345,280.00** | **$ 45,661,440.00** | **$ 89,006,720.00** |
| (Sale Price + Buyer's Premium) | | | |
| Bay Point (Morgan Stanley Debt) | | $ 16,248,932.00 | $ 16,248,932.00 |
| Bay Point (JGB Debt) | $ 29,444,734.72 | $ 26,892,813.08 | $ 56,337,547.80 |
| Bay Point (DIP Debt) | $ 11,451,967.17 | | $ 11,451,967.17 |
| **Bay Point** | **$ 40,896,701.89** | **$ 43,141,745.08** | **$ 84,038,446.97** |
| Listing Broker Fee Reserve | $ 192,500.00 | $ 202,500.00 | $ 395,000.00 |
| Buyer's Broker Fee Reserve | $ 385,000.00 | $ 405,000.00 | $ 790,000.00 |
| Auctioneer Fee Reserve | $ 770,000.00 | $ 810,000.00 | $ 1,580,000.00 |
| Auctioneer Expenses Reserve | $ 46,681.60 | $ 46,681.60 | $ 93,363.20 |
| US Trustee | $ 250,000.00 | $ 250,000.00 | $ 500,000.00 |
| Escrow Agent Reserve | $ 25,000.00 | $ 25,000.00 | $ 50,000.00 |
| Duane Morris Administrative Expense Claim | $ 151,905.95 | | $ 151,905.95 |
| Simmons Legal Reserve | $ 135,000.00 | | $ 135,000.00 |
| Goldberg Weprin Finkel Goldstein LLP Reserve | | $ 140,000.00 | $ 140,000.00 |
| Law Offices of Avrum Rosen, PLLC Reserve | $ 25,338.25 | $ 25,338.25 | $ 50,676.50 |
| State of New York (Secured Debt) | $ 1,997.79 | $ 168.20 | $ 2,165.99 |
| IRS Administrative Expense Claim | $ 425,000.00 | $ 575,000.00 | $ 1,000,000.00 |
| State of New York Administrative Expense Claims | $ 154.52 | $ 6.87 | $ 161.39 |
| Mathew Kabatoff Fee Reserve | $ 30,000.00 | $ 30,000.00 | $ 60,000.00 |
| Accountant Fee Reserve | $ 10,000.00 | $ 10,000.00 | $ 20,000.00 |
| Total Legal Fee and Reserves | **$ 2,448,578.11** | **$ 2,519,694.92** | **$ 4,968,273.03** |
| **Total** | **$ 43,345,280.00** | **$ 45,661,440.00** | **$ 89,006,720.00** |

| Bay Point - Real DIP Loan amount | Amount ($) |
|---|---|
| Alleged Principal: | 62,000,000.00 |
| IGB - Assignment: Principal: | -44,500,000.00 |
| Sub-total | 17,500,000.00 |
| Prepaid interest - as per Bay Point | (3,100,000) |
| Origination Fee - as per Bay Point | (5,580,000) |
| Administrative Deposit to Bay Point Capital Partners II, LP, a Delaware limited partnership | (25,000) |
| DIP Account Funds to Brickchurch Enterprises, Inc., a Delaware corporation | (300,000) |
| Expense Deposit from Bay Point Capital Partners II, LP, a Delaware limited partnership | (1,585,773) |
| Expense Deposit from Bay Point Capital Partners II, LP, a Delaware limited partnership | 50,000 |
| Insurance Reserve to Bay Point Capital Partners II, LP, a Delaware limited partnership | (22,429) |
| Lender's Counsel Fees to Thompson Hine LLP | (500,000) |
| Legal Fees to JFI Law | (208,021) |
| Total Amount Retained by Bay Point ^^ | **(11,271,223)** |
| Disbursed to Debtors: | **6,228,777** |
| Interest @ 24% on DIP Loan - 7 Months | 872,029 |
| Bay Point\s Real DIP Loan amount: | 7,100,805 |

^^ Amount given towards Construction line not considered as the amount was not disbused on

time

| Category | Specific Problem/Issue | Details/Description | Associated Costs/Amounts | Notes/Justifications | Comments |
|---|---|---|---|---|---|
| Tortious Interference | Renovation Line | Interference caused delays and damages during renovation. | 700,000 | Approximate actual damages related to renovation delays. | |
| Tortious Interference | Brick Church Chapter 11 | Forced to stay in Chapter 11 for Brick Church. | 794,905 | Includes trustee costs, Simmons & Messenger lawyer fees. Breakdown required for further details. | Trustee fees + messenger +Simmons |
| Tortious Interference | Aberdeen Chapter 11 | Forced to file Chapter 11 for Aberdeen due to interference/Bay Point tried to Auction and lied to Morgan | 350,000 | Damages related to Aberdeen Chapter 11 filing costs. | Kevin Nash fee + Trustee fees |
| Tortious Interference | Morgan Misrepresentation | Lied about controlling companies, leading to Morgan issuing a mortgage to Baypoint | 1,000,000 | Reputation damages due to Morgan situation. | |
| Market Discount/ Blackmail for Deeds | Forced Stay in Chapter 11 | Forced stay caused market value discounts of ~40%. | To Define | Example: Properties on JIN Lane comparable to ~$65M estates sold at ~$45M. Clarify exact valuation losses. | |
| Delays | Construction Line Approval | Delay in approving the construction line caused project setbacks. | | Interest from the delay should not be due; damages caused by unnecessary delays. | |
| | | Morgan | 447,074.92 | | (7 Months Vs 4 months) |
| | | JGB | 1,335,000.00 | | (7 Months Vs 4 months) |
| Delays | Auction Process Approval | Delayed auction process from August to February. | 498,302.13 | Interest from buyer delays should be adjusted or removed. | (7 Months Vs 4 months) |
| Delays ,Commission Refunds | BayPoint Commission | to interference delays refund requested. | 3,049,039.70 | Include specific brokerage fees (e.g., Sotheby's, Corcoran, etc.). | did you keep one which is the person that sold |
| IRS Bribe, amount not due | Refund of IRS Bribe | Unjustified bribe payment to be refunded/ for preferential ranking | 1,000,000 | Ensure accurate amount, not $10 million as previously misstated. | brickchurch has o link to IRS as well they were charged ??? |
| Tortious interference,fraud | | | To define | | |
| Media Defamation | | | To Define | | |